# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, RESPIRATORY HEALTH ASSOCIATION, and SIERRA CLUB, INC. | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.   13-cv-1181 |
| v. | ) ) ) | |
| ILLINOIS POWER RESOURCES, LLC and ILLINOIS POWER RESOURCES GENERATING, LLC, | ) ) ) ) | |
| Defendants. | ) | |

## OPINION & ORDER

This matter is currently before the court on Plaintiffs' motion for partial summary judgment (Doc. 104) and Defendants' motion for summary judgment (Doc. 108). Each motion is fully briefed and the Court held oral argument on July 13, 2016, so the motions are ready for decision. For the reasons explained below, each motion is GRANTED IN PART and DENIED IN PART.

### BACKGROUND[1]

In this case, three not-for-profit environmental organizations – Natural Resources Defense Council, Respiratory Health Association, and Sierra Club, Inc.[2] –

---

[1] Unless otherwise noted, the facts in the following section are taken from the undisputed facts as determined by the Court from the parties' summary judgment briefing. (*See* Docs. 104-1, 109, 114, and 116).

[2] A fourth Plaintiff, Environmental Law and Policy Center, was voluntarily dismissed on February 26, 2015. (Doc. 55).

have sued Illinois Power Resources Generating, LLC ("IPRG"), which is the owner and operator of the E.D. Edwards Power Plant ("Edwards"), and IPRG's parent-company, Illinois Power Resources, LLC ("IPR"), on behalf of themselves and their members.[3] Plaintiffs have alleged that Edwards was out of compliance with certain Clean Air Act emissions standards on thousands of occasions between 2008 and 2014. They have brought the lawsuit pursuant to the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604, which allows "any person" to commence a civil suit against, among others, persons alleged to be in violation of an emission standard or limitation.

Edwards is a three-unit coal-fired power plant located in Bartonville, Illinois. Two of its units – Units 1 and 2 – exhaust through a common smokestack. The third exhausts through a second smokestack, the center of which is less than 1,000 feet from the center of the common stack. These units are subject to a variety of emission requirements that are designed to ensure compliance with ambient air quality standards established by the United States Environmental Protection Agency ("U.S. EPA") pursuant to the Clean Air Act. *See* 42 U.S.C. §§ 7409-10. Edwards' emission requirements at issue in this case derive from two sources: (1) the Illinois State Implementation Plan ("SIP"), which is a set of regulations intended to implement the

---

[3] Plaintiffs brought their original complaint against Ameren Energy Resources Generating Company ("AERG"), which owned and operated the Plant from the start of the relevant time period until December 2, 2013, and its parent company Ameren Energy Resources Company. (Doc. 44). IPRG, the current owner and operator of the Plant, assumed AERG's liabilities following a merger. In their motion for partial summary judgment, Plaintiffs have only moved for summary judgment against IPRG and have not moved for summary judgment against IPR. Both Defendants, however, have moved for summary judgment in their cross-motion. For simplicity's sake, the Court may refer to "Edwards" rather than "IPRG" at points in this opinion.

ambient air quality standards;[4] and (2) an operating permit ("Permit") issued by the Illinois EPA on June 10, 2004.[5]

Both the Permit and the SIP limit the amount of particulate matter that Edwards can emit while it is operating.[6]  *See* 35 Ill. Admin. Code §§ 212.202, 212.203 (limiting particulate matter emissions from certain power plants that existed prior to April 14, 1972); Permit Condition 2 (Doc. 104-8 at 1). They also, subject to certain exceptions that are discussed more fully below, limit the opacity of the plume emanating from Edwards' two smokestacks.[7] *See* 35 Ill. Admin. Code § 212.123 (limiting opacity for certain power plants that existed prior to April 14, 1972 to thirty percent); Permit Condition 3 (Doc. 104-8 at 2). Because there is a correlation between opacity and particulate matter emission levels, regulators use the degree of opacity as a proxy for the amount of particulate matter that a plant emits.

The Permit and the SIP require that Edwards continuously monitor its opacity to ensure compliance with the thirty-percent limit, and also make quarterly reports

---

[4] The SIP was adopted by the Illinois Pollution Control Board and approved by the U.S. EPA pursuant to 42 U.S.C. § 7410.

[5] The SIP requires that plants like Edwards obtain an operating permit. *See* 35 Ill. Admin. Code § 201.144. Edwards' Permit bears an expiration date of June 30, 2005, and the Illinois EPA issued Edwards a subsequent operating permit pursuant to Title V of the Clean Air Act. However, the Title V permit has been stayed by order of the Illinois Pollution Control Board, *see Ameren Energy Generating Co., Edwards Power Station v. IEPA*, PCB 06-67 (Feb. 16, 2006), so the Permit issued on June 10, 2004 remains in effect. *See* 415 Ill. Comp. Stat. 5/39.5(4)(b).  The Court has previously held that the terms and conditions of the Permit are federally enforceable under the citizen suit provision of the Clean Air Act.  *See Natural Res. Def. Council v. Ameren Energy Res. Co.*, Case No. 13-1181, 2013 WL 5799435 (C.D. Ill. Oct. 28, 2013).

[6] Particulate matter is "any solid or liquid material, other than water, which exists in finely divided form." 35 Ill. Admin. Code § 211.4510.

[7] Opacity is the degree to which particulate matter emissions reduce the transmission of light and obscure the view of an object in the background. 35 Ill. Admin. Code § 211.4130.

to the Illinois EPA that provide information about periods of excess opacity. *See* 35 Ill. Admin. Code §§ 201.401, 201.405; Permit Condition 4 (Doc. 104-8 at 2). These reports "shall be based on six minute averages of opacity" and must contain "[t]he percent opacity for each continuous opacity excess period;" and "[t]he start and stop time in six minute increments of any opacity measurements in excess of the limitation." 35 Ill. Admin. Code § 201.405(c). The quarterly reports must also identify "[t]he cause of the excess emissions; if known." *See* Permit Condition 4(a)(i)(D) (Doc. 104-8 at 2); 35 Ill. Admin. Code § 201.405(a)(4). To comply with Permit Condition 4(a)(i)(D), Edwards includes in its reports "reason codes" for opacity exceedances, including codes such as "01-Excess Emission – Startup/Shutdown," "02 – Excess Emission – Control Equipment Problems," "03 – Excess Emission – Process Problems," and "04 – Excess Emission – Other Known Causes."

Between April 18, 2008 and June 30, 2014, Edwards reported to the Illinois EPA 2,949 instances in which it had an average opacity of greater than thirty percent for six minutes or longer.[8] Plaintiffs seek partial summary judgment on their first three claims based on these reports. In Count One, Plaintiffs have alleged that Edwards violated the opacity standards on those reported occasions in which it was not in a state of startup, malfunction, or breakdown.  In Count Two, Plaintiffs have alleged that Edwards violated the opacity standards on those reported occasions in

---

[8] It is undisputed that these 2,949 exceedances do not qualify for a regulatory exemption that the parties refer to as the "8-minute exemption." The 8-minute exemption provides that Edwards' emissions can have an opacity between thirty and sixty percent "for a period or periods aggregating 8 minutes in any 60 minute period." *See* 35 Ill. Admin. Code § 212.123(b). The exemption does not apply if heightened emissions occur from both of Edwards' stacks during the sixty-minute period or if the heightened emissions occur more than three times in 24 hours. *Id.*

which it may have been in a state of startup, malfunction, or breakdown. And, in Count Three, Plaintiffs have alleged that Edwards violated its particulate matter standards. They rely upon the opacity exceedances established in the first two claims in order to establish a derivative violation of the particulate matter standards. *See* 35 Ill. Admin. Code § 212.124(d)(2)(A) (explaining that for certain power plants, opacity exceedances may also be deemed particulate matter exceedances).

On the merits, Defendants primarily rely upon two regulatory defenses. First, they argue that Edwards was in compliance with its particulate matter limits at all times, including when it was out of compliance with its opacity limits. If correct, this would provide a complete defense to Plaintiffs' first, second, and third claims. Second, they argue that a great number of the opacity exceedances should be excused because they occurred during periods of malfunction, or breakdown.

Plaintiffs concede that Defendants may be able to prove a defense in some instances, so they have excluded certain exceedances from their motion. These include: (1) each exceedance identified in the quarterly reports as being associated with a startup; (2) eight exceedances in which Edwards submitted to the Illinois EPA a malfunction report indicating that opacity exceedances occurred during a malfunction or breakdown; and (3) with respect to only the third claim for relief, each exceedance that occurred within sixty days prior to a particulate matter stack test conducted by Defendants. For the remaining exceedances, however, Plaintiffs argue that the defenses fail as a matter of law.

## LEGAL STANDARD

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).

To survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [it] bears the burden of proof at trial." *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

Cross-motions for summary judgment are considered separately, and each party requesting summary judgment must satisfy the above standard before judgment will be granted in its favor. *See Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004); *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). Thus, the facts are construed in favor of the

non-moving party, which differs depending on which motion is under consideration. *Tegtmeier*, 390 F.3d at 1045.

**DISCUSSION**

Plaintiffs and Defendants each move for summary judgment on the question of whether Plaintiffs have Article III standing to bring this lawsuit, and also move for summary judgment on the merits of Plaintiffs' first three claims. The Court will address the threshold matter of standing before considering the merits.

