E-FILED
Friday, 14 September, 2018  06:27:16 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

NATURAL RESOURCES DEFENSE
COUNCIL, INC.; RESPIRATORY HEALTH
ASSOCIATION; and SIERRA CLUB, INC.,

Plaintiffs,

v.

ILLINOIS POWER RESOURCES
GENERATING, LLC,

Defendant.

Case No. 13-cv-01181
United States District Judge
Joe Billy McDade

Magistrate Judge
Thomas P. Schanzle-Haskins III

**PLAINTIFFS' OPPOSITION TO DEFENDANT ILLINOIS POWER
RESOURCES GENERATING, LLC'S MOTION TO EXCLUDE
THE TESTIMONY OF DR. JOEL SCHWARTZ**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INDEX OF EXHIBITS ....................................................................................................... iv

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

ARGUMENT .................................................................................................................... 5

I.     Dr. Schwartz's opinions about the excess deaths attributable to the Edwards Plant's failure to install needed pollution controls are relevant ...................................................... 5

     A.     Dr. Schwartz properly based his risk assessment on the excess $PM_{2.5}$ pollution in Peoria that is attributable to IPRG's Clean Air Act violations ............................... 6

     B.     Dr. Schwartz properly relied on literature concerning the relationship between premature death and $PM_{2.5}$ pollution generally, and properly refused to assume that coal fly ash particles are less toxic than other particles ................................... 7

     C.     Dr. Schwartz properly relied on epidemiological data collected across the nation, and did not limit his review to Peoria or the central United States ........................ 9

II.     Dr. Schwartz's opinions about the excess deaths attributable to the Edwards Plant's failure to install needed pollution controls are reliable ....................................................... 11

     A.     Dr. Schwartz properly assumed that all $PM_{2.5}$ is equally toxic and used a concentration-response curve that reflects this assumption .................................. 12

     B.     Dr. Schwartz properly used a concentration-response curve based on national data ...................................................................................................... 12

     C.     Dr. Schwartz's concentration-response curve is reliable even though, for reasons he explained, he did not present confidence intervals for its slope ...................... 13

     D.     Dr. Schwartz properly applied a linear concentration-response curve that assumes there is some health risk associated with any level of $PM_{2.5}$ exposure ................ 15

CONCLUSION .................................................................................................................. 16

i

# TABLE OF AUTHORITIES

**Cases**

*Bielskis v. Louisville Ladder, Inc.*,
    663 F.3d 887 (7th Cir. 2011) ........................................................................ 12

*C.W. ex rel. Wood v. Textron, Inc.*,
    807 F.3d 827 (7th Cir. 2015) ................................................................... 7, 13

*Daubert v. Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) .................................................................. 5, 14

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ................................................................................ 5, 16

*eBay, Inc. v. MercExchange LLC*,
    547 U.S. 388 (2006) ........................................................................................ 5

*Gayton v. McCoy*,
    593 F.3d 610 (7th Cir. 2010) ........................................................................ 11

*Krik v. Exxon Mobil Corp.*,
    870 F.3d 669 (7th Cir. 2017) ........................................................................ 16

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................................................... 11

*Metavante Corp. v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010) .......................................................................... 1

*NRDC v. Texaco Refining & Mktg., Inc.*,
    800 F. Supp. 1 (D. Del. 1992) ........................................................................ 6

*Ortiz v. City of Chicago*,
    656 F.3d 523 (7th Cir. 2011) .......................................................................... 1

*Smith v. Ford Motor Co.*,
    215 F.3d 713 (7th Cir. 2000) .......................................................................... 5

*Stollings v. Ryobi Techs., Inc.*,
    725 F.3d 753 (7th Cir. 2013) ........................................................................ 12

*United States v. Westvaco Corp.*,
    00-cv-2602-MJG, 2015 WL 10323214 (D. Md. Feb. 26, 2015) ....................................... 11

**Statutes**

42 U.S.C. § 7413(e)(1) ............................................................................................ 6

**Local Rules**

L.R. 7.1(D)(1) ............................................................................................................ 6

**INDEX OF EXHIBITS**

| Unsealed Exhibits | Letter |
|---|---|
| January 17, 2018 Expert Report of Dr. Joel Schwartz | BA |
| Excerpts from U.S. EPA, Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate Matter, EPA-452/R-12-005 (Dec. 2012) | BB |
| Excerpts from U.S. EPA, Regulatory Impact Analysis for the Proposed Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units, EPA-452/R-18-006 (Aug. 2018) | BC |
| Excerpt from 2610 Highly Cited Researchers (h>100) according to their Google Scholar Citations Public Profiles, http://www.webometrics.info/en/hlargerthan100 (accessed Sept. 13, 2018) | BD |
| h-index, Wikipedia, https://en.wikipedia.org/wiki/H-index (accessed Sept. 6, 2018) | BE |
| May 7, 2018 Expert Rebuttal Report of Dr. Joel Schwartz | BF |
| Excerpts from January 17, 2018 Expert Report of Dr. H. Andrew Gray | BG |
| August 27, 2018 Supplement to Expert Report and Rebuttal Report of Dr. Joel Schwartz | BH |
| Excerpts from Transcript of June 27, 2018 Deposition of Ralph Roberson | BI |
| Excerpts from Transcript of June 27, 2018 Deposition of Dr. Lucy Fraiser | BJ |
| Excerpts from U.S. EPA, Integrated Science Assessment for Particulate Matter, EPA/600/R-08/139F (Dec. 2009) | BK |
| Excerpts from U.S. EPA, Regulatory Impact Analysis for the Final Clean Air Visibility Rule or the Guidelines for Best Available Retrofit Technology (BART) Determinations Under the Regional Haze Regulations, EPA-452/R-05-004 (June 2005) | BL |

