E-FILED
Friday, 21 September, 2018  07:15:47 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

NATURAL RESOURCES DEFENSE
COUNCIL, INC.; RESPIRATORY HEALTH
ASSOCIATION; and SIERRA CLUB, INC.,

Plaintiffs,

v.

ILLINOIS POWER RESOURCES
GENERATING, LLC,

Defendant.

Case No. 13-cv-01181
United States District Judge
Joe Billy McDade

Magistrate Judge
Thomas P. Schanzle-Haskins III

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT CONCERNING INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INDEX OF EXHIBITS ........................................................................................... vi

INTRODUCTION .................................................................................................1

RESPONSE TO IPRG'S STATEMENT OF MATERIAL FACTS ..............................................1

    Undisputed Material Facts ...............................................................................1

    Disputed Material Facts ..................................................................................2

    Undisputed Immaterial Facts ...........................................................................12

    Disputed Immaterial Facts ..............................................................................21

ADDITIONAL MATERIAL FACTS...........................................................................41

ARGUMENT ....................................................................................................45

I.     Evidence that a defendant is still violating and releasing illegal pollution is sufficient to establish harm, for purposes of injunctive relief under the Clean Air Act ..................................................................................................45

II.    IPRG's opacity violations at Edwards are causing harmful air pollution that warrants injunctive relief under the Clean Air Act ............................................48

III.   IPRG's opacity violations are causing irreparable harm ...................................51

IV.   Plaintiffs do not have to show that IPRG is violating Edwards' separate particulate limits to establish irreparable harm and the need for injunctive relief............52

V.    Plaintiffs do not have to show that IPRG's violations have caused or will cause a NAAQS exceedance to establish irreparable harm and the need for injunctive relief ...................................................................................................53

VI.   Although the Court need not reach these issues to deny IPRG's Motion, the balance of harms and public interest also weigh strongly in favor of injunctive relief ...................................................................................................56

    A.    The Court cannot credit IPRG's unsubstantiated claims that new pollution controls at Edwards are "financially untenable" ...................................57

B.      That IPRG does not want to pay to comply with the Clean Air Act is irrelevant to this Court's decision about what injunctive relief is warranted.................................................................................................58

CONCLUSION.................................................................................................................62

# TABLE OF AUTHORITIES

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell, AK,*
    480 U.S. 531 (1987) ................................................................................. *passim*

*Friends of the Earth v. Potomac Elec. Power Co.,*
    419 F. Supp. 528 (D.D.C. 1976)............................................................... 52

*Henderson v. May Dep't Stores Co.,*
    No. 06-C-1933, 2008 WL 2952322 (N.D. Ill. July 30, 2008) ......................... 56

*Idaho Conservation League v. Atlanta Gold Corp.,*
    879 F. Supp. 2d 1148 (D. Idaho 2012) ........................................................ 60

*In re Excel Innovations*, 502 F.3d 1086 (9th Cir. 2007) ...................................... 50

*Kleinman v. City of Austin,*
    310 F. Supp. 3d 770 (W.D. Tex. 2018) ........................................................ 61

*LaFleur v. Whitman,*
    300 F.3d 256 (2d Cir. 2002) .............................................................. 54, 55

*North Carolina ex rel. Cooper v. TVA,*
    593 F. Supp. 2d 812 (W.D.N.C. 2009), rev'd on other grounds, 615 F.3d 291
    (4th Cir. 2010)..................................................................... 13, 25, 55

*NRDC v. Outboard Marine Corp.,*
    692 F. Supp. 801 (N.D. Ill. 1988) ....................................................... 48, 49

*Nunez v. Gordon Food Serv., Inc.,*
    No. 1:16-CV-1077-JBM-JEH, 2017 WL 3610566 (C.D. Ill. Aug. 22, 2017) ................. 56

*Ohio Valley Envtl. Coalition, Inc. v. Hobet Mining, LLC,*
    723 F. Supp. 2d 886 (S.D.W. Va. 2010)....................................................... 47

*Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs,*
    528 F. Supp. 2d 625 (S.D.W. Va. 2007)................................................... 60, 63

*Pound v. Airosol Co., Inc.*, 498 F.3d 1089 (10th Cir. 2007)................................. 39

*Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.,*
    913 F.2d 64 (3d. Cir. 1990)................................................................... 60

*Pub. Interest Research Grp. of N.J., Inc. v. Top Notch Metal Finishing Co.,*
    No. CIV.A. 87-3894, 1987 WL 44393 (D.N.J. Nov. 6, 1987) ......................... 60

iv

*Pub. Interest Research Grp. of N.J. v. Yates Indus.*,
    757 F. Supp. 438 (D.N.J. 1991) ...................................................................... 47

*Sierra Club v. Energy Future Holdings Corp.*,
    No. 12-cv-108, 2014 WL 2153913 (W.D. Tex. Mar. 28, 2014)...................................... 51

*Sierra Club v. Tennessee Valley Authority*,
    592 F. Supp. 2d 1357 (N.D. Ala. 2009) ........................................................... 51

*Sierra Club v. Union Elec. Co.*,
    No. 4:14-cv-00408-AGF, 2014 WL 5783032 (E.D. Mo. Nov. 6, 2014) .......................... 52

*Sierra Club v. Franklin Cty. Power of Ill.*,
    546 F.3d 918 (7th Cir. 2008) ........................................................ 46-47, 49, 54

*Tennessee Clean Water Network v. Tennessee Valley Authority*,
    273 F. Supp. 3d 775 (M.D. Tenn. 2017)........................................................... 47

*United States v. Oakland Cannabis Buyers' Co-op.*,
    532 U.S. 483 (2001).......................................................................... 45, 53

*United States v. Westvaco Corp.*,
    CV MJG-00-2602, 2015 WL 10323214 (D. Md. Feb. 26, 2015) ................................... 55

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)............................................................................... 61

**Statutes**

42 U.S.C. § 7401(b) ............................................................................ 46, 52

42 U.S.C. § 7407(a) ............................................................................ 17, 18

42 U.S.C. § 7409 .................................................................................... 54

42 U.S.C. § 7409(a) ............................................................................ 53, 54

42 U.S.C. § 7409(b) ................................................................................. 53

42 U.S.C. § 7410(a) ........................................................................ 17, 18, 54

42 U.S.C. § 7413(e) ................................................................................. 58

42 U.S.C. § 7471 .................................................................................... 54

42 U.S.C. § 7602(k) ................................................................................................ 53, 54

42 U.S.C. § 7604(a)(1) .............................................................................................. 53

42 U.S.C. § 7604(f)(4) .............................................................................................. 54

**Regulations**

40 C.F.R. § 50.6 ...................................................................................................... 15

40 C.F.R. § 50.18 .................................................................................................. 53, 54

62 Fed. Reg. 38,652 (July 18, 1997) ........................................................................ 13

78 Fed. Reg. 3086 (Jan. 15, 2013) ........................................................................... 42

**State Regulations**

35 Ill. Admin. Code § 201.265 .................................................................................. 3

35 Ill. Admin. Code § 211.4130 .............................................................................. 28

35 Ill. Admin. Code § 211.4510 .............................................................................. 28

35 Ill. Admin. Code § 212.123 .............................................................................. 3, 26

35 Ill. Admin. Code § 212.124 .......................................................................... *passim*

**Local Rules**

C.D. Ill. R. 7.1 .................................................................................................. 6, 7, 36

## INDEX OF EXHIBITS

| Unsealed Exhibits | Letter |
|---|---|
| July 2, 2018 Deposition of Mr. J. Edward Cichanowicz (Excerpted) | DA |
| June 15, 2018 Deposition of Mr. Ralph L. Roberson (Excerpted) | DB |
| May 7, 2018 Expert Rebuttal Report of Dr. H. Andrew Gray (Excerpted) | DC |
| EPA Policy Assessment for the Review of the PM NAAQS (Excerpted) | DD |
| EPA RIA for the Final Transport Rule (Excerpted) | DE |
| June 27, 2018 Deposition of Dr. Lucy Fraiser (Excerpted) | DF |
| Preliminary Draft – Edwards Power Station CAAPP Permit Statement of Basis | DG |
| Plaintiffs' March 10, 2017 First Request for Production of Documents Relating to Remedy | DH |
| Defendant's May 1, 2017 Response to Plaintiffs' First Request for Production of Documents | DI |
| June 8, 2018 Deposition of Mr. Robert M. Lewis (Excerpted) | DJ |
| May 7, 2018 Expert Rebuttal Report of Mr. Jonathan S. Shefftz (Excerpted) | DK |
| EPA Compliance Assurance Monitoring Protocol for an ESP Controlling PM from a Coal-Fire | DL |
| January 17, 2018 Expert Report of Dr. H. Andrew Gray (Excerpted) | DM |
| EPA Table of Historical Particulate Matter NAAQS | DN |

| Sealed Exhibits | Letter |
|---|---|
| May 7, 2018 Expert Rebuttal Report of Dr. Ranajit Sahu (Excerpted) | EA |
| January 17, 2018 Expert Report of Dr. Ranajit Sahu (Excerpted) | EB |
| March 21, 2018 Expert Report of Mr. J. Edward Cichanowicz (Excerpted) | EC |

June 26, 2018 Deposition of Mr. Thomas R. Keeler (Excerpted)     ED

June 21, 2018 Deposition of Dr. Ranajit Sahu (Excerpted)     EE

March 21, 2018 Expert Report of Mr. Ralph Roberson (Excerpted)     EF

March 21, 2018 Expert Report of Dr. Anne E. Smith (Excerpted)     EG

March 21, 2018 Expert Report of Mr. Tony Schroeder (Excerpted)     EH

February 10, 2015 Dustex Proposal, IPR-IPRG-360863     EI

January 17, 2011 Burns & McDonnell, IPR-IPRG-352850     EJ

May 23, 2014 Dustex Proposal, IPR-IPRG-352925     EK

May 25, 2011 URS, IPR-IPRG-354186 (Excerpted)     EL

December 22, 2010 Burns & McDonnell, IPR-IPRG-352885     EM

December 16, 2014 Babcock & Wilcox, IPR-IPRG-395524     EN

November 30, 2017 Deposition of Edwards Maintenance Manager
William Henning (Excerpted)     EO

October 6, 2011 Email, Ex. R103 to Henning Dep., IPR-IPRG-23796     EP

October 10, 2011 Email, Ex. R104 to Henning Dep., IPR-IPRG-361568     EQ

October 13, 2011 Edwards Alternative Capex Solutions, Ex. R105 to
Henning Dep., IPR-IPRG-361545     ER

November 30, 2017 Deposition of Edwards Plant Manager Ted
Lindenbusch (Excerpted)     ES

December 21, 2017 Rule 30(b)(6) Deposition ot IPRG (Excerpted)     ET

Budget Forecast Lindenbusch, IPR-IPRG-093645     EU

March 21, 2018 Expert Report of Mr. Thomas R. Keeler     EV

March 21, 2018 Expert Report of Dr. Lucy Fraiser (Excerpted)     EW

Defendant's May 1, 2017 Objections and Answers to Plaintiffs'
Interrogatories     EX

# INTRODUCTION

There is substantial evidence that IPRG's Clean Air Act violations at Edwards are harming the environment and public health in and around Peoria. The facts sufficient to show that IPRG's violations are causing some harm that warrants injunctive relief under the Act are undisputed. IPRG's claims that there is "no evidence of harm" and that Plaintiffs "are not entitled to any injunctive relief" contradict its own experts' testimony, this Court's liability ruling, and the relevant authorities on what injuries are cognizable under the Clean Air Act and analogous environmental-protection laws. IPRG's secondary claims about the economic burdens of new pollution control are immaterial on summary judgment, unsubstantiated, and inadequate to overcome the strong presumption that injunctive relief is warranted whenever it is needed to end environmentally harmful violations and secure prompt compliance with the law.

This Court need not decide the precise contours of an injunction now, and some of the relevant evidence will be easier to weigh at trial. But injunctive relief is unquestionably an available and appropriate remedy for IPRG's harmful and ongoing Clean Air Act violations. IPRG's summary judgment motion should be denied.[1]

## RESPONSE TO IPRG'S STATEMENT OF MATERIAL FACTS[2]

**Undisputed Material Facts**

1.      Plaintiffs brought this lawsuit against Defendant Illinois Power Resources Generating, LLC ("IPRG") seeking to hold it responsible for alleged violations of the opacity

---

[1] Plaintiffs also request oral argument.

[2] This Response classifies as immaterial statements that are immaterial to the arguments IPRG includes in its Motion for Summary Judgment Concerning Injunctive Relief (Motion), and omits the subheadings within IPRG's Undisputed Facts section, which include no citations and sometimes mischaracterize the record.

and PM limitations in its permit for its coal fired power plant, Edwards Power Station ("Edwards"). (Doc. 1, 88.)

14.     PM$_{2.5}$ refers to particles with a nominal mean aerodynamic diameter of less than or equal to 2.5 μm. 40 C.F.R. § 50.18(a). PM$_{10}$ refers to particles with a nominal mean aerodynamic diameter of less than or equal to 10 μm. 78 Fed. Reg. at 3091; 40 C.F.R. § 50.6(c) (2013).

33.     Plaintiffs' expert, Dr. Ron Sahu, conducted a correlation of opacity to PM emissions at Edwards and used that correlation to estimate PM emissions at Edwards. (Sahu Dep. at 297:23-24, 298:1-20, relevant excerpts attached herein as Ex. 8.)

**Disputed Material Facts**

2.     On August 23, 2016, this Court entered an opinion and order, granting in part Plaintiffs' motion for partial summary judgment on liability on certain claims of opacity violations and, by presumption, PM violations between April 18, 2008 and June 30, 2014. (Doc. 124.)

**Response:**     Plaintiffs dispute this statement as a legal conclusion and to the extent it contradicts the August 23, 2016 Opinion & Order on Summary Judgment (Liability Order), ECF No. 124, which speaks for itself. In the Liability Order, the Court explained that Plaintiffs "rely upon the opacity exceedances established in the first two claims in order to establish a derivative violation of the particulate matter standards. *See* 35 Ill. Admin. Code § 212.124(d)(2)(A) (explaining that for certain power plants, opacity exceedances may also be deemed particulate matter exceedances)." Liability Order, ECF No. 124, at 5. The Court found § 212.124(d)(2) applied to the Plant during the relevant time period, Liability Order, ECF No. 124, at 27-33.

2

3.      The Court held that IPRG could not use the malfunction or breakdown exemptions in its permit for opacity events about which the Illinois Environmental Protection Agency ("IEPA") was not notified "as soon as possible during normal working hours" in accordance with condition 5(c) of Edwards' permit. (Doc. 124 at 39-46.)

**Response:**      Plaintiffs dispute this statement as a legal conclusion and to the extent it contradicts the Liability Order, ECF No. 124, which speaks for itself. The Court explained that

> Edwards' Permit imposes certain conditions on the plant's ability to operate during malfunction and breakdown, including requirements that "[t]he permittee . . . notify the Illinois EPA's Regional Office by telephone as soon as possible during normal working hours upon the occurrence of excess emission due to malfunctions or breakdowns," and "maintain records of excess emissions during malfunctions and breakdowns . . . [that] include . . . [t]he steps taken to prevent similar malfunctions or breakdowns. . . ." Permit Conditions 5(c), (d)(v), (Doc. 104-8 at 2, 3).

Liability Order, ECF No. 124, at 39-40. The Court noted that "Defendants conceded that these conditions in Permit Condition 5 were the sort that they needed to comply with in order to establish the prima facie defense provided by 35 Ill. Admin. Code § 201.265," Liability Order, ECF No. 124, at 40 n.13. After rejecting IPRG's notification arguments, the Court also noted that "It is unnecessary to resolve whether Edwards kept proper records of malfunctions and breakdowns for resolution of these motions." Liability Order, ECF No. 124, at 40 n.15.

40.      Dr. Sahu identified opacity exceedances in the post-liability period that Plaintiffs believe are not exempt under a defense or exemption provided under Edwards' operating permit or Illinois regulations. (Ex. 9 at 12-15; Sahu Exhibit K, discussed in Ex. 8 at 126-27 and attached here as Ex. 10.)

