# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

NATURAL RESOURCES DEFENSE          )
COUNCIL, RESPIRATORY HEALTH        )
ASSOCIATION, and SIERRA CLUB,      )
INC.,                              )
            )  Case No.  1:13-cv-1181
   Plaintiffs,                 )
            )
     v.                  )
            )
ILLINOIS POWER RESOURCES           )
GENERATING, LLC,                   )
            )
   Defendant.                  )

## OPINION & ORDER

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment on Remedy (Doc. 184) and Defendant's Motion for Summary Judgment Concerning Injunctive Relief (Doc. 180). Each motion has been fully briefed, and the Court has determined oral argument is not necessary. (Doc. 226). The parties have submitted supplemental briefing at the Court's direction (Docs. 227, 228, 232, 233). The motions are therefore ripe for decision. For the reasons explained below, both motions are DENIED.

### BACKGROUND[1]

The Edwards Power Station (Edwards) is a coal-fired power plant located in Bartonville, Illinois. It has been owned and operated by Defendant Illinois Power

---

[1] The facts in this section are drawn from the undisputed facts determined by the Court from the parties' summary judgment briefing and the Court's Opinion & Order in this case on August 23, 2016, *Nat. Res. Def. Council v. Ill. Power Res., LLC*, 202 F. Supp. 3d 859 (C.D. Ill. 2016) (*NRDC*), and procedural history is from the docket.

Resources Generating, LLC, (IPRG) since December 2, 2013.[2] Edwards has two smokestacks; one smokestack serves Unit 2 and served Unit 1 until it was retired on January 1, 2016, and the other smokestack serves Unit 3. The two stacks are within 1,000 feet of each other. Edwards is subject to emission requirements designed to ensure compliance with the ambient air quality standards established by the United States Environmental Protection Agency (EPA) under the Clean Air Act, 42 U.S.C. §§ 7409-10. This case concerns requirements from the Illinois State Implementation Plan (SIP) implementing the Clean Air Act and the operating permit issued to Edwards by the Illinois Environmental Protection Agency (IEPA) on June 10, 2004, as revised on July 1, 2004, pursuant to the SIP.[3] Among other things, the SIP and operating permit limit the amount of particulate matter (PM) Edwards may emit and the opacity of the plume emanating from Edwards's two smokestacks.[4] *See* 35 Ill. Admin. Code §§ 212.202, 212.203, 212.123; (Doc. 104-8 at 1-2).

Plaintiffs are three not-for-profit environmental organizations.[5] On April 18, 2013, Plaintiffs filed the instant lawsuit alleging Edwards had violated both its opacity and PM emission standards. (Doc. 1). The liability period in this case began April 18, 2008, and ended June 30, 2014. During that period, Edwards reported to

---

[2] When IPRG assumed ownership of Edwards, it also assumed the prior owner's liability.

[3] Further discussion of this scheme of requirements and its legal force relating to Edwards may be found in this Court's decision on liability, *NRDC*, 202 F. Supp.3d 859.

[4] Particulate matter is "any solid or liquid material, other than water, which exists in finely divided form," 35 Ill. Admin. Code § 211.4510, and opacity is "that fraction of light, expressed in percent, which when transmitted from a source through a smoke-obscured path, is prevented from reaching the observer," 35 Ill. Admin. Code § 211.4130.

[5] A fourth Plaintiff was voluntarily dismissed. (Doc. 55).

IEPA 2,949 instances in which it had an average opacity of greater than thirty percent for six minutes or longer. Relying on these reports, Plaintiffs sought summary judgment on the issue of liability for opacity exceedances where the quarterly reports did not indicate Edwards was in a state of startup, malfunction, or breakdown and where, though the quarterly reports indicated a state of malfunction or breakdown, no report was submitted to the IEPA. Pursuant to 35 Ill. Admin. Code § 212.124(d)(2)(A), these opacity exceedances would legally constitute violations of the PM limitations. Plaintiffs did not move on the exceedances identified as being associated with startup, identified as being associated with malfunction or breakdown where a report was submitted to IEPA, or PM exceedances within 60 days prior to a PM stack test conducted by Defendant. (Doc. 104-1 at 15-16).

The Court's decision on liability speaks for itself, yet because the parties have raised disagreements regarding it this Opinion must speak for it as well. Suffice it to say, the Court held Defendant (1) had not proven it had not violated its PM limitations under the sole method available to it, (2) could not make out a malfunction or breakdown defense on exceedances during periods not reported to the IEPA in accordance with its operating permit, (3) was liable for opacity exceedances that occurred while Edwards was offline, and (4) was not liable for the presumed PM exceedances at such times. *NRDC*, 202 F. Supp. 3d at 874–887. Therefore, the Court granted summary judgment to Plaintiffs on all exceedances in they moved on in

Counts One, Two, and Three except for the presumed PM exceedances that occurred while Edwards was offline. *Id.* at 887.[6]

That was August 2016. In the intervening years, the Court certified three questions for interlocutory appeal under 28 U.S.C. § 1292(b) (Doc. 130), but a divided panel of the Seventh Circuit denied Defendant's petition for permission to appeal (Doc. 132). The parties then stipulated to the dismissal of Illinois Power Resources, LLC, IPRG's then-parent company and co-defendant, against whom Plaintiff had not moved for summary judgment, a claim on which Plaintiff had not requested summary judgment, and the exceedances associated with Counts One, Two, and Three Plaintiffs did not move for summary judgment on. (Doc. 135). The Court denied a request for trial by jury on the facts underlying the damages calculation. (Doc. 144). Following discovery, the parties filed the instant motions on August 31, 2018. (Docs. 180, 184). In the ensuing flurry of briefing, Defendant sought to exclude the testimony of Dr. Joel Schwartz, one of Plaintiffs' expert witnesses, and to strike a declaration by Ian Fisher, counsel for Plaintiff Natural Resources Defense Council. (Docs. 183, 203). The Court denied both requests as well as Plaintiffs' request for oral argument on both motions. (Doc. 226). The Court also ordered supplemental briefing on the Illinois SIP. (Docs. 227, 228).

The facts have continued to develop. IPRG's ultimate parent company became Vistra Energy Corporation rather than Dynegy Incorporated. (Doc. 191). Additionally, Plaintiffs allege thousands more violations of the opacity standards

---

[6] This summary does not discuss the Court's ruling that Plaintiffs have standing because that issue is not germane to the instant motions.

have occurred between the end of the liability period and the present. And as mentioned above, one of Edwards's three units was retired. Against this backdrop, the Court turns to the parties' cross-motions for partial summary judgment.

<h2 style="text-align:center">LEGAL STANDARD</h2>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmovant bears the burden of demonstrating that such genuine issue of material fact exists." *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018).