## I.      Standing to Sue

The first question that must be answered is whether Plaintiffs have standing to bring this lawsuit.  In this case, each Plaintiff is an organization. "An organization has standing to sue if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit." *Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 924 (7th Cir. 2008). Plaintiffs' members establish standing if they can show that they "have suffered an 'injury in fact' that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" that "the injury [is] fairly traceable to the challenged action;" and that it is "likely, not just speculative, that a favorable decision will redress the injury." *Id.* at 925 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

To win on a cross-motion for summary judgment, "a plaintiff cannot rely on mere allegations but must support each element by specific facts via affidavits or other evidence." *Id.* "As long as there is 'at least one individual plaintiff who has

7

demonstrated standing . . .' a court 'need not consider whether the other . . . plaintiffs have standing to maintain the suit." *Bond v. Utreras*, 585 F.3d 1061, 1070 (7th Cir. 2009) (quoting *Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 264 & n. 9 (1977)); *see also Korte v. Sebelius*, 735 F.3d 654, 667 n.8 (7th Cir. 2013); *Bostic v. Schaefer*, 760 F.3d 352, 371 (4th Cir. 2014), *cert denied sub nom. Rainey v. Bostic*, 135 S. Ct. 286 (2014), and *cert denied*, 135 S Ct. 308 (2014), and *cert. denied sub nom. McQuigg v. Bostic*, 135 S. Ct. (2014) (declining to consider whether two plaintiffs have standing after concluding that other plaintiffs do have standing).

The parties do not dispute the second and third elements of organizational standing, but they argue over the first: whether Plaintiffs have shown that at least one of their members would otherwise have standing to bring the lawsuit on her own behalf.

## A. Plaintiffs' Evidence of their Members' Standing

Plaintiffs rely upon the following evidence to establish standing: NRDC has provided declarations and deposition testimony from members Linda Andrews, Robert Jorgensen, and Mary Ann Schafer; Sierra Club has provided a declaration and deposition testimony from member David Pittman; and RHA has provided declarations and deposition testimony from Alicia High and Tracy Meints Fox. Defendants have provided the deposition testimony of most standing witnesses in an effort to undermine their credibility. The evidence is summarized below.

### 1. NRDC Witnesses

Linda Andrews lives "less than 10 miles" from Edwards, and describes herself as "very outdoor-oriented." (Doc. 104-28 at 1). She explains that she regularly runs

marathons and half marathons, and runs outside as much as possible throughout the year. (*Id.*). She avers that "air pollution from [Edwards] can impair [her] ability to do the activities [she enjoys]." She does much of her training "20 miles to the north of her home" because she believes her "strenuous activities are safer" and knows "they are certainly more enjoyable, in the country where the air is cleaner." (*Id.* at 2). She avers that she wishes she could run closer to home, but that she avoids doing so "in view of [her] health concerns and the unpleasantness of running in dirty air." (*Id.*). She also avers that she is concerned about the impact of poor air quality on her husband's health, as he has emphysema. (*Id.*). During her deposition, Andrews described the smoke that she saw coming out of Edwards as ugly, and explained that she has "an issue with particulate matter being released above and beyond the regulations repeatedly." (Doc. 109-13 at 4). Her knowledge of Edwards' emissions' effects on air quality is limited to the allegations that were pleaded in the complaint.

Mary Ann Schafer lives in near Edwards, in Peoria, and avers that she is "very concerned" with Edwards' "impact on air quality" around her because she suffers from asthma and loves fresh air. (Doc. 104-28 at 5). She explained that she used to "open [her] house up" when the weather was good, but does not do so anymore because of her concerns about air quality. (*Id.* at 6). She is also concerned about the impact that pollution from Edwards will have on her grandchildren. (*Id.*). During her deposition, she expressed concern over particulate matter in the air – which she defined as "tiny things that are in the solid state" and "cause problems for people with asthma, like myself" – and said she has grown more concerned about particulate matter as her asthma has gotten worse. She did explain, though, that particulate matter is caused

by many sources and said that it is the worst during "leaf burning" season. (Doc. 109-14 at 3, 7).

Robert Jorgenson lives in East Peoria, Illinois, and has concerns about the impact of poor air quality on his health. Edwards is "a short distance from where he lives," and he also goes to Bartonville "five or six times a year" because his daughter works there. (Doc. 104-28 at 3-4). He is especially concerned about breathing particulate matter because he has a "history of significant cardiac problems." (*Id.* at 4). He is aware of the impact that particulate matter has on cardiovascular health, and he also is aware that Edwards exceeds its particulate matter limits. (*Id.* at 4). Jorgenson regularly goes outside, either to ride his bike, walk, or do house work. (*Id.*). During his deposition testimony, Jorgenson said he would be concerned about Edwards even if it operated within its particulate matter limit, and identified other particulate matter concerns, such as the fact that he lives close to a highway.

## 2. Sierra Club Witness

Sierra Club is basing its standing on only one member: David Pittman. Pittman lives in West Peoria, Illinois, and his house is "less than eight miles downwind" of Edwards. (Doc. 104-31 at 1-2). He is concerned about the health impacts that particulate matter from Edwards will have on his wife, who suffers from a variety of cardiovascular health issues. (*Id.* at 2). He also spends "a large amount of time outdoors," and Edwards' particulate matter diminishes his enjoyment during that time. (*Id.*). During his deposition, Pittman said that he is most concerned with sulfur-dioxide emissions at Edwards, and he also identified other sources of particulate matter that concern him (such as trash burning and wood smoke). (Doc.

109-16 at 3). But he affirmed that he is also concerned with particulate matter emissions from Edwards. (*Id.* at 3-4).

### 3.  RHA Witnesses

RHA is basing its standing on the declarations of two individuals, each of whom claims to be an RHA member. Tracy Meints Fox lives in Chillicothe, Illinois (approximately 25 miles north of the plant). (Doc. 104-33 at 1). Alicia High lived in Bloomington, Illinois (approximately 40 miles from Edwards) when the lawsuit was filed, but she lives in Texas now.

The parties dispute whether High and Fox should be considered members of RHA. Article VI of RHA's 2012 Bylaws defined how individuals become members of the RHA at the time this lawsuit was filed.  It provides that, "Any person who concurs with the purposes of the Association and who makes an active contribution to the work of the Association may become a general member upon election by the Board or Executive Committee and the payment of an annual membership fee to be determined by the Board." (Doc. 104-34 at 3).

There is no evidence in the record that High or Fox were elected by the Board or Executive Committee, nor is there evidence that they paid an annual membership fee. Because RHA cannot show membership that complies with the bylaws, Defendants argue that it lacks standing.

There is, however, evidence that Fox made donations to RHA in 2013 and 2014, that High participated in RHA events beginning in 2012 for which she personally paid $540, and that both High and Fox approve of the organization's purpose.  RHA argues that this evidence of membership is enough, especially in light of an undated

11

resolution passed by the RHA Board that provides, "IT IS HEREBY FURTHER RESOLVED, that Alicia High and Tracy Fox could properly consider themselves 'members' of the Association," because they have "made contributions of money to the Association, and have demonstrated through their actions in a Peoria area power plant litigation matter that they concur with the purpose of the Association and have made an active contribution to the work of the Association." (Doc. 104-34). The Resolution explains that the 2012 Bylaw "was not intended to require the Board or Executive Committee to expressly 'elect' each person to membership, or to require a contribution of a particular size to the Association." (*Id.*). Instead, the Resolution explains that "it was appropriate to treat any person who concurred with the purposes of the Association, and who made a financial contribution, as a 'Member' as that term is used in the Bylaws." (*Id.*).

This dispute raises a number of thorny legal questions. First, should the Court second-guess RHA's interpretation of its Bylaws when a reasonable juror could conclude that RHA adopted a convenient litigation position to allow it to establish standing after the lawsuit was filed? *See Dannhausen v. Bus. Publ'ns Audit of Circulation, Inc.*, 797 F.2d 548, 551 (7th Cir. 1986) ("Illinois law does not permit courts to adjudicate the merits of private associations' decisions."). *But see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000) (explaining that standing should be measured at the outset of litigation); *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 743 n. 2 (7th Cir. 2009) ("[A] plaintiff must establish standing at the time suit is filed and cannot manufacture standing afterwards."). Second, if a person has failed to comply with Bylaws that govern membership but demonstrates

certain other indicia of membership, should a court consider that person to be a member of the organization for standing purposes? *Compare Citizens Coal Council v. Canestrale Contracting Inc.*, 40 F. Supp. 3d 632, 636-43 (W.D. Pa. 2014) *with California Sportfishing Prot. Alliance v. Diablo Grande, Inc.*, 209 F. Supp. 2d 1059, 1066 (E.D. Cal. 2002).   Ultimately, it is unnecessary to resolve this dispute, because as discussed below, both NRDC and Sierra Club have standing and that is all that is required for Plaintiffs to proceed with this lawsuit. *See Bond*, 585 F.3d at 1070.

## B. NRDC and Sierra Club's Undisputed Evidence is Sufficient to Confer Standing

Defendants have challenged the sufficiency of NRDC and Sierra Club's standing witnesses' affidavits to establish standing for the organizations. They argue that each of the declarants has not suffered a redressable injury that is fairly traceable to Defendants' challenged conduct.   The court considers, in turn, each element of individual standing.

### 1.  Injury in Fact

An injury in fact exists only if the injury is concrete, particularized, actual or imminent, and affects the declarant in a "personal and individual way." *Lujan*, 504 U.S. at 560, 560 n. 1. Members of environmental groups can establish injury in fact by showing that "they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (internal quotation marks omitted). *See also Am. Bottom Conservancy v. U.S. Army Corps. of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011); *Pollack*, 577 F.3d at 740; *Franklin Cnty.*, 546 F.3d at 925; *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003); *Friends of the Earth, Inc. v. Gaston Copper*

13

*Recycling Corp.*, 204 F.3d 149, 154-56 (4th Cir. 2000). "The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181. Members are injured when their interests in a geographic area are impacted by "reasonable concerns about the effects" of pollution. *Id.* at 183-84.