June 25, 2018 Letter from Jared E. Knicley, counsel for Plaintiff Natural
Resources Defense Council, to counsel for Defendant Illinois Power                    BM
Resources Generating, LLC

**Sealed Exhibits**

Excerpts from January 17, 2018 Expert Report of Dr. Ranajit Sahu                      CA

Excerpts from May 7, 2018 Rebuttal Expert Report of Dr. Ranajit Sahu                  CB

Excerpts from March 21, 2018 Report of Lucy Fraiser                                   CC

## INTRODUCTION

Dr. Joel Schwartz is one of the world's leading experts on the health hazards of breathing air polluted with particulate matter 2.5 microns or less in diameter ($PM_{2.5}$). His testimony about the deaths and other harms attributable to the Edwards Plant's failure to install the pollution controls needed to avoid Clean Air Act violations is relevant to this Court's injunctive relief and civil-penalty determination: it bears on the seriousness of Defendant Illinois Power Resources Generating, LLC (IPRG)'s violations over the past decade and the considerable public benefits of requiring IPRG to come into compliance with the Act. Dr. Schwartz's testimony is also reliable: it is grounded in his decades of experience as a public-health researcher and risk assessor as well as the latest peer-reviewed literature on the dangers of $PM_{2.5}$.

The Seventh Circuit has made clear that admissibility determinations "should not supplant the adversarial process" under the Federal Rules. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (citation omitted); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011). IPRG's so-called relevance and reliability arguments boil down to contentions about how much weight this Court should give Dr. Schwartz's opinions. IPRG can, come trial, use admissible evidence and cross-examination to try to persuade this Court to discount Dr. Schwartz's testimony. But its motion to exclude his testimony is baseless.

## BACKGROUND

Dr. Schwartz is a Professor of Environmental Epidemiology at Harvard's School of Public Health and the Director of the Harvard Center for Risk Analysis. *See* Jan. 17, 2018 Expert Report of Dr. Joel Schwartz (Schwartz Report), Ex. BA, Appx. A, at 1. He has worked as a Senior Scientist with the U.S. Environmental Protection Agency (EPA), and served on numerous EPA, Centers for Disease Control, and National Academy of Science committees on the public-health impacts of pollution. *Id.* at 1-2. He has written more than seven hundred peer-reviewed

articles, more than one hundred of which explore the relationship between particulate matter and public health. *Id.* Appx. A, at 5-78. He authored many of the leading studies on the relationship between particulate matter and human health, including some referenced in EPA's most recent work on National Ambient Air Quality Standards (NAAQS) for $PM_{2.5}$ and pollution-control standards for coal-fired power plants. *See, e.g.*, Ex. BB, at 5-94 to 5-95, 5-99 to 5-100, 5-107; Ex. BC, at 4-57 to 4-58, 4-60. He is among the most influential researchers of our time.[1]

Dr. Schwartz addressed several topics in his work for the remedy phase of this case, including the scientific consensus that death rates increase with $PM_{2.5}$ exposure; other serious health consequences of $PM_{2.5}$ exposure; the scientific consensus that there is no "threshold" for adverse health effects from $PM_{2.5}$ exposure; and the scientific basis for using risk assessment to estimate the number of premature deaths (or avoided deaths) attributable to decisions that affect $PM_{2.5}$ levels in the ambient air. *See* Schwartz Report 6-67; May 7, 2018 Expert Rebuttal Report of Dr. Joel Schwartz (Schwartz Rebuttal), Ex. BF, at 2-42.

Most importantly for purposes of IPRG's motion to exclude, Dr. Schwartz also conducted a quantitative risk assessment.[2] The risk assessment estimated how many premature deaths and hospital admissions could have been avoided in the greater Peoria area if the Edwards Plant had installed, by the start of the liability period, the pollution controls Plaintiffs' engineering expert

---

[1] Dr. Schwartz's *h*-index, a measure of the impact of an academic's research, is above 100. *See* Highly Cited Researchers List, Ex. BD, at 3, *available at* http://www.webometrics.info/en/hlargerthan100 (accessed Sept. 6, 2018) (ranked list of researchers with the highest h-indices); Wikipedia *h*-index entry, Ex. BE, at 1, *available at* https://en.wikipedia.org/wiki/H-index (accessed Sept. 6, 2018); *see also* Schwartz Report, Appx. A, at 5. For context, just over 100 people—worldwide, and across all relevant disciplines and timeframes—have higher *h*-indices. *See* Ex. BD, at 1-3.