**Response:**      Plaintiffs dispute this statement to the extent it suggests that Dr. Sahu was the one identifying the post-liability period exceedances that were not exempt under the 8-minute exemption in 35 Illinois Administrative Code § 212.123(b), as that identification was made by

3

Plaintiffs. May 7, 2018 Expert Rebuttal Report of Dr. Ranajit Sahu (Sahu Rebuttal), Ex. EA, at

18-19; Pl. Ninth Supp, Objs. and Resps. to Def. First Set of Interrogs. Related to Remedy, Ex. 9

to Mot. (Pl. Supp. ROG Resp.), ECF No. 180-5, at 14-15; Pl. Opening Summ. J. Br., ECF No.

184-1, at 30-31. Plaintiffs note that the document attached as Exhibit 10 to IPRG's motion is

small and segmented to the point of being unreadable. *See* Ex. 10 to Mot., filed under seal at

ECF No. 182.

41.     Despite identifying those post-liability non-exempt opacity exceedances, Dr. Sahu

never determined the amount of PM associated with the opacity exceedances that he said are not

exempt. (Ex. 8 at 337:4 – 338:2.)

**Response:**

a.     Plaintiffs dispute this statement. Dr. Sahu determined the amount of particulate

matter associated with the Plant's opacity violations by developing and subtracting estimates of

how much less $PM_{2.5}$ pollution Edwards would have released had it installed the controls needed

to avoid (as to baghouses) or meaningfully reduce (as to new ESPs) its violations during the

liability period. Sahu Rebuttal, Ex. EA, at 43-44; Jan. 17, 2018 Expert Report of Dr. Ranajit

Sahu (Sahu Report), Ex. EB, at 42-47. Dr. Sahu concluded that Edwards would continue to

violate its opacity limit with its current equipment and that it needs baghouses to avoid, and new

ESPs to substantially reduce, its violating exceedances. Sahu Report, Ex. EB, at 5, 39-42; Sahu

Rebuttal, Ex. EA, at 7, 24-43. IPRG's experts did not disagree that Edwards will continue to

violate its opacity limits with its current equipment. July 2, 2018 Cichanowicz Dep., Ex. DA, at

108:19–109:16; June 15, 2018 Roberson Dep., Ex. DB, at 261:18–262:14; 264:1–265:17. Nor

did they identify any pollution-control equipment that they claim would allow Edwards to

eliminate further violating opacity exceedances. *See* July 2, 2018 Cichanowicz Dep., Ex. DA, at

4

108:19–109:16; June 15, 2018 Roberson Dep., Ex. DB, at 261:18–262:14; 264:1–265:17; *see also* Mar. 21, 2018 Expert Report of Mr. J. Edward Cichanowicz, Ex. EC, at 38, 44-48. Although IPRG's experts questioned whether baghouses would eliminate all opacity violations, they agreed that baghouses would improve the Plant's opacity performance. July 2, 2018 Cichanowicz Dep., Ex. DA, at 116:15–117:19, 142:9–147:16; June 26, 2018 Keeler Dep., Ex. ED, at 93:9–96:19.

    b.    Dr. Sahu concluded that once the necessary pollution controls are installed, they operate at all times; there is no pollution control device that can only be switched on when opacity is above 30%. Sahu Rebuttal, Ex. EA, at 43-44; June 21, 2018 Sahu Dep., Ex. EE, at 338:22–339:17. IPRG has never identified, and Plaintiffs are unaware of, any alternative technology that would have kicked in only when the Edwards Plant was about to violate the Clean Air Act and then curbed the Plant's emissions just enough to avoid the violation. *See, e.g.*, June 15, 2018 Roberson Dep., Ex. DB, at 242:12–245:13.

    c.    Dr. Gray performed dispersion modeling of emissions from Edwards to evaluate the various emission scenarios. May 7, 2018 Expert Rebuttal Report of Dr. H. Andrew Gray (Gray Rebuttal), Ex. DC, at 1. He explained, "[b]y running the model for every hour during the modeling period, and comparing the results to the base case, we obtain an estimate of the overall air quality benefits that would occur if either of those controls were in place." Gray Rebuttal, Ex. DC, at 3. Using the results of Dr. Gray's dispersion modeling, Dr. Schwartz performed a quantitative risk assessment to determine the number of premature deaths and hospitalizations in the Peoria area that would have been avoided had IPRG installed the pollution controls Dr. Sahu identified as necessary to avoid (baghouses) or substantially reduce (new ESPs) IPRG's Clean Air Act violations and increased $PM_{2.5}$ pollution. May 7, 2018 Expert Rebuttal Report of Dr. Joel

Schwartz, Ex. BF to Pl. Opp. to Def. Mot. to Exclude (Schwartz Rebuttal), ECF No. 193-7, at 32, 42-43.

43.    IPRG's expert Dr. Anne Smith calculated the amount of PM associated with both (a) opacity exceedances identified by the Court in its ruling on liability, and (b) a representative portion of the non-exempt opacity exceedances identified by Dr. Sahu for the post-liability period. (Decl. of A. Smith at ¶ 13, attached herein as Ex. 11.) For both those calculations, she used Dr. Sahu's correlation of opacity to PM. (*Id.*)

**Response:**    This statement violates Local Rule 7.1 and should be disregarded. Local Rule 7.1(D)(1)(b) requires parties to "[i]nclude as exhibits to the motion [for summary judgment] all relevant documentary evidence" and, "[f]or each fact asserted, provide citations to the documentary evidence that supports it, appropriately referencing the exhibit and page." The only support cited for this statement is one conclusory paragraph in a declaration. The declaration paragraph begins with "[a]s discussed in my report and my deposition," ECF No. 180-6 ¶ 13, but does not cite where in the report or deposition this information is contained. Moreover, IPRG has not included as an exhibit the report or deposition, or relevant excerpts from those documents. Plaintiffs cannot fully respond to this statement because it is not clear what calculations the declaration is referring to. This statement should be stricken. *See* C.D. Ill. R. 7.1(D) ("Any filings not in compliance may be stricken by the court.").

To the extent Plaintiffs can generally respond to this statement based on the limited information presented, Dr. Smith's estimates grossly understate the amount of excess emissions associated with IPRG's Clean Air Act violations because they rely on the unsubstantiated premise that some opacity control can kick in only during nonexempt exceedances above 30% opacity and reduce the opacity to exactly 30%. *See* response to statement 41, *supra*.

45.     IPRG's toxicology expert Lucy Fraiser, PhD, analyzed the amount of PM associated with the allegedly non-exempt opacity exceedances at Edwards. She concluded that PM concentrations associated with those allegedly non-exempt opacity exceedances are too small to cause harm to human health. (Decl. of L. Fraiser at ¶ 24, attached herein as Ex. 12.) Plaintiffs have no toxicology expert to rebut Dr. Fraiser's conclusions.

**Response:**

a.      This statement violates Local Rule 7.1 and should be disregarded. Local Rule 7.1(D)(1)(b) requires parties to "[i]nclude as exhibits to the motion all relevant documentary evidence" and "[f]or each fact asserted, provide citations to the documentary evidence that supports it, appropriately referencing the exhibit and page." The only support cited for this statement is one conclusory paragraph in a declaration from Dr. Fraiser that states that the $PM_{2.5}$ concentrations "associated with the non-exempt opacity exceedances (as calculated by Dr. Smith and modeled by Mr. Schroeder) . . . are too small to cause harm to human health." Fraiser Decl., ECF No. 180-7, ¶ 24. Although the declaration earlier references an expert report and deposition of Dr. Fraiser, *id.* ¶ 8, it does not cite to either, or any other documents to support its conclusory statements. Moreover, IPRG has not included as an exhibit the report or deposition (or relevant excerpts of either). Plaintiffs cannot fully respond to this statement because it is not clear what calculations and modeling the declaration is referring to. (Nevertheless, see responses to statements 41-44, *supra & infra*, disputing Dr. Smith's and Mr. Schroeder's conclusions—to the extent Plaintiffs can ascertain them—and noting that even those flawed conclusions still showed increased $PM_{2.5}$ emissions associated with IPRG's Clean Air Act violations.) This statement should be stricken. *See* C.D. Ill. R. 7.1(D) ("Any filings not in compliance may be stricken by the court.").

7

b.      Plaintiffs dispute Dr. Fraiser's conclusion that the levels of PM emitted in connection with opacity limit exceedances at Edwards are too small to cause harm, since (as will be proven at trial through expert testimony if necessary) the relationship between PM and adverse health effects, like mortality, are linear with no discernable threshold below which those health effects no longer occur. *See* EPA PM ISA, ECF No. 193-12, at 2-25; EPA PM RIA, ECF No. 193-3, at ES-11, ES-20; Jan. 17, 2018 Expert Report of Dr. Joel Schwartz, Ex. BA to Pl. Opp. to Def. Mot. to Exclude (Schwartz Report), ECF No. 193-2, at 38; Schwartz Rebuttal, ECF No. 193-7, at 17. Because of this relationship, an increase in ambient $PM_{2.5}$ concentrations, even if small, will result in an increased risk of adverse health effects. Schwartz Report, ECF No. 193-2, at 38; Schwartz Rebuttal, ECF No. 193-7, at 17.

EPA has estimated the health benefits of reductions in $PM_{2.5}$ concentrations similar to the excess $PM_{2.5}$ concentrations at issue in this case. EPA Regulatory Impact Analysis for the Final Clean Air Visibility Rule, Ex. BL to Pl. Opp. to Def. Mot. to Exclude (EPA Visibility Rule RIA), ECF No. 193-13, at 3-16 tbl.3-6 (showing reductions in PM2.5 concentrations for three pollution-control scenarios), 4-68 tbl.4-15 (estimating reductions in premature mortality for each scenario); *see also* Schwartz Rebuttal, ECF No. 193-7, at 17. And Plaintiffs' public-health expert, Dr. Joel Schwartz, conducted a risk assessment that estimated how many premature deaths and hospital admissions could have been avoided in the greater Peoria area if the Edwards Plant had installed, by the start of the liability period, the pollution controls Plaintiffs' engineering expert concluded are needed to avoid or substantially reduce the Plant's Clean Air Act violations. Schwartz Report, ECF No. 193-2, at 68-82; Schwartz Rebuttal, ECF No. 193-7, at 26-43. His risk assessment also estimated how many premature deaths and hospital admissions would be avoided in the future if the Edwards Plant installed those same types of pollution

controls now. Schwartz Report, ECF No. 193-2, at 82; Schwartz Rebuttal, ECF No. 193-7, at 43.

Dr. Schwartz's risk assessment showed that the "Edwards's Plant's illegal emission of PM have

resulted in a quantifiable number of deaths and hospital admissions." Schwartz Report, ECF No.

193-2, at 2.

    c.    Plaintiffs also dispute Dr. Fraiser's conclusions that rest on the improper

calculations and modeling of Dr. Smith and Mr. Schroeder, including Mr. Schroeder's improper

decision to cut $PM_{2.5}$ emissions to 30% of their predicted values. *See* response to statement 44,

*infra*.

    d.    That Plaintiffs did not retain a toxicologist to "rebut" Dr. Fraiser's testimony is

immaterial. Dr. Schwartz is a Professor of Environmental Epidemiology with the Harvard School

of Public Health and the Director of the Harvard Center for Risk Assessment. *See* Schwartz

Report, ECF No. 193-2, at App. A., at 1. He is one of the world's leading experts on the health

hazards of breathing PM and has published more than one hundred peer-review articles on the

relationship between particulate matter and public health. *Id.* App. A, at 5-78. Dr. Schwartz is

qualified to rebut Dr. Fraiser's opinions, and he submitted a 43-page rebuttal report principally

responding to the opinions in Dr. Fraiser's report. *See generally* Schwartz Rebuttal, ECF No.

193-7.

    46.    Plaintiffs' expert Dr. Gray, Ph.D, conducted modeling of the concentrations of

PM in the 25 kilometer radius of Edwards associated with all opacity at Edwards, but offered no

opinion concerning modeled impacts of PM associated with opacity exceedances (whether

exempt or not exempt), or the allegedly non-exempt opacity exceedances. (Gray Dep. at 334:20

– 338:4, relevant excerpts attached herein as Ex. 13) ("I didn't calculate or make any estimates of

the impacts only during opacity [excursions], and so I didn't make any conclusions or opinions regarding those periods separate from other periods.")

**Response:**   *See also* response to statement 41, *supra*.

Plaintiffs dispute this statement. Dr. Gray did model the amount of particulate matter associated with the Plant's opacity violations by using and subtracting estimates, developed by Dr. Sahu, of how much less $PM_{2.5}$ pollution Edwards would have released had it installed the controls needed to avoid (as to baghouses) or meaningfully reduce (as to new ESPs) its violations during the liability period. Sahu Rebuttal, Ex. EA, at 43-44; Sahu Report, Ex. EB, at 42-47. Dr. Gray explained, "[b]y running the model for every hour during the modeling period, and comparing the results to the base case, we obtain an estimate of the overall air quality benefits that would occur if either of those controls were in place." Gray Rebuttal, Ex. DC, at 3. Dr. Sahu concluded that once the necessary pollution controls are installed, they operate at all times; there is no pollution control device that can only be switched on when opacity is above 30%. Sahu Rebuttal, Ex. EA, at 43-44; June 21, 2018 Sahu Dep., Ex. EE, at 338:22–339:17. IPRG has never identified, and Plaintiffs are unaware of, any alternative technology that would have kicked in only when the Edwards Plant was about to violate the Clean Air Act and then curbed the Plant's emissions just enough to avoid the violation. *See, e.g.*, June 15, 2018 Roberson Dep., Ex. DB, at 242:12–245:13.

47.     Plaintiffs' expert Dr. Schwartz offered no opinion concerning harm from PM associated with opacity exceedances (whether exempt or not exempt), or the allegedly non-exempt opacity exceedances identified. (Schwartz Dep. at 134:16-135:2, relevant excerpts attached herein as Ex. 14) (risk assessment "wasn't done on the excess emissions"). Dr. Schwartz calculated only harm allegedly arising from PM associated with all of Edwards'

opacity, regardless of whether the emissions were associated with an opacity exceedance or not. (Ex. 14 at 165:17-24, 166:1-24, 167-1-7.)

**Response:**    *See* also response to statement 41, *supra*. Plaintiffs dispute this statement. Dr. Schwartz's expert opinion that "the Edwards's Plant's illegal emission of PM have resulted in a quantifiable number of deaths and hospital admissions," Schwartz Report, ECF No. 193-2, at 2, is based his quantitative risk assessment estimating the harm from $PM_{2.5}$ associated with IPRG's nonexempt opacity exceedances (or violations). Schwartz Report, ECF No. 193-2, at 2-3, 71-72; Schwartz Rebuttal, ECF No. 193-7, 32. Dr. Schwartz did not determine the harm from "all" $PM_{2.5}$ emissions from Edwards; his quantitative risk assessment was based on comparative estimates, developed by Plaintiffs' engineering and air-dispersion experts, of how much less $PM_{2.5}$ pollution Edwards would have released if it had installed the pollution controls needed to avoid (or meaningfully reduce) its violations during the liability period. Schwartz Rebuttal, ECF No. 193-7, at 32.

Dr. Schwartz did not limit his quantitative risk assessment to only the "incremental emissions that occurred during the violations at Edwards," *id.* at 32, because "the only valid comparisons for a quantitative risk assessment are between options that can be taken," July 12, 2018 Schwartz Dep., Ex. A to Def. Mot. to Exclude, ECF No. 183-1, at 220:9-11, and no one has identified a "pollution control strategy [that] would have reduced the emissions [at Edwards] only during the periods of opacity violation but not in other periods," *id.* at 182:16-19; *see also* Schwartz Rebuttal, ECF No. 193-7, at 32 (stating that "waving a magic wand that would have only controlled particle emissions during periods of violation" is "not a valid counterfactual").

In addition to his quantitative risk assessment, Dr. Schwartz also offered other opinions concerning the harm associated with short- and long-term exposure to the additional $PM_{2.5}$ the

11

Plant omits during its opacity violations. *See* Schwartz Report, ECF No. 193-2, at 10-67. These opinions include the scientific consensus that death rates increase with both long- and short-term $PM_{2.5}$ exposure, *see id.* at 10-32, other serious health consequences of exposure to $PM_{2.5}$, *see id.* at 40-52, and the scientific consensus that there is no "threshold" for adverse health effects from $PM_{2.5}$, *see id.* at 33-39. Dr. Schwartz performed a risk assessment to estimate the number of premature deaths (or avoided deaths) attributable to decisions that affect $PM_{2.5}$ levels in the ambient air. *See* Schwartz Report, ECF No. 193-2, at 68-82; Schwartz Rebuttal, ECF No. 193-7, at 42-43. To do so, Dr. Schwartz relied on comparative estimates, developed by Plaintiffs' engineering and air-dispersion experts, of how much less $PM_{2.5}$ pollution Edwards would have released had it installed the controls needed to avoid (as to baghouses) or meaningfully reduce (as to new ESPs) its violations during the liability period. *See* response to statements 41-42, *supra & infra*.