The parties are required to support their assertions that a fact is disputed or cannot be genuinely disputed through citations to evidence in the record. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court views the record in the light most favorable to the nonmovant and draws all reasonable inferences in favor of the nonmovant. *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 900 F.3d 529, 536 (7th Cir. 2018). The Court "must resist the trap of assessing the credibility of witnesses, choosing between competing inferences or balancing the relative weight of conflicting evidence." *Khan v. Midwestern U.*, 879 F.3d 838, 840 (7th Cir. 2018). But inferences "supported by only speculation or conjecture will not defeat a summary judgment motion." *Carmody v. Bd. of Trs. of the U. of Ill.*, 893 F.3d 397, 401 (7th Cir.

2018) *cert. denied*, No. 18-6160, 2019 WL 113249 (U.S. Jan. 7, 2019) (citation omitted).

In reviewing cross-motions for summary judgment, the Court considers the motions separately and construes the record in the light most favorable to the nonmoving party, which differs depending which motion is being considered. *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). The parties are required to satisfy the standard as moving parties on their respective motions and as nonmoving parties when opposing the other side's motion.

**DISCUSSION**

Plaintiffs move for summary judgment on nine declarations of law which would narrow, but not settle, issues relating to the calculation of civil penalties and their request for injunctive relief. Defendant moves for summary judgment denying Plaintiffs' request for injunctive relief.

## I. **Plaintiffs' Motion for Partial Summary Judgment**

Plaintiffs' Motion for Partial Summary Judgment on Remedy (Doc. 184) asks the Court to make nine declarations which, according to Plaintiffs, would "help focus and lay the groundwork for trial." (Doc. 184-1 at 8). These declarations, Plaintiffs claim, may be made pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and Federal Rule of Civil Procedure 56. (Doc. 184-1 at 24).

The Declaratory Judgment Act provides a remedy, not an intermediate litigation tool. Indeed, § 2201 is entitled "Creation of remedy." *See also Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("By the Declaratory Judgment Act, Congress

sought to place a remedial arrow in the district court's quiver . . . ."). This is apparent from the plain text: "Any . . . declaration [under the Act] shall have the full force and effect of a final judgment or decree and shall be reviewable as such." § 2201. Plaintiffs do not want a final decree and do not want a remedy. Rather, they seek to "narrow the issues for trial." (Doc. 184-1 at 40). The Declaratory Judgment Act is not meant to take the place of motions *in limine* or, for that matter, partial summary judgment. To the extent the Court would be authorized to grant these declarations under the Declaratory Judgement Act in the first place, it declines to exercise its discretion to do so. *Wilton*, 515 U.S. at 288 ("In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.").

However, Rule 56(a) allows the Court to grant summary judgment on a part of a claim or defense. Plaintiffs' requested declarations that are a cognizable part of a claim or defense may therefore be granted pursuant to Rule 56(a), provided there is no genuine dispute as to any material fact.

A. *The Clean Air Act Background and the Requested Declarations*

The Clean Air Act provides for a penalty of not more than $25,000 per day for each violation[7] and requires this Court consider and weigh seven factors, along with any other considerations justice requires, in setting the appropriate penalty. 42 U.S.C. § 7413(b), (e). The factors, listed in 42 U.S.C. § 7413(e)(1), are:

(1) "[T]he size of the business";
(2) "the economic impact of the penalty on the business";

---

[7] This amount is adjusted for inflation; for the violations at issue prior to January 12, 2009, the maximum adjusted penalty is $32,500, and for the violations after January 12, 2009, the maximum penalty is $37,500. 40 C.F.R. § 19.4.

(3) "the violator's full compliance history and good faith efforts to comply";

(4) "the duration of the violation as established by any credible evidence (including evidence other than the applicable test method)";

(5) "payment by the violator of penalties previously assessed for the same violation";

(6) "the economic benefit of noncompliance"; and

(7) "the seriousness of the violation."

"Courts generally presume that the maximum penalty under the Clean Air Act should be imposed, and then consider the factors described in § 7413(e) to determine what degree of mitigation, if any, is proper." *Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 707 (7th Cir. 2011). Another approach courts have used is determining "the economic benefit a violator gained by non-compliance . . . and then adjust[ing] upward or downward." *Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1095 (10th Cir. 2007). These two approaches are referred to as the "top down" and "bottom up" approaches, respectively. *Id.*

Plaintiffs' requested declarations are mostly aimed at the process of calculating penalties. First, Plaintiffs seek a declaration that "[t]he Clean Air Act provides for IPRG to pay $44,965,000 in civil penalties for its violations during the liability period." (Doc. 184 at 1). Second, Plaintiffs ask the Court to declare "[n]o one has paid any penalties for IPRG's violations," going to the fifth factor the Court must weigh. (Doc. 184 at 1). Third, Plaintiffs request a ruling this Court must account for the full liability period with respect to factors 3, 4, 6, and 7. (Doc. 184 at 1). Fourth is a declaration the Court "will order IPRG to pay penalties that exceed the economic benefit of noncompliance." (Doc. 184 at 1). The fifth, sixth, and seventh requested rulings go to the economic impact of the penalty on Defendant. Plaintiffs ask the Court to declare this factor requires Defendant to show penalties would be ruinous or

disabling, Defendant's corporate parents' finances are relevant, and Defendant does not qualify for a reduction based on the economic impact of the penalty. (Doc. 184 at 1-2). Eighth, Plaintiffs seek a declaration the Court will account for violations since the end of the liability period in determining injunctive relief. (Doc. 184 at 2). Ninth, Plaintiffs ask the Court to declare Defendant has violated the Clean Air Act at Edwards several thousand times since the end of the liability period. (Doc. 184 at 2).

These declarations fall into three categories. The first declaration is the only one to address a definite monetary amount. The second through seventh declarations are aimed at either defining the contours of the statutory factors this Court must consider. The eighth and ninth declarations are largely focused on Plaintiffs' request for injunctive relief.

### B. A Narrow Dispute of Material Fact Exists with Respect to the Maximum Penalty

Due to some semantic confusion, the first order of business is to state exactly what Plaintiffs' first requested declaration would mean. Defendant appears to read "provides for a penalty" as "mandates," while Plaintiffs read it as "allows for." *See* (Docs. 184-1 at 24-25, 200 at 62, 212 at 53)) The Court understands Plaintiffs' request to be for a declaration of the maximum penalty allowable under 42 U.S.C. § 7413(b), not the penalty to be imposed.

This is a discrete issue which can be properly resolved on summary judgment if there is no dispute of material fact. As discussed above, the Clean Air Act allows for "a civil penalty of not more than $25,000 per day for each violation" when an entity has violated "any requirement or prohibition of an applicable implementation plan or permit." 42 U.S.C. § 7413(b)(1). This penalty is adjusted for inflation, also as

discussed above. 40 C.F.R. § 19.4. If there is not or cannot be a genuine dispute as to the number of violations or the dates on which those violations occurred, the Court can easily determine the maximum penalty.