An "identifiable trifle" will be sufficient to establish injury-in-fact. *Franklin Cnty.*, 546 F.3d at 925. "The magnitude, as distinct from the directness, of the injury is not critical to the concerns that underlie the requirement of standing. . . ." *Am. Bottom Conservancy*, 650 F.3d at 656. Standing witnesses need not show that they have totally abandoned a site because of pollution; they just need to show that their "pleasure is diminished." *Id.* at 658. In the case of air pollution, simple exposure to pollutants can establish the necessary injury in fact. *See Franklin Cnty.*, 546 F.3d at 925; *Murphy v. Murphy Oil USA*, 686 F. Supp. 2d 663, 671 (E.D. La. 2010) (quoting *Texans United for a Safe Economy Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000)).

Here, witnesses from both NRDC and Sierra Club testified that their enjoyment of certain outdoor activities was diminished because of particulate matter emissions from Edwards. NRDC's witness, Linda Andrews, travels 20 miles away from her home for many of her runs in order to avoid pollution that she attributes to Edwards. Mary Ann Schaeffer, another NRDC witness, keeps her windows closed to keep the outside air out and reduce her exposure to particulate matter. Robert Jorgenson, the third NRDC witness, regularly goes outside to hike, bike, and do yard work, and is concerned about his cardiovascular health when he does so. David

Pittman, of the Sierra Club, spends a large amount of time outdoors, and is concerned about the impact on his health that exposure to particulate matter has during that time. He is also concerned about his wife's cardiovascular health.

These standing witnesses – other than Linda Andrews and Mary Ann Schaeffer – do not claim that they changed their behavior *because* of their concerns. It could therefore be argued that they did not suffer the sort of recreational harms that *Laidlaw* held give rise to standing. *See* 528 U.S. at 184. However, the standing witnesses need not show that they abandoned recreational activities because of pollution; they just need to show that their pleasure was diminished because of the pollution. *See Am. Bottom Conservancy*, 650 F.3d at 658. All standing witnesses have claimed that their residential and recreational happiness has been disturbed by the presence of air pollution. This sort of particularized identifiable trifle is a cognizable injury, so long as it is reasonable. *See id.*; *Franklin Cnty.*, 546 F.3d at 925; *Texans United*, 207 F.3d at 792.

Defendants argue that the standing witnesses' fears are unreasonable. They have provided expert testimony from Lucy Fraiser, who opines that the emissions at issue cannot cause the health consequences that concern the standing witnesses. Specifically, Fraiser opines that Edwards "did not cause short-term or long-term atmospheric PM concentrations sufficient to cause or contribute to injury of human life or health and, thus, the magnitude of the potential exposures do not support the fears alleged." (Doc. 109-11 at 22). She further opines that Edwards "did not cause short-term or long-term atmospheric PM concentrations sufficient to cause visibility impairment or other welfare impacts" and the emissions "were not of a characteristic,

15

frequency, or duration that presents a reasonable likelihood of future harm." (*Id.*). She therefore concludes that the standing witnesses' fears are not supported by reliable medical or scientific evidence. (*Id.* at 44).

Defendants have set the bar for reasonableness too high. A fear need not be based on medical or scientific evidence of probable consequences in order to be reasonable. Rather, a fear cannot be "so irrational that it can simply be discredited." *Franklin Cnty.*, 546 F.3d at 927. The relevant question is not whether pollutants are present in such a high concentration that they will assuredly cause health problems. Rather, it is whether pollutants that can be attributed to Defendant could cause harm and are present in the geographic area in which the standing witness has an interest. *See Pollack*, 577 F.3d 736; *Am. Canoe Ass'n*, 326 F.3d 505; and *Gaston Copper*, 204 F.3d 149 (4th Cir. 2000).

In *Pollack*, a resident of Highland Park, Illinois alleged that he was harmed by the discharge of lead bullets from a firing range into Lake Michigan. Among other things, the plaintiff based his claim for standing on the fact that "he drinks water drawn from Lake Michigan for Highland Park." 577 F.3d at 741. The Court concluded that his "intention to drink water and his fear that his water has been contaminated by lead from bullets does not give rise to standing." *Id.* It explained that his fear was unreasonable because it was unclear from the record whether "any pollution from bullets discharged into Lake Michigan [would] travel the thirteen miles" from where they were discharged to where the plaintiff's drinking water was drawn. *Id.* The court suggested, however, that the outcome would have been different had Pollack "actually used the areas affected by pollution." *Id.* Indeed, in a concurring opinion, Judge

Cudahy noted that the plaintiff had only pointed to a "small amount of lead" in his drinking water but concluded that it would have been sufficient to establish injury-in-fact if the plaintiff had provided "competent evidence" that the lead was from the firing range. *Id.* at 746 (Cudahy, J. concurring).

In *American Canoe*, a standing witness asserted that he was harmed by the illegal discharge of hog waste because he used a stream four-miles downstream from the discharge site for "swimming, drinking, and fishing." 326 F.3d at 518. He asserted that "[h]is fear of pollution has kept him from swimming in, bathing in, or drinking the water" from the creek. *Id.* at 519. He based his fear of pollution on expert testimony that the pollutants in the swine waste "may have severe adverse environmental and human health effects," and that the pollutants traveled downstream. *Id.* Without discussing whether the concentration of pollutants in the creek was sufficient to cause those health effects, the Court concluded that the standing witness's fear was reasonable because he "used an area subject to contamination from the discharge." *Id.* at 520. Indeed, the Court suggested that the contamination itself was relatively insignificant, as it noted the "minimal number of discharges" at issue. *Id.*

Finally, in *Gaston Copper*, a homeowner who lived downstream from a smelting factory "plainly demonstrated injury in fact" by testifying that "he and his family swim less in and eat less fish from [his] lake because his fears of pollution from [the factory's] permit exceedances." 204 F.3d at 156. He was "anything but a roving environmental ombudsman seeking to right environmental wrongs," because he "[was] a real person who owns a real home and lake in close proximity" to the

defendant. *Id.* at 157. The Court explained that there was "ample evidence that [his] fears are reasonable and not based on mere conjecture" because "[t]he record is replete with evidence that Gaston Copper is fouling its receiving waters." *Id.* Indeed, there were "over 500 violations of the company's discharge limits, including unlawful releases of cadmium, copper, iron, lead, and zinc, as well as pH violations," and also "EPA studies and expert testimony of the adverse health and environmental effects of these chemicals." *Id.* As in both *American Canoe* and *Pollack*, in *Gaston* the court's injury-in-fact analysis focused on the presence of pollutants that are known to cause harm to human health in an area in which the standing witness has an interest.

Here, there is no dispute that particulate matter of the type emitted by Edwards can be harmful. As discussed in greater detail below, the record establishes that Edwards regularly exceeded its particulate matter limitations during the relevant time period. *See infra* at 25-39. And at oral argument, the parties conceded that each of the standing witnesses for NRDC and Sierra Club live, work, or recreate in a geographic area where Edwards' particulate matter emissions were and are present. In light of this, the standing witnesses' concerns were reasonable. *See Pollack*, 577 F.3d at 741; *Am. Canoe Ass'n*, 326 F.3d at 518-20; *Gaston Copper*, 204 F.3d at 156; *see also Laidlaw*, 528 U.S. at 184-85 (explaining that fears of pollution are reasonable when there is evidence of "continuous and pervasive illegal discharges of pollutants into a river.").

Defendants argue that this sort of injury is at best a possible future injury that is insufficient to establish standing. (Doc. 109 at 56-57). To support this argument, they rely upon *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013). In *Clapper*, a

18

variety of attorneys and human rights, labor, legal, and media organizations sought declaratory and injunctive relief from a provision of the Foreign Intelligence Surveillance Act that they argued was unconstitutional. The plaintiffs primarily based their standing on the "objectively reasonable likelihood that their communications [with targets of the FISA law] will be acquired . . . at some point in the future." *Id.* at 1143. The Supreme Court held that the plaintiffs did not suffer an injury in fact that conferred standing. It explained, that the "threatened injury must be certainly impending to constitute injury in fact," and rejected the plaintiffs' injury as a "highly speculative fear" that their communications would be intercepted by government agents who relied upon the challenged statute for authority. *Id.* at 1148-49.

Here, the standing witnesses have stipulated that they did not suffer any health harms because of Edwards' emissions, (Doc. 109-10), and Defendants argue that all fear of future harm is too speculative. Defendants, however, seek to extend the holding of *Clapper* too far. The line of cases beginning with *Laidlaw* remains good law, and was unchanged by *Clapper*. In fact, the Supreme Court expressly distinguished *Clapper* from *Laidlaw*. It explained that in *Laidlaw*, the standing was based upon harm caused by "unlawful discharges of pollutants" that were "concededly ongoing," whereas it was dealing with a challenge to a law in which there was no evidence of ongoing surveillance. 133 S. Ct. at 1153. It was the ongoing discharge of pollution in *Laidlaw*, and the pollution's impact on recreational and aesthetic interests, that created actual, and not speculative, injury. *Id.*

For the above reasons, the Court finds that the undisputed material facts establish that NRDC and Sierra Club's members have shown injury in fact.