[2] IPRG asserts that "*none* of [Dr. Schwartz's] opinions are admissible," IPRG's Mot. to Exclude Testimony of Joel Schwartz (Mot.), ECF No. 183, at 2, but its arguments focus on specific assumptions he made and information he used for his risk assessment.

has concluded are needed to avoid or substantially reduce the Edwards Plant's Clean Air Act violations. Schwartz Report 68-82; Schwartz Rebuttal 26-43. It also estimated how many premature deaths and hospital admissions would be avoided in the future if the Edwards Plant installed those same types of pollution controls. Schwartz Report 82; Schwartz Rebuttal 43.

Dr. Schwartz's risk assessment incorporated three kinds of information, each of which is a standard element in risk assessments for pollutants like $PM_{2.5}$. Schwartz Report 70-71.

First, Dr. Schwartz accounted for the population within the study area—here, the area surrounding the Edwards Plant—and that population's baseline mortality rate. *See id.* at 70-72.

Second, Dr. Schwartz accounted for the predicted difference in $PM_{2.5}$ pollution levels in the study area between the status quo—operation of the Edwards Plant with its current pollution controls—and alternative scenarios—operation of the Plant with either baghouses or new electrostatic precipitators (ESPs) installed. *See id.* at 71-72. For this part of his analysis, Dr. Schwartz relied on modeling developed by Plaintiffs' air-dispersion expert, Dr. Andrew Gray, *see id.*, who modeled estimated $PM_{2.5}$ concentrations using $PM_{2.5}$ emissions estimates provided by Plaintiffs' engineering expert Dr. Ranajit Sahu, *see* Jan. 17, 2018 Expert Report of Dr. H. Andrew Gray, Ex. BG, at 24-31, Appx. B (air-dispersion modeling results for each pollution-control scenario); Jan. 17, 2018 Expert Report of Dr. Ranajit Sahu (Sahu Report), Ex. CA, at 42-47 (emission estimates for each scenario).

Third, Dr. Schwartz accounted for the mathematical relationship, based on the epidemiological literature, between changes in the levels of $PM_{2.5}$ pollution in the ambient air and changes in mortality rate. *See* Schwartz Report 71. This relationship is known as a concentration-response curve and often expressed as a numerical "slope." *See id.* To develop his concentration-response curve for the Edwards risk assessment, Dr. Schwartz followed the

established epidemiological practice of describing the relationship between $PM_{2.5}$ concentrations and mortality rate as linear. *See id.* at 35-38, 68; Schwartz Rebuttal 27. He selected a slope of 1.06%, meaning that under his risk assessment mortality rates in the Peoria area would increase by 1.06% with each one-microgram-per-cubic-meter increase in the ambient concentration of $PM_{2.5}$. *See* Schwartz Report 79-81. As Dr. Schwartz noted in his reports, his 1.06% slope is firmly based in the epidemiological literature: it is the average of the slopes developed by independent experts for EPA in 2006; it is around the midpoint of the slopes found in two of the seminal studies linking $PM_{2.5}$ exposure and premature death; and it has been used in other peer-reviewed risk assessments. *See id.* at 79-80; Schwartz Rebuttal 35. It was both a reasonable and conservative choice for his risk assessment, given that newer studies have derived even higher slopes—that is, shown that mortality rates increase more sharply with increases in airborne $PM_{2.5}$ pollution. *See* Schwartz Rebuttal 39-40, 42-43; Aug. 27, 2018 Supplement to Expert Report and Rebuttal Report of Dr. Joel Schwartz (Schwartz Supplement), Ex. BH, at 1-2.

The concentration-response curve Dr. Schwartz applied in his risk assessment was linear, meaning that the estimated increase in risk associated with a given increase in $PM_{2.5}$ is the same at any point on the curve. It also had no threshold, meaning there is no level of $PM_{2.5}$ below which there is no increased risk for mortality. *See* Schwartz Report 68-69; *see also id.* at 34. As a result, as Dr. Schwartz explained, "any increase in particle concentrations in downwind communities of an emission source will result in an increase in the death rate in those communities." *Id.* at 38; *see also* Schwartz Rebuttal 17. Those increases in mortality may be small, if the increases in $PM_{2.5}$ concentrations are small. But they will never be zero. Schwartz Report 38. This is a necessary implication of the fact that the curve is linear and has no threshold. Schwartz Rebuttal 17.

Dr. Schwartz applied the information and assumptions described above to estimate that there would have been 2.3 fewer deaths in the Peoria area during the liability period, had Edwards installed the baghouses necessary to avoid its Clean Air Act violations. *Id.* at 42.[3]

## ARGUMENT

I.      **Dr. Schwartz's opinions about the excess deaths attributable to the Edwards Plant's failure to install needed pollution controls are relevant**

The relevance standard "is a liberal one." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993). Expert testimony is relevant so long as it "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (explaining that relevance hinges on "whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case"). Dr. Schwartz's opinions logically advance material aspects of the major remedies Plaintiffs propose for IPRG's Clean Air Act violations.

With respect to permanent injunctive relief, the relationship between PM$_{2.5}$ pollution and human health is material to the interest of Plaintiffs, their members, and the general public in the new pollution controls that are needed to end (as to baghouses) or meaningfully reduce (as to new ESPs) violations at the Edwards Plant.[4] The relationship between PM$_{2.5}$ pollution and human

---

[3] For his rebuttal report, Dr. Schwartz re-ran his calculations and revised his premature-death estimates to account for revised PM$_{2.5}$ pollution modeling for the underlying pollution-control scenarios provided by Plaintiffs' air-dispersion expert, Dr. Gray. *See* Schwartz Rebuttal 42. The revisions have no bearing on the aspects of his risk-assessment methodology that IPRG attacks. Those were unchanged in his rebuttal report.