**Undisputed Immaterial Facts**

8.      On March 16, 2017, the parties entered into a Stipulation of Voluntary Dismissal, under which Plaintiffs agreed to dismiss (1) all claims against former Defendant Illinois Power Resources, LLC, (2) the Fourth Claim for Relief in the Complaint, (3) claims based on opacity exceedances excluded from Plaintiffs' partial summary judgment motion, and (4) claims based on PM exceedances excluded from that motion. (Doc. 135 at 1-2.)

**Response:**      Plaintiffs clarify with respect to (3) that they voluntarily dismissed their claims based on opacity exceedances excluded from their Partial Summary Judgment Motion on liability, as indicated in the corrected version of Exhibit 2 to the Motion and explained in the accompanying text at pages 7-8 of the Memorandum. Stip. of Voluntary Dismissal, ECF No. 135, at 2; Ex. to Stip. of Voluntary Dismissal, ECF No. 135-1; *see also* Pl. Mem. of Law in

Supp. of Pl. Mot. for Partial Summ. J., ECF No. 104-1, at 7-8.

With respect to (4), Plaintiffs voluntarily dismissed claims based on particulate matter exceedances excluded from Plaintiffs' Partial Summary Judgment Motion on liability, as indicated in the corrected version of Exhibit 3 to the Motion and explained in the accompanying text at pages 7-8 of the Memorandum. Stip. of Voluntary Dismissal, ECF No. 135, at 2; Ex. to Stip. of Voluntary Dismissal, ECF No. 135-2; *see also* Pl. Mem. of Law in Supp. of Pl. Mot. for Partial Summ. J., ECF No. 104-1, at 7-8. The stipulation said nothing about opacity or particulate matter exceedances that post-date the liability period.

10.     National Ambient Air Quality Standards ("NAAQS") are nationwide standards for ambient air set by the United States Environmental Protection Agency ("USEPA") under the Clean Air Act. 42 U.S.C. § 7409(a)-(b).

**Response:**     This statement is a legal conclusion rather than a statement of fact. It is also immaterial to IPRG's Motion because as Plaintiffs discuss in more detail in Argument section V, *infra*, the NAAQS levels are irrelevant to whether the excess emissions attributable to IPRG's Clean Air Act violations have caused some harm cognizable under the Act (including but not limited to harm to public health). *See, e.g.*, *North Carolina ex rel. Cooper v. TVA*, 593 F. Supp. 2d 812, 821 (W.D.N.C. 2009) ("$PM_{2.5}$ exposure has significant negative impacts on human health, even when the exposure occurs at levels at or below the NAAQS."), *rev'd on other grounds*, 615 F.3d 291 (4th Cir. 2010).

According to EPA, the Clean Air Act "does not require [EPA] to establish a primary NAAQS at a zero-risk level," 62 Fed. Reg. 38,652, 38,653 (July 18, 1997), and the $PM_{2.5}$ NAAQS are "not set at levels that eliminate the risk of air pollution," EPA Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate

Matter, Ex. BB to Pl. Opp. to Def. Mot. to Exclude (EPA PM RIA), ECF No. 193-3, at ES-20.

EPA has concluded that "causal relationship[s]" exist between short-term exposures to $PM_{2.5}$ and

cardiovascular health harms, short-term exposures to $PM_{2.5}$ and mortality, long-term exposures

to $PM_{2.5}$ and cardiovascular health harms, and long-term exposures to $PM_{2.5}$ and mortality. EPA

Integrated Science Assessment for Particulate Matter, Ex. BK to Pl. Opp. to Def. Mot. to

Exclude (EPA PM ISA), ECF No. 193-12, at 2-10 to 2-12.

      EPA has also determined that "no discernible thresholds have been identified for any

health effects associated with long- or short-term $PM_{2.5}$ exposures," EPA Policy Assessment for

the Review of the Particulate Matter National Ambient Air Quality Standards, Ex. DD, at ES-1

to ES-2, and has repeatedly calculated the health benefits of reductions of ambient $PM_{2.5}$

concentrations below the annual $PM_{2.5}$ NAAQS, *see, e.g.*, EPA Regulatory Impact Analysis for

the Proposed Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility

Generating Units, Ex. BC to Pl. Opp. to Def. Mot. to Exclude (EPA ACE RIA), ECF No. 193-4,

at 4-25 to 4-27, 4-35 tbl.4-8; EPA PM RIA, ECF No. 193-3, at ES-11 to ES-12; EPA Regulatory

Impact Analysis for the Final Transport Rule, Ex. DE, at 20, 192-93; EPA Visibility Rule RIA,

ECF No. 193-13, at 4-70.

      The parties' experts agree that there are health risks from exposure to $PM_{2.5}$ at levels

below the NAAQS. *See* Schwartz Report, ECF No. 193-2, at 38-39; Schwartz Rebuttal, ECF No.

193-7, at 2-4; June 27, 2018 Fraiser Dep., Ex. DF, at 123:6–124:4.

      11.    USEPA is required to set primary NAAQS at levels requisite to protect the public

health with an adequate margin of safety and secondary NAAQS at levels requisite to protect the

public welfare with an adequate margin of safety. *Id.* § 7409(b)(1)-(2).

      **Response:**    *See* response to statement 10, *supra*.

12.     NAAQS are required to be based on criteria that "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities." *Id.* § 7408(a)(2). The Clean Air Act directs USEPA to review the NAAQS every five years and revise them as appropriate. *Id.* § 7409(d)(1).

**Response:**     *See* response to statement 10, *supra*.

13.     USEPA has explained that "[p]articulate matter is a generic term for a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes, such that the indicator for a PM NAAQS has historically been defined in terms of particle size ranges." 78 Fed. Reg. 3086, 3090 n.4 (Jan. 15, 2013). Accordingly, USEPA has currently established NAAQS concerning two sizes of PM: $PM_{2.5}$ and $PM_{10}$. *Id.* at 3090-91.

**Response:**     This statement is immaterial to IPRG's Motion for the reasons provided in response to statement 10, *supra*. Plaintiffs also dispute this statement to the extent that "accordingly" implies a causal relationship between the two sentences, which IPRG's citations do not support.

15.     The current primary NAAQS established by USEPA for $PM_{2.5}$ are an annual standard of 12.0 $\mu g/m^3$ and a 24-hour standard of NAAQS at 35 $\mu g/m^3$. 40 C.F.R. § 50.18(a). The current primary NAAQS established by USEPA for PM10 is a 24-hour standard of 150 $\mu g/m^3$. 40 C.F.R. § 50.6(a).

**Response:**     *See* response to statement 10, *supra*.

17.     Illinois has a network of air monitors to collect data with which to assess compliance with the PM NAAQS. This includes an air monitor for $PM_{2.5}$ located in Peoria

15

County at 613 N.E. Jefferson, described as the City Office Building, which was in place during the liability period of this case and remains in place during the post-liability period. (ILLINOIS ENVIRONMENTAL PROTECTION AGENCY, ILLINOIS AIR QUALITY REPORTS (2008-2016), *http://www.epa.illinois.gov/topics/air-quality/air-quality-reports/index,* relevant excerpts attached herein as Ex. 3.) It also includes an air monitor for $PM_{10}$ that was in place at the same location from 2008 through 2010. (*Id.*)

> **Response:**   This statement is immaterial to IPRG's Motion. How NAAQS compliance is assessed in Illinois is irrelevant to whether the excess emissions attributable to IPRG's Clean Air Act violations have caused some harm cognizable under the Act (including but not limited to harm to public health). *See* response to statement 10, *supra.*

18.   Monitoring data from the Peoria City Office Building available for the liability and post-liability period, in all instances, showed $PM_{2.5}$ and $PM_{10}$ was at levels below the $PM_{2.5}$ and $PM_{10}$ NAAQS. (*Id.*)

> **Response:**   This statement is immaterial to IPRG's Motion because the Peoria area's compliance with the PM NAAQS is irrelevant to whether the excess emissions attributable to IPRG's Clean Air Act violations have caused some harm cognizable under the Act (including but not limited to harm to public health). *See* response to statement 10, *supra.*

19.   If a particular area does not meet applicable NAAQS for $PM_{2.5}$ or $PM_{10}$, the area will be designated as being in "non-attainment" with that NAAQS by USEPA. 42 U.S.C. § 7407(d)(1)(A). USEPA has not made such a determination for the area in which Edwards is located, Peoria County, or any of the counties adjacent to Peoria County. USEPA, *Illinois Nonattainment/Maintenance Status for each County by Year for All Criteria Pollutants* (Aug. 23, 2018), https://www3.epa.gov/airquality/greenbook/anayo_il.html.

**Response:**       The first sentence of this statement is a conclusion of law rather than a statement of fact. This statement is also immaterial to IPRG's Motion, because the Peoria area's attainment of the PM NAAQS is irrelevant to whether the excess emissions attributable to IPRG's Clean Air Act violations have caused some harm cognizable under the Act (including but not limited to harm to public health). *See* response to statement 10, *supra*.

20.       The PM limits in the Edwards Air Operating Permit are based on PM limits set under the Illinois State Implementation Plan ("IL SIP"). (Illinois Environmental Protection Agency, Operating Permit for Edwards Power Station # 143805AAG (July 1, 2004), attached herein as Ex. 4; 35 Ill. Admin. Code 212.202, 203.)

**Response:**       The basis for the PM limits in Edwards' operating permit is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act.

21.       A state implementation plan includes regulations promulgated by a state and approved by USEPA to ensure attainment or maintenance of the NAAQS. 42 U.S.C. §§ 7407(a), 7410(a).

**Response:**       This is a statement of law rather than a statement of fact. Plaintiffs agree that the Clean Air Act requires states to submit state implementation plans for approval by the U.S. EPA that specify the manner in which NAAQS will be achieved and maintained. 42 U.S.C. §§ 7407(a), 7410(a). The promulgation of a state implementation plan is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act.

22.       The PM limits in the IL SIP and the Edwards permit are set at levels to ensure compliance with the NAAQS. (Ex. 4; 35 Ill. Admin. Code 243.120.)

17

**Response:** The basis for the PM limits in Edwards' operating permit is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act. IPRG's citations do not support the statement. Plaintiffs agree that as a matter of law, state implementation plans are required to help achieve and maintain NAAQS. 42 U.S.C. §§ 7407(a), 7410(a).

25.     IEPA recently released for publication and comment a new air permit for Edwards. The PM limits are unchanged. (Illinois Environmental Protection Agency, Proposed Operating Permit for Edwards Power Station #143805AAG (Issuance Date TBD) at 63, attached herein as Ex. 5.)

**Response:** The issuance of a draft permit and the PM limits in that draft are immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations of its current permit (including its opacity violations) are causing any harm cognizable under the Clean Air Act. It is undisputed that the "new air permit for Edwards" that IPRG references (ECF No. 180-3) is a draft and is not in effect. This draft would also preserve the Edwards Plant's 30% opacity limit as an independent emissions limitation. *See* Draft Revised Clean Air Act Permit Program Permit (Draft Title V Permit), Ex. 5 to Mot., ECF No. 180-3, at 21. The draft permit is being developed under the Clean Air Act Permit Program, which is the operating permit program established in Illinois for stationary sources of emissions that is required by Title V of the Clean Air Act. Preliminary Draft - Edwards Power Station CAAPP Permit Statement of Basis (Statement of Basis), Ex. DG, at 4 n.3. The draft permit is being developed pursuant to the Clean Air Act's prevention of significant deterioration and other requirements for individual sources of air pollution. *See* Draft Title V Permit, ECF No. 180-3, at 4 ¶ 1.5 (referencing prevention of significant deterioration requirements).

26.     The new IEPA permit changes the triggers for the reporting of any malfunction or breakdown. Only non-exempt exceedances lasting more than 42 minutes, instead of those lasting just 6 minutes, are subject to the requirement. (Ex. 5 at 96.)

**Response:**     The issuance of a draft permit and its proposed time of exceedances for notifying Illinois EPA of any malfunction or breakdown is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act.[3]

35.     On August 7, 2018, after the close of expert discovery, Plaintiffs stated "[b]ased on the facts presently available to them, Plaintiffs do not expect to present evidence concerning specific occasions on or after April 16, 2015 on which the Plant exceeded its PM standard or limit at the remedy trial in this case." (Plaintiffs' Ninth Supplemental Objections and Responses to Defendants' First Set of Interrogatories Related to Remedy at 16, attached herein as Ex. 9.)

**Response:**     Evidence concerning specific occasions on or after April 16, 2015 on which the Plant exceeded its particulate matter standard or limits is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act. Plaintiffs do not dispute that their Ninth Supplemental Objections and Responses include the language IPRG quotes, but for completeness add that Plaintiffs also stated:

> Plaintiffs may, however, present evidence of PM emission rates from a September 2017 stack test (which was not produced to Plaintiffs until IPRG's March 21 expert disclosure) and estimated PM emission rates from opacity correlations developed by IPRG expert Ralph Roberson (based on the September 2017 stack

---

[3] IPRG describes and cites to this statement in its Argument section I.A. for the proposition that it signals Illinois EPA has "little concern that PM associated with shorter, six minute exceedances poses any threat to human health. SUF No. 26." Def. Mot. for Summ. J. Concerning Inj. Relief, ECF No. 180 (Mot.), at 16. This mischaracterizes the statement, which the Court should disregard.

19

test) to respond to anticipated claims by IPRG to the effect that the Edwards Plant's PM emissions both during and since the liability period have remained below numeric limits in the Plant's operating permit, and/or are immaterial for purposes of the factors relevant to the Court's application of the injunctive-relief standards and civil-penalty factors.

Pl. Supp. ROG Resp., ECF No. 180-5, at 16.

37.    Plaintiffs' experts Dr. Sahu, Dr. Andrew Gray, and Dr. Schwartz, offered no opinion that the area surrounding Edwards had failed to meet established NAAQS for PM.

**Response:**    This statement is immaterial to IPRG's Motion for Summary Judgment Concerning Injunctive Relief, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act. *See* response to statements 10, 16, 41, 45, 47, *supra*, and Argument section V, *infra*.

38.    Plaintiffs have offered no evidence of a PM NAAQS exceedance concerning the Peoria area.

**Response:**    This statement is immaterial to IPRG's Motion for Summary Judgment Concerning Injunctive Relief, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act. *See* response to statements 10, 16, 41, 45, 47, *supra*, and Argument section V, *infra*.

39.    Under Edwards' operating permit, "Operation in excess of applicable opacity . . . standards is allowed during periods of startup, malfunction, and breakdown." (Ex. 4 at ¶ 5a.)

**Response:**    This statement is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act. Plaintiffs add that to qualify for the defense under this provision, IPRG must abide by recordkeeping, notification, and operational requirements in Permit Conditions 5b, 5c, 5d, 5e, and 5f. Permit, ECF No. 180-2.  IPRG has not made that

20

showing for all of the violations it claims are exempt pursuant to paragraph 5a. *See, e.g.*, Pl. Opening Mem. in Supp. of Partial Summ. J. on Remedy (Pl. Opening Summ. J. Br.), ECF No. 184-1, at 31 n.12; Ex. AR to Pl. Mot. for Partial Summ. J. on Remedy, filed under seal at ECF No. 187.

49.     Plaintiffs estimate that baghouses for Units 2 and 3 would cost $51.7 million and $64.2 million, respectively, or $115.9 million total, in 2009 dollars. (Ex. 9 at 11.)

**Response:**     This statement is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act, and the subsidiary premise that there is no harm to balance against the costs of injunctive relief.

50.     Plaintiffs estimate that new ESPs for Units 2 and 3 would cost $28 million and $36.6 million, respectively, or $64.6 million total, in 2011 dollars. (Ex. 9 at 11.)

**Response:**     *See* response to statement 49, *supra.*

**Disputed Immaterial Facts**

4.     The Court also held that IPRG, in all but a few instances, could not make use of evidence of compliance with its PM limits as a defense for Plaintiffs' presumptive PM violation claims, in part, because "Edwards only became subject to promulgated Section 112 regulations after the relevant time period at issue." (Doc. 124 at 25-31.)