The parties disagree about whether the number of exceedances was determined in the Court's decision on liability. Plaintiffs state the Court found Defendant liable for 2,632 unexcused opacity exceedances (Doc. 184-1 at 12), while Defendant maintains the ruling "did not quantify the number of opacity events to which the ruling applied" and contests the list of 2,632 opacity exceedances by noting three instances where duplicate events are listed (Doc. 200 at 16-17).

During the liability period, Plaintiffs alleged there were a total of 2,949 individual opacity exceedances at Edwards. *NRDC*, 202 F. Supp. 3d at 864. The Court's decision on liability granted Plaintiffs summary judgment "on all opacity exceedances in Counts One and Two for which they have moved for summary judgment, and granted summary judgment to Plaintiffs on all exceedances for which they have moved for summary judgment with respect to Count Three except for those opacity exceedances that occurred while the relevant unit was off-line." *Id.* at 887. Counts One and Two referred to opacity violations at Edwards where no malfunction or breakdown was reported to IEPA as required by Edwards's operating permit and the SIP. *Id.* at 864. Count Three transforms, by operation of law, all the opacity standards violations into PM violations. *Id.* at 864–65. Plaintiffs did not move on all exceedances included in those Counts. (Doc. 104-1 at 15-16). The Court granted summary judgment for Defendant on an affirmative defense which excluded from the

PM violations—but not the opacity violations—instances where the relevant unit was offline. *NRDC*, 202 F. Supp. 3d at 887.

It is two and a half years too late for Defendant to argue about whether it is liable for exceedances identified by Plaintiffs in their summary judgment motion on liability. Plaintiffs' memorandum of law in support of that motion clearly explained which opacity exceedances were being moved on. (Doc. 104-1 at 15-16). Those exceedances were set forth in spreadsheets appended to Plaintiffs' motion. (Docs. 104-4; 104-5). Defendant did not dispute the individual instances in Counts One and Two moved on at the time. Moreover, in the Stipulation of Voluntary Dismissal (Doc. 135), Defendant agreed "[o]pacity exceedances excluded from Plaintiffs' Motion for Partial Summary Judgment . . . as indicated in" an exhibit attached were to be voluntarily dismissed. So, Defendant has waived any argument it is not liable for individual opacity exceedances in Plaintiffs' original list as it applies to exceedances in Counts One and Two which Plaintiffs moved for summary judgment on. Defendant has also waived the argument any exceedances on that list were not exceedances in Counts One and Two moved on to the extent they are not identified in Exhibit One of the Stipulation of Voluntary Dismissal (Doc. 135-1) as not such.

The only arguments left to Defendant are that specific instances were not on the original list or were marked to be dismissed with the Stipulation of Voluntary Dismissal. Because Defendant's dispute with regard to the number of violations does not take this form, the argument Defendant makes in response to Plaintiffs' current motion is waived. Consequently, no genuine issue of material fact is possible regarding the number of opacity violations except that instances have been

improperly added or not removed. The parties should therefore be able to stipulate to the number of violations found in the liability phase. The Court expended considerable judicial resources to ensure a thorough and correct resolution of Defendant's liability. Defendant would do well to wait to challenge its liability on appeal rather than arguing at the edges about the Court's ruling.

Defendant further argues violations are double counted by being counted as violations of both the opacity and PM standards. If that argument was correct, the Court would not need to consider whether Plaintiffs set forth the correct number of PM violations. But the statute clearly states the penalty is assessable for each violation, 42 U.S.C. § 7413(b), and the opacity and PM violations are separately enforceable. Defendant's cursory argument that an instance which is both a PM and an opacity violation constitutes only one violation does not persuade the Court otherwise.

However, the number of violations of PM standards cannot be determined on summary judgment. Because the Court found Defendant had an affirmative defense for instances where the unit was offline, the decision on liability "grant[ed] summary judgment to Plaintiffs on all exceedances for which they have moved for summary judgment with respect to Count Three except for those opacity exceedances that occurred while the relevant unit was off-line." *NRDC*, 202 F. Supp. 3d at 887. Plaintiffs note Defendant identified 224 instances that fall into this category, but this was not an exhaustive list. (Doc. 212 at 12 (citing Doc. 116 at 12 n.20)). The Court's ruling reflected that uncertainty. *NRDC*, 202 F. Supp. 3d at 887. Defendant has now claimed the actual number of exceedances excused by that affirmative defense is 250.

(Doc. 200 at 24). Since Plaintiffs do not concede this number or alter their total to account for it, the exact number of PM violations Defendant is liable for remains in dispute. The Court therefore cannot grant summary judgment on the maximum penalty. The Court denies Plaintiffs' request for a declaration of the maximum penalties under the Clean Air Act on this narrow ground. But the Court trusts that Defendant, reminded of arguments waived and stipulations made, will bear in mind the limited arguments available to it as this case proceeds.

Additionally, Plaintiffs' calculation of the maximum allowable penalty disregarded violations of the same type occurring on the same day, instead applying the maximum amount only to days on which violations occur. (Doc. 184-1 at 25-27). This generosity seems potentially inconsistent with the language of the Clean Air Act. In 1990, Congress amended the penalty provisions of the Clean Air Act, changing the relevant language from "per day of violation" to "per day for each violation." *United States v. Midwest Suspension & Brake*, 824 F. Supp. 713, 734 n.28 (E.D. Mich. 1993). The Senate Report explains this aspect of the amendment "clarifies that the maximum statutory penalty may be assessed for each day of each violation." S. Rep. No. 228, 101st Cong., (1990), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3748. If the Court determines the statutory maximum penalty, it would be inclined to count each violation rather than disregarding certain violations as Plaintiffs suggest.

### C. Summary Judgment is Not Appropriate for Declarations That Are Not a Distinct Part of a Claim

Federal Rule of Civil Procedure 56(a) allows a party to seek summary judgment on any "claim or defense—or [a] part of [a] claim or defense." The authorization to grant partial summary judgment was added in 2010 to make explicit that summary

judgment may be sought and granted "not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment. The Seventh Circuit has instructed, "[a] request for partial summary judgment can serve a useful brush-clearing function even if it does not obviate the need for a trial, and it may also facilitate the resolution of the remainder of the case through settlement." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 606 (7th Cir. 2015) (*Hotel 71*) (citation omitted); *see also BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("At the summary-judgment stage, the court can properly narrow the individual *factual* issues for trial by identifying the material disputes of fact that continue to exist." (emphasis in original)). However, the Seventh Circuit also explained "that a party should not pursue a needlessly piecemeal litigation strategy." *Hotel 71*, 778 F.3d at 606.