## 2. Traceability

In addition to showing injury in fact, Plaintiffs must show a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. In other words, the "injury must be fairly traceable to the challenged action of the [Defendant]" and "not the result of the independent action of some third party not before the court." *Id.*

Defendants next argue that any injuries suffered by the standing witnesses cannot be traced to the challenged activities. They argue that Plaintiffs cannot show that there is a "substantial likelihood" that Edwards caused Plaintiff's harm because there is no evidence that Edwards exceeded the particulate matter violations. (Doc. 109 at 5 (citing *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)).

Defendants' argument fails for two reasons. First, as explained below, Plaintiffs have established, through derivative opacity violations, that Edwards did violate its particulate matter limits. Second, the standing witnesses need not even demonstrate such a violation in order to prove standing.

Injuries are not fairly traceable when they are the result of "independent action of some third party not before the court." *Texas Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 972 (7th Cir. 2005). "Where a plaintiff has pointed to a polluting source as the seed of his injury, and the owner of the polluting source has supplied no alternative culprit, the 'fairly traceable' requirement can be said to be

20

fairly met." *Gaston Copper*, 204 F.3d at 162; *Franklin Cnty.*, 546 F.3d at 926-27. However, where a defendant has pointed to an alternative culprit that is responsible for all of the pollution at issue, the injury is not fairly traceable to the defendant. *See Pollack*, 577 F.3d at 746 (Cudahy, J. concurring) ("Pollack's limited evidence that lead has traveled or will travel south to Highland Park and enter the plaintiff's drinking water was outweighed in the view of the district court by the defendants' evidence of an alternative cause for lead in the water – the corrosive pipes. . . .").

In this case, it is undisputed that there are a variety of sources of particulate matter in the air that the standing witnesses breathe. This includes particulate matter from Edwards, and also includes for example, particulate matter from leaf burning and highway traffic. When multiple sources contribute to the pollution at issue, plaintiffs are not required to show "to a scientific certainty that defendant's [emissions], and defendant's [emissions] alone, caused the precise harm suffered by the plaintiff." *See Powell Duffryn Terminals Inc.*, 913 F.2d at 72.  Instead, plaintiffs "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Gaston Copper*, 204 F.3d at 161 (internal quotation marks omitted); *see also Sierra Club v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 558 (2d Cir. 1996).  The fact that "third parties could also have contributed to the alleged injuries," does not mean that the injury is not fairly traceable to a defendant's conduct. *Am. Canoe Ass'n*, 326 F.3d at 520.

Here, Plaintiffs' witnesses have all averred that they are concerned about particulate matter. As particulate matter from Edwards made it into the geographic area at issue, the recreational injuries that result from that reasonable fear can be

fairly traced to Edwards' conduct. *See id.*; *Sierra Club v. Energy Future Holdings Corp.*, Case No. W-12-CV-108, at *14 (W.D. Tex. Nov. 22, 2013) ("if [a defendant's] opacity violations . . . can impair the air quality around [the standing witness's] home, even within national limits, an injury, however 'trifle' has been established" that is fairly traceable to the defendant).

### 3. Redressability

Finally, Plaintiffs must prove that their fairly traceable injuries are redressable. A plaintiff "need not show that a favorable decision will relieve his *every* injury." *Mass. v. EPA*, 549 U.S. 497, 525 (2007). Rather, a plaintiff simply needs to show "that a favorable decision will relieve a discrete injury to himself." *Id.*

In this case, Plaintiffs allege that Edwards engaged in opacity and particulate matter violations that began before the lawsuit was filed and continued thereafter. They seek declaratory relief, injunctive relief, and civil penalties.

This evidence – of past, continuing wrongs – is sufficient to establish that Plaintiffs' injuries are redressable by injunctive relief. *See Gaston Copper*, 204 F.3d at 162-63 (explaining that "[a] plaintiff seeking injunctive relief shows redressability by alleging a continuing violation or the imminence of a future violation of the statute at issue" and concluding that post-complaint violations demonstrate a continuing violation that is redressable by injunctive relief) (internal quotation marks omitted); *Concerned Citizens Around Murphy*, 686 F. Supp. 2d at 673 (explaining that past violations, together with violations that continued after the filing of the complaint, sufficiently establish that "unless some action is taken to prevent the illegal conduct, there is a real threat that such violations will continue to occur.").

Plaintiffs have also established that their injuries are redressable by civil penalties. Civil penalties "do more than promote immediate compliance by limiting the defendant's economic incentive to delay its attainment of permit limits" – they also deter future violations by encouraging defendants to discontinue ongoing illegal conduct. *Laidlaw*, 528 U.S. at 186-87; *see also Sierra Club v. Tennessee Valley Auth.*, 430 F.3d 1337, 1345 (11th Cir. 2005) ("civil penalties . . . redress injuries . . . by abating current violations and preventing future ones. . . .") (internal quotation marks omitted). Therefore, civil penalties redress Plaintiffs' injuries for the same reason that injunctive relief does.

Defendants make one additional argument that must be addressed. They argue that Plaintiffs cannot show a likelihood of future particulate matter violations because the regulatory provision that establishes Edwards' particulate matter violations would not apply to future violations. Defendants are correct: Plaintiffs rely upon 35 Ill. Admin. Code § 212.124(d)(2) to prove that Edwards violated its particulate matter limits, and Plaintiffs concede that they could not prove future particulate matter violations in that way. However, this confuses the issue. Just because a plaintiff could no longer prove particulate matter violations through § 212.124(d)(2) does not mean that particulate matter limits no longer apply to Edwards. It simply takes one way to establish the particulate matter violations off the table. In this case, Plaintiffs have alleged that Edwards continued to violate particulate matter limits, and have (as discussed below) proven that continuing violation. Just because the method of proof the Plaintiffs have relied upon does not

apply to future violations does not negate that proof of past continuing violations or suggest that future violations will not occur.

As discussed above, the undisputed facts show that members of NRDC and the Sierra Club have suffered an injury in fact that is fairly traceable to Edwards' emissions and would be redressed by a judgment in favor of Plaintiffs. As NRDC and Sierra Club have standing, the Court's subject-matter jurisdiction is secure.

## II.     The Merits

With the threshold matter of standing addressed, it is now appropriate to address the merits of Plaintiffs' claims. Plaintiffs move for partial summary judgment on their first three claims against IPRG. Each of these claims is based on self-reported incidents of excess opacity. If IPRG cannot produce evidence that would allow it to prove an affirmative defense for these exceedances, summary judgment for Plaintiffs is appropriate. *See U.S. v. B&W Inv. Prop.*, 38 F.3d 362, 367 (7th Cir. 1994) (explaining that the CAA is a strict liability statute); *Concerned Citizens Around Murphy*, 686 F. Supp. 2d at 680 (granting summary judgment based on the defendant's self-reports of emission violations).

Defendants have raised three defenses that the Court will consider in turn. First, they argue that they were in compliance with their particulate matter limitations at all times. Second, they argue that many of the exceedances occurred during periods of excusable malfunctions or breakdowns. Third, they argue that the particulate matter limits and opacity limits do not apply during times in which Edwards is not operating. The first two defenses fail. The third succeeds with respect to Count Three, but fails with respect to Counts One and Two.

### A. Particulate Matter Defense

One regulatory defense established by the Illinois Pollution Control Board ("IPCB") to opacity violations that is available to Defendants is the particulate matter defense, which is codified at 35 Ill. Admin. Code § 212.124(d). This defense provides, in relevant part:

> Compliance with the particulate regulations of this Part shall constitute a defense.
>
>   1) For all emission units which are not subject to Chapters 111 or 112 of the CAA and [certain particulate matter limits to which Edwards is subject] but which are subject to [opacity limitations]: the opacity limitations . . . shall not apply if it is shown that the emission unit was, at the time of such emission, in compliance with the applicable particulate emissions limitations of Subparts D through T of this Part.[9]
>
>   2) For all emission units which are not subject to Chapters 111 or 112 of the CAA but which are subject to [certain particulate matter limits to which Edwards is subject]:
>
>     A) An exceedance of the [opacity limitations] shall constitute a violation of the applicable particulate limitations . . . . It shall be a defense to a violation of the applicable particulate limitations if, during a subsequent performance test conducted within a reasonable time not to exceed 60 days, under the same operating conditions for the unit and the control devices, and in accordance with Method 5, 40 CFR part 60, incorporated by reference in Section 212.113 of this Part, the owner or operator shows that the emission unit is in compliance with the particulate emission limitations.

---

[9] Subparts D through T of Part 212 of the Illinois SIP establish particulate matter limitations for a variety of different types of emission sources, including sources that are different from Edwards. Edwards' particulate matter limits are included among those in Subpart E, which establishes limits for emissions from Fuel Combustion Emission Units. *See* 35 Ill. Admin. Code §§ 212.201-210. But Subpart D, for example, covers particulate matter emissions from incinerators. *See* 35 Ill. Admin. Code §§ 212.181-185.

B) It shall be a defense to an exceedance of the opacity limit if, during a subsequent performance test conducted within a reasonable time not to exceed 60 days, under the same operating conditions of the emission unit and the control devices, and in accordance with Method 5, 40 CFR part 60, Appendix A, incorporated by reference in Section 212.113 of this Part, the owner or operator shows that the emission unit is in compliance with the allowable particulate emissions limitation while, simultaneously, having visible emissions equal to or greater than the opacity exceedance as originally observed.