[4] *See eBay, Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006) (permanent injunction test accounts for injury and harm to plaintiffs and the public interest); Aug. 23, 2016 Order & Opinion, ECF No. 124, 13-20 (discussing some of Plaintiffs' members' interests in limiting their exposure to illegal pollution from Edwards); Sahu Report 41-42 (Plaintiffs' engineering expert's testimony on how baghouses and new ESPs would improve Edwards' opacity performance and curb its violations and PM$_{2.5}$ pollution).

health is also material to the seriousness of IPRG's violations, one of the factors this Court must

consider in setting the civil penalty. *See* 42 U.S.C. § 7413(e)(1); *NRDC v. Texaco Refining &*

*Mktg., Inc.*, 800 F. Supp. 1, 23-24 (D. Del. 1992) (citing, as evidence of seriousness under the

Clean Water Act's analogous civil-penalty factor, expert testimony that some of defendants'

illegal pollution had threatened the Delaware River's ecosystem by contaminating sediments,

water, and plant and animal life), *rev'd on other grounds*, 2 F.3d 93 (3d. Cir. 1993).

Each facet of Dr. Schwartz's risk assessment that IPRG attacks as "irrelevant" is properly

tailored to inform this Court's consideration of the seriousness of IPRG's violations and the

public's interest in the injunctive relief needed to end those violations. The testimony is relevant.

### A.    Dr. Schwartz properly based his risk assessment on the excess $PM_{2.5}$ pollution in Peoria that is attributable to IPRG's Clean Air Act violations

Dr. Schwartz did not base his opinions on "*all* $PM_{[2.5]}$ emitted by Edwards," as IPRG

claims. Mot. 5. He based his opinions on comparative estimates, developed by Plaintiffs'

engineering and air-dispersion experts, of how much less $PM_{2.5}$ pollution Edwards would have

released had it installed the controls needed to avoid (as to baghouses) or meaningfully reduce

(as to new ESPs) its violations during the liability period. Schwartz Rebuttal 32.

That was not just a relevant approach to estimating the harmful pollution caused by the

violations, but also the only reasonable one. As Dr. Schwartz understood and Plaintiffs'

engineering expert has explained, baghouses and new ESPs are generally designed to operate and

curb $PM_{2.5}$ emissions whenever the power plant is running, not just when the plant is about to

violate its pollution limits. July 12, 2018 Dep. of Joel Schwartz (Schwartz Dep.), Mot. Ex. A,

ECF No. 183-1, at 182:2–183:5, 218:21–219:6; May 7, 2018 Rebuttal Expert Report of Dr.

Ranajit Sahu, Ex. CB, at 43-44. IPRG has never identified, and Plaintiffs are unaware of, any

alternative technology that would have kicked in only when the Edwards Plant was about to

violate the Clean Air Act and then curbed the Plant's emissions just enough to avoid the violation. *See, e.g.*, June 15, 2018 Dep. of Ralph Roberson, Ex. BI, at 242:12–245:13. Dr. Schwartz did not try to model the health effects of installing this hypothetical pollution-control technology. That is because, as he explained in his rebuttal report and again at his deposition, "the only valid comparisons for a quantitative risk assessment are between options *that can be taken*." Schwartz Dep. 220:9-11 (emphasis added); *see also id.* at 221:1-5; Rebuttal Report 32.[5]

> **B.    Dr. Schwartz properly relied on literature concerning the relationship between premature death and PM$_{2.5}$ pollution generally, and properly refused to assume that coal fly ash particles are less toxic than other particles**

Dr. Schwartz's assumption that PM$_{2.5}$ particles from different sources are equally toxic is consistent with the scientific literature, some of IPRG's own expert testimony, and EPA's practice in its PM$_{2.5}$ risk assessments. *Contra* Mot. 6-8.

Dr. Schwartz did not use a concentration-response curve specific to PM$_{2.5}$ from coal-fired power plants (as IPRG suggests he should have), because there is not a distinct curve for PM$_{2.5}$ from coal plants. As Dr. Schwartz explained in his reports, the current literature does not support risk-assessment approaches that ascribe different levels of toxicity to PM$_{2.5}$ particles from different sources.[6] Schwartz Report 40; Schwartz Rebuttal 37-38. Considered collectively, the differential-toxicity studies show that all types of PM$_{2.5}$ from combustion processes "are toxic and of roughly similar toxicity." Schwartz Rebuttal 38. Any difference found in one study tends

---

[5] Dr. Schwartz's comment that "the illegal thing[] is not having the right control technology," Mot. 5, is immaterial. Legal interpretation is the Court's domain. Dr. Schwartz's potential confusion on a legal point does not render his scientific opinions irrelevant.