**Response:**     Plaintiffs dispute this statement as a legal conclusion and to the extent it contradicts the Liability Order, ECF No. 124, which speaks for itself. The Court concluded that Section 212.124(d)(2) provides Edwards with its sole method of proving the Particulate Matter Defense during the liability period. Liability Order, ECF No. 124, at 33-36. The Court concluded

that Section 212.124(d)(2)(B) provides the sole particulate matter defense to opacity violations.

Liability Order, ECF No. 124, at 38.

> To satisfy it, Edwards needed to conduct a stack test while operating with an opacity that was equal to or greater than the original exceedance within sixty days of that exceedance. There is no evidence that Edwards conducted any such tests, so Plaintiffs are entitled to summary judgment on Defendants' particulate matter defense for those counts.

*Id.* The Court concluded that Section 212.124(d)(2)(A) provides the sole particulate matter

defense to the corresponding particulate matter violations. Liability Order, ECF No. 124, at 38.

> To satisfy it, Edwards needed to conduct a stack test under the same operating conditions that were present during the initial exceedance within sixty days of that exceedance. Plaintiffs are also entitled to summary judgment on Defendants' particulate matter defense for all exceedances on Count Three except for those that occurred within sixty days prior to a stack test, which Plaintiffs excluded from their motion.

*Id.* at 38-39. The Court made no finding on whether IPRG had any evidence of compliance with

its PM limits in any instances. The Court found that "Defendants are not entitled to summary

judgment as to Counts One, Two, and Three because they have not shown, through undisputed

evidence, compliance with § 212.124(d)(2)." Liability Order, ECF No. 124, at 39.

5.      The Court made no finding, on the merits, that any harm flowed from any of the

opacity violations, or from the presumed PM violations, for which the Edwards plant could not

claim an exemption.

**Response:**      Plaintiffs dispute this statement as a legal conclusion and to the extent it

contradicts the Liability Order, ECF No. 124, which speaks for itself. The Clean Air Act is a

strict liability statute, and IPRG's liability for violating Edwards' opacity and particulate limits

does not turn on evidence that the violations have caused harm to any specific person. Moreover,

as Plaintiffs discuss in Argument sections I-V, *infra*, evidence that a defendant is violating an

emissions limit enforceable through the Clean Air Act, in ways that impair air quality and lead to

22

the release of additional pollution, establishes irreparable harm. The Court also found in the

context of standing that violations of this nature injure Plaintiffs' members. *See, e.g.*, Liability

Order, ECF No. 124, at 18 ("Here, there is no dispute that particulate matter of the type emitted

by Edwards can be harmful."). The Court held that "the undisputed facts show that members of

NRDC and the Sierra Club have suffered an injury in fact that is fairly traceable to Edwards'

emissions and would be redressed by a judgment in favor of Plaintiffs." *Id.* at 24.

6.      Indeed, the Court credited the statements of Plaintiffs' standing witnesses that

they have "stipulated that they did not suffer any health harms because of Edwards' emissions."

(Doc. 124 at 19 (citing Doc. 109-10).)

**Response:**      *See* response to statement 5, *supra*.

7.      The Court also expressly held (agreeing with IPRG and accepting Plaintiffs'

concession) that Plaintiffs could not rely on a presumption, under 35 Ill. Admin. Code

§ 212.124(d)(2), to prove "future violations" of PM limitations. (*Id.* at 23.)

**Response:**      The applicability of § 212.124(d)(2) to prove future violations of PM

limitations is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's

violations (including its opacity violations) are causing any harm cognizable under the Clean Air

Act. Plaintiffs dispute this statement as a legal conclusion and to the extent it contradicts the

Liability Order, ECF No. 124, which speaks for itself. In rejecting IPRG's argument that

Plaintiffs cannot show a likelihood of future particulate matter violations, because the Plant

became subject to Section 112 of the Clean Air Act on April 16, 2015, when the Mercury and

Air Toxics Standard (MATS) rule took effect, the Court explained,

> Plaintiffs rely upon 35 Ill. Admin. Code § 212.124(d)(2) to prove that Edwards
> violated its particulate matter limits, and Plaintiffs concede that they could not
> prove future particulate matter violations in that way. However, this confuses the
> issue. Just because a plaintiff could no longer prove particulate matter violations

23

through § 212.124(d)(2) does not mean that particulate matter limits no longer
apply to Edwards. It simply takes one way to establish the particulate matter
violations off the table. In this case, Plaintiffs have alleged that Edwards
continued to violate particulate matter limits, and have (as discussed below)
proven that continuing violation. Just because the method of proof the Plaintiffs
have relied upon does not apply to future violations does not negate that proof of
past continuing violations or suggest that future violations will not occur.

Liability Order, ECF No. 124, at 23-24; *see also id.* at 28 n.10.

9.      In response to the Court's order, IPRG instituted and adheres to a new procedure

for reporting malfunction and breakdown events to IEPA as soon as possible during normal

working hours, which was formalized through a procedure document. (Lindenbusch Dep. at 247-

257, relevant excerpts attached herein as Ex. 1; "Opacity Exceedances Due to Malfunction or

Breakdown Notification," discussed in Ex. 1 at 288 and attached herein as Ex. 2.)

**Response:**      This statement is immaterial to IPRG's Motion. It is undisputed that IPRG

is still violating the Clean Air Act, after instituting this procedure. June 26, 2018 Keeler Dep.,

Ex. ED, at 161:4–162:2; *see also* Pl. Opening Summ. J. Br., ECF No. 184-1, Stmt. Of

Undisputed Facts at 6-7 ¶¶ 27-31 & Arg. § IX at 29-33 (describing violations identified in

IPRG's reports and expert's testimony and compiled in supporting Ex. U); Ex. U to Pl. Mot. for

Partial Summ. J. on Remedy, ECF No. 184-30 (violation compilation).

IPRG's citations do not support the stated reason for the procedure. Plaintiffs do not

dispute that IPRG instituted a new procedure, but do dispute that IPRG is fully "adher[ing] to"

the procedure. In particular, Plaintiffs dispute whether IPRG has faithfully applied the

procedure's definition for malfunction or breakdown ("Any sudden, infrequent and not

reasonably preventable failure of air pollution control equipment, process equipment, or a

process to operate in a normal or usual manner." Ex. 2 to Mot. filed under seal at ECF No. 182,

at IPR-IPRG-400403.) Sahu Report, Ex. EB, at 15-18 (concluding the vast majority of

24

exceedances reported as attributable to malfunctions per Permit Condition 5(c) do not meet the definition of malfunction or breakdown); Sahu Rebuttal, Ex. EA, at 19-21 (same). IPRG's own expert, Mr. Thomas Keeler, purported to apply the procedure's definition but classified some events differently than the Plant had. June 26, 2018 Keeler Dep., Ex. ED, at 119:15–121:9.

16.      The NAAQS for PM "provide requisite protection of public health and welfare." 78 Fed. Reg. at 3088. The current annual PM2.5 standard provides "protection against health effects associated with long- and short-term exposures," *id.* at 3088, and the current 24-hour $PM_{2.5}$ standard and $PM_{10}$ standard provide protection against "effects associated with short-term exposures." *Id.* at 3088-89.

**Response:**      This statement is a legal conclusion rather than a statement of fact. It also selectively quotes the preamble to a regulation, which speaks for itself. It is also immaterial to IPRG's Motion; the NAAQS are irrelevant to whether the excess emissions attributable to IPRG's Clean Air Act violations have caused some harm cognizable under the Act (including but not limited to harm to public health).

Plaintiffs also dispute this statement to the extent that IPRG implies that there are no health effects associated with exposure to PM2.5 at concentrations below the NAAQS. *See* response to statement 10, *supra*; s*ee, e.g.*, *North Carolina ex rel. Cooper*, 593 F. Supp. 2d at 821 (recognizing that "PM2.5 exposure has significant negative impacts on human health, even when the exposure occurs at levels at or below the NAAQS."). The parties' experts agree that there are health risks from exposure to PM2.5 at levels below the NAAQS. *See* Schwartz Report, ECF No. 193-2, at 38-39; Schwartz Rebuttal, ECF No. 193-7, at 2-4; June 27, 2018 Fraiser Dep., Ex. DF, at 123:6–124:4. Plaintiffs' public-health expert, Dr. Joel Schwartz, conservatively estimates that there would have been 2.3 fewer deaths and .56 fewer hospitalizations from cardiovascular

disease in the Peoria area during the liability period had the Edwards Plant installed the baghouses that Plaintiffs' engineering expert considers necessary for the Plant to avoid its Clean Air Act violations. *See* Schwartz Rebuttal, ECF No. 193-7, at 42.

23.     Opacity is not a pollutant. It means "that fraction of light, expressed in percent, which when transmitted from a source through a smoke-obscured path, is prevented from reaching the observer or instrument receiver." 35 Ill. Admin. Code 211.4130. At Edwards, opacity is measured using devices called Continuous Opacity Monitors. (Ex. 1 at 233:1-23, 234:1-14.)

**Response:**     IPRG provides no citations to support the first sentence. The sentence is also immaterial because IPRG's characterization of opacity as a non-pollutant does not alter the fact that IPRG is subject to independently enforceable opacity limits and has exceeded those limits thousands of times. Plaintiffs also dispute IPRG's characterization. Opacity limits are emissions standards enforceable through the Clean Air Act. Liability Order, ECF No. 124, at 3-4; Operating Permit, Ex. 4 to Mot. (Permit), ECF No. 180-2, Condition 3; 35 Ill. Admin. Code § 212.123. IEPA stated the following in comments to Illinois Pollution Control Board (IPCB) concerning the proposed opacity rules, including the provisions now codified as 35 Ill. Admin. Code §§ 212.123 and 212.124:

> [T]he Agency concurs with the Board's earlier statement, "…the appearance of an emission relates directly to the esthetic concerns, which should not be overlooked in air pollution control." (4 PBC 310) The fact that dirty and unsightly smoke plumes "unreasonably interfere with the enjoyment of life or property" is evidenced by the frequency of citizen complaints to the Agency which are stimulated by such observations.

Oct. 9, 1985 IEPA Comments on the Record and on the Proposed Rule, Second First Notice, Ex. 30 to Pl. Mot. for Partial Summ. J., ECF No. 104-39, at 6. In its comments concerning a version of the opacity regulation in which opacity exceedances would not be directly enforceable, EPA

26

(which has authority to approve or disapprove state implementation plan provisions) stated as

follows:

> The purpose of this letter is to register our very serious concerns with the Board's proposal. The proposal to modify 35 Ill. Adm. Code 212.123(a) regarding the opacity standard cannot be approved by USEPA if it is finally adopted in the form presently contemplated by the Board. . . .
>
> Section 51.19(c) of Title 40 of the Code of Federal Regulations clearly requires a State to establish a system for detecting violations of rules and regulations through the enforcement of appropriate visible emission limitations and for investigating complaints. The Board's proposed modification of Section 212.123(a) would preclude the use of visible emissions as an enforcement tool.

Feb. 26, 1986 Letter from Steve Rothblatt, Chief, Air & Radiation Branch, EPA, to Jacob D.

Dumelle, Chairman, IPCB, Ex. 31 to Pl. Mot. for Partial Summ. J., ECF No. 104-40, at 1.

Following further revisions by IPCB to the opacity standard in the Proposed Rule, IEPA stated in

a letter to IPCB as follows:

> [T]he Pollution Control Board originally adopted standards for the emissions of particulate matter from coal-fired boilers as long ago as April 13, 1972. Because of a delayed date of compliance in that adoption and because of subsequent court reversings of the regulations and remandings back to the Board, it was not until July 2, 1986 that the Board was able to validly adopt such a regulation.
>
> The particulate standards for coal-fired boilers, however, represent, even at this late date, only "half a measure". The opacity standards have not been promulgated even though they were also first proposed on January 21, 1982, and even though the most recent first notice was issued August 14, 1986. I call the particulate standards without the opacity provisions only half a measure because it is difficult (and expensive) to enforce a particulate limit without the use of an opacity limit as a surrogate. An opacity limit is also desirable because it will enable the Agency to cooperate with the United States Environmental Protection Agency's (USEPA's) announced policy of requiring continuous emissions monitoring systems for the larger emissions sources. . . .
>
> USEPA and the Agency both recognize that good control strategies for particulate matter also control PM10. In particular, the Agency considers the above mentioned Board particulate emission standards for coal-fired boilers to be just as necessary for PM10 control as for particulate control. . . .

> What is needed therefore is a fulfillment of the emission standards by a prompt
> promulgation of the opacity standards after a new first notice to replace the one
> that expired one year after August 14, 1986.

Nov. 6, 1987 Letter from Michael J. Hayes, Manager, Division of Air Pollution Control, IEPA,

to Jacob D. Dumelle, Chairman, IPCB, Ex. 32 to Pl. Mot. for Partial Summ. J., ECF No. 104-41.

With respect to the second sentence of IPRG's statement 23, Plaintiffs do not dispute that

35 Ill. Admin. Code § 211.4130 describes opacity, but add that the Court noted that "[o]pacity is

the degree to which particulate matter emissions reduce the transmission of light and obscure the

view of an object in the background." Liability Order, ECF No. 124, at 3 n.7.

Plaintiffs do not dispute the third sentence of IPRG's statement 23.

24.    PM is a term for a broad class of substances which is defined as "any solid or

liquid material, other than water, which exists in a finely divided form." 35 Ill. Admin. Code

211.4510. The current Edwards air permit lists a PM limit of 0.15 lbs/MMBtu for Unit 2 and a

PM limit of 0.10 lbs/MMBtu for Unit 3. (Ex. 4 at ¶2.)

**Response:**    The definition of PM is immaterial to IPRG's Motion for Summary

Judgment Concerning Injunctive Relief, which rests on the false premise that none of IPRG's

violations (including its opacity violations) are causing any harm cognizable under the Clean Air

Act. Plaintiffs agree that 35 Ill. Admin. Code § 211.4510 defines particulate matter as "any solid

or liquid material, other than water, which exists in finely divided form." Plaintiffs dispute the

second sentence of IPRG's statement 24 to the extent that it omits that the boilers shall not

exceed those limits "in any one-hour period." Permit, ECF No. 180-2, Condition 2.

27.    Particulate matter emissions from the boilers at Edwards (and opacity) are

controlled by ESPs and flue gas conditioning (dual feed and SO3 injection system). (Ex. 5 at 60.)

**Response:**      The devices IPRG uses to lower, but not adequately control, particulate matter emissions from the boilers at Edwards is immaterial to IPRG's Motion, which does not cite statement 27 and also rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act. Plaintiffs do not dispute that IPRG uses electrostatic precipitators (ESPs) and flue gas conditioning to try to reduce opacity and particulate matter emissions from the boilers at Edwards. Plaintiffs dispute this statement to the extent "controlled" implies that the pollution controls for opacity and particulate matter that are in place at Edwards today adequately control emissions for purposes of IPRG's Clean Air Act obligations. It is undisputed that IPRG is not controlling particulate matter enough to avoid continued violations of the Act. June 26, 2018 Keeler Dep., Ex. ED, at 161:4–162:2; Sahu Rebuttal, Ex. EA, at 23-24; Pl. Opening Summ. J. Br., ECF No. 184-1, at 29-33; Ex. U to Pl. Mot. for Partial Summ. J. on Remedy, ECF No. 184-30.

28.      Plaintiffs' allegations of PM violations in their Complaint, and the Court's finding of PM violations at summary judgment, were based on a regulatory presumption, not evidence of any actual PM violations. (Doc. 88 at 13-14, Doc. 124 at 5.)

**Response:**      The basis for and evidence of the Plant's already adjudicated particulate matter violations are immaterial to IPRG's Motion for Summary Judgment Concerning Injunctive Relief, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act.

Plaintiffs also dispute this statement as a legal conclusion and to the extent it contradicts the Liability Order, ECF No. 124, which speaks for itself. In the Liability Order, the Court explained that Plaintiffs "rely upon the opacity exceedances established in the first two claims in order to establish a derivative violation of the particulate matter standards. *See* 35 Ill. Admin.

29

Code § 212.124(d)(2)(A) (explaining that for certain power plants, opacity exceedances may also be deemed particulate matter exceedances)." Liability Order, ECF No. 124, at 5. The Court found § 212.124(d) applied to the Plant during the relevant time period. *Id.* at 27-33. Violations of the Plant's 30% opacity limits is evidence of particulate matter violations. 35 Ill. Admin. Code § 212.124(d)(2)(A).