The issue with the statutory factors is that Plaintiffs are not asking for summary judgment on a discrete portion of a claim, but rather isolated decisions on a test mandated by Congress. The purpose of the factors set forth in 42 U.S.C. § 7413(e) is to "achieve an equitable mitigation (if any is warranted in a particular case)." *United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*, 150 F.3d 329, 339 (3d Cir. 1998); *cf. Tull v. United States*, 481 U.S. 412, 427 (1987) ("[H]ighly discretionary calculations that take into account multiple factors are necessary in order to set civil penalties under the Clean Water Act.").[8] The Court finds this to be

---

[8] "The penalty provisions of the [Clean Air Act] and the Clean Water Act (CWA) are virtually identical; thus CWA cases are instructive in analyzing issues arising from the [Clean Air Act]." *Pound*, 498 F.3d at 1094 n.2.

an instance "where summary judgment is too blunt a weapon with which to win the day." *Miller v. Gen. Outdoor Advert. Co.*, 337 F.2d 944, 948 (2d Cir. 1964).

To illustrate, one of the requested declarations is that Defendant must show economic penalties would be "ruinous or disabling" to qualify for a reduction. (Doc. 184-1 at 32). Plaintiffs cite *In re Oil Spill*, 148 F. Supp. 3d 563, 565–66, 575 (E.D. La. 2015) to support this point, but that case arose out of the infamous Deepwater Horizon spill which resulted in thousands upon thousands of barrels of oil and gas discharging into the Gulf of Mexico. They also cite *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 861, 868 (S.D. Miss. 1998), in which wastewater was discharged directly into the waters of the United States, causing serious harm. It is true in these cases the discussions are siloed, but the Court thinks it not impossible that the mandated equitable mitigation might require allowing a showing of less than ruinous or disabling penalties if, for instance, the Court found the violation to be trivial rather than serious. To be quite clear, the Court is not saying the factors necessarily bleed into one another in this manner. Rather, the Court thinks the *potential* that the factors could influence each other, combined with binding precedent instructing this Court to engage in discretionary, equitable consideration of seven congressionally mandated factors, means ruling on those factors piecemeal would be improper.

In light of this, rulings to curtail or explain a factor do not constitute a part of a claim, leaving the Court without the ability to rule on Plaintiffs third, fourth, fifth, sixth, and seventh declarations under Rule 56(a). Even if rulings on individual factors constituted parts of a claim, it would be inappropriate for the Court to begin weighing

the factors independently. The Court denies summary judgment on these declarations.

That said, Plaintiffs' second requested declaration—that no one has paid any penalties in this case—is factual, established, and undisputed. (Doc. 200 at 70). It is therefore appropriate to enter an order stating it "is not genuinely in dispute" and treating it "as established in the case." Fed. R. Civ. P. 56(g).[9]

This logic also applies to Plaintiffs' eighth requested declaration, which states; "In determining injunctive relief, the Court must account for IPRG's Clean Air Act violations at Edwards since the end of the liability period." (Docs. 184-1 at 36). Although Defendant does not dispute this (Doc. 200 at 70), it is not actually part of a claim. The Court thinks issuing this declaration would be outside of its power under Rule 56(a).

### D. The Number of Exceedances since the Liability Period

The final requested declaration seeks a ruling that Defendant has violated the Clean Air Act on 2,205 instances since the liability period ended. (Doc. 212 at 56).[10] This is a discrete factual claim for which summary judgment is appropriate. *BBL, Inc.*, 809 F.3d at 325. Defendant does not dispute there was a level of opacity which,

---

[9] Defendant also asserts this factor is immaterial because it is designed for situations with multiple enforcement actions or multiple defendants. (Doc. 200 at 70). Were the fact immaterial, it would not be possible to enter the Rule 56(g) order. Defendant has set forth a compelling view of the purpose of this factor. Nevertheless, while this factor is not at issue in this case, it is not immaterial because Congress requires the Court to consider it. 42 U.S.C. § 7413(e)(1).

[10] Plaintiffs removed six instances between their initial motion and their reply to address a small number of inconsistencies. (Doc. 212 at 57).

if unexcused, would constitute a violation in these 2,205 instances. (Doc. 200 at 10, 26-27, 78). However, Defendant vigorously denies these instances were unexcused.

Defendant's first response is the Court should not consider any instances which met the definition of malfunction or breakdown, even if those instances were not reported to IEPA as required by the operating permit. (Doc. 200 at 78-79). This is an attempt to resurrect a defense rejected in the liability phase. *NRDC*, 202 F. Supp. 3d at 882–85. The Court stands by its previous reasoning and rejects Defendant's argument.

Defendant's second line of defense is the 8-minute exemption. The 8-minute exemption permits opacity greater than 30 percent but less than 60 percent "for a period or periods aggregating 8 minutes in any 60 minute period" but only from one emission unit located within 1,000 feet of another emission unit operated by the same person and "limited to 3 times in any 24 hour period." 35 Ill. Admin. Code § 212.123(b) (§ 123(b)).[11] The parties disagree about whether any of the exceedances at issue fall within this exemption. This is an issue of law which may properly be resolved on summary judgment.

---

[11] The regulation, in its entirety, reads:

> The emission of smoke or other particulate matter from any such emission unit may have an opacity greater than 30 percent but not greater than 60 percent for a period or periods aggregating 8 minutes in any 60 minute period provided that such opaque emissions permitted during any 60 minute period shall occur from only one such emission unit located within a 305 m (1000 ft) radius from the center point of any other such emission unit owned or operated by such person, and provided further that such opaque emissions permitted from each such emission unit shall be limited to 3 times in any 24 hour period. § 123(b).

The interpretation of § 123(b) is a matter of first impression. The parties have not provided, and the Court's research has not uncovered, any decision from any court or administrative agency applying this section. This question was not reached earlier in this case because Defendant did not dispute Plaintiffs' application of the 8-minute rule to the exceedances at issue during the liability period at the liability phase.[12]

### 1. The 8-Minute Exemption Applies to Rolling Periods

An initial disagreement is whether the 8-minute exemption applies to hours starting on the hour and days starting at midnight—Defendant's preferred reading (Doc. 200 at 82)—or rolling periods—Plaintiffs' preferred reading (Doc. 212 at 56)— which requires determining the 60-minute period with reference to an individual exceedance in determining if it is exempt. The disagreement is, in reality, the familiar fight that occurs when regulatory text and regulatory history diverge. The applicable text says *any* 60-minute period and *any* 24-hour period. This text clearly directs the rolling method. However, Defendant provides a document from the Illinois Pollution Control Board from the promulgation of the rule which describes the rule as allowing eight minutes in any *hour* and three times *daily*. (Doc. 200-5 at 15).

"Courts interpreting a regulation first look to the regulation's text, and look past it only 'when it is ambiguous or where a literal interpretation would lead to an absurd result or thwart the purpose of the overall statutory scheme.' " *NRDC*, 202 F.