35 Ill. Admin. Code § 212.124(d).

Defendants rely upon the first sentence of § 212.124(d) to argue that they have a complete defense to both the opacity violations alleged in Counts One and Two and the particulate matter violations alleged in Count Three. Their expert, Ralph Roberson, correlated particulate matter emissions from Edwards to contemporaneous opacity readings. He concluded that "there is no evidence to support a claim that the Edwards Power Station (either Unit 1 or 2, which exhaust through a Common Stack, or Unit 3) has exceeded the allowable PM emission limits on the individual units." (Doc. 109-6 at 22). Roberson reached this conclusion by utilizing stack testing data from Edwards, but as explained below, this method did not comply with the method prescribed under § 212.124(d)(2).

Plaintiffs, however, argue that in proving the particulate matter defense, Edwards is restricted to the method established in § 212.124(d)(2). This would make Roberson's testimony irrelevant. Under § 212.124(d)(2), a covered power plant satisfies the particulate matter defense for opacity exceedances by, within sixty days of the exceedance, conducting a stack test to show that it is within the applicable particulate matter limitations while the unit is both operating under the same

26

conditions and with opacity equal to or greater than the originally-observed opacity. *See* 35 Ill. Admin. Code § 212.124(d)(2)(B). A covered power plant satisfies the particulate matter defense for derivative particulate matter exceedances by, within sixty days of the opacity exceedance, conducting a stack test that shows it is within the applicable particulate matter limitations while the unit is operating under the same operating conditions as it was during the exceedance. *Id.* § 212.124(d)(2)(A).

The record shows that Edwards conducted a stack test on one unit on November 19-20, 2011, stack tests on all units on July 16-19, 2013, and stack tests on all units on April 23-24, 2014. During these tests, Edwards' opacity did not exceed thirty percent. Plaintiffs argue that these stack tests cannot support a defense for the first two counts and can only arguably provide a defense for the third count for those exceedances that occurred within sixty days of the stack tests.

As the facts here are not in dispute, whether and to what extent Defendants can rely upon the particulate matter defense is a question of law that is well-suited for summary judgment. Its resolution depends upon resolving two separate issues: first, whether Edwards is even subject to § 212.124(d)(2); and second, whether § 212.124(d)(2) provides an exclusive way for Edwards to prove the particulate matter defense.

### 1. Section 212.124(d)(2)'s application to Edwards

Section 212.124(d)(2) does not apply to emission units that are "subject to Chapters 111 and 112 of the CAA." Although the parties agree that Edwards was not subject to Section 111 of the Clean Air Act during the relevant period, they dispute whether Edwards was subject to Section 112 (42 U.S.C. § 7412) for purposes of §

212.124(d)(2). Defendant argues that Edwards was subject to Section 112 because the U.S. EPA listed coal-fired electrical generating units (like Edwards) under Section 112(c). Plaintiffs, however, argue that Edwards was not subject to Section 112 because the U.S. EPA had not issued any regulations that pertained to Edwards during the relevant time period.[10]

The Court must determine what "subject to Chapter[] . . . 112 of the CAA" means for the purpose of § 212.124(d)(2). Courts interpreting a regulation first look to the regulation's text, and look past it only "when it is ambiguous or where a literal interpretation would lead to an absurd result or thwart the purpose of the overall statutory scheme." *Nat'l Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 477 (7th 1999) (internal quotation marks omitted). The text of § 212.124(d)(2) is susceptible to both parties' readings, so understanding both how Section 112 of the Clean Air Act operates and the regulatory history of § 212.124(d)(2) is necessary to make this determination.

Section 112 is the codification of the National Emissions Standards for Hazardous Air Pollutants Program ("NESHAP"), one of the Clean Air Act's programs designed to control air pollution from stationary sources. *See* Case Comment, *Michigan v. EPA*, 129 Harv. L. Rev. 311 (2015). NESHAP regulates the emission of

---

[10] Plaintiffs argue that Edwards became subject to Section 112 for purpose of the regulation on April 16, 2015, which was the deadline for existing power plants to comply with the U.S. EPA's Mercury and Air Toxics Standard, which was issued pursuant to 42 U.S.C. § 7412(d). *See* 40 C.F.R. § 63.9984. It is worth noting that in arguing that Edwards was not subjection to Section 112 of the Clean Air Act, Plaintiffs are not arguing that Edwards was not subject to other Clean Air Act obligations. Indeed, it is Edwards' Clean Air Act obligations that give rise to this lawsuit. Edwards was subject to the Illinois SIP regulations, which implement Section 109 of the Clean Air Act. *See* 42 U.S.C. §§ 7409-10.

certain listed hazardous air pollutants into the atmosphere. *Wildearth Guardians v. Lamar Utilities Bd.*, 932 F. Supp. 2d 1237, 1239 (D. Colo. 2013). "Congress established a unique procedure to determine the applicability of [NESHAP] to fossil-fuel-fired power plants." *Michigan v. EPA*, 135 S. Ct. 2699, 2705 (2015). It directed the U.S. EPA to "perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by [power plants] of [hazardous air pollutants] after imposition of the requirements of this chapter." 42 U.S.C. § 7412(n)(1)(A). It further directed the U.S. EPA to regulate these plants pursuant to Section 112 if it found that "regulation is appropriate and necessary after considering the results of the study." *Id.*

"[T]he 'appropriate and necessary' finding" is only the beginning of a regulatory process – a "kick-off finding" that lists plants like Edwards and eventually leads to the promulgation of emissions limits for certain listed pollutants. *See Michigan*, 135 S. Ct. at 2717 (Kagan, J. dissenting). Following the "appropriate and necessary" finding, coal-fired power plants are listed under Section 112(c) and the U.S. EPA must then "promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation." 42 U.S.C. § 7412(c)(2), (d)(1). A decision to list a category of sources pursuant to Section 112(c) is not a final agency action that is subject to immediate judicial review. *Id.* § 7412(e)(4). Instead, judicial review must wait until the U.S. EPA has issued regulations pursuant to Section 112(d). *Id.*

The U.S. EPA completed the study required by Section 112(n)(1)(A), and in 2000 concluded that the regulation of coal- and oil-fired power plants is appropriate

and necessary. Environmental Protection Agency Notice of Regulatory Finding, 65 Fed. Reg., 7,0825, 7,9826 (Dec. 20, 2000). However, it did not promulgate any regulations until 2012, and those regulations did not apply to existing coal-fired power plants until 2015. *See* 40 C.F.R. § 63.9984.

Plaintiffs rely upon this statutory structure in arguing that Edwards was not subject to Section 112 of the Clean Air Act for purposes of § 212.124(d)(2). Although they acknowledge that Edwards was listed pursuant to Section 112(c), they point out that Edwards did not need to comply with any regulatory obligations under Section 112 during the relevant period.

Listing under Section 112(c) does have certain legal consequences, however, and Defendants seize onto them in arguing that Edwards was subject to Section 112 for purposes of § 212.124(d)(2). Under Section 112(g), listed major sources that are not subject to regulations issued pursuant to Section 112(d) must still meet "maximum achievable control technology emission limitations" following construction, reconstruction, or modification. 42 U.S.C. § 7412(g); Memorandum from Robert J. Meyers to Regional Administrators (Jan. 7, 2009) (Doc. 109-22 at 2) ("coal- and oil-fired EGUs, which were a listed source category under Section 112 beginning December 20, 2000, remain on the Section 112(c) list and therefore are subject to Section 112(g). . . ."). These standards are established "on a case-by-case basis," 42 U.S.C. § 7412(g), and are ordinarily made prior to a plant's construction, reconstruction, or modification. *Wildearth Guardians*, 932 F. Supp. 2d at 1240.

Edwards – which was in operation at the time that coal-fired power plants were listed – was not immediately subject to any emission standards under Section 112.

Instead, at the time of listing, any obligations that Edwards had under Section 112 were necessarily abstract or conditional. Edwards only became subject to promulgated Section 112 regulations after the relevant time period at issue. Further, under Section 112(g), Edwards would only have needed to meet certain established emission standards if it was modified or reconstructed, but it was not. Thus, the structure of Section 112 suggests that Edwards was not subject to it even though it was listed.[11]

A review of regulatory history confirms that a power plant is only subject to Section 112 for purposes of § 212.124(d)(2) if it is subject to standards promulgated pursuant to it. *See First Nat'l Bank*, 172 F.3d at 477 (explaining that the regulatory history of a regulation is relevant in determining the intent of the regulation). Section 212.124 was issued by the IPCB, an entity that is tasked with "determin[ing],

_____

[11] Defendants' insistence that it is the U.S. EPA's official policy that Edwards was subject to Section 112 is unpersuasive. In the Meyers Memorandum issued on January 7, 2009, the EPA's principal deputy assistant administrator wrote to the U.S. EPA's regional administrators regarding the "[a]pplication of CAA Section 112(g) to Coal- and Oil-Fired Electric Utility Steam Generating Units that Began Actual Construction or Reconstruction Between March 29, 2005 and March 14, 2008." (Doc. 109-22 at 2). Meyers wrote the memo after the United States Court of Appeals for the District of Columbia Circuit vacated a rule that had delisted coal-fired power plants. *See New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008). He concluded that since those plants "remain on the Section 112(c) list" they are "subject to Section 112(g)." (Doc. 109-22 at 2).