[6] IPRG's motion attaches a declaration that presents disputed opinion testimony as if it is undisputed fact, without citing supporting materials. *See* Decl. of Lucy Fraiser, ECF No. 183-4. Because this kind of declaration "amounts to nothing more than the *ipse dixit* of the expert," the Court should disregard it. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015).

to "wash[] out" when considered in light of the others.[7] Schwartz Dep. 26:6-8; *id.* at 26:5-6 (explaining that there is no "consistency in the results"). IPRG's expert, Dr. Lucy Fraiser, agrees that there is "uncertainty as to, whether certain chemical components of [particulate matter] are more harmful to human health than others." Fraiser Report 41 (quoting Schwartz Report 40).

Dr. Schwartz's assumption that all $PM_{2.5}$ particles are equally toxic tracks EPA's risk-assessment practice. *See* Schwartz Rebuttal 37-38. In its last rulemaking for the $PM_{2.5}$ NAAQS, for example, EPA "assume[d] that all fine particles, regardless of their chemical composition, are equally potent in causing premature mortality" because "the scientific evidence is not yet sufficient to allow differentiation of effect estimates by particle type." Ex. BB, at ES-11. EPA based its assumption on the results of its 2009 peer-reviewed Integrated Science Assessment for Particulate Matter. *Id.* In that Integrated Science Assessment, EPA concluded—after a lengthy review of the extant literature—that while "many constituents of $PM_{2.5}$ can be linked with multiple health effects . . . the evidence is not yet sufficient to allow differentiation of those constituents or sources that are more closely related to specific outcomes." Ex. BK, at 2-17. In its 2018 proposal to repeal the Clean Power Plan, which *focuses* on pollution from coal plants, EPA assumed again that all $PM_{2.5}$ particles are equally toxic. *See* Ex. BC, at 4-25.

It is immaterial that, as IPRG points out, the $PM_{2.5}$ pollution in our air is a blend of particles from various sources and that some of those particles' properties may vary according source. *See* Mot. 6-8. What matters for risk-assessment purposes is whether the scientific

---

[7] IPRG has never substantiated its claim that Edwards' $PM_{2.5}$ pollution is mainly "crustal material" (a generic term for natural material that originated in the Earth's crust, such as soil and road dust, *see* Ex. BK, at 2-28). *See* Mot. 7. Dr. Fraiser provided no support for this claim. *See* Fraiser Decl. ¶ 14; Mar. 21, 2018 Expert Report of Lucy Fraiser (Fraiser Report), Ex. CC, at 30. At her deposition, she admitted she did not know the composition of the fly ash emitted from Edwards. June 27, 2018 Dep. of Lucy Fraiser, Ex. BJ, at 236:16-21.

literature shows that PM$_{2.5}$ pollution from coal plants is less toxic than other forms. Because it does not, Dr. Schwartz used a concentration-response curve that applies to PM$_{2.5}$ generally to assess the risks presented by the PM$_{2.5}$ pollution from the Edwards Plant. IPRG has never identified a curve it considers better suited for this purpose. Dr. Schwartz's approach was relevant and scientifically appropriate.

### C.   Dr. Schwartz properly relied on epidemiological data collected across the nation, and did not limit his review to Peoria or the central United States

Dr. Schwartz's use of a concentration-response curve based on national data was also consistent with the scientific literature and EPA's risk-assessment practice. *Contra* Mot. 8-11. He did not use a Peoria-specific curve because the literature does not support that approach. He explained in his rebuttal report that there is "little consistency" across studies "as to what regions of the United States might have higher or lower slopes" for a PM$_{2.5}$ concentration-response curve. *See* Schwartz Rebuttal 38. The lack of consistency across studies precludes use of region-specific concentration-response curve, for the same reasons just discussed in response to IPRG's suggestion that Dr. Schwartz should have used a curve specific to coal plants. *Id.*

Dr. Schwartz's approach once again tracks EPA's risk-assessment practice. In its last PM$_{2.5}$ NAAQS rulemaking, for example, EPA assumed that concentration-response curves "based on national studies are representative for exposures and populations in California." Ex. BB, at 1-13; *see also* Ex. BL, at 3-15 to 3-16 & tbl.3-6, 4-26 to 4-27 & tbl.4-7 (applying the same concentration-response curve to the eastern and western regions of the United States when assessing health benefits of the Clean Air Visibility Rule).

Here again, IPRG's factual points are immaterial. It is true that some studies show different concentration-response slopes for different cites or regions, and that studies that focus on particular U.S. regions do not always show a statistically significant association between

PM$_{2.5}$ concentrations and premature death. *See* Mot. 8-9. But as Dr. Schwartz explained, the relevant question is whether those different studies reflect real interregional differences or just statistical noise. *See* Schwartz Dep. 235:6-12; *see also id.* at 241:13-21. The literature does not provide a consistent answer.[8] *See* Schwartz Rebuttal 38.

The national concentration-response curve Dr. Schwartz used was accordingly the relevant and appropriate one. As with its toxicity argument, IPRG has not identified any available and more-appropriate alternative. The logical implication of IPRG's argument is that Plaintiffs need to conduct a new, multi-year epidemiological study of tens of thousands of people in the Peoria region before this Court can even consider expert testimony showing that Edwards' PM$_{2.5}$ pollution had any effect on public health in Peoria. This is inconsistent with the scientific consensus that PM$_{2.5}$ pollution causes premature deaths. *See* Ex. BK, at 2-12; *accord* Schwartz Report 3-10. And it is inconsistent with EPA's approach to PM$_{2.5}$ pollution, in which the agency has repeatedly relied on the results of national studies to estimate the health benefits of reduced ambient PM$_{2.5}$ concentrations in smaller regions of the country.