29.     Method 5 PM stack tests are the method specified under the IL SIP for demonstrating compliance with PM limits. 35 Ill. Admin. Code 212.110; *See*, 40 C.F.R., Pt. 60, Appendix A-3.

**Response:**     The methods for demonstrating compliance with PM limits under the Illinois SIP are immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act. Plaintiffs agree that 35 Ill. Admin. Code 212.110 states that "[m]easurement of particulate matter emission units subject to this Part shall be conducted in accordance with 40 CFR part 60, Appendix A, Methods 5, 5A, 5D, or 5E." Plaintiffs dispute the statement to the extent it implies Method 5 PM stack tests are the only method under the Illinois SIP to demonstrate compliance or lack of compliance with the Edwards Plant's one-hour PM limits— opacity over/under 30% has been a method for demonstrating compliance or lack of compliance with the PM limits. *See* 35 Ill. Admin. Code § 212.124(d)(2).

30.     Method 5 tests were conducted at Edwards in July 2013, April 2014, September 2014, December 2015, April 2016, February 2017, March 2017, May 2017, June 2017, July 2017, September 2017, December 2017, February 2018, April 2018, and July 2018. (Roberson Dep. at 45:8-16, relevant excerpts attached herein as Ex. 6; Method 5 Test Reports, discussed in

Ex. 6 at 45:8-16 and attached herein as Ex. 7a-v.) Results from all of these tests showed that

Edwards was in compliance with its PM limits. (Ex. 7a-v.)

    **Response:**    Compliance with PM limits during certain hour periods of testing is

immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations

(including its opacity violations) are causing any harm cognizable under the Clean Air Act.

Plaintiffs do not dispute Method 5 tests were conducted at Edwards during those months.

Plaintiffs dispute that results from all of these tests showed that Edwards was in compliance with

its PM limits 0.15 lb/mmBtu limit in any one-hour period at Boiler 2 and 0.10 lb/mmBtu limit in

any one-hour period at Boiler 3, *see* Permit, ECF No. 180-2, Condition 2; the results from two of

them show the exact opposite. Exhibit 7n shows that Boiler 3 exceeded its PM emission limit on

September 27, 2017 with a one-hour period of 0.102 lb/mmBtu PM emissions. Ex. 7n to Mot.,

filed under seal at ECF No. 182, at 4. Further, Exhibit 7c shows a one-hour period at Boiler 2

with a PM emission rate of 0.203 lb/mmBtu on April 24, 2014. Ex. 7c to Mot., filed under seal at

ECF No. 182, at IPR-IPRG-013915. Plaintiffs also dispute this statement to the extent it implies

Edwards was in compliance with its particulate matter limits at any times beyond those tested,

which almost universally occurred when the average opacity was below 30%. *See* March 21,

2018 Expert Report of Mr. Ralph Roberson (Roberson Report), Ex. EF, at App. A.

    31.    A Method 5 PM stack test conducted in September 2017 showed Edwards in

compliance with its PM limits when opacity was at levels greater than 30%. (Ex. 7n at 5, 8.)

    **Response:**    Compliance with PM limits during certain hour periods of testing is

immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations

(including its opacity violations) are causing any harm cognizable under the Clean Air Act.

Plaintiffs also dispute this statement. As explained in response to statement 30, *supra*, Exhibit 7n

31

shows that Boiler 3 exceeded its PM emission limit on September 27, 2017 with a one-hour period of 0.102 lb/mmBtu. Ex. 7n to Mot. filed under seal at ECF No. 182, at 4. This exceedance occurred over a 71-minute period with an average opacity of 33.6%. *Id.* at 75-76. It is undisputed that Edwards' emissions have exceeded and continue to exceed 33.6% opacity. Edwards 2018 Quarterly Opacity Excess Emissions Reports, Ex. B to Pl. Mot. for Partial Summ. J. on Remedy, ECF No. 184-5, at 47 (examples of recent reported opacity exceedances over 33.6%)

32.    In addition to PM, opacity is also measured and recorded during Method 5 stack tests. IPRG's expert, Ralph Roberson, using data from Method 5 stack tests, studied the correlation between opacity and PM emission rates at Edwards, and concluded that Edwards did not violate its PM limitation during the period of this litigation, even at opacity levels above 30%. (Ex. 6 at 24:4-25:24, 43:12-20; 44:21-47:5.)

**Response:**    Compliance with PM limits is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act. Plaintiffs dispute the assertion that Mr. Roberson's report provides a basis to conclude that PM limits were not exceeded at the individual units. It is undisputed that multiple stack test runs show particulate matter emission rates over one-hour periods that exceed Edwards' permitted limits. *See* Ex. 7c to Mot. filed under seal at ECF No. 182, at IPR-IPRG-013915 (showing test run with emissions rate of 0.203 lb/mmBtu at Common Stack 1 serving Units 1 and 2); Ex. 7n to Mot. filed under seal at ECF No. 182, at 4 (showing test run with emissions rate of 0.102 lb/mmBtu at Unit 3); Sahu Rebuttal, Ex. EA, at 46. It is also undisputed that Mr. Roberson's correlations show exceedances of Edwards' permitted particulate matter limits at certain opacities above 30%, that are reflected in Edwards' reported opacity values. Sahu Rebuttal, Ex. EA, at 46-48; Roberson Report, Ex. EF, at 7.

Plaintiffs also dispute this statement to the extent it implies IPRG did not violate the PM limits at Edwards during the liability period; this Court has already found that it did based on evidence from self-reported opacity violations. Liability Order, ECF No. 124, at 38-39, 49. Plaintiffs dispute the statement to the extent that IPRG tries to relitigate that decision.

34.     Dr. Sahu, despite preparing his own study of the correlation between opacity and PM at Edwards, did not disagree with, or rebut, Mr. Roberson's conclusion that Edwards did not violate its PM limitation during the period of this litigation, even at opacity levels above 30%. (Ex. 8 at 114:7-13; 297:23-24, 298:1-20.)

**Response:**     Compliance with PM limits is immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act.[4] IPRG's citations are incomplete and do not support its statement. *See* June 21, 2018 Sahu Dep., Ex. EE, at 112:23–114:13 (question stating we'll return to Mr. Roberson's report later and focusing question on Opinions 2 and 3 of Dr. Sahu's initial report), 297:14–298:20 (correcting description of opacity data used for certain time period to estimate particulate matter emissions). And other record evidence contradicts IPRG's statement. Dr. Sahu explained that Mr. Roberson's correlation for Unit 3 predicts particulate matter emissions above Unit 3's limit whenever opacity is 36% or higher and that one of the September 2017 Unit 3 test runs that Roberson based his correlation on resulted in a particulate matter emission rate of 0.103 lb/mmBtu when the opacity was 33.6%. Sahu Rebuttal, Ex. EA, at 46-47. Dr. Sahu also explained there are many problems with Mr. Roberson's correlation (which

---

[4] IPRG cites this statement for the proposition that "Even Plaintiffs' expert, Dr. Sahu, admits that when opacity levels at the Edwards plant have exceeded 30% the level of PM is still within the PM limitation in its permit." Mot. 16. This mischaracterizes the statement, which the Court should disregard as immaterial, unsubstantiated, and disputed in any event.

formed the basis for Mr. Roberson's flawed conclusion), including the limited number of and

small range of data points, as well as the undisputed fact that Mr. Roberson's correlation predicts

negative particulate matter emissions rates at certain opacity values, suggesting the plant is

somehow removing particulate matter from the atmosphere. Sahu Rebuttal, Ex. EA, at 45-47.

Mr. Roberson does not dispute these flaws. June 15, 2018 Roberson Dep., Ex. DB, 98:1–104:5.

36.    Plaintiffs have offered no evidence of PM emissions in excess of the amount of

emissions allowed under Edwards' IEPA permit.

**Response:**    Evidence of PM emissions in excess of the amount of emissions allowed

under Edwards' IEPA permit is immaterial to IPRG's Motion, which rests on the false premise

that none of IPRG's violations (including its opacity violations) are causing any harm cognizable

under the Clean Air Act. Plaintiffs dispute this statement: IPRG's own estimates show evidence

of particulate matter emissions that violate the limits in Edwards' permit. *See* response to

statements 30-32, 34, *supra*.

42.    Dr. Sahu likewise never determined the amount of PM associated with the opacity

exceedances identified by the Court in its ruling on liability.

**Response:**    *See also* response to statement 41, *supra*. This statement is immaterial to

IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its

opacity violations) are causing any harm cognizable under the Clean Air Act. Dr. Sahu

determined, and it is not genuinely disputed, that there is some additional PM pollution

associated with violating opacity exceedances. *See* Pl. Add'l Material Facts (Facts) ¶ 4, *infra*.

44.    Plaintiffs do not rebut Dr. Smith's calculations (for both the liability and post-

liability periods) of PM associated with the opacity exceedances that Plaintiffs contend, or the

Court has determined, are not exempt (referred to hereinafter as the "non-exempt opacity exceedances").

**Response:**      Dr. Smith's calculations are immaterial to IPRG's Motion, which rests on the false premise that none of IPRG's violations (including its opacity violations) are causing any harm cognizable under the Clean Air Act. Plaintiffs dispute Dr. Smith's calculations for many reasons, including those explained in responses to statements 41 and 43, *supra*. Additionally, Plaintiffs dispute Dr. Smith's calculations attempting to correct an error that was not in fact present in Dr. Sahu's calculations, Sahu Rebuttal, Ex. EA, at 58-59. Although it is unclear what calculations this statement is referring to, Plaintiffs dispute Dr. Smith's calculations that relied on IPRG's dispersion modeler, which inappropriately cut the $PM_{2.5}$ emissions to 30% of their predicted values based on data from other coal plants in the 1980s. March 21, 2018 Expert Report of Dr. Anne Smith (Smith Report), Ex. EG, at 15 (describing cases using assumptions provided by IPRG expert Tony Schroeder that adjust for $PM_{2.5}$ fraction); March 21, 2018 Expert Report of Mr. Tony Schroeder (Schroeder Report), Ex. EH, at 6, 8, 11 (explaining cut of emissions to 30%); Sahu Rebuttal, Ex. EA, at 48-57 (explaining why 30% is wrong and contradicts Plant specific data). IPRG's expert, Mr. Thomas Keeler, conceded that the actual fraction is "probably higher." June 26, 2018 Keeler Dep., Ex. ED, at 286:17–287:1. Plaintiffs further note that even Dr. Smith's flawed calculations all show increased emissions of $PM_{2.5}$ from IPRG's Clean Air Act violations. Smith Report, Ex. EG, at 13-14.

48.      Plaintiffs seek a court order for injunctive relief mandating the installation of two baghouses on Edwards Units 2 and 3 or, in the alternative, a court order mandating the installation of two new ESPs on Units 2 and 3. (Ex. 9 at 10-11.)

**Response:**      This characterization is immaterial to IPRG's Motion, which rests on the

false premise that none of IPRG's violations (including its opacity violations) are causing any

harm cognizable under the Clean Air Act, and the subsidiary premise that there is no harm to

balance against the costs of injunctive relief. Plaintiffs dispute this characterization of the

injunctive relief they will seek. Plaintiffs will almost certainly ask the Court for an order

mandating baghouse installation on Units 2 and 3, may also ask for an order mandating

installation of new, adequately sized, properly designed ESPs on Units 2 and 3, and may seek

other forms of injunctive relief including: numeric caps on PM emissions; numeric caps on

generation/capacity levels (e.g., permanent derates) at Units 2 and 3 (the still-operating units);

installation of continuous emissions monitoring systems for PM on Units 2 and 3; real or close to

real-time public reporting of measured opacity and PM emissions from Units 2 and 3; and

stipulated penalties following each new violation of the current opacity and PM limits applicable

to Units 2 and 3, and/or any alternative caps or limits imposed by the Court; and mitigation

projects. *See* Pl. Supp. ROG Resp., ECF No. 180-5, at 10-12.

51.     An injunction ordering IPRG to install two new baghouses or two new ESPs

would lead to closure of the Edwards Plant. (Decl. of B. Boswell, attached herein as Ex. 15.)

**Response:**

a.     This statement is immaterial with respect to IPRG's Motion, which rests on the

false premise that none of IPRG's violations are causing harm cognizable under the Clean Air

Act, and the subsidiary premise that there is no harm to balance against the costs of injunctive

relief.

b.     This statement is based only on a conclusory and unsupported declaration filed

four days after the summary-judgment deadline. The late-filed declaration and citations to it

violate Local Rule 7.1 and should be disregarded. The declaration is based on unspecified

36

discussions and unspecified "information available today," and asserts an injunction order will trigger a decision by other individuals "to move forward with the closure of the Edwards plant." Boswell Decl., ECF No. 189 ¶ 7. The only explanation is that, baghouses and new ESPs "are prohibitively expensive" and "would render the plant uneconomic to operate." *Id.*

c.       This is the first time IPRG has made such an assertion, and it is contrary to extensive evidence in the record. IPRG and the Plant's previous owner have solicited proposals from outside contractors to install baghouses. Those proposals have ranged in price from $18 million for one baghouse for Unit 3, Feb. 10, 2015 Dustex, IPR-IPRG-360863, Ex. EI, at 12, to $231 million for two baghouses to control emissions from the Plant's three units, Jan. 17, 2011 Burns & McDonnell, IPR-IPRG-352850, Ex. EJ, at IPR-IPRG-352853. *See* Sahu Report, Ex. EB, at 41 & n.64 (citing May 23, 2014 Dustex, IPR-IPRG-352925, Ex. EK; May 25, 2011, URS, IPR-IPRG-354186, Ex. EL; Feb. 10, 2015 Dustex, IPR-IPRG-360863, Ex. EI; Jan. 17, 2011 Burns & McDonnell, IPR-IPRG-352850, Ex. EJ; Dec. 22, 2010 Burns & McDonnell, IPR-IPRG-352885, Ex. EM); *see also* Dec. 16, 2014, Babcock & Wilcox, IPR-IPRG-395524, Ex. EN. The Plant also inserted plans to install baghouses in formal budget documents at least twice in the past decade. Nov. 30, 2017 Henning Dep., Ex. EO at 74:9–77:14; Nov. 30, 2017 Lindenbusch Dep., Ex. ES, 200:18–214:1; 222:16–223:10; Dec. 21, 2017 IPRG Dep., Ex. ET, at 58:6–59:6 (discussing putting in cost from Dustex baghouse proposal as possibility in five-year plan).

d.       In 2011, the Plant put in a budgetary spreadsheet $202 million for the installation of baghouses for Units 2 and 3 in 2014. Nov. 30, 2017 Henning Dep., Ex. EO, at 74:9–77:14; Oct. 6, 2011 Email, Ex. R103 to Nov. 30, 2017 Henning Dep., IPR-IPRG-023796, Ex. EP; Oct. 10, 2011 Email, Ex. R104 to Nov. 30, 2017 Henning Dep., IPR-IPRG-361568, Ex. EQ; Oct. 13, 2011 Edwards Alternative Capex Solutions, Ex. R105 to Nov. 30, 2017 Henning Dep., IPR-

IPRG-361545, Ex. ER. The Plant removed the baghouses from the budget and instead budgeted

for upgrades on the Unit 2 ESP and a helper ESP on Unit 3 (which was never installed). Oct. 10,

2011 Email, Ex. R104 to Nov. 30, 2017 Henning Dep., IPR-IPRG-361568, Ex. EQ; Draft Title V

Permit, Ex. 5 to Mot., ECF No. 180-3, at 60.

   e. In 2014, the Plant budgeted $51 million ($48 million for direct capital costs and

$3 million for removal costs) for a project that included the possibility of installing baghouses

for Units 2 and 3 in 2018 in its 5-year capital forecast. Nov. 30, 2017 Lindenbusch Dep., Ex. ES,

200:18–214:1; 222:16–223:10, Edwards Plant 2015-2019 and 2016-2020 five-year capital

budget forecast, Budget Forecast, IPR-IPRG-093645, Ex. EU, at 11-12 (showing capital and

removal costs for "Precipitator Upgrade Baghouse" project in row 106 for Unit 2 and row 128

for Unit 3); Dec. 21, 2017 IPRG Dep., Ex. ET, at 20:22–22:24. The next year the forecasted

baghouse spending was removed. Edwards Plant 2015-2019 and 2016-2020 five-year capital

budget forecast, Budget Forecast, IPR-IPRG-093645, Ex. EU, at 4-6; Dec. 21, 2017 IPRG Dep.,

Ex. ET, at 182:8–183:2.

   f. One of IPRG's experts (Mr. Cichanowicz) also testified that there is space to

install baghouses at Edwards, and IPRG identified no major technical barrier to siting baghouses

at Edwards. July 2, 2018 Cichanowicz Dep., Ex. DA, at 66:2–70:14; Dec. 21, 2017 IPRG Dep.,

Ex. ET, at 57:14-23, 88:16–109:18 (discussing Dustex baghouse installation proposals).

   g. Ted Lindenbusch, the Plant Manager, testified that he was not aware of any long-

term plans to shut down Units 2 or 3. Nov. 30, 2018 Lindenbusch Dep., Ex. ES, at 94:16–95:21.