---

[12] By not disputing the application of the 8-minute exemption to those exceedances, Defendant has waived this argument with respect to the exceedances determined at the liability phase. Any error in Plaintiffs' methodology would therefore not relieve Defendant of liability on any such exceedances. The Court will view unfavorably attempts by Defendant to use the discussion of the 8-minute exemption here to mitigate penalties for the violations which occurred in the liability period by claiming some or all of those violations were subject to the 8-minute exemption.

Supp. 3d at 876 (quoting *First Nat'l Bank of Chicago v. Standard Bank & Tr.*, 172 F.3d 472, 477 (7th Cir. 1999)). The text here is clear, and it directs using rolling periods. Therefore, the Court finds the regulation contemplates rolling periods.

### 2. The 8-Minute Exemption is Not Lost When There Are More Than 8 Minutes of Exceedance

Defendant next argues Plaintiffs err by assuming the 8-minute exemption does not exclude eight minutes of exceedance even if more than 8 minutes of exceedance occur within a 60-minute period. In other words, if there are two 8-minute exceedances within an hour, Plaintiffs would count two violations and Defendant would count one. Similarly, Defendant argues even if there are more than three opacity exceedance events subject to the rule in a 24-hour period, three exceedances should still be excluded from the total number of violations.

The text of the regulation is quite clear on its face about the 24-hour period: "[S]uch opaque emissions permitted from each such emission unit shall be *limited to* 3 times in any 24 hour period." § 123(b) (emphasis added). The language sets a limit of three exceedances per 24 hours. Therefore, the Court holds that where more than three exceedances which would be exempted by the 8-minute exemption occur within a 24-hour period, three exceedances are not violations while the remaining exceedances are.

The regulatory text also indicates the 8-minute exemption is not lost when there are more than 8 minutes of exceedance in a 60-minute period. The regulation says an emission unit "may have" an opacity which would otherwise be an exceedance "for a period or periods aggregating 8 minutes in any 60 minute period" and refers to these emissions as being "permitted." § 123(b). Nothing in the regulation suggests

this permitted period of exceedance is nullified by violations that occur once the exemption has been used.

The regulatory history and purpose of the regulation support this reading. Defendant has submitted a document in which the Illinois Pollution Control Board promulgated the rule and explained its purpose. (Doc. 200-5). The Board explained "the danger of inadvertent" exceedances coupled with the "minimal nature of the problem" justified a "general allowance of not over eight minutes in any hour and not more than three times daily." (Doc. 200-5 at 15). From this, the Court concludes the Board's intention was the "general allowance" would allow 8 minutes of exceedance even where more than 8 minutes occurred in one 60-minute period.

### 3. Violations Are Not Measured in 6-Minute Averages; Consequently, the 8-Minute Exemption Applies by Exempting Individual Minutes

Defendant's remaining argument against Plaintiffs' application of the 8-minute exemption is that Plaintiffs only allows 6 minutes exempted rather than 8. (Doc. 200 at 80). This is undisputed. But Plaintiffs have used the 6-minute averages reported by IPRG pursuant to 35 Ill. Admin. Code § 201.405 (§ 405) and reasonably note this reported data should contain all necessary information to determine if a violation has occurred. (Doc. 212 at 56-57 n.13). The problem, succinctly stated, is how to exempt a period aggregating 8 minutes from violations which, Defendant asserts, occur when the average opacity in a 6-minute period exceeds 30%, where data are reported in 6-minute averages.

To explain the Illinois regulations, it is necessary to briefly discuss the history of opacity measurements. The Ringelmann Chart was a widely accepted method of

measuring opacity in 1972 when § 123(b) was adopted. *See Air Pollution Variance Bd. of Colo. v. W. Alfalfa Corp.*, 416 U.S. 861, 863 n.1 (1974) ("The Ringelmann test is generally sanctioned for use in measuring air pollution."). The basic method involved comparing the color of a plume to a chart which, viewed from a distance, presented varying shades of grey. *People v. Int'l Steel Corp.*, 226 P.2d 587, 590–91 (Cal. App. Dep't Super. Ct. 1951). As far as the Court's research has revealed, using the Ringelmann Chart did not require averaging periods or any particular time increment between observations. In 1974, EPA stopped using the Ringelmann Chart in favor of "Method 9," which requires a visual observer to determine opacity every 15 seconds in a 6-minute period. *Visible Emissions Field Manual EPA Methods 9 and 22*, EPA, 3, 4 (1993) https://www3.epa.gov/ttn/emc/methods/VEFieldManual.pdf. The Illinois Pollution Control Board subsequently adopted Method 9 and a 6-minute averaging period for reporting in the SIP. 35 Ill. Admin. Code. §§ 201.405(c), 212.109 (§ 109).

The question is whether the incorporation of Method 9 as a method of determining opacity also altered the Illinois SIP to measure violations in 6-minute average opacity. If § 123(a) was revised by the incorporation of Method 9, applying the 8-minute exemption becomes nigh impossible because § 123(b) does not contemplate 6-minute increments, but rather applies to periods aggregating 8 minutes (most likely aggregated through 1-minute average opacity data).[13] Indeed,

---

[13] By contrast, in the regulation providing for adjusted opacity standards procedures, 35 Ill. Admin. Code 212.126(a)(4), which is not at issue in this case, the Illinois Pollution Control Board created an exemption which did contemplate 6-minute average opacity, allowing "opacity for one six-minute averaging period in any 60 minute period to exceed the adjusted opacity standard."

the interaction between the purportedly revised-by-reference § 123(a) and the unrevised § 123(b) would open a veritable Pandora's Box of regulatory snarls. The vexing questions which might be unleashed include whether the periods aggregating 8 minutes referenced in § 123(b) include minutes above the 30% limitation in § 123(a) but not part of a 6-minute average over 30%, what criteria are used to determine which 8 minutes are exempted, and, perhaps most challengingly, how to apply the 6-minute averaging period after one or more minutes in the original period are exempted by the 8-minute exemption. Because § 123(b) was never written or revised with 6-minute average opacity measurements in mind, if raised these questions might have no answer. This cuts against the argument that § 123(a) was revised by incorporation to measure violations in 6-minute average opacity.