The memorandum was written in a particular context: assessing whether units that began construction or reconstruction following the delisting rule but prior to the delisting rule's vacatur needed to comply with Section 112(g). Defendants' reliance on this language to suggest that Edwards is "subject to Chapter 112 of the CAA" for purposes of § 212.124(d)(2) takes the memorandum out of this particular context, which has nothing to do with an interpretation of § 212.124(d)(2). Indeed, Defendants' position is inconsistent with the position that the U.S. EPA subsequently took in litigation where § 212.124(d) was squarely at issue. *See* Complaint, *United States v. Midwest Generation, LLC*, No. 1:09-cv-05277, at ¶¶ 53, 72, 90, 108, 126, 144, 172, 190, 208, 226 (N.D. Ill. Aug. 27, 2009).

defin[ing] and implement[ing] the environmental control standards applicable to the State of Illinois."  415 Ill. Comp. Stat. § 5/5(b). At the time that it promulgates a final regulation, the IPCB must also issue a written opinion that explains its decision. 35 Ill. Admin. Code § 102.608. In the IPCB's final order and opinion that accompanied § 212.124, it explained the language in § 212.124(d)(1)-(2) exempting sources that are subject to Chapters 111 and 112 of the Clean Air Act. *See* Final Order, Illinois Pollution Control Board, *In re: Particulate Emission Limitations, Rule 203(g)(1) of Chapter 2*, 1988 Ill. ENV LEXIS 319, at *16 (June 30, 1988). The IPCB explained that it "made certain clarifications to the text of the proposed rules," before final adoption, including "language to clarify that Section 212.124(d)(1) does not apply to sources subject to New Source Performance Standards, i.e., subject to Section 111 or 112 of the Clean Air Act." *Id.* It also added language "to clarify that Section 212.124(d)(2) does not apply to sources subject to New Source Performance Standards." *Id.* at *16-17.

This indicates that the IPCB understood the regulatory language at issue to be equivalent to "subject to standards issued pursuant to Section 111 or 112 of the Clean Air Act." As with Section 112, Section 111 does not itself establish standards. Rather, it simply establishes the manner through which standards shall be set. Section 111 of the Clean Air Act authorizes the U.S. EPA to either develop regulations governing new sources (New Source Performance Standards regulations) or to require states to regulate existing sources. *See* 42 U.S.C. § 7411(b), (d). So, the IPCB's explanation that § 212.124(d)(2) does not apply to "sources subject to" regulatory-established standards – and its acknowledged shorthand for that (sources "subject to

32

Section 111 or 112 of the Clean Air Act,") suggest that the IPCB does not consider listed sources to be subject to Section 112 of the Clean Air Act *unless* the listed source is subject to emission standards established through Section 112(d) or (g).

In light of the foregoing, the Court concludes that, for purposes of § 212.124(d)(2), Edwards was not subject to Section 112 of the Clean Air Act during the period of exceedances at issue in this case. Therefore, it was subject to § 212.124(d)(2).

### 2. Section 212.124(d)(2) provides Edwards with its sole method of proving the Particulate Matter Defense

The next issue is whether Defendants can prove the particulate matter defense in any way other than that provided by § 212.124(d)(2). As shown by the text, structure, and regulatory history of § 212.124(d), Edwards is limited to the method provided in § 212.124(d)(2) to establish the particulate matter defense.

Defendants argue that the first sentence of § 212.124(d) – "Compliance with the particulate regulations of this Part shall constitute a defense." – provides a general particulate matter defense that they can prove with any admissible evidence. They suggest that subsections (d)(2)(A) and (d)(2)(B) provide operators of power plants with a particular method for proving compliance as a safe harbor that aids but does not otherwise restrict the particulate matter defense.

This argument is contrary to the structure of § 212.124(d). It is a basic tenant that a regulation "ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). Defendants' reading of the regulation would render § 212.124(d)(1) superfluous.

33

Section 212.124(d)'s two major subsections apply to mutually exclusive sets of emission units. Section 212.124(d)(2) only applies to a subset of coal-fired power plants, while § 212.124(d)(1) applies to a broader range of power plants but does not apply to those covered by § 212.124(d)(2). While subsection (d)(2) describes a particular way of proving compliance with the particulate matter regulations, subsection (d)(1) provides a general particulate matter defense: "[T]he opacity limitations . . . shall not apply if it is shown that the emission unit was, at the time of such emission, in compliance with the applicable particulate emissions limitations. . . ."

As established above, Edwards is subject to subsection (d)(2) and therefore cannot be subject to subsection (d)(1). If Edwards could mount a general defense based upon the first sentence of subsection (d), it would essentially be mounting the same defense established by subsection (d)(1). In that case, the division between subsections (d)(1) and (d)(2) would collapse, and it would be superfluous to explicitly allow emission sources subject to (d)(1) a general defense.

A review of the rule's regulatory history confirms this reading of the text. *See First Nat'l Bank*, 172 F.3d at 477. In its final order and opinion, the IPCB explained that "Section 212.124(d)(1) and (2) are defense provisions for different types of sources." Final Order, Illinois Pollution Control Board, *In re: Particulate Emission Limitations, Rule 203(g)(1) of Chapter 2*, 1988 Ill. ENV LEXIS 319, at *16. The stack testing method described in subsection (d)(2) "is clearly designed for accurate measurement of stack particulate emissions," and is even "the preferred method of demonstrating compliance under Section 212.124(d)(1)." *Id.* at *19. However,

34

subsection (d)(1) provides a broader defense than (d)(2) because sources subject to it "(1) may not have a stack or (2) may be allowed to use other methods in lieu of the stack test to show compliance." *Id.* The IPCB's explanation of the difference between (d)(1) and (d)(2) establishes that its decision to divide § 212.124(d) into two subsections and provide subsection (d)(1) with a general defense was purposeful. It also establishes that the IPCB did not intend for the method described in (d)(2) to be a safe harbor. Rather, the method in subsection (d)(2) is the method through which an emission unit subject to subsection (d)(2) must establish the defense, and only units covered by subsection (d)(1) are "allowed to use other methods in lieu of the stack test . . . ." *See id.* The U.S. EPA's understanding of § 212.124(d) is consistent with the IPCB's, as it commented on the "clearly define[d] criteria for a source's use of compliance with the particulate regulations as a defense to a violation of the applicable opacity standards." Approval and Promulgation of Implementation Plans; Illinois, 57 Fed. Reg. 61,834-01 (Dec. 29, 1992).[12]

In light of the clear structure of the regulation and the compelling regulatory history, Defendants' arguments to the contrary must be rejected. Defendants primarily argue that § 212.124(d)(2) does not restrict them because the text of the regulation is framed permissibly. They note that subsection (d)(2) provides "a defense" to opacity exceedances. Pointing to other regulatory provisions, Defendants argue that the IPCB knows how to draft exclusive defenses but elected not to use that sort of language in § 212.124(d): it did not describe the defense in § 212.124(d)(2) as

---

[12] The U.S. EPA's understanding of § 212.124(d) is highly relevant, as the Clean Air Act required that the U.S. EPA approve the Illinois SIP and any changes to it. *See* 42 U.S.C. § 7410.

"'**the**' defense, the '**only**' defense, the '**exclusive**' defense, the '**sole**' defense, or the '**single**' defense." (Doc. 109 at 46).

This textual argument is right, in a sense, but it does not prove what Defendants want it to prove. The particulate matter defense is not the exclusive defense available for opacity exceedances. Indeed, § 212.124 itself provides for defenses other than the particulate matter defense at issue here. *Compare* 35 Ill. Admin. Code § 212.124(a) (the startup, malfunction, and breakdown defense) *with id*. § 212.124(d) (the particulate matter defense). It is for that reason that the first sentence of subsection (d) generally states that "[c]ompliance with the particulate regulations of this Part shall constitute *a* defense." 35 Ill. Admin. Code § 212.124(d) (emphasis added).   Subsection (d)(2), which uses parallel language to the first sentence of § 212.124(d) and also refers to itself as "a defense," can be read naturally to clarify the particulate matter defense defined in the first sentence by referring back to it. *See Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears . . . .").   The fact that the text of subsection (d)(2) refers to the specific particulate matter defense as "a defense" does not mean that § 212.124(d) is broader.   It just means that § 212.124(d) itself is not an exclusive defense.

### 3.   Fair Notice

Finally, Defendants argue that they are entitled to summary judgment on the particulate matter defense on the basis of the fair notice doctrine. The fair notice doctrine prohibits courts from "validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires." *Gates & Fox Co. v. OSHRC*,

790 F.2d 154, 156 (D.C. Cir. 1986). When "regulations and other policy statements [issued by the relevant regulator] are unclear . . . and where the agency itself struggles to provide a definitive reading of the regulatory requirements, a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations, and may not be punished." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1333-34 (D.C. Cir. 1995). Courts assess whether a regulated entity had fair notice of the reach of a regulation by considering whether "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty' the standards with which the agency expects parties to conform. . . ." *United States v. Southern Indiana Gas and Elec. Co.*, 245 F. Supp. 2d 1994, 2011 (S.D. Ind. 2003) (quoting *Gen Elec. Co.*, 53 F.3d at 1329).

Defendants contend that their reading of § 212.124(d) is reasonable, and they argue that they lacked fair notice of any contrary interpretation that would subject Edwards to § 212.124(d)(2).  This argument, however, does not contend with the IPCB's public statements. Defendants, "acting in good faith," could have reasonably ascertained that Edwards was subject to § 212.124(d)(2) based upon the  "public statements issued by" the IPCB at the time that it promulgated § 212.124. *See Southern Indiana Gas and Elec. Co.*, 245 F. Supp. 2d at 2011. The IPCB's order definitively explained that § 212.124(d)(2) "does not apply to sources subject to . . . Standards" issued pursuant to Sections 111 or 112 of the Clean Air Act. *See In re: Particulate Emission Limitations*, 1988 Ill. ENV LEXIS 319, at *16-17. Defendants had fair notice that Edwards was subject to § 212.124(d)(2) during the relevant time period because it was not subject to any standards during that time.