---

[8] The study IPRG cites, Mot. 9, underscores the consistency issue that led Dr. Schwartz to use a concentration-response curve based on nationwide data. That study found no statistically significant relationship between PM$_{2.5}$ and early deaths when looking solely at the "central" region of the United States (which includes Peoria). *See* Schwartz Dep. 231:23–232:2. But the study found a statistically significant relationship between PM$_{2.5}$ concentrations and early death based on the dataset for the entire nation, which includes data from the central region. *See id.* 232:8-23. The study's finding that there was no statistically significant relationship between PM$_{2.5}$ concentrations and early deaths in the central region does not, as IPRG suggests, prove there is no relationship. Rather, the average relationship for the central region and entire country were almost identical, *see id.* at 232:8-16 (central hazard ratio of 1.2, national hazard ratio of 1.19), but the relationship in the central region was not statistically significant, in Dr. Schwartz's opinion, because it had a "smaller sample size," *id.* at 233:13-16. Thus, the study shows that the relationship between PM$_{2.5}$ concentrations and premature mortality in the central region is real and "about the same as the national average." *Id.* at 233:10-12.

As Plaintiffs will explain in more depth in their forthcoming response to IPRG's motion for partial summary judgment, *see* ECF No. 180, IPRG's argument would also set a far higher bar than Congress intended for Clean Air Act remedies.[9] Courts charged with enforcing the Act have not hesitated to rely on general evidence about the health effects of $PM_{2.5}$ exposure to conclude that illegal emissions from a facility threatened and harmed public health. *See, e.g.*, *United States v. Westvaco Corp.*, 00-cv-2602-MJG, 2015 WL 10323214, at *9 (D. Md. Feb. 26, 2015) (concluding that "precise determination of the adverse environmental effect [from $PM_{2.5}$] is impossible," but finding that "at a minimum, the excess emissions [here] caused negative health effects [and] an increased risk of premature mortality to humans exposed to $PM_{2.5}$").

## II. Dr. Schwartz's opinions about the excess deaths attributable to the Edwards Plant's failure to install needed pollution controls are reliable

The reliability standard for expert testimony is "flexible." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). As IPRG concedes, this Court can use any number of factors to assess reliability—including the "level of acceptance within the relevant [scientific] community"—and has "wide latitude in . . . determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." Mot. 11; *see Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). So long as Dr. Schwartz used a "valid and properly applied methodology" to assess the public-health impacts of IPRG's Clean Air Act violations, arguments that attempt to cast

---

[9] IPRG's August 31 summary judgment motion cross-references its motion to exclude, and the two motions rest on the same false premises about the forms and evidence of harm cognizable under the Clean Air Act. *See* ECF No. 180, at 15 n.3. Plaintiffs will respond to the summary judgment motion by next Friday, September 21, *see* L.R. 7.1(D)(1) (allowing 21 days to respond to summary judgment motions). If the Court is disinclined to deny the motion to exclude on the papers, Plaintiffs request the Court defer ruling until it has had the opportunity to consider Plaintiffs' response to IPRG's summary judgment motion, and request that the Court schedule the motion to exclude for oral argument concurrent with any argument on summary judgment.

doubt on his conclusions go (at most) to the weight this Court gives Dr. Schwartz's testimony—

not to its admissibility. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765-66 (7th Cir. 2013).

Each facet of Dr. Schwartz's risk assessment that IPRG attacks as "unreliable" is

grounded in the epidemiological literature. The assumptions IPRG challenges are the same ones

EPA makes in its own risk assessments for $PM_{2.5}$. Dr. Schwartz's testimony is reliable.

### A.     Dr. Schwartz properly assumed that all $PM_{2.5}$ is equally toxic and used a concentration-response curve that reflects this assumption

As discussed at Part I.B, Dr. Schwartz's assumption that $PM_{2.5}$ from all sources is equally

harmful to human health is consistent with the epidemiological literature, EPA's practice, and

some of IPRG's own expert's testimony. There is overwhelming consensus that $PM_{2.5}$ causes

premature mortality, and there is no consistent scientific evidence that $PM_{2.5}$ from coal plants is

any less toxic than $PM_{2.5}$ from any other source. Schwartz Report 40; Schwartz Rebuttal 37-38.

Dr. Schwartz's assumption that all $PM_{2.5}$ particles are equally toxic was not merely a relevant

and appropriate assumption, but the only defensible one.

*Bielskis v. Louisville Ladder, Inc*., 663 F.3d 887 (7th Cir. 2011), cited by IPRG, *see* Mot.

14, is not to the contrary. In that case, the expert submitted "nothing" demonstrating there would

be "any consensus" in his field for his opinions. *Bielskis*, 663 F.3d at 895. As Dr. Schwartz

explained in his reports and at his deposition, his approach is supported by EPA's consistent

practice in risk assessments and the peer-reviewed literature in his field. *See supra* 7-9.