Plaintiffs requested that IPRG "Produce all documents concerning the possibility of future

decommissioning, long-term shutdown, or long-term reduction of load at Units 1, 2, or 3 at the

Facility (since 2013)." March 10, 2017 Pl. First Req. for Produc. of Docs. Relating to Remedy

(Pl. Remedy RFP), Ex. DH, at 12 #27. IPRG has not produced any documents relating to the
retirement or shutdown of Edwards. Plaintiffs also requested that IPRG "Produce all documents
concerning personnel layoffs that would occur in the event of closure of any unit at the Facility
(since 2014)." Pl. Remedy RFP, Ex. DH, at 13 #34. IPRG responded that it "has no such
documents." May 1, 2017 Defs' Resp. to Pls.' First Req. for Produc. Of Docs. Relating to
Remedy, Ex. DI, at 17. IPRG has not supplemented this response or produced any documents in
response to Plaintiffs' Remedy Request for Production # 34.

52.    Closing down Edwards is one of Plaintiffs' primary goals. (McFadden Dep. at
9:24, 10:1-14, relevant excerpts attached herein as Ex. 16; Scrafford Dep. at 42:1-24, 43:1-4,
86:1-88:12, relevant excerpts attached herein as Ex. 17; "Sierra Club is hiring in Peoria,"
discussed in Ex. 17 at 106:19-111:22 and attached herein as Ex. 18.)

**Response:**    This statement is irrelevant and does not accurately reflect any of the three
Plaintiff organizations' motivations in this case. This statement is immaterial to IPRG's Motion,
which rests on the false premise that none of IPRG's violations (including its opacity violations)
are causing any harm cognizable under the Clean Air Act, and therefore, according to IPRG,
there is no harm to balance against the costs of injunctive relief. It is also irrelevant to this
proceeding generally; that a Plaintiff is hiring in Peoria, or has taken certain public positions on
energy policy, has no bearing on the existence of or appropriate remedies for IPRG's Clean Air
Act violations. *Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1097 (10th Cir. 2007).

Plaintiffs also dispute the statement. Their collective goal in bringing this enforcement
action is to "address significant and ongoing violations of air pollution permit emission limits at
the E.D. Edwards Generation Plant in Bartonville, Illinois." Second Am. Compl., ECF No. 87-1,
at 1.

53.     IPRG's expert, Robert Lewis, concluded that the closure of the Edwards plant would lead to the loss of roughly 90 jobs and approximately $90 million in economic benefit to the already economically distressed greater Peoria area. (Lewis Dep. at 88:14-18, 111:18-112:15, relevant excerpts attached herein as Ex. 19.)

**Response:**     The conclusion IPRG cites is immaterial because it is based on an unsubstantiated "scenario," provided by IPRG's counsel, concerning economic impacts "if the jobs were eliminated or the plant downsized." June 8, 2018 Lewis Dep., Ex. DJ, at 29:9-17; *see also* Argument IV, *infra*. Mr. Lewis expressed no opinions on and made no predictions concerning whether, if IPRG is forced to install new pollution controls, it will close or eliminate any jobs at Edwards. Plaintiffs also dispute the cited conclusion because Mr. Lewis's figures do not account for mitigating circumstances. June 8, 2018 Lewis Dep., Ex. DJ, at 87:3-8, 91:18–92:10, 185:4-23 (not incorporating reemployment), 131:4–132:23 (ignoring timeframe), 134:8-19 (ignoring policymakers' reactions), 199:8–200:5 (ignoring redevelopment opportunities).

54.     Plaintiffs' offered no expert testimony, and did not produce any admissible evidence during discovery, to rebut Mr. Lewis' conclusion.

**Response:**     *See also* response to statement 53, *supra*, disputing Mr. Lewis's conclusion and its materiality. Plaintiffs add that the same methodology Mr. Lewis used to estimate the economic impacts of closure could be used to show the beneficial economic impacts of capital expenditures to install baghouses or new ESPs at Edwards. *See* June 8, 2018 Lewis Dep., Ex. DJ, at 223:14-21. Plaintiffs' expert Jonathan Shefftz referenced Mr. Lewis's opinions in his rebuttal report and noted that he was unaware of any commitment by IPRG or Vistra to close Edwards. May 7, 2018, Expert Report of Mr. Jonathan Shefftz, Ex. DK, at 1-2, 26-27.

## ADDITIONAL MATERIAL FACTS

1.      The parties' experts agree that opacity and particulate matter are correlated at
Edwards. Roberson Report, Ex. EF, at 6-7; Sahu Report, Ex. EB, at 42-43.

2.      The parties' experts agree that opacity is a proxy for particulate matter. March 21,
2018 Expert Report of Mr. Thomas Keeler, (Keeler Report), Ex. EV, at 21, 23-24; Roberson
Report, Ex. EF, at 4-5; June 15, 2018 Roberson Dep., Ex. DB, at 85:21–86:5; Def. Resp. to Pl.
Mot. for Partial Summ. J., Illinois Power's Add'l Facts, ECF No. 109, at 25-26 ¶ 12.

3.      EPA and Illinois EPA agree that opacity and particulate matter are correlated, and
Illinois EPA assumed they are correlated at Edwards in developing Edwards' draft Title V Clean
Air Act Permit. ECF No. 109, Def. Resp. to Pl. Mot. for Partial Summ. J., Illinois Power's Add'l
Facts, at 25-26 ¶ 12; EPA Compliance Assurance Monitoring (CAM) Protocol for an ESP
Controlling PM from a Coal-Fired Boiler, Ex. DL, at 3; Statement of Basis, Ex. DG, at 48-49.

4.      The parties' experts agree that the plant emitted additional particulate matter
pollution each time it exceeded its opacity limits. Smith Report, Ex. EG, at 13-14; Roberson
Report, Ex. EF, at 11-13 (describing his development of estimates of how much particulate
emissions increase as opacity increases); June 15, 2018 Roberson Dep., Ex. DB, at 44:4-9; Sahu
Report, Ex. EB, at 43-44; Sahu Rebuttal, Ex. EA, at 46-48.

5.      The parties' experts agree that some of the particulate matter emitted from
Edwards' stacks, including during violating opacity exceedances, is $PM_{2.5}$. Sahu Rebuttal, Ex.
EA, at 48-56; Keeler Report, Ex. EV, at 77-78; March 21, 2018 Expert Report of Dr. Lucy
Fraiser (Fraiser Report), Ex. EW, at 8; Smith Report, Ex. EG, at 15-17; Schroeder Report, Ex.
EH, at 6; Roberson Report, Ex. EF, at 15.

6.      EPA agrees that increases in $PM_{2.5}$ exposure are correlated with increased threats to human health. *See, e.g.*, National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3086, 3088, 3103-04 (Jan. 15, 2013); EPA ACE RIA, ECF No. 193-4, at 4-16 to 4-18.

7.      EPA assumes in its analysis of health effects from $PM_{2.5}$ pollution that the relationship between $PM_{2.5}$ concentrations and premature mortality is linear. *See, e.g.*, EPA ACE RIA, ECF No. 193-4, at 4-21 to 4-25; Schwartz Report, ECF No. 193-2, at 1-13.

8.      The Parties' experts agree that exposure to $PM_{2.5}$ can threaten human health. Fraiser Report, Ex. EW, at 6-7; June 27, 2018 Fraiser Dep., Ex. DF, at 123:6–124:4; 149:19–150:24; Schwartz Report, ECF No. 193-2, at 3-67; Schwartz Rebuttal, ECF No. 193-7, at 2-21.

9.      Long- and short-term exposures to $PM_{2.5}$ cause premature death. *See* EPA PM ISA, ECF No. 193-12, at 2-11 to 2-12; Schwartz Report, ECF No. 193-2, at 10-33.

10.     Long- and short-term exposures to $PM_{2.5}$ harm cardiovascular health. *See* EPA PM ISA, ECF No. 193-12, at 2-10, 2-12; Schwartz Report, ECF No. 193-2, at 44, 50-52.

11.     EPA has not identified a threshold below which $PM_{2.5}$ does not cause adverse health effects. *See* EPA PM RIA, ECF No. 193-3, at ES-20 ("[T]here is no evidence of a population-level threshold in $PM_{2.5}$-related health effects in the epidemiology literature.").

12.     The Parties' experts agree that there are health risks from exposure to $PM_{2.5}$ at levels below the primary annual NAAQS for $PM_{2.5}$ (12.0 µg/m³). June 27, 2018 Fraiser Dep., Ex. DF, at 123:6–124:4; Schwartz Report, ECF No. 193-2, at 33-39; Schwartz Rebuttal, ECF No. 193-7, 8-13, 15-16, 27, 33, 37.

13.     $PM_{2.5}$ concentrations at levels below the 12.0 µg/m³ annual primary NAAQS for $PM_{2.5}$ (including the levels around Edwards) are associated with increased risks of premature

42

death and other serious health problems, including heart attacks and impaired lung function. *See* Schwartz Report, ECF No. 193-2, at 2, 33-45; Schwartz Rebuttal, ECF No. 193-7, 8-13, 15-16, 27, 33, 37; EPA PM RIA, ECF No. 193-3, at ES-20; *see also* EPA ACE RIA, ECF No. 193-4 at 4-21 (explaining that EPA "historically has estimated health impacts above and below the prevailing NAAQS" for $PM_{2.5}$).

14.     The parties' experts agree that $PM_{2.5}$ from Edwards' stacks disperses into and spreads through the ambient air in and around Peoria. Jan. 17, 2018 Expert Report of Dr. H. Andrew Gray, Ex. DM, at 5-9; Gray Rebuttal, Ex. DC, at 1, 11-14; Schroeder Report, Ex. EH, at 8-12.

15.     IPRG's own reports to Illinois EPA and expert testimony show that opacity violations continue at Edwards. June 26, 2018 Keeler Dep., Ex. ED, at 161:4–162:2; *see also* Pl. Opening Summ. J. Br., ECF No 184-1, Stmt. of Undisputed Facts ¶¶ 27-31, Arg. § IX at 29-33 (describing violations identified in IPRG's reports and expert's testimony and compiled in supporting Exhibit U); Ex. U to Pl. Mot. for Partial Summ. J. on Remedy, ECF No. 184-30 (violation compilation).

16.     Many of the opacity exceedances the parties agree are also violations have occurred and continue to occur in daylight, when the stacks and excess opacity are most visible. Ex. A to Pl. Mot. for Partial Summ. J. on Remedy, ECF No. 184-4 (listing opacity violations during the liability period, with occurrence times); Ex. U to Pl. Mot. for Partial Summ. J. on Remedy, ECF No. 184-30 (listing additional opacity violations from July 1, 2014 to June 30, 2018 identified in IPRG's reports and expert's testimony, with occurrence times).

17.     IPRG is a wholly owned subsidiary of Illinois Power Resources, LLC, which in turn is a wholly owned subsidiary of IPH, LLC, which in turn is a wholly owned subsidiary of

Vistra Operations Company LLC, which in turn is a wholly owned subsidiary of Vistra

Intermediate Company LLC, which in turn is a wholly owned subsidiary of Vistra Energy Corp.

Def. Amd. Certificate of Interest, ECF No. 191.

18.        IPRG identified Ted Lindenbusch (Plant Managing Director), William Henning

(Plant Maintenance Manager) and Mark Davis (Plant Environmental and Chemistry Manager) as

the people most knowledgeable regarding long-term measures or significant steps that were

considered, analyzed, or evaluated and that would impact opacity or PM emissions at Edwards.

May 1, 2017, Def. Objs. and Answers to Pl. Interrogs., Ex. EX, at 3. IPRG identified Mr.

Lindenbusch as the person most knowledgeable regarding decision-making at Edwards,

including for capital expenditures and operations and maintenance expenditures. *Id.* at 4.

19.        Dr. Sahu concluded that Edwards would continue to violate its opacity limit with

its current equipment and that it needs baghouses to avoid, and new ESPs to substantially reduce,

its violating exceedances. Sahu Report, Ex. EB, at 5, 39-42; Sahu Rebuttal, Ex. EA, at 7, 24-43.

20.        IPRG's experts did not disagree that Edwards will continue to violate its opacity

limits with its current equipment. July 2, 2018 Cichanowicz Dep., Ex. DA, at 108:19–109:16;

June 15, 2018 Roberson Dep., Ex. DB, at 261:18–262:14; 264:1–265:17.

21.        IPRG's experts did not identify any pollution-control equipment that they claim

would allow Edwards to eliminate further violating opacity exceedances. *See* July 2, 2018

Cichanowicz Dep., Ex. DA, at 108:19–109:16; June 15, 2018 Roberson Dep., Ex. DB, at

261:18–262:14; 264:1–265:17; *see also* Mar. 21, 2018 Expert Report of Mr. J. Edward

Cichanowicz, Ex. EC, at 38, 44-48.

22.    IPRG's experts agreed that baghouses would improve Edwards' opacity performance. July 2, 2018 Cichanowicz Dep., Ex. DA, at 116:15–117:19, 142:9–147:16; June 26, 2018 Keeler Dep., Ex. ED, at 93:9–96:19.

## ARGUMENT

**I.    Evidence that a defendant is still violating and releasing illegal pollution is sufficient to establish harm, for purposes of injunctive relief under the Clean Air Act**

IPRG cites the right four-factor test for permanent injunctive relief, *see* Mot. 12-13, but largely ignores what the controlling authorities say about how to apply that test in cases to enforce the Clean Air Act and other laws that exist to protect public health and the environment.

The Supreme Court has emphasized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987). If environmental injury is "sufficiently likely," "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* The Court has also instructed lower courts to focus on "the underlying substantive policy" expressed in environmental-protection laws when considering how best to enforce them. *Id.* at 544. This follows from the general rule that once Congress has "decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978)). "Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all." *Id.* at 497-98 (citations omitted).

The Clean Air Act exists "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). It reflects Congress's concern about and desire to limit not only air pollution that sickens and kills people, but also pollution that harms air quality and public welfare in other ways—for example, by artificially darkening or clouding air in ways that undermine people's aesthetic and recreational interests in a clean environment. *Cf. Sierra Club v. Franklin Cty. Power of Ill.*, 546 F.3d 918, 925-27 (7th Cir. 2008); Liability Order, ECF No. 124, at 13-24 (confirming Plaintiffs' standing to seek injunctive relief and other remedies for IPRG's Clean Air Act violations at Edwards, and citing other cases recognizing that pollution that threatens recreational or aesthetic interests causes cognizable injury under the Clean Air Act and other federal environmental laws).

Because the Act exists to "protect and enhance" air quality, 42 U.S.C. § 7401(b)(1), and air pollution (like other environmental injury) is typically irreparable, a showing that a defendant's violations threaten air quality is normally sufficient to show irreparable injury and entitle the plaintiff to injunctive relief. In *Sierra Club v. Franklin County Power of Illinois*, for example, the Seventh Circuit affirmed an order enjoining the construction of a new coal plant until the defendant had obtained a required Clean Air Act permit. 546 F.3d at 922-23. The court first confirmed that the plant's potential release (if construction were not enjoined) of *some* pollution near a lake used by one of the Club's members was sufficient to establish traceable injury for standing purposes, even if "no one knows the ultimate magnitude of [the] injury—for example, we don't know if the particulate matter from the plant will blot out the sky or merely create a thin haze that's not visible to the naked eye." *Id.* at 926-27. The court then reviewed the district court's injunction decision on the merits, and found the same facts concerning the

threatened pollution sufficient to show irreparable injury under the test for injunctive relief. *Id*. at 936-97.