The plain text of § 123(a) does not require a 6-minute average opacity above 30% to complete a violation. *Id.* ("No person shall cause or allow the emission of smoke or other particulate matter, with an opacity of greater than 30 percent, into the atmosphere from any emission unit . . . ."). Defendant provides evidence suggesting IEPA believes the Illinois Pollution Control Board incorporated 6-minute averaging into the violation standard, whereby a violation is only complete when there is an average opacity of above 30% in a 6-minute period. (Doc. 233-4 at 31-32 n.23). And yet, the regulatory history indicates that particular dog didn't bark, *Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 17–18 (1987); there is no discussion whatsoever of changing the amount of time necessary to determine a violation in the regulatory

history cited by the parties.[14] Moreover, IEPA's views are not necessarily the views of the Illinois Pollution Control Board. *See Ill. EPA v. Ill. Pollution Control Bd.*, 896 N.E.2d 375 (Ill. App. Ct. 2008). Plaintiffs, relying primarily upon the text of the regulation and the lack of regulatory history showing an intent to change, argue a 6-minute averaging period is not necessary for a violation of § 123(a).

The answer to whether § 123(a) was amended *sub silentio* by incorporation lies tangled in a thicket of regulations. Violations of § 123 are determined by certain methods set out in 35 Ill. Admin. Code § 212.125 (§ 125). Among those methods are "visual observations conducted in accordance with Section 212.109." § 125(a). In turn, § 109 provides "measurements of opacity shall be conducted in accordance with Method 9, 40 CFR part 60, Appendix A." However, § 109 provides an important limitation: Method 9 applies "*except* for the methods of data reduction when applied to Sections 212.122 and 212.123." (emphasis added). And while Method 9 does require observations be collected over a 6-minute period, 40 C.F.R. Pt. 60 App. A ¶ 2.4, the portion of Method 9 which requires opacity to "be determined as an average of 24 consecutive observations recorded at 15-second intervals" (i.e., the 6-minute averaging period) is in a paragraph entitled "Data Reduction," 40 C.F.R. Pt. 60 App. A ¶ 2.5; *Visible Emissions Field Manual EPA Methods 9 and 22*, EPA, 14-16 (1993).

---

[14] Defendant urges a phrase stating, "the proposed regulation sets forth . . . the time for compliance," *In re Proposed Amendments to 35 Ill. Admin. Code 201, subparts J & L (Self-Monitoring)*, case no. R1987-38, 1988 WL 1026539, at *3 (Oct. 6, 1988, Ill. Pol. Control Bd.), shows the intent to alter the duration of a violation to a 6-minute averaging period. (Doc. 233 at 5 n.5). This was more likely a reference to 35 Ill. Admin. Code § 201.408, which, *inter alia*, requires "that monitoring and recording begin within 18 months of this Subpart being approved by the USEPA," subject to certain exceptions, and is entitled "Compliance Schedules."

The Illinois Pollution Control Board therefore specifically exempted § 123 from incorporating a six-minute averaging period. The Court thus concludes *any* emission of opacity exceeding 30% from a source regulated by § 123(a), if unexcused, violates the Clean Air Act.

Defendant has shown IEPA thinks otherwise and has stated as much when issuing permits. The Court does not consider the effect such statements may have on whether sources are liable for violations not measured in 6-minute averaging periods. But the plain language of the rule promulgated by the Illinois Pollution Control Board overcomes IEPA's statements with regard to the meaning of the rule and how it interacts with § 123(b), the instant question.

Both Plaintiffs and Defendant also point out the reporting requirements in 35 Ill. Admin. Code § 201.405 may be inconsistent with violations being measured in increments other than 6-minute averages, and in ordering supplemental briefing, the Court noted a concern that reporting in 6-minute averages might raise issues with federal regulations requiring State Implementation Plans to impose reporting requirements that require sources report sufficient data to allow enforcement of the applicable visible emissions limitations. (Docs. 227 at 1-2, 228 at 1-2); 40 C.F.R. § 51.211 and 40 C.F.R. Pt. 51, App. P. ¶ 4.2. However, this too does not overcome the plain regulatory text in determining the meaning of § 123. And it would not bear on Defendant's liability. *See United States v. Cinergy Corp.*, 623 F.3d 455, 458–59 (7th Cir. 2010). The Court therefore thinks it unnecessary to discuss the issue further.

The Court must address one more issue before returning to the application of the 8-minute exemption. In its supplemental brief, Defendant described § 109 as

follows: "Section 212.109 . . . provides, with certain exceptions not applicable here, that 'measurements of opacity shall be conducted in accordance with Method 9 . . . .' " (Doc. 233 at 3). As the Court has explained, there is an exception very much applicable here. The Court would not fault counsel for an incorrect reading of the law, but here the possibility that an exception would be applicable is apparent: one exception explicitly says Method 9's "data reduction"—the name of the paragraph Defendant cites in the following sentence—does not apply to "Section 212.123"—the regulation at the heart of this dispute. While counsel has a duty to zealously advocate, counsel also has a duty of candor to the Court—a duty reinforced by law. *See* Fed. R. Civ. P. 11(b)(2), (c)(3).

### 4. Applying the 8-Minute Exemption

There are four limitations on the 8-minute exemption: (1) opacity exceedances greater than 60% may not be exempted; (2) there may be no exceedances within 60 minutes from another stack within 1000 ft owned or operated by the same person; (3) the exemption may be applied to a maximum of 8 minutes in any 60-minute period; and (4) the exemption may be used only 3 times in any 24-hour period. The first and second limitations are simple to apply, and if either applies to a given exceedance it may not be exempted by the 8-minute exemption. The third and fourth, however, are more complex. Because violations are not measured in 6-minute averaging periods, the 8-minute exemption can be applied by utilizing the 1-minute data from the Continuous Emissions Monitor System Defendant keeps pursuant to Section 4a of

the Permit[15] and understanding that every minute where opacity was above 30% is a violation unless exempted.

Applying the third limitation requires looking at each potentially exempt minute of exceedance. To determine whether the 8-minute exemption exempts a given minute of exceedance, one must look back 59 minutes from that individual minute. If there are no more than 7 minutes which are exempted by the 8-minute exemption in that 59-minute period, the 60-minute limitation does not bar exempting the minute in question.

Applying the fourth limitation similarly requires retrospection. The use of the 8-minute exemption is "limited to 3 times in any 24 hour period." § 123(b). This requires the exemption be used in not more than three 60-minute periods within a 24-hour period. Therefore, one looks back 24 hours from the exceedance in question. The first use of the 8-minute exemption starts with the first minute the exemption was used in that 24-hour period. The second use begins with the first minute exempted more than 59 minutes after the first use, and the third use begins with the first minute exempted more than 59 minutes after the second use. This is true regardless of whether the 8-minute exemption exempted any other minutes of exceedance in any of those 59-minute periods. If no more than 2 such uses occurred in the 24-hour period preceding the exceedance in question, the 24-hour limit does not bar exempting the exceedance in question.

---

[15] The parties agree the 1-minute data may be appropriately used for this purpose. (Docs. 232 at 6; 233 at 6).