Defendants could have also reasonably ascertained that the method provided by § 212.124(d)(2) was Edwards' sole available method of proving the particulate matter defense. As explained above, Defendants could have looked to the text and structure of the regulation itself. They could have also relied upon the IPCB and the U.S. EPA's public statements, which were consistent with the regulation's text and structure. *See, e.g., id.* at *18-19 (explaining that "[o]ne reason for the different defense provision between [subsections (d)(1) and (d)(2)] is that the performance test conducted in accordance" with subsection (d)(2) may not apply to sources subject to subsection (d)(1), and sources subject to subject to (d)(1), unlike those subject to (d)(2), may have other methods for proving the defense available); Approval and Promulgation of Implementation Plans; Illinois, 57 Fed. Reg. 61,834-01 (praising the "clearly define[d] criteria" for the particulate matter defense).

### 4. Conclusion

Section 212.124(d)(2)(B) provides the sole particulate matter defense available to Defendants on Counts One and Two. To satisfy it, Edwards needed to conduct a stack test while operating with an opacity that was equal to or greater than the original exceedance within sixty days of that exceedance. There is no evidence that Edwards conducted any such tests, so Plaintiffs are entitled to summary judgment on Defendants' particulate matter defense for those counts.

Section 212.124(d)(2)(A) provides the sole particulate matter defense available to Defendants on Count Three. To satisfy it, Edwards needed to conduct a stack test under the same operating conditions that were present during the initial exceedance within sixty days of that exceedance. Plaintiffs are also entitled to summary

judgment on Defendants' particulate matter defense for all exceedances on Count Three except for those that occurred within sixty days prior to a stack test, which Plaintiffs excluded from their motion. Defendants are not entitled to summary judgment as to Counts One, Two, and Three because they have not shown, through undisputed evidence, compliance with § 212.124(d)(2).

### B.   The   Startup,   Malfunction,   and   Breakdown   Defense

Next, Defendants argue that the vast majority of the exceedances at issue are excusable because they occurred during periods of malfunction and breakdown. Defendants would need to rewrite the contours of this defense in order to take advantage of it for nearly all of the exceedances at issue.

The Illinois SIP provides that Edwards may operate during periods of malfunction and breakdown if its Permit allows it to do so. *See* 35 Ill. Admin Code §§ 201.149, 201.261, 212.124(a). Edwards' Permit does. *See* Permit Condition 5(a) (Doc. 104-8 at 2) ("Operation in excess of applicable opacity, particulate matter, and carbon monoxide emission standards, is allowed during periods of startup, malfunction, and breakdown.").

When the Illinois EPA has granted permission to operate during periods of malfunction and breakdown, "full compliance with any terms and conditions connected" with the permission "shall be a prima facie defense to an enforcement action alleging violation of . . . the emission and air quality standards [in the SIP]." 35 Ill. Admin. Code § 201.265. Edwards' Permit imposes certain conditions on the plant's ability to operate during malfunction and breakdown, including requirements that "[t]he permittee . . . notify the Illinois EPA's Regional Office by telephone as soon

39

as possible during normal working hours  upon the occurrence of excess emission due to malfunctions or breakdowns," and "maintain records of excess emissions during malfunctions and breakdowns . . . [that] include . . . [t]he steps taken to prevent similar malfunctions or breakdowns. . . ." Permit Conditions 5(c), (d)(v), (Doc. 104-8 at 2, 3).[13]

It is undisputed that Edwards only notified the Illinois EPA of malfunctions or breakdowns on eight occasions during the relevant time period. Plaintiffs argue that they are entitled to summary judgment on this defense for all exceedances that they have not excluded from their motion because Edwards needed to notify the Illinois EPA about each of them. *See* Permit Condition 5(c) (Doc. 104-8 at 2); 35 Ill. Admin Code § 201.265.[14] Defendants, however, relying on an agreement with the Illinois EPA that is dehors the Permit, argue that they only needed to report exceedances that lasted longer than thirty-minutes to invoke this defense rather than reporting all of the emissions that fall outside of Edwards' opacity limitations. As discussed below, Defendants' arguments cannot be reconciled with the text of the SIP or the Permit Condition 5(c), which requires that Edwards report all opacity exceedances due to malfunction and breakdown. Therefore it must be rejected.[15]

---

[13] During oral argument, Defendants conceded that these conditions in Permit Condition 5 were the sort that they needed to comply with in order to establish the prima facie defense provided by 35 Ill. Admin. Code § 201.265.

[14] Plaintiffs excluded from their motion the eight exceedances for which Defendants notified the Illinois EPA, but do not concede that Defendants satisfied the malfunction and breakdown defense for those exceedances.

[15] Plaintiffs also challenge Defendants' compliance with Permit Condition 5's record keeping requirements.  It is unnecessary to resolve whether Edwards kept proper records of malfunctions and breakdowns for resolution of these motions.

Defendants have produced some evidence that Edwards has a side-agreement with the Illinois EPA to only report exceedances that last longer than thirty minutes. This includes Edwards' stayed, and non-operative, Title V Permit, which would require that Edwards only report exceedances that are greater than thirty minutes (Doc. 104-37 at 45); an internal email that pre-dates the operative Permit in which an environmental manager for Edwards' former operator discusses "opacity related requirements," and writes, "we have to report all periods when we exceed 30% on a unit for more that [sic] 30 consecutive minutes," (Doc. 104-46); and opacity operational guidance dated March 19, 2004. (Doc. 110-4).

Such an agreement – if it existed – could not be reconciled with the text of the currently operative Permit, which says nothing about the duration of emissions and straightforwardly requires reporting "upon the occurrence of excess emissions due to malfunctions or breakdowns." Permit Condition 5(c). (Doc. 104-8 at 2). Defendants argue that the two could be squared because the Permit requires that Edwards comply with the Illinois EPA's "reasonable and safe directives" with respect to malfunctions and breakdowns. (*Id.*). But this argument reads the language of Edwards' Permit out of context. Permit Condition 5(c) requires that Edwards first "notify the Illinois EPA's Regional Office by telephone" when there are excess emissions, and then "comply with all reasonable and safe directives . . . regarding such malfunctions and breakdowns." (*Id.*). The phrase "such malfunctions and breakdowns" naturally refers to the subset of malfunctions and breakdowns that Edwards has already reported to the Illinois EPA regional office. *See Such Definition*, Oxford English Dictionary, http://www.oed.com/view/Entry/193400 (last visited June

41

29, 2016) ("Such" refers to "the character, degree, or extent described, referred to, or implied in what has been said."). The directives anticipated by the Permit are specific directives regarding already-reported exceedances, and not general directives with respect to all future excess emissions.

Defendants also argue that Edwards complied with the SIP because most of the excess opacity emissions due to malfunction and breakdown were short and quickly corrected, and the SIP requires reporting during periods of "continuous emission." *See* 35 Ill. Admin. Code § 201.263. This argument is also unpersuasive. The text of § 201.263 states that its terms are preempted by contrary terms in the operating permit. *See id.* (requiring reports during "continued operation of an emission source" in certain circumstances, "except if otherwise provided in the operating permit."). Edwards' Permit requires reporting "upon the occurrence of excess emission due to malfunctions or breakdowns." Permit Condition 5(c) (Doc. 104-8 at 2). This language in the Permit controls over any arguably contrary language in the regulation. *See* 35 Ill. Admin. Code § 201.263.

Defendants' attempt to rewrite the text of the Permit through informal agreement must be rejected. The purported agreement between Edwards and the Illinois EPA is dehors the Permit, so it is immaterial. No matter how longstanding the agreement may have been, or its merit, the agreement cannot modify or supplement Permit Condition 5(c). The Court previously held that third parties like Plaintiffs can independently enforce the terms of Edwards' Permit under the Clean Air Act. *See Nat. Res. Def. Council v. Ameren Energy Resources Co.*, Case No. 13-1181, 2013 WL 5799435 (C.D. Ill. Oct. 28, 2013). In such a context, courts and plaintiffs

42

alike should be able to rely upon the language of the Permit and regulators' reasonable interpretations of the language in the Permit. *See Nat. Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 20 F. Supp. 2d 700, 710 n. 5 (D. Del. 1998), *aff'd* 182 F.3d 904 (3d Cir. 1999) (in the Clean Water Act context, explaining that "the agency's interpretation of the permit should be considered *if not in conflict with the plain language of the permit."*) (emphasis added). Allowing for informal amendments to the text of the very document that the Clean Air Act allows Plaintiffs to enforce would undercut the purposes of the Clean Air Act's citizen suit provision. If Edwards and the Illinois EPA wished to amend the Permit, they should have complied with the provisions of the Illinois SIP that allow for amendment. *See* 35 Ill. Admin. Code § 201.167 ("The Agency may revise any permit issued . . . or any condition contained in such permit . . . [u]pon reapplication by the permittee; or. . . [u]pon the revision of the [statute or regulations].").

Defendants argue, as a fallback, that they can prove the malfunction and breakdown defense even if they have not complied with the conditions associated with the Permit. They say that the prima facie defense provides the easiest method: if the record reflected that Edwards complied with the terms and conditions of the malfunction and breakdown defense in its Permit, it would presumptively establish the defense. But, they argue that this doesn't preclude the opportunity to establish a malfunction and breakdown defense the hard way: without the presumption provided for by the prima facie defense.