### B.     Dr. Schwartz properly used a concentration-response curve based on national data

As discussed at Part I.C, Dr. Schwartz's use of a concentration-response curve based on

national data is consistent with the scientific literature and EPA practice. IPRG's assertion that

Dr. Schwartz's curve is unreliable because national-level trends may not apply at smaller

geographic scales,[10] *see* Mot. 12-13, ignores both that no Peoria-specific curve exists and that there is no scientific basis for creating one. *Supra* 9-11. Dr. Schwartz's approach to this issue was not only proper and reliable, but was the only reliable way to proceed.

### C.    Dr. Schwartz's concentration-response curve is reliable even though, for reasons he explained, he did not present confidence intervals for its slope

As discussed in the Background section, Dr. Schwartz used a concentration-response curve with a slope of a 1.06% to estimate the number of premature deaths attributable to the Edwards Plant's failure to install the pollution controls needed to end or (in the alternative) meaningfully reduce its violations. *Supra* 3-4. Dr. Schwartz gave several reasons for selecting this slope. First, the 1.06% slope was the average of the slopes identified by twelve independent experts in an EPA expert interview process in 2006. Schwartz Report 80. Second, the 1.06% slope is almost exactly the midpoint of the slopes from two of the seminal, long-running studies into mortality effects of $PM_{2.5}$. *See id.* at 81; Schwartz Rebuttal 33. Third, an EPA advisory committee had recommended taking this approach to determining a central slope for use in risk assessments. *See* Schwartz Report 81; Schwartz Rebuttal 33-34. And finally, the 1.06% slope had been adopted by the United Nations and used in peer-reviewed risk assessments published in premier scientific journals. *See* Schwartz Report 80; Schwartz Rebuttal 35.

IPRG's claim that Dr. Schwartz's risk assessment is unreliable because he did not present confidence intervals for his slope, Mot. 13-14, is baseless. IPRG cites no authority for the idea that the admissibility of expert testimony turns on the expert's presentation of confidence intervals, and that proposition does not square with the rule that the existence of a "potential or known rate of error" is just one of many factors that *may* inform a reliability assessment. *Id.* at

---

[10] This claim is based on a blanket statement in Dr. Fraiser's declaration that lacks any citations or references, *see* Fraiser Decl. ¶ 23, and thus should be disregarded by the Court, *see* *C.W. ex rel. Wood*, 807 F.3d at 837.

13

11; *see also Daubert*, 43 F.3d at 1316-17 & n.4 (concluding that this factor need not apply "in every case" and may also be "difficult or impossible to apply" to certain kinds of testimony).

With respect to Dr. Schwartz's reports, there was no clear way for him to define confidence intervals given the inputs he used to determine the concentration-response slope for his risk assessment here. Schwartz Dep. 223:11-19.[11] He therefore presented only his 1.06% slope, while also explaining that this slope was conservative—meaning that it likely understates the health effects of increased $PM_{2.5}$ concentrations, given that studies published over the last decade have often found much higher slopes.[12] Schwartz Rebuttal at 39-40, 43.

Dr. Schwartz also explained that the most statistically sound way to determine both a slope and a confidence interval is through a "meta-analysis" of all relevant studies regarding the relationship between $PM_{2.5}$ and mortality. Schwartz Dep. 223:19-21. As it happens, Dr. Schwartz had conducted that exact meta-analysis for a separate academic paper by the time he wrote his remedy reports for this case. He did not, however, cite the meta-analysis in his reports because his paper had not yet been accepted for publication by a peer-reviewed journal, and the practice in his field is to cite only papers accepted in peer-reviewed journals. *Id.* at 223:24–224:3.

Dr. Schwartz's paper about the meta-analysis was accepted for publication several weeks before his deposition, and Plaintiffs produced a pre-publication copy to IPRG. *See* Ex. BM. At his deposition, Dr. Schwartz explained that if he were to conduct a risk assessment for this case today, he would use the slope from the meta-analysis as well as its confidence interval. Schwartz

---

[11] IPRG's claim that had Dr. Schwartz included a confidence interval "he would have to conclude that he does not know" whether Edwards' $PM_{2.5}$ pollution "actually increases health risks of people in Peoria," Mot. 13, is unsubstantiated by its expert. In any event, Dr. Schwartz testified that, even without determining a specific confidence interval, he knew that the increased mortality risks within such an interval would not "include zero." Schwartz Dep. 225:8-23.

[12] For example, had Dr. Schwartz used the slope from one of those newer studies, his estimates of excess deaths would have been almost 30% higher. *See* Schwartz Rebuttal 43.

Dep. 224:5-7. After his deposition, he produced a brief written supplement to his reports that shows what the results of his risk assessment would have been had he used the meta-analysis slope and confidence interval. *See* Schwartz Supplement 1. He explained that "[e]ven the lower endpoint for the meta-analysis's confidence interval [1.09%] is higher than the slope of 1.06% that [he] used for [his] model in this case," *id.* which confirms his earlier conclusion that he has "taken a conservative approach in using a slope of 1.06%" for his risk assessment, *id.* at 2.

In short, as Dr. Schwartz explained, the 1.06% slope he used for his concentration-response curve was grounded in the epidemiological literature linking $PM_{2.5}$ to premature deaths. It was also a conservative choice because more recent studies like his meta-analysis and those discussed in his rebuttal report support the use of steeper concentration-response slopes. His decision not to use the meta-analysis, which would have allowed him to present a confidence interval with his risk assessment (and would have provided higher premature-death estimates because of its steeper slope, *see* Schwartz Supplement 2), was well grounded in his field's practice of citing papers only once they have been accepted for peer-review publication.