Courts charged with enforcing the Clean Water Act have likewise found evidence that a defendant's violations are causing additional pollution to be released into the environment sufficient to establish irreparable injury, for purposes of injunctive relief. In *Tennessee Clean Water Network v. Tennessee Valley Authority*, for example, citizens' groups sued to remedy a coal plant's ongoing discharges of coal ash waste into the Cumberland River. 273 F. Supp. 3d 775, 835-42 (M.D. Tenn. 2017). The court ruled that these discharges violated the plant's permit, *id*. at 842-43, and that plaintiffs had accordingly "easily cleared the initial hurdle of demonstrating that injunctive relief is necessary." *Id*. at 845. The court reasoned that "[t]he injury here is the unlawful contamination of the river. The strict liability regime adopted by Congress makes clear that unauthorized contamination itself is a harm warranting remediation. The only adequate remedy is one that addresses and mitigates that unlawful contamination." *Id*.; *see also Ohio Valley Envtl. Coalition, Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886, 923-25 (S.D.W. Va. 2010) (defendant's ongoing violations of an effluent limit, which were causing the release of excess pollution into and thus degrading a watershed, were sufficient to establish irreparable injury for purposes of injunctive relief); *Pub. Interest Research Grp. of N.J. v. Yates Indus*., 757 F. Supp. 438, 455 (D.N.J. 1991) (finding that risk of future effluent violations was "the very type of injury which the [Clean Water] Act was designed to protect against" and therefore was sufficient to establish irreparable injury for purposes of injunctive relief).

**II.   IPRG's opacity violations at Edwards are causing harmful air pollution that warrants injunctive relief under the Clean Air Act**

IPRG's opacity violations have caused and continue to cause the type of harm that courts have recognized warrants injunctive relief under the Clean Air Act and analogous statutes. IPRG's contrary arguments distort both the factual record and the law on injunctions.

First, there is no genuine dispute that IPRG still regularly exceeds its opacity limits at Edwards, including in circumstances that do not entitle it to any exemption and constitute new violations of the Clean Air Act. *See* Pl. Opening Summ. J. Br., ECF No. 184-1, Stmt. of Undisputed Facts ¶¶ 27-31 & Arg. § IX (identifying some of IPRG's post-liability violations by reference to its public and expert reports). The parties may disagree about how many violations have occurred in the past few years, but there is no question that IPRG has violated its opacity limits many times, over many years, including this past one. *Id.* This alone supports injunctive relief. *See NRDC v. Outboard Marine Corp.*, 692 F. Supp. 801, 820 n.34, 824 (N.D. Ill. 1988) (enjoining future permit violations and questioning the defendant's emphasis on the violation count, given the "numerous violations that would remain even if [defendant] were right"); *supra* Argument I (citing cases finding a defendant's extended and ongoing violations of an emissions limit were sufficient to establish irreparable injury).

Second, as IPRG concedes, opacity is a measure of the light-blocking property of a plant's emissions. Mot. 14. Whenever the emissions from a stack at Edwards exceed 30% opacity, they block additional light and interfere more with the air's clarity. Excess opacity accordingly impairs and harms air quality in and of itself. Illinois EPA recognized this principle when it commented on the opacity rules that established Edwards' 30% opacity limit and are now codified in the Illinois SIP. *See* Resp. to IPRG Stmt. of Material Facts (Resp. to Facts) ¶ 23 ("esthetic concerns . . . should not be overlooked in air pollution control," and "dirty and

48

unsightly smoke plumes unreasonably interfere with the enjoyment of life or property" (internal quotation marks omitted)). In asserting that opacity "does not cause harm," Mot. 13-14, IPRG is trying to relitigate the factual predicate for a regulation that has been the law in Illinois for decades. It is too late for that. *See Outboard Marine Corp.*, 692 F. Supp. at 823 (enjoining defendant's violations of its permit limits for total suspended solids and refusing to "go back to square one to review whether the permit's [total suspended solids] restrictions furthered the goals of the [Clean Water] Act").

Third, it is undisputed that IPRG's violations of its opacity limits cause additional particulate pollution to be released, which disperses into the air around Peoria. Facts ¶¶ 1-5, 13. This Court has noted that "there is a correlation between opacity and particulate matter emission levels;" that is why "regulators use the degree of opacity as a proxy for the amount of particulate matter that a plant emits." Liability Order, ECF No. 124, at 3 (discussing the rationale for the opacity limits that apply to Edwards). IPRG's own experts have testified that opacity and particulate matter emissions are correlated at Edwards. Facts ¶ 1. Illinois EPA has repeatedly recognized that exceedances of the 30% opacity limit that applies to Edwards are associated with higher emissions of particulate matter, including in its development of Edwards' new draft Clean Air Act Title V permit. Facts ¶ 3; Resp. to Facts ¶ 25.

The parties may disagree about the best way to quantify how much additional particulate matter has been released because of IPRG's opacity violations, but it is undisputed that the violations cause the release of some additional particulate matter, in addition to obscuring and impairing natural air quality. *See* Facts ¶¶ 1-2, 4-5. This is more than sufficient to show that the violations have caused the kind of environmental injury and harm that warrants injunctive relief. *See, e.g.*, *Franklin Cty. Power*, 546 F.3d at 927, 936. No "speculation" about injury is required.

49

*Contra* IPRG Mot. 15 (citing *In re Excel Innovations*, 502 F.3d 1086 (9th Cir. 2007)).

Fourth, there is no dispute that some of the pollution attributable to IPRG's opacity violations is composed of particles less than or equal to 2.5 microns in diameter, or $PM_{2.5}$; that people in the Peoria area are exposed to some of that $PM_{2.5}$ as it moves away from the stacks at Edwards and through the ambient air; and that $PM_{2.5}$ pollution can threaten human health. Facts ¶¶ 5, 7-8, 11, 13. Any questions about how much $PM_{2.5}$ pollution IPRG's violations have caused go (at most) to the *degree* of harm to health and the environment—not its existence.

IPRG's claim that Plaintiffs need their public health expert's testimony to establish a "triable issue" on harm, Mot. 15-16 n.3, thus mischaracterizes both the law and the factual record. It is enough to show that IPRG's violations impair air quality and cause pollution, and there is not merely a triable issue but also agreement on the essential facts that show impairment and pollution. Dr. Schwartz's testimony, which surveys the literature on the dangers of $PM_{2.5}$ pollution and estimates many people have died prematurely or been sent to the hospital because Edwards lacks the pollution controls it needs to comply with its opacity limits, simply underscores the public importance of injunctive relief that provides for those controls.[5]

Last, there is no reason to doubt that without an injunction, IPRG will continue violating its opacity limits and harming air quality and public health in and around Peoria. IPRG has just confirmed (through its Motion) that it does not plan to install the baghouses it needs to end its opacity violations unless ordered to do so, and its experts have identified no viable alternative controls that would end those violations at Edwards. Facts ¶ 19-22; Resp. to Facts ¶ 41(a).

---

[5] *See* Pl. Opp. to Def. Mot. to Exclude, ECF No. 193, at 3-16 (summarizing some of Dr. Schwartz's testimony); Schwartz Rebuttal, ECF No. 193-7, at 42 (Dr. Schwartz's estimates for premature deaths and hospital admissions). The testimony is admissible in any event, for the reasons stated in Plaintiffs' response to IPRG's motion to exclude it. *See* ECF No. 193.

Injunctive relief is accordingly needed to end the harmful pollution associated with IPRG's violations and secure IPRG's compliance with the Clean Air Act.

*Sierra Club v. Tennessee Valley Authority (TVA)* and *Sierra Club v. Energy Future Holdings Corp.*, cited by IPRG, do not bolster its claim that injunctive relief should be unavailable in this case. *Contra* Mot. 14-15. The main reason each court gave for denying injunctive relief (following a bench trial) was a change in law that led it to conclude the defendant was no longer violating the Clean Air Act. *TVA*, 592 F. Supp. 2d 1357, 1375-76 (N.D. Ala. 2009) (citing a "total lack of evidence" that TVA was "in violation of *existing* law," following a change in permit terms); *Energy Future Holdings Corp.*, No. 12-cv-108, 2014 WL 2153913, at *19-20 (W.D. Tex. Mar. 28, 2014) (similar).[6] Here, IPRG is still operating under, and violating, the same opacity limits that have applied to Edwards since the liability period began. Resp. to Facts ¶¶ 1, 20, 23.

## III.    IPRG's opacity violations are causing irreparable harm

The unlawfully opaque and particle-laden flue gases IPRG releases in connection with its opacity violations irreparably harm the environment and public health. Once illegal pollution leaves Edwards' stacks, there is no way to scrub it from Peoria's air, to remove it from the bodies of the people who end up breathing and ingesting it, to reverse the health problems and hospital

---

[6] The court in *Energy Future Holdings* also found that there were no *past* violations to remedy, because defendants established affirmative defenses for all of the contested opacity exceedances. *Energy Future Holdings*, 2014 WL 2153913 at *19. The later commentary on irreparable harm, *see id.* at *21, has no bearing here, where IPRG has been found liable and continues to violate in ways that harm air quality and public health. It is also unpersuasive: it relies, improperly, on common-law tort standards rather than authorities concerning what harms are cognizable under the Clean Air Act and similar laws that impose strict liability on polluters. *Id.* at *22 (citing *Adams v. Johns-Mansville Sales Corp*., 783 F.2d 589, 591-92); *cf.* Liability Order, ECF No. 124, at 16 (recognizing in the context of standing that Clean Air Act plaintiffs need not show a defendant's illegal pollution "will assuredly cause health problems").

visits it causes, or to restore and extend the lives it cuts short. *See* Resp. to Facts ¶ 16; Facts ¶ 13 (citing evidence on health effects). These harms—like most environmental injuries, *see Amoco*, 480 U.S. at 545—are irreparable.

**IV.    Plaintiffs do not have to show that IPRG is violating Edwards' separate particulate limits to establish irreparable harm and the need for injunctive relief**

IPRG's claim that "any continuing" opacity violations cause no harm because they "do not result in violations of the applicable PM limit under Edwards' permit," Mot. 16, is an improper bid to relitigate matters the Court resolved on liability and write the opacity limits out of Edwards' permit and the Illinois SIP. It also rests on an unsubstantiated and disputed premise about IPRG's compliance with Edwards' particulate matter limits.

As this Court recognized in its 2016 liability ruling, Edwards' opacity and particulate matter limits are separate and independently enforceable emissions limitations. Liability Order, ECF No. 124, at 3 ("Both the Permit and the SIP limit the amount of particulate matter that Edwards can emit while it is operating," and "also . . . limit the opacity of the plume emanating from Edwards' two smokestacks," and going on to discuss the correlation between opacity and particulate matter emissions). Each of those limits furthers the Clean Air Act's purposes by promoting air quality and pollution control. *See* 42 U.S.C. § 7401(b)(1); *see also Friends of the Earth v. Potomac Elec. Power Co.*, 419 F. Supp. 528, 538 (D.D.C. 1976) ("[I]t is well-settled that [] visible emissions regulations are emission limitations for pollution control purposes in general and for the Clean Air Act in particular."). Other courts presented with arguments similar to IPRG's have expressly rejected the idea that a defendant's opacity limits are unenforceable unless the defendant is also violating its particulate limits. *See Sierra Club v. Union Elec. Co.*, No. 4:14-cv-00408-AGF, 2014 WL 5783032, at *2-5 (E.D. Mo. Nov. 6, 2014) (denying motion to dismiss). Here, it is also undisputed that IPRG's opacity violations harm Peoria's air quality

52

within the meaning of the Clean Air Act—whether or not IPRG is also violating Edwards'

particulate limits. Facts ¶¶ 1-2, 4-5, 8, 12, 13-15 & Argument I-II, *supra*.

For the reasons above, a showing that IPRG is complying with its separate particulate

limits would not excuse its opacity violations and foreclose the injunctive relief needed to

remedy those violations. *See* Resp. to Facts ¶ 41(a) (describing some of the remedies Plaintiffs

will show at trial are needed to end the opacity violations alone); *see also Oakland Cannabis*,

532 U.S. at 497 (courts sitting in equity cannot "override Congress' policy choice, articulated in

a statute, as to what behavior should be prohibited"). IPRG also has not made that showing. The

evidence it cites does not support its premise that Edwards has consistently operated "within [its

particulate] limits" in recent years. Mot. 16. And other evidence—including from IPRG's own

experts—undermines that premise. Resp. to Facts ¶¶ 30-32.

**V.    Plaintiffs do not have to show that IPRG's violations have caused or will cause a
        NAAQS exceedance to establish irreparable harm and the need for injunctive relief**

IPRG's claims about the national ambient air quality standards (NAAQS) for particulate

matter are irrelevant and factually wrong.[7] *See* Mot. 13, 16-17.

The NAAQS claims are irrelevant because as Plaintiffs have just explained, IPRG's

opacity violations are sufficient to establish harm and irreparable injury for purposes of the Clean

Air Act. Edwards' opacity limits are independently enforceable against IPRG, including through

---

[7] IPRG does not specify which NAAQS it is referring to. There are multiple NAAQS for particulate matter, some that apply to $PM_{2.5}$ and some that apply to all particulate matter less than or equal to 10 microns in diameter ($PM_{10}$), some focused on human health (known as the "primary" NAAQS), others on public welfare. *See* 42 U.S.C. § 7409(a)(1)-(2), (b). The current primary NAAQS for $PM_{2.5}$ are an annual standard of 12.0 $\mu g/m^3$ and a 24-hour standard of 35 $\mu g/m^3$. 40 C.F.R. § 50.18(a); *see also* EPA, Table of Historical Particulate Matter (PM) National Ambient Air Quality Standards, available at https://www.epa.gov/pm-pollution/table-historical-particulate-matter-pm-national-ambient-air-quality-standards-naaqs (visited Sept. 18, 2018) (attached as Ex. DN). Plaintiffs' response focuses on the primary NAAQS for $PM_{2.5}$ because $PM_{2.5}$ is particularly harmful to human health.

injunctive relief. *See* 42 U.S.C. §§ 7604(a)(1), (f)(4), 7602(k) (empowering this Court to enforce violations of any "emission standard or limitation," including those imposed through the Illinois SIP, *id*. § 7604(f)(4), and any other state-adopted limit on the "quantity, rate, or concentration of emissions of air pollutants on a continuing basis," *id*. § 7602(k)); *Franklin Cty. Power*, 546 F.3d at 935 (injunctions and penalties are both available remedies under the Clean Air Act's citizen suit provision). IPRG cites no support for the notion that Plaintiffs must establish a violation of some other emission standard or limitation before this Court can enjoin ongoing violations of its opacity limits, *see* Mot. 16-17, and Plaintiffs are aware of none.

IPRG also mischaracterizes the NAAQS' purpose. As their name implies, NAAQS are ambient standards that cap the levels of a regulated pollutant (such as $PM_{2.5}$) that may be present in the ambient air—not emissions of that pollutant from any individual source. *See* 42 U.S.C. § 7409; 40 C.F.R. § 50.18 (primary NAAQS for $PM_{2.5}$). The whole reason Illinois has a SIP that limits Edwards' opacity and other emissions is that Congress understood ambient standards alone would not achieve the Clean Air Act's purposes, and so required states to adopt plans "provid[ing] for implementation, maintenance, and enforcement of" the NAAQS. 42 U.S.C. § 7410(a)(1); *see also id*. § 7410(a)(2) (required contents of SIPs). SIPs must ensure both that individual sources' emissions do not "contribute significantly" to NAAQS violations, and also that they do not cause any "significant deterioration of air quality" in areas where ambient pollutant levels are below (or, in the Clean Air Act's terms, in "attainment" with) the NAAQS. *Id*. § 7410(a)(2)(D)(i); *see also id*. § 7471 (SIPs must "contain emission limitations and such other measures as may be necessary . . . to prevent significant deterioration of air quality" in areas classified as in attainment with a NAAQS under § 7407); *LaFleur v. Whitman*, 300 F.3d 256, 260 (2d Cir. 2002) (the Clean Air Act "seeks to prevent the significant deterioration of air

quality in areas of the country that have achieved the NAAQS").

One reason Congress required states to regulate individual sources' emissions of NAAQS-regulated pollutants even in NAAQS attainment areas is that it "recognized that there are potentially adverse affects [sic] from air pollution at levels *below* the NAAQS." *Whitman*, 300 F.3d at 270. Courts have accordingly rejected arguments (like IPRG's here) that so long as the affected area is in attainment with the NAAQS for a given pollutant, a defendant's illegal emissions of that pollutant do not injure public health or the environment within the meaning of the Clean Air Act. *Id*. at 269-71 (confirming plaintiffs' standing to challenge permitting determination that would lead facility to release more sulfur dioxide into the ambient air than it would if plaintiffs prevailed, notwithstanding defendant's claim that even in a "worst case" scenario, ambient levels would remain "well below" the NAAQS for sulfur dioxide).