The Court has expended considerable time and resources to reach this conclusion. The process described above is the interpretation which best hews to the text of the regulation and its stated purpose. By employing rolling periods, it ensures there is never a 60-minute period with more than 8 minutes exempted, nor a 24-hour period where the exemption is used more than 3 times. By applying the exemption to the first eligible minutes, this method avoids gamesmanship where sources attempt to minimize the number of violations by attempting to exempt short violations while refusing to apply the exemption to longer violations, or where IEPA or private plaintiffs attempt to maximize violations by taking as many minutes from long exceedances as possible.

Moreover, this interpretation of the regulation does not create bad incentives by allowing a source to abuse the 8-minute exemption by, for example, creating a fixed period such as an hour starting on the hour at the end of which the source would have an incentive to pollute if it had not already used its 8-minute allowance of exceedance. At the same time, this interpretation allows the exemption to fulfill its purpose of exempting a small number of inadvertent exceedances. That purpose would be vitiated if, for example, a person applying the exemption had to look forward as well as backward in determining whether the exemption applied to a specific minute, which might result in no minutes being exempted at all. In short, the Court's interpretation respects the finely reticulated scheme packed into § 123(b) by providing a solution compatible with both the text and purpose of that provision.

However, this interpretation differs greatly from the interpretations of either Plaintiffs or Defendant. For that reason, summary judgment is not appropriate on

the precise number of violations which have occurred since the end of the liability period. However, the Court is hopeful that with the interpretation settled, the parties will be able to either stipulate to a precise number of exceedances, or at least stipulate to some number with only a small number of disputed exceedances. Should the parties prove unable to agree on the number of violations under the standard above, the Court is willing to entertain another motion for partial summary judgment on that issue.

## II. Defendant's Motion for Partial Summary Judgment

In determining whether injunctive relief is appropriate, this Court must consider "(1) whether the plaintiff has suffered or will suffer irreparable injury, (2) whether there are adequate remedies available at law to compensate for the injury, (3) the balance of hardships, and (4) the public interest." *Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 935 (7th Cir. 2008). Defendant argues Plaintiffs do not have admissible evidence creating a genuine issue of material fact with respect to harm and, in the alternative, any harm is outweighed by the costs of injunctive relief to Defendant and the Peoria area.

### A.    *Plaintiffs Have Presented Admissible Evidence of Harm*

Defendant makes four points in its argument Plaintiffs have not shown harm. It claims (1) opacity itself does not cause harm, (2) Plaintiffs lack evidence that the amount of PM associated with unexcused opacity exceedances is causing harm or will cause harm, (3) any current opacity exceedances do not result in a violation of the applicable PM limit "and thus as a matter of law do not endanger human health and the environment," and (4) the PM associated with Edwards does not contribute to an

exceedance of the National Ambient Air Quality Standards (NAAQS) in Peoria, precluding a finding of harm. (Doc. 180 at 17-21).

The first and third points are moot because there is a genuine dispute of material fact regarding whether Defendant has emitted, and is continuing to emit, PM in exceedance of its PM limits. Plaintiffs have pointed to evidence in the record showing at least one PM emission over the PM limit during tests. (Docs. 198 at 40-41; 182-4 at 8). Defendant suggests the Court should ignore the exceedance in question, although its argument on this point is unclear. The apparent response, which lies at the end of a winding path including a footnote and several internal references, indicates Defendant's position that the Court should be looking at 3-hour periods to correlate opacity to PM. (Doc. 208-1 at 10, 14, 45 n.10). But Edwards's PM violations are measured in 1-hour increments per their operating permit (Doc. 104-8 at 1), and there is no correlation necessary when Defendant's tests show PM exceedances. Therefore, it is not necessary to determine whether opacity alone causes harm or whether PM increase related to an opacity violation is harm which can be considered if the PM does not also exceed the PM limitations.

As Defendant recognizes, its argument that there was no genuine dispute of material fact with regard to whether the potentially small increment of PM increases associated with opacity exceedances depended on the Court excluding the testimony of one of Plaintiffs' expert witnesses, Dr. Joel Schwartz. (Doc. 180 at 19-20 n.2). The Court ruled Dr. Schwartz's testimony is admissible. (Doc. 226). And while Defendant's arguments against admissibility may raise doubts as to the weight of Dr. Schwartz's testimony, this Court views it in the light most favorable to the

nonmovant, Plaintiffs, as required on a motion for summary judgment. Through this lens, Plaintiffs have admissible evidence showing an incremental increase in PM results in a corresponding incremental increase in harm to human health.

This leaves Defendant with one argument, the content of which has morphed over the briefing on Defendant's motion. Initially, Defendant stated "Plaintiffs' failure to show exceedances of the PM NAAQS in the Peoria area precludes a finding of harm from any non-exempt opacity exceed[a]nces." (Doc. 180 at 20-21). The reply brief shows a full retreat from the language suggesting emissions causing NAAQS violations were necessary for a finding of harm—rather "the region's compliance with NAAQS[] is additional evidence that non-exempt opacity exceedances identified by Plaintiffs are not causing harm to human health or the environment." (Doc. 208-1 at 44). Defendant has therefore abandoned its position that compliance with regional NAAQS is one of four reasons why Plaintiffs have not shown harm (Doc. 180 at 17-18) by characterizing it as merely evidence of lack of harm (Doc. 208-1 at 44).

The argument, after its metamorphosis, fails because the admission of Dr. Schwartz's testimony and evidence that PM emissions, both increased during opacity exceedances and additional PM exceedances in their own right, provide evidence that Edwards's continuing violations of the Clean Air Act continue to cause harm to human health. Even assuming, *arguendo*, that PM not exceeding the NAAQS is evidence that individual source's violations did not cause harm to human health, the Court cannot weigh conflicting evidence while ruling on a motion for summary judgment. *Khan*, 879 F.3d at 840. Therefore, this is not a ground for summary judgment.

*B.     The Balance of Harms Remains Unclear*

Defendant urges, in the alternative, the harm identified in Dr. Schwartz's opinion is outweighed by the "draconian, economically crushing" equitable relief sought by Plaintiffs. (Doc. 180 at 21). The argument is installing the pollution controls would cost either $56 million for two new electrostatic precipitators (ESPs) or $116 million for two baghouses, and the cost of installing either would cause the closure of Edwards, resulting in 90 jobs and $90 million lost for the Peoria area. (Doc. 180 at 21).

Plaintiffs disagree. One source of disagreement, and the only one necessary to discuss, is whether Edwards would be forced to close. For this proposition, Defendant relies solely on the declaration of Barry Boswell, Senior Vice President and Chief Fossil Officer at Vistra Energy Corporation (Doc. 189), filed (and dated) on September 4, 2018. That one sentence alone reveals two issues with this declaration.