However, compliance with the terms and conditions of the Permit provides the only method through which Edwards can prove the malfunction and breakdown

defense. Here, a prima facie defense is synonymous with an affirmative defense. *See Lutz v. Chesapeake Appalacia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (explaining that only once a defendant has made a prima facie defense will "the burden shift[] to the plaintiff to establish an exception . . . ."); *Premier Capital Mgmt., LLC v. Cohen*, No. 02 C 5368, 20008 WL 4378300, at *14 (N.D. Ill. Mar. 24, 2008) ("Thus, Plaintiffs need only rebut if the defendants make out a *prima facie* affirmative defense" and do not need to "preemptively offer facts to overcome the defenses as part of their case in chief.").

Allowing Defendants to prove the malfunction and breakdown defense in some way other than compliance with the Permit's conditions would present an unworkable legal problem: there would be no clear boundaries on the defense. In other states, the malfunction and breakdown defense is often defined by regulation. For example, Georgia regulations provide that "[e]xcess emissions resulting from startup, shutdown, [or] malfunction of any source which occur through ordinary diligence is employed *shall be allowed*" so long as: (1) the best operational practices to reduce emissions were used; (2) pollution control equipment was operated properly; and (3) "the duration of excess emissions [was] minimized." *Sierra Club v. Georgia Power Co.*, 443 F.3d 1346, 1351 (11th Cir. 2006) (discussing Ga. Comp. R. & Regs. 391-3-1.02(2)(a)7(i)). And in Texas, power plants must meet ten criteria in order to establish the defense, including showing that opacity was properly documented and reported to the regulator. *See Sierra Club v. Energy Future Holdings Corp.*, No. W-12-CV-108, 2014 WL 2153913, at *2 (W.D. Tex. March 28, 2014) (discussing 30 Tex. Admin. Code § 101.222(d), (e)). Illinois has not promulgated these sorts of standards through

44

regulation; instead the standards are included in the permits issued to power plants. Therefore, without reference to the Permit conditions, there would be no obvious elements to the malfunction and breakdown defense that Edwards would need to satisfy.

Finally, Defendants argue that they would be denied fair notice if the Court concluded that they were liable for Clean Air Act violations because they failed to comply with the Permit's reporting requirements for malfunctions and breakdowns. As previously explained, Courts determine whether a regulated entity had fair notice "by reviewing the regulations and other public statements issued by the agency," and determining whether "a regulated party acting in good faith would be able to identify with 'ascertainable certainty,' the standards with which the agency expects parties to conform . . . ." *Southern Indiana Gas and Elec. Co.*, 245 F. Supp. 2d at 2011 (quoting *Gen. Elec. Co.*, 53 F. 3d at 1329).

Defendants' fair notice defense is unpersuasive because they cannot point to any textual ambiguity in the Permit that was issued by the Illinois EPA, nor can they point to any public statements by the Illinois EPA that are contrary to the language included in the Permit. Defendants' fair notice argument is better conceived of as an argument that Plaintiffs should be estopped from enforcing the Permit because Defendants reasonably relied upon private statements made by the Illinois EPA that are contrary to the language of the permit. To establish an estoppel defense, Defendants would need to, among other things, show that they reasonably relied upon statements made by Plaintiffs. *See Edgewater Hosp., Inc. v. Bowen*, 857 F.2d

45

1123, 1137 (7th Cir. 1988). They have not done so, and at oral argument, counsel for Defendants conceded that they were not making an estoppel argument.

Edwards cannot satisfy the malfunction and breakdown defense for those unreported exceedances. Therefore, Plaintiffs' motion for partial summary judgment as to the malfunction and breakdown defense is granted for those exceedances at issue in their motion. To the extent that Defendants have sought summary judgment on the eight properly-reported exceedances, their motion is denied because they have not provided evidence of compliance with each of the other conditions associated with permission to operate during periods of malfunction and breakdown.

## C. Off-line Defense

Finally, the parties dispute the applicability of the opacity regulations during periods in which the emission units at Edwards were not operating. Approximately 200 of the opacity exceedances for which Plaintiffs have moved for summary judgment occurred during periods when the operating unit was offline and undergoing maintenance activities.

The parties agree that Edwards' visible emissions exceeded thirty-percent opacity during these periods of maintenance.  Indeed, Defendants' expert Richard McRanie opined that "[o]pacity excursions can occur during off-line/shutdown periods for a variety of reasons. Most of the reasons revolve around maintenance activities inside the boiler, ductwork and ESP."[16] (Doc. 109-9 at 17). Plaintiffs conceed that

---

[16] An ESP is an "electrostatic precipitator," which is a tool utilized by coal-fired power plants to minimize pollution.

Edwards' particulate matter limitations do not apply to units during these periods.[17] Defendants argue that opacity limitations should not, either.

In *Sierra Club v. Georgia Power*, No. 3:02-CV-141-JTC, 2007 U.S. Dist. LEXIS 100219 (N.D. Ga. Jan. 11, 2007), a district court in Georgia determined that opacity limits do not apply to coal-fired power plants in Georgia when a unit is not operating. *Id.* at *23-24. That court examined both the record and the Georgia SIP, which exempts maintenance activities from emissions standards, and concluded that "[n]othing in the record indicates that the opacity regulations are intended to control [offline] exceedances, as opposed to those exceedances relating to the combustion of fuel, which occur while the unit is operating." *Id.* at *24.

Defendants argue that this logic should apply here, especially because opacity goes hand-in-hand with particulate matter limitations. They point primarily to the structure of § 212.124(d)(2)(B) for support. Section 212.124(d)(2)(B), as discussed earlier, allows power plants to excuse periods of heightened opacity by showing compliance with particulate matter emissions "under the same operating conditions." Defendants argue that by framing the particulate matter defense in these terms, § 212.124(d)(2)(B) implies that actionable opacity exceedances only occur when a unit is operating. Otherwise, there would be opacity exceedances for which the particulate matter defense could not apply.

Unlike in *Georgia Power*, however, other aspects of Edwards' Permit and the Illinois SIP imply that opacity limits apply even when a unit is offline. Certain other

---

[17] This is because the particulate matter limitations are stated in terms of pounds per million British thermal units combusted. *See* Permit Condition 2 (Doc. 104-8 at 2).

states limit the applicability of opacity limits during periods of maintenance. *See Georgia Power*, 2007 U.S. Dist. LEXIS 100219, at *24; *Pub. Citizen v. Am. Elec. Power Co.*, No. 5:05-CV-39-DF, 2006 WL 3813762, at *5 (E.D. Tex. Dec. 27, 2006); *Sierra Club v. Energy Future Holdings Corp.*, 921 F. Supp. 2d 674, 684 (W.D. Tex. 2013). But Defendants cannot point to an analogous section of the Illinois SIP that limits the applicability of opacity regulations during periods of maintenance or shutdown. Indeed, Edwards' opacity limitation is framed as a uniform thirty-percent limit, with no reference to whether the unit is operating or undergoing maintenance. *See* 35 Ill. Admin. Code § 212.123(a); Permit Condition 3 (Doc. 104-8 at 2).

In light of this, the Court concludes that opacity limits continue to apply during periods of maintenance. Defendants are correct that opacity is most often used as a proxy for particulate matter. That is why the particulate matter defense in § 212.124(d)(2)(B) exists. But just because particulate matter emissions cannot be measured during times of maintenance or shutdown does not mean that the opacity limits should not apply during those times. Indeed, there are strong policy reasons that it should: opaque clouds that Edwards emits during maintenance activities could have preventable and high amounts of unmeasured particulate matter. It is sensible, then, to subject those emissions to the opacity limits even if the particulate matter defense cannot apply. If Illinois wished to create explicit exemptions from generally applicable opacity limits during periods of maintenance, it could have. *See, e.g., Georgia Power*, 2007 U.S. Dist. LEXIS 100219, at *24. It did not, and interpreting the Illinois SIP to imply that it did would conflict with the EPA's determination that units are not exempt from opacity regulations during periods of offline maintenance. *See*

48

State Implementation Plans: Response to Petition for Rulemaking, 80 Fed. Reg. 33,840, 33,911 (June 12, 2015) ("[T]he EPA does not agree with commenters that total exemptions from opacity emission limitations during [maintenance] activities are consistent with CAA requirements for SIP provisions. . . [M]aintenance activities are predictable and planned activities during which sources should be expected to comply with applicable emission limitations.").

For these reasons, Defendants' motion for summary judgment on this issue is granted as to Count Three. The fact that Edwards was off-line, however, is not a defense to Counts One and Two.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment (Doc. 104) is GRANTED IN PART and DENIED IN PART. The Court concludes that Plaintiffs have standing to bring this lawsuit, grants summary judgment to Plaintiffs on all opacity exceedances in Counts One and Two for which they have moved for summary judgment, and grants summary judgment to Plaintiffs on all exceedances for which they have moved for summary judgment with respect to Count Three except for those opacity exceedances that occurred while the relevant unit was off-line. Defendants' Motion for Summary Judgment (Doc. 108) is GRANTED with respect to those particulate matter exceedances in Count Three that occurred while the relevant unit was off-line, but otherwise DENIED. Plaintiffs' Motion to Strike (Doc. 119) is DENIED AS MOOT. Plaintiffs' motion to exclude certain expert testimony (Doc. 113) remains pending. By September 1, 2016, Plaintiffs shall notify the Court whether this order has mooted any of the issues raised in that motion. IT IS SO ORDERED.

49

Entered this 23rd day of August, 2016.


                                        s/Joe B. McDade
                              _____
                                   JOE BILLY McDADE
                              United States Senior District Judge