### D.     Dr. Schwartz properly applied a linear concentration-response curve that assumes there is some health risk associated with any level of $PM_{2.5}$ exposure

As discussed in the Background section of this brief, the concentration-response curve Dr. Schwartz used for his risk assessment was linear. *Supra* 4. EPA and the National Academy of Sciences—among others—agree that concentration-response curves for long-term $PM_{2.5}$ concentrations and mortality are linear and have no discernable threshold. *See* Schwartz Report 33-35; Schwartz Rebuttal 2-4. This view is supported by the epidemiological data. *See* Schwartz Report 35-38; *see also* Ex. BK, at 2-25.

IPRG's suggestion that the changes in $PM_{2.5}$ concentrations at issue here are too small to translate into calculable health effects is belied by the very testimony it attacks: Dr. Schwartz

concluded that there were more premature deaths and hospitalizations in the Peoria area during the liability period than there would have been had the Edwards Plant installed the pollution controls needed to avoid or reduce its Clean Air Act violations. *See* Schwartz Rebuttal 42-43. EPA has calculated mortality effects from similar changes in PM₂.₅ concentrations. *See id.* at 17; *see also* Ex. BL, at 3-16 tbl.3-6 (showing reductions in PM₂.₅ concentrations for three pollution-control scenarios), 4-68 tbl.4-15 (estimating reductions in premature mortality for each scenario).

IPRG's citation to *Krik v. Exxon Mobil Corp.*, 870 F.3d 669 (7th Cir. 2017), *see* Mot. 15, is inapposite. The expert in *Krik* did not consider the plaintiff's level of exposure to asbestos at all, despite the "fundamental principle[]" that "illnesses like cancer are dose dependent." 870 F.3d at 674-75. Dr. Schwartz *did* consider, as one of its primary inputs to his risk assessment, the increases in PM₂.₅ pollution attributable to the Edwards Plant's failure to install the pollution controls the Plant needs to comply with the Clean Air Act. *Supra* 3, 6-7.

\* \* \*

The risk assessment Dr. Schwartz conducted for this case is reliable because it was informed by the scientific literature and accepted practices in his field and is consistent with EPA's approach to similar risk assessments. The risk assessment is also relevant to this Court's upcoming decisions about what injunctive relief to order and what civil penalties to impose. IPRG can use cross-examination and any admissible evidence it may have to try to cast doubt on Dr. Schwartz's testimony about the dangers of PM₂.₅. *See Daubert*, 509 U.S. at 596 (cross-examination and contrary evidence are the "traditional and appropriate means of attacking" admissible evidence). But IPRG cannot simply bar the introduction of relevant, reliable, and damaging evidence of how its Clean Air Act violations affect public health in the Peoria area.

**CONCLUSION**

IPRG's motion to exclude should be denied.

16

Respectfully submitted September 14, 2018,

s/ *Jared E. Knicley*
Jared E. Knicley (DC Bar No. 1027257)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Selena Kyle (IL Bar No. 6311573)
Ian Fisher (CO Bar No. 47858)
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7906
skyle@nrdc.org
(312) 995-5903
ifisher@nrdc.org

Ann Alexander (IL Bar No. 6278919)
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6190
aalexander@nrdc.org

*Counsel for Plaintiff Natural Resources Defense*
*Council*

s/ *Gregory E. Wannier*
Gregory E. Wannier (CA Bar No. 275349)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94110
(415) 977-5646
greg.wannier@sierraclub.org

Faith E. Bugel (IL Bar No. 6255685)
Attorney at Law
1004 Mohawk Road
Wilmette, IL 60091
(312) 282-9119
fbugel@gmail.com

*Counsel for Plaintiff Sierra Club*

17

s/ *Jeffrey Hammons*
Jeffrey Hammons (IL Bar No. 6324007)
Justin Vickers (IL Bar No. 6305129)
Scott Strand (MN Bar No. 147151)
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
jhammons@elpc.org
jvickers@elpc.org

*Counsel for Plaintiffs Sierra Club and Respiratory Health Association*

## CERTIFICATE OF COMPLIANCE

I hereby certify that that the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANT ILLINOIS POWER RESOURCES GENERATING, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. JOEL SCHWARTZ** complies with the type volume limitation set forth in Local Rule 7.1(D)(5). The opposition brief contains a total of 5,564 words.

s/ *Jared E. Knicley*
Jared E. Knicley

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2018, I caused the following to be served on all

parties' counsel via the Court's CM/ECF system:

**PLAINTIFFS' OPPOSITION TO DEFENDANT ILLINOIS POWER
RESOURCES GENERATING, LLC'S MOTION TO EXCLUDE
THE TESTIMONY OF DR. JOEL SCHWARTZ**

**DECLARATION OF JARED E. KNICLEY AND EXHIBITS BA THROUGH CC
(EXHIBITS CA THROUGH CC BEING FILED UNDER SEAL)**

**MOTION FOR LEAVE TO FILE UNDER SEAL**

s/ *Jared E. Knicley*
Jared E. Knicley