There is also scientific consensus that $PM_{2.5}$ pollution at below-NAAQS levels increases the risk of premature death and other health problems. Facts ¶¶ 11-13. The evidence on this point includes EPA's own analyses for the $PM_{2.5}$ NAAQS and for national limits on pollution from coal-fired power plants. Facts ¶¶ 6-13; Resp. to Facts ¶ 10. IPRG's expert (Dr. Fraiser) agrees that there are health risks from exposure to $PM_{2.5}$ below the NAAQS. Facts ¶ 12. Other courts charged with enforcing Clean Air Act violations have recognized that illegal $PM_{2.5}$ pollution harms human health regardless of how the levels of $PM_{2.5}$ in the ambient air compare to the NAAQS, because there is no level of $PM_{2.5}$ pollution that does *not* harm human health. *See United States v. Westvaco Corp*., CV MJG-00-2602, 2015 WL 10323214, at *9 (D. Md. Feb. 26, 2015) (crediting "the majority scientific consensus . . . that the harm from exposure to $PM_{2.5}$ is linear, and there is no known threshold below which $PM_{2.5}$ is not harmful to human health"); *North Carolina ex rel. Cooper*, 593 F. Supp. 2d at 821 (finding "$PM_{2.5}$ exposure has significant

55

negative impacts on human health, even when the exposure occurs at levels at or below the NAAQS"), *rev'd on other grounds*, 615 F.3d 291 (4th Cir. 2010). That IPRG or its expert may disagree with EPA and Dr. Schwartz about the relative dangers of below-NAAQS $PM_{2.5}$ pollution just underscores why an injunction to remedy IPRG's violations and associated $PM_{2.5}$ pollution cannot be "take[n] . . . off the table" on summary judgment. *Contra* Mot. 17.

## VI. Although the Court need not reach these issues to deny IPRG's Motion, the balance of harms and public interest also weigh strongly in favor of injunctive relief

The law and facts cited above dispose of IPRG's arguments that there is "no evidence of harm to human health or the environment," Mot. at 13, and—by extension—that "there is nothing for the Court to balance" under the four-factor test for permanent injunctive relief. *See* Mot. 17. There is no genuine dispute that IPRG's violations have caused and continue to cause irreparable harm.[8] Any disputes go, at most, to the depth of harm and the precise scope of the injunction this Court should issue following the remedy trial this March.

In the event that this Court wishes to consider Part B of IPRG's brief, Plaintiffs provide the following response to IPRG's mischaracterizations of the relevant facts and law on economic hardship in the context of injunctive relief under the Clean Air Act and analogous statutes.[9]

---

[8] At the very least, the evidence Plaintiffs cite here precludes summary judgment to IPRG on whether its violations cause harm and warrant injunctive relief. *See* Liability Order, ECF No. 124, at 6 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)) ("At the summary judgment stage, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial."). This case is nothing like the individual tort and employment cases IPRG relies on, where the defendant was granted summary judgment after an individual plaintiff failed to come forward with any evidence (apart from their own statements and speculation) that created a factual dispute on any material issue. *See Nunez v. Gordon Food Serv., Inc.*, No. 1:16-CV-1077-JBM-JEH, 2017 WL 3610566, at *4 (C.D. Ill. Aug. 22, 2017); *Henderson v. May Dep't Stores Co.*, No. 06-C-1933, 2008 WL 2952322, at *1-3 (N.D. Ill. July 30, 2008).

[9] IPRG focuses on the prospect that this Court will order it to install new pollution control at Edwards. This is an important element of the injunctive relief Plaintiffs plan to seek, but they may request other measures to help end IPRG's violations and mitigate the harm those violations have caused the public. *See* Resp. to Facts ¶ 48 (describing some such measures).

### A.     The Court cannot credit IPRG's unsubstantiated claims that new pollution controls at Edwards are "financially untenable"

IPRG's assertions that an order requiring it to install baghouses or new ESPs would "cause great harm to IPRG," "unjustifiably injure the public interest," and "lead to the closure of [Edwards]" are unsubstantiated. Mot. 17. The only pieces of evidence IPRG cites on these points are a declaration IPRG filed four days after the summary judgment deadline, from Vistra Energy Corporation's Chief Fossil Officer Barry Boswell, and excerpts from the report of Mr. Lewis, who assumed a plant closure for purposes of his analysis but did not opine on whether (or under what circumstances) Edwards would close. *See id*.; *see also id.* at 11, IPRG Stmt. of Facts 48-54.

The Court should not credit the Boswell declaration. IPRG filed it four days after the August 31, 2018 dispositive-motion deadline, without the Court's permission. *See* ECF No. 189 (filed Sept. 4, 2018); Dec. 14, 2017 Text Order (setting Aug. 31, 2018 deadline). It is conclusory, based on Mr. Boswell's discussions with people he does not name and perhaps other "information" he does not identify. ECF No. 189 ¶ 7. And it does not square with what IPRG has said and produced to Plaintiffs in remedy discovery.

With respect to the affordability of new controls, IPRG and its predecessor, original defendant AERG, have solicited and received several detailed consultant proposals to install baghouses at Edwards. Resp. to Facts ¶ 51(c). Ted Lindenbusch, IPRG's Plant Managing Director and one of the people IPRG designated as most knowledgeable about any significant steps IPRG has considered that would affect Edwards' opacity and particulate matter emissions, included $51 million to install baghouses or upgrade Edwards' ESPs in 2017 or 2018 in a capital plan he prepared for the Plant. Resp. to Facts ¶ 51(e) (discussing 2015 five-year capital plan). At least one earlier budget includes $202 million for baghouses at Edwards. Resp. to Facts ¶ 51(d).

57

With respect to closure, at his individual deposition, shortly before the end of fact discovery on remedy, Mr. Lindenbusch testified that he was unaware of any discussions about ceasing operations of either Unit 2 or Unit 3 (the two still-operating units) at Edwards. Resp. to Facts ¶ 51(g); *see also* Pl. Opening Summ. J. Br., ECF No. 184-1, Stmt. of Undisputed Facts ¶ 6 (Unit 1 retired in 2016). Plaintiffs' remedy-phase document requests, which IPRG has an ongoing duty to supplement, include requests for "all documents concerning the possibility of future decommissioning [or] long-term shutdown" of those units, and "all documents concerning personnel layoffs that would occur in the event of closure" of those units. Resp. to Facts ¶ 51. IPRG has not produced any such documents.

The Court should disregard the Lewis testimony IPRG cites on closure because it depends on the premise that an injunction will cause closure, Resp. to Facts ¶ 53, and the only evidence in support of that premise is the improper Boswell declaration. Resp. to Facts ¶ 51.

### B.   That IPRG does not want to pay to comply with the Clean Air Act is irrelevant to this Court's decision about what injunctive relief is warranted

Part B of IPRG's Motion boils down to an argument that the Court should not order installation of the pollution controls Edwards needs to end its opacity violations because IPRG (or its corporate parent Vistra Energy Corporation) would rather not pay for them.[10] That IPRG would rather not pay for baghouses (or the new ESPs needed to substantially reduce its violations, *see* Resp. to Facts ¶ 41(a)) because it considers them too costly is irrelevant to this Court's decision about whether to order installation, for several reasons.[11]

---

[10] As discussed earlier, there is no genuine dispute that ending IPRG's violations will require installation of baghouses; IPRG and its experts have not identified any alternative technology that would accomplish the same goal. Facts ¶ 19-22; Resp. to Facts ¶ 41(a).

[11] IPRG's refusal to invest in the necessary pollution controls *is* relevant to civil penalties and weighs in favor of a higher penalty amount, because penalties must be based on factors including "the violator's full compliance history and good faith efforts to comply" and the

First, many laws require businesses to make investments the businesses might not otherwise choose to make. This Court presumably would not excuse IPRG from paying property or employment taxes, or funding construction mandated by local fire or building codes, just because the company deemed those costs economically burdensome or "untenable." Environmental laws are fundamentally no different from the many other laws and regulations that exist to protect the public and force businesses to account for some of the negative side effects—like pollution—of private enterprise. Investments necessary to comply with the Clean Air Act and Illinois SIP are a non-negotiable cost of doing business in Illinois.

Second, Illinois EPA decided what balance to strike between Edwards' owners' interests in financial gain and the public's interest in avoiding harmful air pollution when it adopted the 30% opacity limit in the Illinois SIP, and again when it issued Edwards' current operating permit in 2004. *See* Resp. to Facts ¶ 20. The permit and Illinois SIP already allow Edwards to release a substantial amount of $PM_{2.5}$ and other pollution into Peoria's air. The reason Plaintiffs are seeking injunctive relief and other remedies is that IPRG and its predecessors have repeatedly violated those generous limits and released *more* harmful air pollution than the law allows. By refusing to invest in the pollution controls Edwards needs to comply with emissions standards that have applied to it for decades, IPRG and its predecessors have upset the balance Congress and Illinois struck between private profits and protection of public health and the environment.

---

violations' seriousness. 42 U.S.C. § 7413(e)(1). Baghouses are used at many coal-fired power plants in the United States, and IPRG has identified no meaningful technological barriers to installing them at Edwards. Sahu Rebuttal, Ex. EA, at 38-40; Sahu Report, Ex. EB, at 46; Resp. to Facts ¶ 51(f). IPRG is also able to pay for baghouses, and for new ESPs (which would cost less and would meaningfully reduce but not eliminate violations). Resp. to Facts ¶ 51(c)-(e); *see also* Pl. Opening Summ. J. Br., ECF No. 184-1, Stmt. of Undisputed Facts ¶¶ 61-62, 64, 69-70, 75-81 (additional facts relevant to IPRG's ability to pay).

Once a polluter like IPRG violates an emissions standard in ways that harm public health or the environment, the equities tip sharply towards injunctive relief—and away from further private gain. One reason for this is that courts must align their weighing of the equities with the priorities Congress has expressed. *See supra* Arg. I; *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1161 (D. Idaho 2012) (concluding that the costs of new pollution controls "do not constitute an extreme economic hardship that would militate against the entry of an injunction," and that "[h]arm to environment outweighs a defendant's financial interests, particularly where the violations are of a longstanding and continual nature"); *Pub. Interest Research Grp. of N.J., Inc. v. Top Notch Metal Finishing Co.*, No. CIV.A. 87-3894, 1987 WL 44393, at *5 (D.N.J. Nov. 6, 1987) ("If to stay in business [the defendant] must expend a large sum of money to come into immediate compliance with toxic substance limitations, that is a balance Congress has struck in favor of the environment, and I do not strike the balance differently here."); *cf. Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d 625, 632, 634 (S.D.W. Va. 2007) (cited by IPRG) (preliminarily enjoining the filling of a valley with mining waste to avoid irreparable injury to the valley and people nearby, notwithstanding company's claim that it might respond by abandoning the mine).

Yet another reason the equities tip sharply towards injunctive relief is that violators like IPRG should not "be able to obtain an economic benefit vis-a-vis their competitors due to their noncompliance with environmental laws." *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 80 (3d. Cir. 1990) (quoting S. Rep. No. 50, 99th Cong., 1st Sess. 25 (1985), which discussed one of Congress's rationales for directing courts to consider "the economic benefit of noncompliance" when setting Clean Water Act penalties). Allowing IPRG to keep illegally polluting for the indefinite future because it would rather not pay for

adequate pollution controls would not only irreparably harm Peoria's air and everyone who breathes it, but also disadvantage competitors who have paid for such controls. It would send the message that it is better to cut corners and gamble on enforcement than to invest in compliance.

The citations in the final section of IPRG's brief simply underscore the contrast between this case and those where courts have declined injunctive relief. In *Weinberger v. Romero-Barcelo*, the district court ordered the defendant to apply for a required Clean Water Act permit but did not enjoin unpermitted discharges during the application process. *See* 456 U.S. 305, 309-10, 320 (1982). The Supreme Court found that the more limited injunction did not undermine the Act's purposes. It noted that "[t]he [d]istrict [c]ourt did not face a situation in which a permit would very likely not issue, and the requirements and objective of the statute could therefore not be vindicated if discharges were permitted to continue." *Id.* at 320. It also found the discharges were "not polluting the water." *Amoco*, 480 U.S. at 542 (discussing the basis for the *Romero-Barcelo* decision). Even so, the Court cautioned that "[s]hould it become clear that no permit will be issued and that compliance with the [Act] will not be forthcoming, the statutory scheme and purpose would require the court to reconsider the balance it has struck." *Romero-Barcelo*, 456 U.S. at 320.

In *Amoco*, similarly, the Court found the district court could properly deny a preliminary injunction against oil exploration, under a law aimed at preserving subsistence resources, based on the district court's finding that "injury to subsistence resources from exploration was not at all probable." 480 U.S. at 545; *see also id.* at 539-40.

In *Kleinman v. City of Austin*, the court denied the plaintiff's requested injunction after finding that (1) there was "no evidence" the defendant's illegal erosion was "detrimental to human health;" (2) the defendant had already committed to a $12.5 million construction project

that would "substantially reduce" that erosion; and (3) the plaintiff had failed to show "that an alternative project would better stymie erosion." 310 F. Supp. 3d 770, 781 (W.D. Tex. 2018).

This case is a far cry from the ones IPRG relies on. More than a decade after the liability period started, four years after it ended, and two years after this Court's summary judgment ruling on liability, IPRG is still violating the Clean Air Act at Edwards. With each new violation, IPRG releases more PM$_{2.5}$—a pollutant that hastens death and causes other serious health problems—into Peoria's air. IPRG has just affirmed that it does not plan to install the pollution controls it needs to end its violations, which are widely used in its industry and feasible to install at Edwards. Facts ¶ 19-22; Resp. to Facts ¶¶ 41(a), 51(c)-(f); Sahu Rebuttal, Ex. EA, at 38-40; Sahu Report, Ex. EB, at 46. It has not identified, let alone committed to install, any alternative controls that *would* end its violations. Facts ¶ 19-22; Resp. to Facts ¶ 41(a). It asks, instead, for a permanent pass on compliance.

An order denying injunctive relief in these circumstances would force Plaintiffs' members and the public to keep breathing dangerous and technologically avoidable pollution for the indefinite future and condone lawbreaking for private financial gain. It would be an abuse of discretion and an abdication of this Court's responsibility under the Clean Air Act.

## CONCLUSION

IPRG's motion for summary judgment should be denied.

Respectfully submitted September 21, 2018,

s/ *Selena Kyle*
Selena Kyle (IL Bar No. 6311573)
Ian Fisher (CO Bar No. 47858)
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7906
skyle@nrdc.org
(312) 995-5903

ifisher@nrdc.org

Jared E. Knicley (DC Bar No. 1027257)
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Ann Alexander (IL Bar No. 6278919)
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6190
aalexander@nrdc.org

*Counsel for Plaintiff Natural Resources Defense Council*

s/ *Gregory E. Wannier*
Gregory E. Wannier (CA Bar No. 275349)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94110
(415) 977-5646
greg.wannier@sierraclub.org

Faith E. Bugel (IL Bar No. 6255685)
Attorney at Law
1004 Mohawk Road
Wilmette, IL 60091
(312) 282-9119
fbugel@gmail.com

*Counsel for Plaintiff Sierra Club*

s/ *Jeffrey Hammons*
Jeffrey Hammons (IL Bar No. 6324007)
Justin Vickers (IL Bar No. 6305129)
Scott Strand (MN Bar No. 147151)
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
jhammons@elpc.org
jvickers@elpc.org

*Counsel for Plaintiffs Sierra Club and Respiratory*

63

*Health Association*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT CONCERNING INJUNCTIVE RELIEF** complies with the type volume limitation set forth in Local Rule 7.1(D)(5). The Argument contains a total of 6170 words.

*s/ Selena Kyle*
Selena Kyle

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2018, I caused the following to be served on all

parties' counsel via the Court's CM/ECF system:

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT CONCERNING INJUNCTIVE RELIEF**

**EXHIBITS DA THROUGH DN**
(EXHIBITS EA THROUGH EX BEING FILED UNDER SEAL)

**MOTION FOR LEAVE TO FILE UNDER SEAL**

**DECLARATION OF IAN FISHER**

*s/ Selena Kyle*
Selena Kyle