First, the dispositive motion deadline was August 31, 2018—the declaration was not timely filed. Defendant rather cursorily dismisses an objection from Plaintiff on this score by citing Rule 56(c)(1), which requires evidence examined at summary judgment be admissible. (Doc. 208-1 at 46). But even if this filing complied with the Federal Rules of Civil Procedure, it was a violation of the Local Rules, and the Court would decline to consider the affidavit for that reason alone. CDIL-LR 7.1(D) ("Any filings not in compliance may be stricken by the court."); 7.1(D)(1)(b) ("Include as exhibits to the motion all relevant documentary evidence."); *Hummel v. St. Joseph*

*Cty. Bd. Of Comm'rs*, 817 F.3d 1010, 1017 (7th Cir. 2016).[16] Moreover, the late submission of this affidavit coupled with the failure to disclose any such conversations to Plaintiffs calls into doubt its veracity. *Cf. Fischer v. Avanade, Inc.*, 519 F.3d 393, 407 (7th Cir. 2008) (holding a "late justification" for why plaintiff in an employment discrimination case was not hired "provided at the eleventh hour in conjunction with Defendant's motion for summary judgment[] raises a genuine issue of material fact as to whether this justification [was] a later fabrication on Defendant's part").

Second, Defendant spends a significant amount of time in its response to Plaintiffs' motion explaining why the Court should not consider its corporate parents' finances in determining the economic impact of civil penalties, primarily arguing the Court should view them as not responsible for IPRG's conduct. (Doc. 200 at 73-77). But Defendant assumes unsupported *ipse dixit* from an officer at one of those corporate parents that the corporate parent will move forward with the closure of the plant matters here. In other words, Defendant is at once arguing that "Vist[r]a and Dynegy . . . do not own or operate Edwards" (Doc. 200 at 75) and that because a Vistra executive says Vistra will decide to shut down Edwards, the Court must take it as a given that it will occur.

Of course, this is not irreconcilable—Defendant's position is that Vistra does not have control of the day-to-day operations at Edwards. (Doc. 200 at 75-76). But if Vistra is exercising control over what pollution technologies Edwards can install and

---

[16] The Court notes Defendant asked neither permission nor forgiveness for its failure to comply with the Local Rules.

determining whether to shut it down such that IPRG must be profitable according to Vistra's desires, that certainly casts doubt on Defendant's point. And according to Defendant, "*IPRG* compiles the budget and directs capital investment planning"; while the budget must be approved by Vistra "there is no evidence that the *contents* in the budget were driven by anything other than the operation and capital needs of the plant, as directed by IPRG." (Doc. 200 at 76-77 (emphasis in original)). Although the form of briefs and opinions finely chop cases into pieces, Defendant should remember that inconsistencies in the whole do not go unnoticed.

There are more issues. For one thing, Boswell is incorrect about the costs of new ESPs. (Doc. 189 at 2 ("[T]he cost for the enlarged ESPs is approximately $65 million.")).[17] Therefore, even if the Court were to credit the Boswell declaration, it is insufficient to show the ESPs at their actual cost—$56 million—would cause the closure of Edwards. The declaration is also largely uncorroborated by evidence which Plaintiffs had access to, depriving Plaintiffs of an opportunity to meaningfully investigate Boswell's claims. Defendant points to one instance, in one part of a deposition transcript, where there is testimony that an obligation to install something viewed as unneeded might set Edwards on "a potential glide path to a shutdown." (Doc. 210-1 at 11). But this testimony was speaking in the hypothetical, not the actual. And Plaintiffs have presented at least some evidence that Edwards has budgeted for baghouses before. (Doc. 199-19 at 5-10). Additionally, the Court is aware from Plaintiffs' motion that Vistra has reported this litigation and other CAA

---

[17] This might well be a scrivener's error, but the Court, bound to view the evidence in the light most favorable to Plaintiffs as the nonmoving party with respect to the motion supported by the Boswell declaration, presumes it is not.

litigation "could result in increased capital expenditures for the installation of pollution control equipment . . . or could result in an order or a decision to retire [violating] plants." (Doc. 184-21 at 3). *See Boyd v. Wexler*, 275 F.3d 642, 645 (7th Cir. 2001) ("Circumstantial evidence can create an issue of credibility.").

The reed holding up Defendant's argument, one declaration from one corporate officer not timely filed and potentially not properly disclosed, is too slender. Generally, attacks on credibility alone are not enough to defeat summary judgment. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002). But in light of the inconsistent circumstantial evidence in the record and Defendant's procedural failures, a credibility determination about Boswell's testimony is essential. *Outlaw v. Newkirk*, 259 F.3d 833, 838 (7th Cir. 2001) ("[I]ssues of credibility defeat summary judgment . . . where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility." (citation, internal quotation marks, and alteration omitted)). Credibility determinations are a function for trial, not summary judgment. *Deets v. Massman Const. Co.*, 811 F.3d 978, 982 (7th Cir. 2016). The Court therefore finds a genuine dispute of material fact with regard to whether injunctive relief would cause Edwards to shut down, which consequently means there is a genuine issue about the harm to the Peoria area.

There is one more issue to address. Plaintiffs indisputably requested "all documents concerning the possibility of future decommissioning, long-term shutdown, or long-term reduction of load" at Edwards starting in 2013, the year in which the suit was filed. (Doc. 198-9 at 13). "Documents" is defined quite broadly in

the request. (Doc. 198-9 at 5-6). Although Defendant claims the declaration is consistent with its discovery disclosures (Doc. 208-1 at 46), it does not explain how, nor how Boswell had reviewed the demand with other senior managers (Doc. 189 at 3) without creating documents which needed to be turned over to Plaintiffs. Nor is there any indication that any such documents have been turned over during the pendency of these motions. The Court reminds Defendant of its continuing discovery obligations under Rule 26(e). *See also* Fed. R. Civ. P. 37(c).[18] And, the Court notes that earlier disclosure of conversations about shutting down Edwards might have allowed the record to be developed, and Boswell's credibility less weakened, to the point where summary judgment could have been appropriate now.

There are genuine disputes of material fact as to both the harm caused by Defendant's violations of the Clean Air Act and the harm that would be caused by ordering injunctive relief. Summary judgment is therefore inappropriate and Defendant's motion is denied.

## CONCLUSION

For the reasons stated, Plaintiffs' Motion for Partial Summary Judgment on Remedy (Doc. 184) and Defendant's Motion for Summary Judgment Concerning Injunctive Relief (Doc. 180) are DENIED. However, pursuant to Federal Rule of Civil Procedure 56(g), the Court finds no genuine dispute that no one, including Defendant,

---

[18] Had the Court determined concerns about credibility were insufficient to defeat summary judgment and decided to ignore Defendant's violation of the Local Rules, it would have ordered supplemental briefing on whether to disregard Boswell's declaration under Rule 37(c).

has yet paid any penalties for the violations found in this Court's decision on liability.

Therefore, that fact will be treated as established in this case.

SO ORDERED.

Entered this 15th day of January 2019.

s/Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge