E-FILED
Wednesday, 27 February, 2019 09:56:16 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.; RESPIRATORY HEALTH ASSOCIATION; and SIERRA CLUB, INC., | |
| Plaintiffs, | Case No. 13-cv-01181<br>United States District Judge<br>Joe Billy McDade |
| v. | |
| ILLINOIS POWER RESOURCES GENERATING, LLC, | Magistrate Judge<br>Thomas P. Schanzle-Haskins III |
| Defendant. | |

**PLAINTIFFS' INITIAL PRETRIAL BRIEF**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

I. Civil Penalties ........ 1

A. IPRG's penalty should be high enough to deter and punish IPRG's violations, strip IPRG of the economic gains of violating, and encourage regulated parties to invest in strict compliance with the Clean Air Act ........ 1

B. The Court should calculate IPRG's penalty top down from the statutory maximum and consider all relevant evidence on the enumerated factors ........ 4

C. IPRG is liable for 6,612 violations during the liability period, the maximum penalty for those violations is $237,095,000, and the Court should increase the maximum to account for post-liability violations ........ 7

D. The Court should not treat the period before IPRG owned Edwards any differently ........ 9

E. In assessing economic benefit, the Court should consider how much IPRG saved by delaying the investments necessary for compliance ........ 10

F. In assessing business size and economic impact, the Court should consider evidence that IPRG's operations are intertwined with those of its corporate parents, and its parents' resources ........ 13

G. In assessing duration and compliance history, the Court should focus on how often and for how long IPRG violated the Clean Air Act and other evidence that bears on IPRG's attitude towards compliance ........ 15

H. In assessing seriousness, the Court should consider the number, duration, frequency, and magnitude of IPRG's violations and any evidence that they pose a risk or potential risk of harm to health or the environment ........ 17

I. Plaintiffs are not aware of any "other factors [that] justice may require" the Court to account for in determining IPRG's penalty ....... 20

J. IPRG's penalty should exceed the economic benefit of noncompliance ....... 20

II. Injunctive Relief ....... 22

A. This Court should use its broad equitable powers to secure IPRG's compliance with the Clean Air Act ....... 22

B. IPRG's violations cause irreparable harm ....... 24

C. IPRG's opacity violations cause irreparable harm even where they do not concur with particulate matter violations ....... 26

D. There are no adequate legal remedies for IPRG's violations ....... 28

E. In weighing the equities and considering the public interest, the Court should account for all of the pollution that will be avoided if IPRG installs the controls it needs to avoid further violations ....... 29

F. In weighing the equities and considering the public interest, the Court should give more weight to the interests Congress sought to promote in the Clean Air Act, and less weight to private or economic interests ....... 30

G. The Court should consider the remedial benefits of injunctive relief ....... 31

H. Penalties and injunctions serve different purposes under the Clean Air Act, and it would be contrary to Congress's intent and unjust to use the cost of injunctive relief as a basis for reducing IPRG's penalty ....... 32

# TABLE OF AUTHORITIES

## Cases

*Ala. Envtl. Council v. EPA*,
711 F.3d 1277 (11th Cir. 2013) ....................26

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987).................... 24-25, 28

*Ariz. Pub. Serv. Co. v. EPA*,
562 F.3d 1116 (10th Cir. 2009) ....................27

*Atl. States Legal Found. Inc. v. Universal Tool & Stamping Co.*,
786 F. Supp. 743 (N.D. Ind. 1992) ....................11, 14, 21

*California v. Bureau of Land Mgmt.*,
286 F. Supp. 3d 1054 (N.D. Cal. 2018) ....................25

*Congaree Riverkeeper, Inc. v. Carolina Water Serv., Inc.*,
248 F. Supp. 3d 733 (D.S.C. 2017)....................33

*Directv, Inc. v. Barczewski*,
604 F.3d 1004 (7th Cir. 2010) ....................21

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
824 F.3d 507 (5th Cir. 2016) .................... 11-12

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
No. CV H-10-4969, 2017 WL 2331679 (S.D. Tex. Apr. 26, 2017) ....................12, 16, 21

*EPA v. Envtl. Waste Control, Inc.*,
917 F.2d 327 (7th Cir. 1990) ....................5

*Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*,
382 F.3d 743 (7th Cir. 2004) ....................32

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
890 F. Supp. 470 (D.S.C. 1995),
*vacated on other grounds*, 149 F.3d 303 (4th Cir. 1998),
*rev'd on other grounds*, 528 U.S. 167 (2000).................... 21-22

*Hecht v. Bowles*,
321 U.S. 321 (1944)....................25

*Idaho Conservation League v. Atlanta Gold Corp.*,
879 F. Supp. 2d 1148 (D. Idaho 2012) ............................................................... *passim*

*In re Oil Spill*,
148 F. Supp. 3d 563 (E.D. La. 2015).................................................................6, 11

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
399 F.3d 248 (3d Cir. 2005)..................................................................................31

*Kelly v. EPA*,
203 F.3d 519 (7th Cir. 2000) ............................................................................ 3-4

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010).............................................................................................23

*NRDC v. County of Los Angeles*,
No. CV 08-01467 BRO (PLAx), 2015 WL 1459476 (C.D. Cal. Mar. 30, 2015),
*rev'd in part on other grounds*, 840 F.3d 1098 (9th Cir. 2016)..........................................9

*NRDC v. Sw. Marine, Inc.*,
236 F.3d 985 (9th Cir. 2000) ..............................................................................23

*Ohio Valley Envtl. Coalition, Inc. v. Fola Coal Co., LLC*,
No. CV 2:13-5006, 2015 WL 5972430 (S.D.W. Va. Oct. 14, 2015) ......................... 23-24

*Ohio Valley Envtl. Coalition. v. U.S. Army Corps of Eng'rs*,
528 F. Supp. 2d 625 (S.D.W. Va. 2007) ...............................................................30

*Pound v. Airosol Co.*,
498 F.3d 1089 (10th Cir. 2007) ........................................................................ *passim*

*Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*,
No. 89–3193 (JCL), 1995 WL 461252 (D.N.J. Mar. 9, 1995) ...................................15

*Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*,
913 F.2d 64 (3d Cir. 1990)..........................................................................11, 18, 20

*Pub. Interest Research Grp. of N.J., Inc. v. Top Notch Metal Finishing Co.*,
No. CIV.A. 87-3894, 1987 WL 44393 (D.N.J. Nov. 6, 1987) ...................................30

*Riverkeeper, Inc. v. Brooklyn Ready Mix Concrete, LLC*,
No. 14-CV-1055 (NGG) (SMG), 2016 WL 4384716 (E.D.N.Y.
Aug. 16, 2016) ..............................................................................................6, 11, 21

*S.F. Baykeeper v. Tosco Corp.*, 309 F.3d 1153 (9th Cir. 2002) ....................10

*Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918 (7th Cir. 2008) .................... 24-26, 28

*Sierra Club v. Khanjee Holdings (US) Inc.*, 655 F.3d 699 (7th Cir. 2011) ....................5

*Student Pub. Interest Research Grp. of N.J., Inc. v. Monsanto Co.*, No. CIV. A. 83-2040, 1988 WL 156691 (D.N.J. Mar. 24, 1988).................... 18-20, 22, 33

*Titan Wheel Corp. of Iowa v. EPA*, 291 F. Supp. 2d 899 (S.D. Iowa 2003), *aff'd*, 113 F. App'x 734 (8th Cir. 2004)....................12

*Tull v. United States*, 481 U.S. 412 (1987)....................15, 28

*United States v. A.A. Mactal Const. Co.*, No. 89-2372, 1992 WL 245690 (D. Kan. Apr. 10, 1992)....................16, 21

*United States v. Allegheny Ludlum Corp.*, 366 F.3d 164 (3d Cir. 2004)....................11

*United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*, 150 F.3d 329 (3d Cir. 1998)....................5

*United States v. Bethlehem Steel Corp.*, 829 F. Supp. 1047 (N.D. Ind. 1993) ....................4, 16, 32

*United States v. B & W Investments Properties, Inc.*, No. 91 C 5886, 1994 WL 53781 (N.D. Ill. Feb. 18, 1994), *aff'd*, 38 F.3d 362 (7th Cir. 1994)....................2, 18

*United States v. B & W Investments Properties*, 38 F.3d 362 (7th Cir. 1994) ....................5

*United States v. City of Chicago*, 549 F.2d 415 (7th Cir. 1977) ....................23

*United States v. Deaton*, 332 F.3d 698 (4th Cir. 2003) ....................31

*United States v. Dotterweich*, 320 U.S. 277 (1943)....................1

*United States v. Gulf Park Water Co., Inc.*,
14 F. Supp. 2d 854 (S.D. Miss. 1998) .......... 6, 11, 18-19

*United States v. ITT Cont'l Baking Co.*,
420 U.S. 223 (1975) .......... 3

*United States v. J & D Enters. of Duluth*,
955 F. Supp. 1153 (D. Minn. 1997) .......... 2

*United States v. Lane Labs-USA Inc.*,
427 F.3d 219 (3d Cir. 2005) .......... 22

*United States v. Lexington-Fayette Urban Cty. Gov't*,
591 F.3d 484 (6th Cir. 2010) .......... 33

*United States v. Mac's Muffler*,
No. C85–138R, 1986 WL 15443 (N.D. Ga. Nov. 4, 1986) .......... 19

*United States v. Marine Shale Processors*,
81 F.3d 1229 (5th Cir. 1996) .......... 5

*United States v. Mex. Feed & Seed Co.*,
980 F.2d 478 (8th Cir. 1992) .......... 10

*United States v. Midwest Suspension & Brake*,
824 F. Supp. 713 (E.D. Mich. June 16, 1993),
*aff'd*, 49 F.3d 1197 (6th Cir. 1995) .......... 6, 9, 16

*United States v. Mountain State Carbon, LLC*,
No. 5:12-CV-19, 2014 WL 3548662 (N.D.W. Va. July 17, 2014) .......... 6, 30

*United States v. Mun. Auth. of Union Twp.*,
929 F. Supp. 800, 806 (M.D. Pa. 1996),
*aff'd*, 150 F.3d 259 (3d Cir. 1998) .......... 14, 22

*United States v. Mun. Auth. of Union Twp.*,
150 F.3d 259 (3d Cir. 1998) .......... 13

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001) .......... 23

*United States v. Oliver*,
No. 06-196, 2009 WL 10671371 (D. Ak. June 25, 2009) .......... 16-17

*United States v. Park*,
421 U.S. 658 (1975) .......... 2, 3, 17, 29

*United States v. SCM Corp.*,
667 F. Supp. 1110 (D. Md. 1987) .......... 13

*United States v. Smithfield Foods, Inc.*,
972 F. Supp. 338 (E.D. Va. 1997),
*aff'd in relevant part, rev'd on other grounds*, 191 F.3d 516 (4th Cir. 1999) .......... 12, 16-17

*United States v. Smithfield Foods, Inc.*,
191 F.3d 516 (4th Cir. 1999) .......... 12

*United States v. Tzavah Urban Renewal Corp.*,
696 F. Supp. 1013 (D.N.J. 1988) .......... 24, 28

*United States v. Vista Paint Corp.*,
No. 94-0127, 1996 WL 477053 (C.D. Cal. Apr. 16, 1996),
*aff'd*, 129 F.3d 129 (9th Cir. 1997) .......... 13, 16-17

*United States v. Westvaco Corp.*,
No. MJG-00-2602, 2015 WL 10323214 (D. Md. Feb. 26, 2015) .......... 27

*U.S. ex rel. Adm'r of E.P.A. v. CITGO Petroleum Corp.*,
723 F.3d 547 (5th Cir. 2013) .......... 11, 19, 33

*U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me., LLC*,
339 F.3d 23 (1st Cir. 2003) .......... 31-32

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .......... 23

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) .......... 25

**Statutes**

33 U.S.C. § 1319(d) .......... 4

33 U.S.C. § 1365(a) .......... 4

42 U.S.C. § 7401(b) .......... 25, 29, 31

42 U.S.C. § 7413(b) .......... 5, 8-9

42 U.S.C. § 7413(e) .......... *passim*

42 U.S.C. § 7604(a) .......... 4-5, 22

47 U.S.C. § 605 .......... 23

Pub. L. No. 91-604, § 302(h), 84 Stat. 1676 (1970) .......... 26

Pub. L. No. 95-95, § 111, 91 Stat. 685 (1977) .......... 2

Pub. L. No. 101-549, § 701, 104 Stat. 2399 (1990) .......... 2

**Legislative History**

136 Cong. Rec. S16895 (Conf. Rep.) (daily ed. Oct. 27, 1990) .......... 20

S. Rep. No. 88-638 (1963) (excerpted and attached as Exhibit JA) .......... 31

S. Rep. No. 90-403 (1967) (excerpted and attached as Exhibit JB) .......... 3, 25

H.R. Rep. No. 90-728 (1967) (excerpted and attached as Exhibit JC) .......... 3

S. Rep. No. 95-127 (1977) (excerpted and attached as Exhibit JD) .......... 1, 3

H.R. Rep. No. 95-294 (1977) (excerpted and attached as Exhibit JE) .......... *passim*

H.R. Rep. No. 95-564 (1977) (Conf. Rep.) (excerpted and attached as Exhibit JF) .......... 2

S. Rep. No. 101-228 (1989) (excerpted and attached as Exhibit JG) .......... 4, 15, 31

H.R. Rep. No. 101-490 (1990) (excerpted and attached as Exhibit JH) .......... 4, 26

**Other Authorities**

40 C.F.R. § 19.4 .......... 8

Adopted Rule & Final Order, *In the Matter of: Particulate Emission Limitations, Rule 203(g)(1) and 202(b) of Chapter 2*, No. R82-1 (Docket B) (Ill. Pollution Control Bd. June 30, 1988), ECF No. 232-1 .......... 27

EPA, Combined Enforcement Policy for Clean Air Act Sections 112(r)(1), 112(r)(7) and 40 C.F.R. part 68 (June 2012), ECF No. 184-32 .......... 21

## INTRODUCTION

Congress has vested this Court with the power and responsibility to penalize IPRG for its long history of Clean Air Act violations and ensure that those violations do not continue or recur. In determining the appropriate penalty for IPRG's violations, the Court should focus on the goals Congress expressed: Punishing polluters who cut corners on the pollution-control investments and other prophylactic measures needed to ensure their compliance with the Clean Air Act, and discouraging other regulated parties from gambling on noncompliance. In determining the appropriate injunctive relief, the Court should focus on what new pollution controls and other measures are needed to eliminate further violations at Edwards, and thus avert further irreparable harm to air quality, public health, and welfare in and around Peoria.

### I. Civil Penalties

#### A. IPRG's penalty should be high enough to deter and punish IPRG's violations, strip IPRG of the economic gains of violating, and encourage regulated parties to invest in strict compliance with the Clean Air Act

Congress first empowered courts to impose civil penalties on violators of State Implementation Plan requirement and stationary source regulations more than forty years ago, in the 1977 Clean Air Act Amendments. *See* 42 U.S.C. § 7413; H.R. Rep. No. 95-294, at 69-70 (1977), Ex. JE; S. Rep. No. 95-127, at 50-51 (1977), Ex. JD. Like the Federal Food, Drug, and Cosmetic Act it was patterned on, the Clean Air Act "deal[s] with activities which 'touch phases of the lives and health of people which, in the circumstances of modern industrialism, are beyond self-protection.'" H.R. Rep. No. 95-294, at 70-71, Ex. JE (quoting *United States v. Dotterweich*, 320 U.S. 277, 280 (1943)). The House Report to the 1977 Amendments notes:

> In cases like assembly line errors in production of automobiles, the accidental contamination of unleaded gasoline, the malfunction of a pollution control device, violations of emission limitations or other pollution control requirements may occur. The result is some increase in the risk to the public's health or well-being, even if the degree of the increase in risk is unquantifiable or unable to be proved. It

> matters not whether the violation was knowing as far as its effect on the public is concerned. In many instances, proper quality control, maintenance, inspection, monitoring, repair, personnel tests, or other measures can prevent or minimize the likelihood of such accidental violations. The omission or inadequate execution of such prophylactic measures would be a proper basis for enforcement . . . just as surely as an intentional violation.

H.R. Rep. No. 95-294, at 71, Ex. JE.[1]

The civil penalty provisions accordingly "impose[] [on operators] not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure violations will not occur." *Id.* at 71 (quoting *United States v. Park*, 421 U.S. 658, 672 (1975)); *see also United States v. J & D Enters. of Duluth*, 955 F. Supp. 1153, 1158-59 (D. Minn. 1997) (concluding that "without question, Congress intended to impose a strict, regulatory scheme in order to ensure compliance"). The House explained that "to make the owners, managers, and operators of pollution sources 'the strictest censors' of their activities, the Clean Air Act . . . 'punishes neglect where the law requires care, or inaction where it imposes a duty.'" H.R. Rep. No. 95-294, at 71, Ex. JE (citing *Park*, 421 U.S. at 671) (quotation marks omitted). Penalties should accordingly "be assessed in amounts which are adequate to assure compliance will result, rather than permitting continued noncompliance to be economically profitable." *Id*. at 70.

[1] The civil penalty provision added to the Act in 1977 was based on language proposed by the House and provided for courts to consider "(in addition to other factors) the size of the business, the economic impact of the penalty on the business, and the seriousness of the violation." Pub. L. No. 95-95, § 111, 91 Stat. 685 (1977); H.R. Rep. No. 95-564, at 132 (1977) (Conf. Rep.), Ex. JF (presenting both chambers' proposals and explaining that "[t]he conferees agreed to accept the House provision," with a few changes concerning lawsuits by the United States Environmental Protection Agency (EPA) and against individuals). The penalty provision was amended to its current form in 1990. *Compare* Clean Air Act Amendments of 1990, Pub. L. No. 101-549, § 701, 104 Stat. 2399, 2679 (1990), *with* 42 U.S.C. § 7413(e)(1); *see also United States v. B & W Investments Properties, Inc.*, No. 91 C 5886, 1994 WL 53781, at *3-4 (N.D. Ill. Feb. 18, 1994) (comparing the pre- and post-1990 amendment civil penalty language), *aff'd*, 38 F.3d 362 (7th Cir. 1994).

Congress understood that it would take widespread compliance to achieve the Act's promise of "establishing an environment that not only protects public health but is conducive to good living." S. Rep. No. 90-403, at 9 (1967), Ex. JB; *see also* H.R. Rep. No. 90-728, at 8-9 (1967), Ex. JC (similar). That is one reason why the Act empowers courts to penalize not only willful violations, but also conduct that increases the risk of accidental violations, such as underinvestment in pollution-control measures. *See* H.R. Rep. No. 95-294, at 71, Ex. JE (discussing the value of "prophylactic measures"); *see also* S. Rep. No. 95-127, at 52, Ex. JD. (discussing "the recalcitrance of some source owners and operators toward expeditiously complying with requirements under the act" and the need to complement the existing criminal penalty provisions with new civil penalty ones). The Act enforces a strict duty of care on owners and operators of polluting facilities, for broader public benefit. *See* H.R. Rep. No. 95-294, at 71, Ex. JE ("The requirements of foresight and vigilance imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are not more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them." (quoting *Park*, 421 U.S. at 672)).

Congress reaffirmed the value of civil penalties in the 1990 Clean Air Act Amendments, which added the economic-benefit, duration, and compliance-history factors and provided for penalties to be assessed in citizen suits like this one. *See supra* n.1. The accompanying Senate Report explains that civil penalties are "necessary for deterrence, restitution and retribution."[2]

[2] Other federal laws include civil penalty provisions for similar reasons. *See, e.g.*, *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 231 (1975) (discussing the Federal Trade Commission Act) ("Congress was concerned with avoiding a situation in which the statutory penalty would be regarded by potential violators . . . as nothing more than an acceptable cost of violation, rather than as a deterrence to violation."); *Kelly v. EPA*, 203 F.3d 519, 523 (7th Cir.

S. Rep. No. 101-228, at 373 (1989), Ex. JG. As background for the 1990 Amendments generally, the Senate noted that people have "no choice but to breathe the air, whether it is clean or polluted"; that air "is a national resource that should be protected as our parks and national monuments are protected"; and that "[t]o protect this resource a strong national control strategy is needed." *Id.* at 3; *see also* H.R. Rep. No. 101-490, at 144 (1990), Ex. JH (noting that President George H.W. Bush had sent Congress "a comprehensive proposal" to amend the Act and said that "progress has not come quickly enough and much remains to be done" (internal quotation marks omitted)). The Senate also recognized that "[w]e are routinely exposed to thousands of different air pollutants emitted every day" and that air-pollution research completed after the Clean Air Act's enactment had "demonstrated adverse effects at levels of exposure previously presumed to be safe"). S. Rep. No. 101-228, at 2, Ex. JG.

Civil penalties respond to these concerns by encouraging regulated parties like IPRG to invest in strict compliance with their emissions limits, and thus reduce their contributions to the blend of air and other environmental pollution that threatens the health and welfare of people in Peoria and across the United States.

**B. The Court should calculate IPRG's penalty top down from the statutory maximum and consider all relevant evidence on the enumerated factors**

The Court can "apply any appropriate civil penalties" for IPRG's violations, 42 U.S.C. §

---

2000) ("Civil penalties under the Clean Water Act are intended to punish culpable individuals and deter future violations, not just to extract compensation or restore the status quo."); *United States v. Bethlehem Steel Corp.*, 829 F. Supp. 1047, 1057 (N.D. Ind. 1993) (discussing civil penalties under the Resource Conservation and Recovery and Safe Drinking Water Acts) ("[T]he major purpose of a civil penalty is deterrence").

The law on Clean Water Act remedies is especially pertinent because the Clean Water Act's civil penalty and citizen suit provisions are so similar to the Clean Air Act's. *Compare* 33 U.S.C. § 1319(d), and *id.* § 1365(a), *with* 42 U.S.C. § 7413(e), *and id.* § 7604(a). *See also* Jan. 15 Op. & Order, ECF No. 235, at 14 n.8 (recognizing that Clean Water Act cases "are instructive in analyzing issues arising from" the Clean Air Act (quoting *Pound v. Airosol Co*., 498 F.3d 1089, 1094 n.2 (10th Cir. 2007)).

7604(a), after accounting for the statutory maximum penalty, *see id.* § 7413(b), and the factors in 42 U.S.C. § 7413(e)(1), *id.*; *see also Pound*, 498 F.3d at 1098; *United States v. B & W Investments Properties*, 38 F.3d 362, 368 (7th Cir. 1994). The Clean Air Act "does not prescribe with precision how or with what weight to apply the [civil-penalty] factors." *B & W*, 38 F.3d at 368; *see also United States v. Marine Shale Processors*, 81 F.3d 1329, 1338 (5th Cir. 1996) ("[C]alculation of discretionary penalties is not an exact science, and few courts could comply with [the defendant-appellant's] request that the importance of each factor be precisely delineated."); *EPA v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 335 (7th Cir. 1990) (discussing penalties under the Resource Conservation and Recovery Act) ("The assessment of penalties is committed to the informed discretion of the trial court . . . .").

The Act also does not specify a calculation method. *See Pound*, 498 F.3d at 1095; *United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*, 150 F.3d 329, 338 (3d Cir. 1998). As this Court and the Seventh Circuit have noted, however, the "top-down" method is the prevailing one. *See Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 707 (7th Cir. 2011) ("Courts generally presume that the maximum penalty under the Clean Air Act should be imposed, and then consider the factors described in [42 U.S.C.] § 7413(e) to determine what degree of mitigation, if any, is proper."); Jan. 15 Op. & Order, ECF No. 235, at 8 (quoting *Khanjee*); *see also B & W*, 38 F.3d at 368 ("courts generally presume that the maximum penalty should be imposed"); *Pound*, 498 F.3d at 1095 (citing *B & W*); *Dell'Aquilla*, 150 F.3d at 339 (same). The Court should use the top-down method here, to help ensure that the final penalty amount does not become unmoored from the statutory maximum and furthers Congress's deterrence, retribution, and restitution goals. *See supra* pt. I.A.

The Court should consider all admissible evidence that is relevant to each penalty factor.[3] *See United States v. Midwest Suspension & Brake*, 824 F. Supp. 713, 735 n.30 (E.D. Mich. 1993), *aff'd,* 49 F.3d 1197 (6th Cir. 1995). Plaintiffs have the burden of persuading the Court that the evidence on any given factor weighs in favor of a higher penalty (all else being equal), and IPRG has the burden of persuading the Court that the evidence weighs in favor of a lower one. Thus, for example, IPRG has the burden with respect to arguments to the effect that the economic impact of a given penalty amount would be too harsh, or that the otherwise-appropriate penalty should be reduced because it tried in good faith to comply. *See, e.g.*, *In re Oil Spill*, 148 F. Supp. 3d 563, 575 (E.D. La. 2015) (Defendant had the burden as to whether penalties should be reduced to avoid a "ruinous" or "disabling" impact on its business under the economic impact factor); *United States v. Mountain State Carbon, LLC*, No. 5:12-CV-19, 2014 WL 3548662, at *35 (N.D.W. Va. July 17, 2014) ("The burden of showing that a civil penalty would have a detrimental effect on the violator's business rests with the violator"); *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 868 (S.D. Miss. 1998) (citing additional cases for this principle); *Midwest Suspension & Brake*, 824 F. Supp. at 736 (the "full compliance history and good faith efforts to comply" factor "weigh[ed] in favor of not reducing the statutory maximum penalty" because the plaintiff presented sufficient evidence of regular violations over a number of years, and the "defendant did not introduce any evidence with respect to its good faith efforts to comply"); *Riverkeeper, Inc. v. Brooklyn Ready Mix Concrete, LLC*, No. 14-CV-1055 (NGG) (SMG), 2016 WL 4384716, at *8 (E.D.N.Y. Aug. 16, 2016) ("Defendants have not demonstrated that they made good faith attempts to comply . . . .").

[3] This Court has already found "that no one, including [IPRG], has yet paid any penalties for the violations found in this Court's decision on liability," and thus will treat "that fact . . . as established in this case." Jan. 15 Op. & Order, ECF No. 235, at 35-36.

**C. IPRG is liable for 6,612 violations during the liability period, the maximum penalty for those violations is $237,095,000, and the Court should increase the maximum to account for post-liability violations**

IPRG should be penalized for 3,592 opacity violations and 3,020 particulate matter violations during the liability period, which ran from April 18, 2008 through June 30, 2014. These violation counts, the exceedance events they are based on, and the statutory maximum penalty calculation for the liability period are set forth in Exhibit JI to this brief. *See* Ex. JI at 2 (statutory maximum penalty calculation and summary violation counts); *see also id*. at 70 (total number of unexcused opacity exceedance events and corresponding violation count for the liability period) and 124 (total number of unexcused particulate matter exceedance events and corresponding violation count for the liability period).

The list of exceedance events Plaintiffs used to develop these violation counts is the same as the one Plaintiffs presented with their reply brief in support of their motion for partial summary judgment on remedy, *see* ECF No. 212, at 8; Revised Ex. A, ECF No. 212-2, except that Plaintiffs have substituted the 250 events IPRG asserted occurred during offline periods when it opposed Plaintiffs' motion for the events Plaintiffs had earlier assumed were excused as offline (for purposes of ascertaining the number of opacity violations that also constitute violations of IPRG's separate particulate matter limit). *See* Defs. Resp. to Pls. Partial Summ. J., ECF No. 200, at 19 resp. to ¶ 21. This substitution should resolve the "narrow ground" on which the Court denied summary judgment on the liability-period violation count. *See* Jan. 15 Op. & Order, ECF No. 235, at 13 (identifying this discrepancy as the reason "the exact number of [particulate matter] violations Defendant is liable for remains in dispute").

To develop the violation counts presented in this brief, Plaintiffs have counted each six-minute interval of time during which this Court found IPRG unlawfully exceeded its opacity limit as a separate violation of that limit. Plaintiffs followed the same approach to count

particulate matter violations. Basing IPRG's liability-period violation count on six-minute intervals is most consistent with the Court's August 2016 ruling granting partial summary judgment on liability, because that ruling was predicated on the exceedance information IPRG included in its quarterly excess emissions reports to Illinois EPA, and IPRG reports exceedances by reference to six-minute-average data. *See, e.g.*, Aug. 23, 2016 Op. & Order, ECF No. 124, at 3-4. It is also the most logical approach from a deterrence perspective, because it avoids the prospect that some six-minute intervals during which IPRG was in violation of one or both limits will get less weight in the ultimate penalty calculation simply because they immediately precede or follow another such interval in IPRG's publicly reported opacity data. Treating longer continuous exceedance periods as functionally equivalent to six-minute periods could dilute regulated parties' incentives to bring themselves back into compliance with the opacity limit as soon as possible after registering an exceedance. Clean Air Act penalties should be set in a way that encourages strict compliance with the Act. *See supra* pt. I.A.

The statutory maximum civil penalty for IPRG's liability-period opacity and particulate matter violations is $237,095,000. Ex. JI at 2.[4] Plaintiffs calculated this figure by applying the maximum penalty amount to each individual violation, rather than lumping together multiple violations that occurred on the same calendar day. *See id.*; Jan. 15 Op. & Order, ECF No. 235, at 13 (noting Court's inclination to "count each violation" separately for purposes of the maximum-penalty calculation, rather than basing the calculation on the number of distinct calendar days on which violations of the same type occurred); 42 U.S.C. § 7413(b) (referring to courts' authority

[4] The $25,000 maximum penalty in 42 U.S.C. § 7413(b) has been adjusted for inflation to $32,500 for the violations before January 13, 2009 and $37,500 for the violations between January 13, 2009 and June 30, 2014. *See* Jan. 15 Op. & Order, ECF No. 235 at 7 n.7; 40 C.F.R. § 19.4 (Table 1, row marked "42 U.S.C. 7413(b)" and "Clean Air Act (CAA)," three rightmost columns).

"to assess . . . a civil penalty of not more than $25,000 per day *for each violation*" (emphasis added)); *Midwest Suspension & Brake*, 824 F. Supp. at 734 n.28 (assessing "civil penalties against defendant for each violation, even if the violations occur on the same day, is warranted under § 7413(b)"). This approach promotes internal consistency in the penalty calculation and deterrence for the same reasons the Court should base the violation count on six-minute exceedance intervals.

Although it is too early to specify the number of times IPRG has violated its opacity and particulate matter limits since the liability period ended, the Court should plan to increase the maximum penalty to account for violations since June 30, 2014. This will promote judicial economy and finality by allowing this Court to address as many violations as possible in a single remedy order. *See, e.g.*, *NRDC v. County of Los Angeles*, No. CV 08-01467 BRO (PLAx), 2015 WL 1459476, at *17-18 (C.D. Cal. Mar. 30, 2015) (granting summary judgment to plaintiffs as to several years' worth of violations that occurred after plaintiffs filed an earlier summary judgment motion, as a predicate to determining civil penalties for those violations and earlier ones), *rev'd in part on other grounds*, 840 F.3d 1098 (9th Cir. 2016).

### D. The Court should not treat the period before IPRG owned Edwards any differently

In assessing penalty factors that naturally call for the Court to account for the full liability period, such as economic benefit, duration, the violator's full compliance history and any good-faith efforts to comply, and seriousness, the Court should not ignore or discount otherwise relevant evidence that predates IPRG's tenure as the immediate owner of Edwards. "When IPRG assumed ownership of Edwards, it also assumed the previous owner's liability." Jan. 15 Op. & Order, ECF No. 235, 2 n.2. It would be contrary to that assumption of liability—which Plaintiffs relied on to dismiss the previous owner and its immediate parent as defendants, *see* ECF No. 45

¶¶ 1-4 & ECF No. 44—for the Court to credit the ownership change as a basis for cutting back the penalty for Clean Air Act violations at the plant. It would also set a damaging precedent, by signaling to regulated parties that they may be able to erase some potential penalty liability by simply transferring violating facilities to new owners or reorganizing themselves.[5] *Cf. S.F. Baykeeper v. Tosco Corp.*, 309 F.3d 1153, 1155, 1160 (9th Cir. 2002) (applying similar deterrence rationale to reject a predecessor owner's effort to evade Clean Water Act penalties); *United States v. Mex. Feed & Seed Co*., 980 F.2d 478, 486-87 (8th Cir. 1992) (given CERCLA's goals of promoting swift, polluter-financed cleanups, "Congress could not have intended that [responsible] corporations be enabled to evade their responsibility by dying paper deaths, only to rise phoenix-like from the ashes, transformed, but free of their former liabilities"). IPRG stands in its predecessor's shoes for purposes of this case. It is responsible for all conduct by that predecessor that is germane to the penalty, to the same extent as its own.

**E. In assessing economic benefit, the Court should consider how much IPRG saved by delaying the investments necessary for compliance**

The "economic benefit of noncompliance" factor aims to prevent the violator from profiting from the conduct that led to its violations and thus gaining (or retaining) an unfair

[5] For example, this lawsuit was filed against AmerenEnergy Resources Generating Company (AERG), Edwards's immediate owner and operator at the time, and Ameren Energy Resources Company LLC (AER), of which AERG was a wholly owned subsidiary at the time. May 23, 2014 Stipulation of Facts, ECF No. 44 ¶ 1; Aug. 23, 2016 Order & Op., ECF No. 124, at 2 n.3. AER, in turn, was a wholly owned subsidiary of Ameren Corporation (Ameren). May 23, 2014 Stipulation of Facts, ECF No. 44 ¶ 1. Less than a year into the litigation and over the course of about a week, a new company called New Ameren Energy Resources, LLC (New AER) was formed; a wholly owned subsidiary of Ameren named Ameren Capital Trust, I was converted into a company called New AERG, LLC (New AERG); AER transferred its assets and some liabilities to New AER; AERG merged into and with New AERG; Illinois Power Holdings, LLC acquired New AER in a transaction agreement with Ameren; New AER changed its name to Illinois Power Resources, LLC; and New AERG changed its name to Illinois Power Resources Generating, LLC. *Id*. ¶¶ 2-9. There is no reason to rule out further reorganizations, acquisitions, and transfers.

advantage over its competitors. *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 178 (3d Cir. 2004). This factor also helps to deter future violations by signaling to prospective violators that underinvesting in compliance is not worth the financial risk. *See Atl. States Legal Found. Inc. v. Universal Tool & Stamping Co.*, 786 F. Supp. 743, 753 (N.D. Ind. 1992) (observing that penalties should not "merely become a cost of doing business," and that substantial penalties make it less likely that polluters will accept the risk of violating).

To determine the economic benefit of noncompliance, courts generally "consider the financial benefit to the offender of delaying capital expenditures and maintenance costs on pollution-control equipment." *U.S. ex rel. Adm'r of EPA v. CITGO Petroleum Corp.*, 723 F.3d 547, 552 (5th Cir. 2013); *see also Pound*, 498 F.3d at 1100; *Allegheny Ludlum*, 366 F.3d at 178. The "precise economic benefit to a polluter may be difficult to prove," *Pound*, 498 F.3d at 1100 (quoting *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc*., 913 F.2d 64, 80 (3d Cir. 1990)), and it is sufficient to establish "a reasonable approximation or rational estimate of the benefit, with uncertainties resolved in favor of a higher estimate." *In re Oil Spill*, 148 F. Supp. 3d at 571; *see also Brooklyn Ready Mix*, 2016 WL 4384716, at *8. Related, "[t]he determination of economic benefit does not require an elaborate evidentiary showing." *Gulf Park*, 14 F. Supp. 2d. at 863. Courts that lack the information to estimate the economic benefit of noncompliance in the usual way can consider any reasonable alternative that "is not in conflict with the [Clean Air Act] or basic economic principles." *Pound*, 498 F.3d at 1100.

The most common method of estimating economic benefit is the avoided or delayed cost method. Courts first determine what additional pollution-control investments or other measures were needed to achieve compliance and the cost of those measures, and then "apply an interest rate to determine the present value of the avoided or delayed costs." *Env't Texas Citizen Lobby,*

*Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 528 (5th Cir. 2016); *see also United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 530 (4th Cir. 1999). This method accounts for the fact that "[w]hen a company delays or avoids certain costs of capital and operations and maintenance necessary for compliance, the company is able to use those funds for other income-producing activities, such as [reinvestment in the company]." *United States v. Smithfield Foods, Inc*., 972 F. Supp. 338, 349 (E.D. Va. 1997), *aff'd in relevant part, rev'd on other grounds*, 191 F.3d 516 (4th Cir. 1999).

The court calculates the benefit of delaying compliance spending by using an estimated weighted-average cost of capital, or WACC, which is akin to an interest rate and reflects the time value of money to the violator. *See, e.g.*, *Smithfield Foods*, 972 F. Supp. at 349 (describing the WACC as a "discount/interest rate in the economic benefit calculation"); *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1166-68 (D. Idaho 2012) (summarizing and relying on economic benefit figure prepared by economic expert Jonathan Shefftz, using an estimated WACC); *see also Titan Wheel Corp. of Iowa v. EPA*, 291 F. Supp. 2d 899, 930 (S.D. Iowa 2003) (summarizing WACC-based benefit calculation performed by Mr. Shefftz and used by EPA to set an administrative penalty), *aff'd*, 113 F. App'x 734 (8th Cir. 2004). Where the WACC is positive, the economic benefit of noncompliance continues growing until the defendant is forced to disgorge that amount as part of a penalty payment. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, No. CV H-10-4969, 2017 WL 2331679, at *28 (S.D. Tex. Apr. 26, 2017) (applying an upward adjustment to the economic benefit figure presented in Mr. Shefftz's report to account for the forty-one months that had passed since completion of the report).

Importantly, economic benefit estimates developed using the delayed and avoided cost

method do not include the *prospective* costs to a defendant of taking whatever measures are necessary to bring itself into compliance. They account only for the economic gains of delaying that spending through the time of trial. The Court should account for IPRG's future compliance costs in the context of injunctive relief, as Plaintiffs discuss at part II.H, *infra*.

### F. In assessing business size and economic impact, the Court should consider evidence that IPRG's operations are intertwined with those of its corporate parents, and its parents' resources

The "size of the business" and "economic impact on the business" factors help ensure that the final penalty is high enough to punish the defendant's conduct and financially deter future violations, as well as to guard against any disabling impact on the defendant. *See United States v. SCM Corp.*, 667 F. Supp. 1110, 1126 (D. Md. 1987). Courts have used a variety of financial metrics to assess business size and economic impact. *See, e.g.*, *United States v. Mun. Auth. of Union Twp*., 150 F.3d 259, 268-69 (3d. Cir. 1998) (information from parent's financial statement, including its assets); *Atlanta Gold*, 879 F. Supp. 2d at 1170 (defendant and parent's assets); *United States v. Vista Paint Corp*., No. 94-0127, 1996 WL 477053, at *12 (C.D. Cal. Apr. 16, 1996) (defendant's annual revenues, net income, net worth, assets, earning capacity, and borrowing capacity), *aff'd*, 129 F.3d 129 (9th Cir. 1997); *SCM Corp*., 667 F. Supp. at 1126 (cash dividends paid by the defendant in a recent year).

Consistent with Congress's use of the word "business" in these penalty factors, where the evidence shows that the defendant is part of a larger business enterprise, courts should consider the defendant's parents' financial resources. *See* 42 U.S.C. § 7413(e)(1) (referring to "the size of *the business*," and "the economic impact of the penalty on *the business*," "*the violator*'s full compliance history and good faith efforts to comply," and "payment by *the violator* of penalties previously assessed") (emphases added)); *Atlanta Gold*, 879 F. Supp. 2d at 1170 ("[S]o long as the penalties are not actually imposed on the parent, consideration of a parent's assets is one

factor, among many, that is appropriate [to penalty setting] . . . ."). Parents' resources are particularly relevant where the evidence shows that the defendant's operations are intertwined with those of its parents and that the defendant does not function as a standalone business. *See United States v. Mun. Auth. of Union Twp.*, 929 F. Supp. 800, 808 (M.D. Pa. 1996) (characterizing the parent as "so closely interconnected with [the defendant] for purposes of the instant suit that the two should be treated as a single entity," and considering the parent's finances in assessing the economic impact of a penalty on the defendant), *aff'd*, 150 F.3d 259 (3d Cir. 1998).

Among other things, evidence that a parent has the final say over major pollution-control investments at the defendant's facilities indicates intertwinement. *See id.* at 808 (finding that the parent was "closely involved with [the defendant] in evaluating the options for resolving [the defendant's] wastewater problems, and [] had complete control over whether and when [the defendant] would achieve compliance" with its permit). So does evidence that a parent wholly owns the defendant, benefits from or supports the defendant's operations, or does not consistently distinguish the defendant's activities from its own when communicating with regulators and the public. *See id*. at 808-09 (citing evidence that the parent was "siphoning profits" from the defendant); *Atlanta Gold*, 879 F. Supp. 2d at 1170 (noting that the defendant and its parent "file joint annual reports which refer to 'the Company' without making any distinction between the two entities," that the parent had provided intercompany loans to the defendant, and that the defendant was a wholly owned subsidiary of the parent); *cf. Universal Tool & Stamping Co.*, 786 F. Supp. at 753 (considering information from parent's annual 10k financial report to help assess impact and citing that report as evidence that "management was aware of potential fines being imposed for its failure to comply with various federal, state and

local environmental statutes and regulations.").

As Plaintiffs will show at trial, IPRG is functionally intertwined with Vistra Energy Corporation, its ultimate corporate parent. The Court should therefore consider Vistra's resources in assessing business size and economic impact. This will help ensure that the penalty accounts for the true nature of IPRG's "business," 42 U.S.C. § 7413(e)(1), and adequately punishes IPRG and deters violations within its industry. *Cf. Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc*., No. 89–3193 (JCL), 1995 WL 461252, at *19 (D.N.J. Mar. 9, 1995) ("Since defendant is a wholly-owned subsidiary of Alcan Aluminum of Canada, the economic benefit realized as a result of defendant's noncompliance actually inured to the benefit of Alcan . . . . Thus, Alcan's ability to pay the penalty, not defendant's, should be considered in determining the size of the penalty.").

**G. In assessing duration and compliance history, the Court should focus on how often and for how long IPRG violated the Clean Air Act and other evidence that bears on IPRG's attitude towards compliance**

The "duration of the violations" and "violator's compliance history and good-faith efforts to comply" factors focus on evidence about the violations' impact and violators' attitudes towards compliance. They complement the seriousness factor (discussed at part I.H, *infra*) and help ensure that penalties are adequate not only to recoup the economic gains of noncompliance and deter future violators, but also to punish the defendant. *See Tull v. United States*, 481 U.S. 412, 422-23 (1987) (discussing Clean Water Act penalties) ("A court can require retribution for wrongful conduct based on the seriousness of the violations, the number of prior violations, and the lack of good-faith efforts to comply with the relevant requirements"); S. Rep. No. 101-228, at 373, Ex. JG (Clean Air Act penalties are necessary for "deterrence, restitution *and retribution*") (emphasis added).

Evidence that violations went on for years weighs in favor of a higher penalty under the

duration factor. *See, e.g.*, *Env't Tex. Citizen Lobby*, 2017 WL 2331679, at *26 (that the defendant had averaged more than one violation per day over an eight-year period weighed in favor of a penalty); *United States v. Oliver*, No. 06-196, 2009 WL 10671371, at *15 (D. Ak. June 25, 2009) (because violations spanned a nearly five-year period, and "there can be no doubt that additional violations have occurred" since that time, the duration factor does not warrant a penalty reduction and "suggests some upward adjustment"); *Vista Paint Corp.*, 1996 WL 477053, at *15 (the violations "spanned a period of almost six years," and "[s]uch duration of violations supports a substantial penalty"); *Midwest Suspension & Brake*, 824 F. Supp. at 736-37 (no reduction from maximum penalty warranted, given that the violations continued for approximately six years); *see also United States v. A.A. Mactal Const. Co.*, No. 89-2372, 1992 WL 245690, at *3 (D. Kan. Apr. 10, 1992) (no reduction from the maximum penalty was warranted because some of defendant's violations had "lasted approximately six weeks" (emphasis added)).

A defendant's good-faith efforts to bring itself into compliance may support a penalty reduction under the full compliance history factor. However, evidence that the defendant was aware of and chose not to pursue pollution-control measures that would have helped it avoid some or all its violations cuts *against* any such reduction.[6] *See, e.g.*, *Smithfield Foods*, 972

[6] Similarly, some courts have refused to credit spending on pollution controls that were inadequate to achieve compliance. For example, the court in *Atlanta Gold* refused to decrease the defendant's penalty by the amount it spent building and maintaining a pilot water-treatment facility because "[i]n order to achieve compliance, [the defendant] clearly needed to take additional steps beyond simply maintaining [the facility] in its current state." 879 F. Supp. 2d at 1169. It reasoned that "[m]oney spent on environmental compliance efforts generally cannot be used to reduce a [Clean Water Act] penalty when those expenses are not the same as the expenses the defendant avoided by not complying with the terms of its permit." *Id.*; *see also Bethlehem Steel*, 829 F. Supp. at 1056 ("Bethlehem claims it has already spent over $500,000 on corrective action. However, this Court will not credit this amount for Bethlehem's efforts while it was not complying with the permits.")

F. Supp. at 350-51 (defendants' claim that they acted in good faith by hiring pollution-control consultants was undercut by evidence that they often ignored consultants' advice and delayed implementing consultants' suggestions). Evidence that a defendant continued violating after it became clear that the violating conduct was illegal also cuts against any penalty reduction and may justify an increase. In *United States v. Oliver*, for example, the Court found that after the defendant failed to finance its compliance strategy, its conduct

> deteriorated into wishful thinking, then evolved into a desperate effort to find a loophole in the regulatory scheme, and culminated in a willful continuation of operations in disregard of EPA's determinations and this court's rejection of [one of the defendant's defenses]. The factor does not warrant a reduction . . . . and some of the conduct would warrant an upward adjustment.

2009 WL 10671371, at *15; *see also Vista Paint Corp*., 1996 WL 477053, at *12-13, 15 (noting that the defendant kept violating the Clean Air Act and risking penalties after becoming aware that its conduct was illegal, and finding that this was "non good faith" conduct and "demonstrates a history of *non-full* compliance" that "supports a substantial penalty").

The Court should account for the post-liability period in assessing these factors, as well as the seriousness factor. *See Oliver*, 2009 WL 10671371, at *15 (referring to additional violations since the end of the liability period in assessing duration). Truncating the analysis at the end of the liability period would be contrary to the Clean Air Act, which directs the Court to consider IPRG's "full compliance history" in setting the penalty. 42 U.S.C. § 7413(e)(1).

### H. In assessing seriousness, the Court should consider the number, duration, frequency, and magnitude of IPRG's violations and any evidence that they pose a risk or potential risk of harm to health or the environment

The seriousness factor focuses on the extent and impact of the violations and (by extension) the depth of the violator's breach of its duty to "insure violations will not occur." H.R. Rep. No. 95-294, at 71, Ex. JE (quoting *Park*, 421 U.S. at 671); *see id*. at 70 (seriousness is "the degree to which any emission limit was exceeded and the duration and frequency of any such

violation, rather than its air quality impact or its direct adverse health effects").

Evidence concerning the number, duration, frequency, and magnitude of violations is central to the seriousness assessment. *See id.* at 70; *Powell Duffryn*, 913 F.2d at 79 (affirming district court's reliance on the "large number of gross exceedances" in determining that the violations were serious). When the evidence shows that defendants continued violating for some time, courts should be careful to keep the penalty for individual violations high enough "to prevent violators from adopting a 'cheaper by the dozen' attitude, an idea that they can drag their feet on clean-up without incurring a larger total fine because the courts will decrease the daily fine in proportion with the length of the delay." *B & W*, 1994 WL 53781, at *4.

Evidence that a defendant's violations posed a "risk or potential risk of environmental harm" is also relevant. *Pound*, 498 F.3d at 1099. However, the "mere absence of a measurable harm to the public or the environment stemming from a particular [Clean Air Act] violation does not necessarily indicate that a violation is not 'serious.'" *Id.* (criticizing district court's conclusion the violations were not serious because there was no evidence of "a single measurable injury to the environment or the public caused by [the defendant's] manufacture and sale of" banned ozone-depleting substances, and observing that "the effects of ozone pollution are well-documented"); *see also Gulf Park*, 14 F. Supp. 2d at 860 ("The United States is not required to establish that environmental harm resulted from the defendants' discharges or that the public health has been impacted due to the discharges, in order for this Court to find the discharges 'serious'"). Rather, "[p]enalties may properly be imposed even absent any proof of deleterious effect." *Student Pub. Interest Research Grp. of N.J., Inc. v. Monsanto Co.*, No. CIV. A. 83-2040, 1988 WL 156691, at *15 (D.N.J. Mar. 24, 1988) (discussing gravity of Clean Water Act violations). Evidence that a defendant's violations actually sickened people or caused other harm

is just an "aggravating factor." *United States v. Mac's Muffler*, No. C85–138R, 1986 WL 15443, at *9 (N.D. Ga. Nov. 4, 1986) (considering the injury to the public resulting from a Clean Air Act violation) (stating that defendants' removal of catalytic converters "necessarily increased emissions of pollutants into the atmosphere, and constituted injury to the public *per se*" and that "[p]roof of actual injury from these emissions is not required").

A corollary principle is that plaintiffs need not quantify any harm or increased risk of harm to public health or the environment for a defendant's violations to be serious. *See Pound*, 498 F.3d at 1099 (noting "the difficulty of measuring these types of [environmental harms]"); *Gulf Park*, 14 F. Supp. 2d at 860 ("[T]he United States does not have the burden of quantifying harm caused to the environment by the defendants"); *Monsanto*, 1988 WL 156691, at *15 ("Although there is no way to quantify any actual harm . . . by reason of the discharges, actual harm need not be precisely proved."). Congress understood that when polluters violate their emissions limits, "[t]he result is some increase in the risk to the public's health or well-being, *even if the degree of the increase in risk is unquantifiable or unable to be proved*." H.R. Rep. No. 95-294, at 71, Ex. JE (emphasis added). The practice of assessing seriousness by reference to the number, duration, frequency, and magnitude of the violations, along with any evidence that they posed a risk or potential risk of environmental harm, thus furthers Congress's intent of compelling regulated parties to exercise due care to prevent the release of excess and potentially harmful pollution. *See supra* pt. I.A (discussing legislative history); *cf. CITGO Petroleum*, 723 F.3d at 556 (discussing a penalty-enhancement provision for grossly negligent and willful violations and reasoning that "almost winning a highly risky gamble with the environment does not much affect the egregiousness of having been gambling in the first place").

For similar reasons, a defendant's disregard of emission limits does not have to be willful

or intentional for its violations to be serious, particularly where the violations were numerous and went on for years. *See, e.g.*, *Monsanto*, 1988 WL 156691, at *15 (declining to find that any of Monsanto's violations were intentional or willful, but noting Monsanto's "long history of substantial and frequent violations," and commenting that "[t]he very explanation that Monsanto finally has been able to comply with the permit limitations by 'fine-tuning' the system over an almost ten-year span of time suggests some degree of avoidable delay"). Congress chose not to limit the application of civil penalties to "knowing" violations of the Clean Air Act, and the legislative history reflects its desire to penalize accidental as well as intentional violators. H.R. Rep. No. 95-294, at 70-71, Ex. JE. The seriousness and penalty factors should be applied in a way that honors this legislative intent.

**I. Plaintiffs are not aware of any "other factors [that] justice may require" the Court to account for in determining IPRG's penalty**

All of the evidence Plaintiffs expect to be relevant to the Court's determination of IPRG's penalty should fit within one of the factors enumerated in 42 U.S.C. § 7413(e)(1). The Court has some discretion to identify additional factors, *see id.*, but there are limits to that discretion. That IPRG has been sued by not-for-profit citizens' groups, for example, is not an appropriate ground for reducing IPRG's penalty. *Pound*, 498 F.3d at 1096-97 (citing *Powell Duffryn*, 913 F.2d at 80). Nor are the costs of injunctive relief, for the reasons presented at part II.H, *infra*.

**J. IPRG's penalty should exceed the economic benefit of noncompliance**

However the Court ultimately weighs the factors and assesses the evidence on each one, it should set a final penalty that ensures IPRG does not "obtain an economic benefit vis-a-vis [its] competitors due to [its] noncompliance with environmental laws." *Powell Duffryn*, 913 F.2d at 80 (citation omitted); *accord* 136 Cong. Rec. S16895, S16952-53 (Conf. Rep.) (daily ed. Oct. 27, 1990) (Conference Report to the 1990 Clean Air Act Amendments). Penalties that fail to

recoup the economic benefit of noncompliance undermine Congress's deterrence goals. *See Brooklyn Ready Mix*, 2016 WL 4384716, at *9 (a penalty that does not exceed economic benefit "is no deterrent at all" (citation omitted)); *A.A. Mactal Const. Co.*, 1992 WL 245690, at *3 (finding that "the recovery of economic benefit is essential and that economic benefit should serve as the floor below which the maximum civil penalty should not be mitigated"); *cf.* EPA, Combined Enforcement Policy for Clean Air Act Sections 112(r)(1), 112(r)(7), and 40 C.F.R. part 68, at 7-8 (June 2012), ECF No. 184-32, at 5-6 ("[E]conomic incentives for noncompliance are to be eliminated. If, after a penalty is paid, a violator still profits by violating the law, there is little incentive to comply.").

To the extent that the Court uses the economic benefit of noncompliance as a reference point for the minimum possible penalty here, it should apply an upward adjustment so that the penalty floor stays comfortably above—not merely equal to—economic benefit. This furthers Congress's deterrence goals by helping to account for the fact that some violations will never be caught and penalized.[7] The Seventh Circuit has endorsed this idea in other penalty-setting contexts. *See DirecTV, Inc. v. Barczewski*, 604 F.3d 1004, 1010 (7th Cir. 2010) (discussing penalties for satellite signal theft pursuant to 47 U.S.C. § 605) ("One economically sound way to determine a penalty is to divide the harm done by the probability of apprehension.").

---

[7] *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 890 F. Supp. 470, 491-92 & n.16 (D.S.C. 1995) (explaining that the "reality of imperfect enforcement suggests that civil penalties beyond the amount of the violator's economic benefit should be imposed so that dischargers do not simply gamble that they will not be caught"), *vacated on other grounds*, 149 F.3d 303 (4th Cir. 1998), *rev'd on other grounds*, 528 U.S. 167 (2000); *Universal Tool & Stamping Co.*, 786 F. Supp. at 753 (The "penalty must be high enough such that the penalty does not merely become a cost of doing business," and "a substantial penalty reduces the likelihood that polluters will choose accepting the risk that non-compliance will go unpunished."); *Env't Tex. Citizen Lobby*, 2017 WL 2331679, at *31 (setting a penalty floor 50% higher than the economic benefit of noncompliance).

A more fundamental reason to keep the penalty floor comfortably above the economic benefit of noncompliance is that "[i]f a penalty recovered merely required the polluter to disgorge the benefit it received from noncompliance, then from a purely economic standpoint, a discharger would be indifferent between spending the money necessary to achieve compliance in a timely manner and ignoring the regulation . . . ." *Friends of the Earth*, 890 F. Supp. at 491; *see also Monsanto*, 1988 WL 156691, at *14 ("[I]f a penalty does no more than simply take away the economic benefit, it does not, as a practical matter impose any real economic penalty against the violator."); *Mun. Auth. of Union Twp*., 929 F. Supp. at 806 (Penalties "must include a punitive component in the form of a sum in addition to economic benefit which accounts for the degree of seriousness and/or willfulness of the violations. Without the second component, those regulated by the Clean Water Act would understand that they have nothing to lose by violating it.").

Congress wanted to foster strict compliance with emissions limits—not indifference to those limits. *Supra* pt. I.A. Keeping IPRG's penalty above the economic benefit of noncompliance honors that legislative intent.

## II. Injunctive Relief

### A. This Court should use its broad equitable powers to secure IPRG's compliance with the Clean Air Act

The Clean Air Act's citizen suit provision empowers this Court not only to penalize IPRG's past violations of its opacity and particulate matter limits, but also to order injunctive relief to avert future violations. *See* 42 U.S.C. § 7604(a) (empowering district courts to "enforce" emissions standards or limitations, as well as to "apply any appropriate civil penalties"); *United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 225 (3d Cir. 2005) ("[W]hen a statutory provision gives the courts power to 'enforce prohibitions' contained in a regulation or statute, Congress

will be deemed to have granted as much equitable authority as is necessary to further the underlying purposes and policies of the statute."); *United States v. City of Chicago*, 549 F.2d 415, 440-41 (7th Cir. 1977) ("A court is not limited to simply prohibiting action in violation of a statute, but may also require affirmative acts to be taken to assure compliance."); *NRDC v. Sw. Marine, Inc.*, 236 F.3d 985, 1000-01 (9th Cir. 2000) (finding that the district court "properly exercised its equitable authority to enforce existing requirements with which [d]efendant had failed to comply" when it ordered pollution-control measures that complemented but were not specified in the violated permits).

The four-factor test for permanent injunctive relief requires Plaintiffs to show that (1) they "ha[ve] suffered an irreparable injury"; (2) "remedies available at law . . . are inadequate"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

In deciding how to exercise its broad equitable powers, the Court should focus on "order[ing] relief that will achieve *compliance*" with the Clean Air Act. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 318 (1982) (discussing injunctive relief under the Clean Water Act). Although the Court is not bound to issue an injunction if it finds that lesser remedies will suffice to secure the IPRG's compliance with the Clean Air Act, *see id.* at 314; *Monsanto*, 561 U.S. at 165-66, the Court "cannot . . . override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). Injunctions are often necessary or appropriate where the defendant has a long history of violations of the Act or similar laws and its violations threaten the environment or public health. *See Ohio Valley Envtl. Coalition, Inc. v. Fola Coal Co.*, LLC, No. CV 2:13-

5006, 2015 WL 5972430, at *2-4 (S.D.W. Va. Oct. 14, 2015) (citing harm to aquatic ecosystem from defendant's violation); *Atlanta Gold*, 879 F. Supp. 2d at 1159-62 (citing harm to water quality, a "significant possibility" of health harm, and the defendant's longstanding violations and neglect of "opportunities to fix the problem"); *cf. United States v. Tzavah Urban Renewal Corp.*, 696 F. Supp. 1013, 1022-24 (D.N.J. 1988) (citing history of violations and associated public health threats, as well as the relatively minimal and recent nature of defendant's compliance efforts).

**B. IPRG's violations cause irreparable harm**

As Plaintiffs will show at trial, for as long as IPRG continues to run Edwards without adequate pollution controls for opacity and particulate matter, it will risk violating the plant's emissions limits and causing more air pollution than it would with adequate controls in place. Once excessively opaque and particulate-laden air leaves the smokestacks at Edwards, there is no realistic way to prevent it from clouding the sky above the plant, spreading through neighboring communities, entering people's lungs, and threatening and impairing public health and welfare. This is classic irreparable injury that cannot be adequately remedied after the fact. *See, e.g.*, *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (explaining that "[e]nvironmental injury, by its nature . . . is often permanent or at least of long duration, *i.e.,* irreparable"). It is also the kind of injury that commonly supports injunctive relief. *See Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 936 (7th Cir. 2008) (affirming grant of a permanent injunction and reasoning that the plaintiff would "likely suffer irreparable injury" for which "an economic award would not sufficiently compensate" if the defendant was allowed to build its power plant under the challenged permit, and thus take advantage of more relaxed emissions standards).

Although the Court should not need to reach this issue because the evidence will show that IPRG's violations also threaten people's health, IPRG's violations cause other injuries that

independently warrant injunctive relief. *See* Feb. 1 Order, ECF No. 236, at 3 (inquiring about "aesthetic, recreational, or environmental contamination harms"); *see also California v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1074 (N.D. Cal. 2018) (characterizing as "serious and irreparable harms" methane-pollution-induced increases in "erosion and flooding," "extreme weather events," "water and electricity supply disruptions, drought, insect outbreak, and wildfire"); *cf. Franklin Cty. Power*, 546 F.3d at 936 (citing, as a form of irreparable injury supporting injunctive relief, the fact that one of the plaintiff's members would "likely suffer a decrease in recreational and aesthetic enjoyment" if the defendant was allowed to build under the challenged and likely more relaxed permit).

Illegal air pollution that may not directly harm human health but causes other injuries is particularly likely to warrant injunctive relief in Clean Air Act enforcement cases, because the Act aims to promote both public health and welfare more generally. *See* 42 U.S.C. § 7401(b)(1) (the Act aims "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population"); *Amoco*, 480 U.S. at 544 (the propriety of injunctive relief should be assessed by reference to the purpose and "underlying substantive policy" of the law the defendant has violated); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 131 (1969) (An injunction's "availability should be 'conditioned by the necessities of the public interest which Congress has sought to protect.'" (quoting *Hecht v. Bowles*, 321 U.S. 321, 330 (1944))).

The Act's legislative history shows that Congress was concerned about and wanted to avert a broad range of negative impacts of air pollution, in addition to its health impacts. *See, e.g.*, S. Rep. No. 90-403, at 10, Ex. JB (noting that air pollution "is not limited to large urban areas" and also affects "agricultural and recreational areas where it damages farm crops, timber,

and plants of all kinds," leading to "several billion dollars" of annual economic losses, in addition to "the toll exacted by . . . respiratory diseases . . . associated with continuing exposure to polluted air"); H.R. Rep. No. 95-294, at 128, Ex. JE ("There is increasing evidence of adverse effect on public welfare from low levels of pollution. Under the Clean Air Act, 'public welfare' includes 'effects on soils, water, crops, vegetation, man-made materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being'." (quoting Pub. L. No. 91-604, § 302(h), 84 Stat. 1676, 1710 (1970))). It includes express references to the negative impacts of particulate matter pollution from coal-fired power plants and other sources on public welfare. *See* H.R. Rep. No. 101-490, at 211-14, Ex. JH (discussing particulate matter's threats to visibility and property in the context of the national ambient air quality standards). The Court can account for such impacts, in addition to health impacts, in assessing what injunctive relief is warranted here.

### C. IPRG's opacity violations cause irreparable harm even where they do not concur with particulate matter violations

The Court's February 1 Order asks "[w]hether the Court ought to consider the effects of a heightened release of PM associated with levels of opacity that constitute a violation where the PM does not exceed the PM limitation." Feb. 1 Order, ECF No. 236, at 3. The answer is yes. The more particle-laden and opaque IPRG's emissions are, the more they alter the natural appearance and clarity of Peoria's air and the greater their potential to cause aesthetic and recreational harm. *Cf. Franklin Cty. Power*, 546 F.3d at 926-27 (recognizing that pollution that decreases visibility can cause aesthetic and recreational harm). Opacity levels are also positively correlated with levels of harmful particulate matter pollution. *See* Aug. 23, 2016 Op. & Order, ECF No. 124, at 3 ("regulators use the degree of opacity as a proxy for the amount of particulate matter that a plant

emits"); *see also Ala. Envtl. Council v. EPA*, 711 F.3d 1277, 1282 (11th Cir. 2013) (opacity is "related to particulate matter" and "important in the Clean Air Act regulatory scheme as an indicator of the amount of visible particulate pollution being discharged" (citation omitted)); *United States v. Westvaco Corp.*, No. MJG-00-2602, 2015 WL 10323214, at *8-9 (D. Md. Feb. 26, 2015) (Fine particulate matter, or $PM_{2.5}$, "pos[es] adverse risks to the environment," and there is "no known threshold below which $PM_{2.5}$ is not harmful to human health.").

Opacity limits are particularly important to enforce at Edwards because IPRG does not continuously monitor the plant's particulate matter emissions. *See* Adopted Rule & Final Order, *In the Matter of: Particulate Emission Limitations, Rule 203(g)(1) and 202(b) of Chapter 2*, No. R82-1 (Docket B) (Ill. Pollution Control Bd. June 30, 1988), ECF No. 232-1, at 4 (reciting EPA's testimony that federal regulations "require enforceable [opacity] limitations in order to ensure that particulate control equipment is properly operated and maintained on a continuing basis"); *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1127-28 (10th Cir. 2009) (explaining EPA's judgment that an opacity limit was necessary to ensure a coal-fired power plant's proper operation, maintenance, and compliance with its particulate matter limit in between annual tests for direct compliance with that limit). The opacity limits thus help to control and protect the public from excess harmful particulate matter pollution at times when IPRG's separate particulate matter limits are either not in effect or are effectively unenforceable. *See* Aug. 23, 2016 Op. & Order, ECF No. 124, at 48 ("[J]ust because particulate matter emissions cannot be measured during times of maintenance or shutdown does not mean that the opacity limit[] should not apply during those times. Indeed, there are strong policy reasons that it should: opaque clouds that Edwards emits during maintenance activities could have preventable and high

amounts of unmeasured particulate matter.”).[8]

### D. There are no adequate legal remedies for IPRG’s violations

The Court’s February 1 Order asks, under headings for “[i]njunctive relief” and “[r]emedies at law,” “[w]hether a high penalty . . . would serve to compensate for any injuries.” Feb. 1 Order, ECF No. 236, at 3. Injunctive relief is an equitable remedy, not a remedy at law. *See Tull*, 481 U.S. at 422-25. It is appropriate here because the kinds of environmental injuries IPRG causes when it violates its opacity and particulate matter limits cannot be redressed after the fact, by money damages or similar economic relief. *See Amoco*, 480 U.S. at 545 (1987) (“Environmental injury, by its nature, can seldom be remedied by money damages . . . .”); *Franklin Cty. Power*, 546 F.3d at 936 (citing *Amoco*, finding that “[a]n economic award would not sufficiently compensate” for any aesthetic and recreational harms that might occur if the defendant were allowed to build its plant under a weaker permit that allowed it to emit more pollution, and affirming district court’s grant of an injunction).

Civil penalties are a form of remedy at law, *see Tull*, 481 U.S. at 422-25, but like injunctive relief cannot “compensate” for the environmental injuries IPRG’s violations cause. An appropriately calculated penalty will punish IPRG, strip it of the gains of noncompliance, and deter other violators, but a penalty cannot scrub pollution that has already been released from the ambient air or from the bodies of the people who have inhaled it. *See Tzavah Urban Renewal*, 696 F. Supp. at 1023 (“[C]ivil penalties would in no way compensate victims exposed to asbestos as a result of the defendants’” violations.). A penalty cannot turn back the clock on the extra deaths, hospital visits, and other injuries to public health and welfare that IPRG’s violations

[8] For the same reasons presented here, the Court should account for all past opacity violations, not just those the evidence shows concurred with a particulate matter violation, in assessing the seriousness and full-compliance-history penalty factors.

have already caused in and around Peoria. The best the Court can do is use injunctive relief to end those violations and forestall further irreparable harm.

**E. In weighing the equities and considering the public interest, the Court should account for all of the pollution that will be avoided if IPRG installs the controls it needs to avoid further violations**

For the purposes of this case, the most meaningful reference point for the public interest is the full decrease in air pollution that the evidence shows will occur once IPRG installs new pollution controls and takes whatever other measures are needed to avoid further Clean Air Act violations at Edwards. Considering the full pollution-control benefits of the injunctive relief needed to bring IPRG into compliance is the only realistic way to assess how it will benefit the public and serve the public interest.[9]

Accounting for all of the opacity and particulate matter pollution IPRG will avoid once it makes the investments needed to fully comply with the Clean Air Act is also far more faithful to legislative design. Congress wanted to "*enhance* the Nation's air quality," 42 U.S.C. § 7401(b)(1) (emphasis added), not just preserve it. It wanted to account for evolving scientific knowledge on air pollution's hazards, and the cumulative risks people face because they are exposed to many different sources of pollution in their day-to-day lives. *Supra* p. 4. It imposed a strict duty of care on owners and operators of polluting facilities, and gave them the burden of taking whatever measures are needed to avoid accidental violations. *See, e.g.*, H.R. Rep. No. 95-294, at 71, Ex. JE (explaining that the "act imposes not only a positive duty to seek out and remedy violations when they occur *but also, and primarily, to implement measures that will insure violations will not occur*" (emphasis added) (quoting *Park*, 421 U.S. at 671)). It would

[9] If IPRG or its corporate parents choose to close Edwards to avoid paying for new pollution controls, *see infra* at 33-34, the decrease in opacity and particulate matter pollution and associated public health and welfare benefits will be even greater.

subvert Congress's precautionary goals to focus narrowly on the pollution Edwards releases each time it exceeds its limits, and to discount or ignore the other pollution IPRG will eliminate once it installs the controls it needs to avoid further Clean Air Act violations.

### F. In weighing the equities and considering the public interest, the Court should give more weight to the interests Congress sought to promote in the Clean Air Act, and less to private or economic interests

In applying the third and fourth prongs of the injunctive relief test, the Court should give the most weight to the public health and welfare interests Congress sought to promote in the Clean Air Act, and less weight to private or economic interests. *See Mountain State Carbon*, 2014 WL 3548662, at *33 ("The court's responsibility is 'crafting a remedy that is protective of public health, and this responsibility necessarily takes preeminence over all other considerations.' . . . [C]ourts faced with environmental injury must largely defer to the balance of hardships that Congress has already struck." (citation omitted)); *Atlanta Gold*, 879 F. Supp. 2d at 1161 ("Harm to environment outweighs a defendant's financial interests, particularly where violations are of a longstanding and continual nature."); *Pub. Interest Research Grp. of N.J., Inc. v. Top Notch Metal Finishing Co.*, No. CIV.A. 87-3894, 1987 WL 44393, at *5 (D.N.J. Nov. 6, 1987) ("If to stay in business [the defendant] must expend a large sum of money to come into immediate compliance with toxic substance limitations, that is a balance Congress has struck in favor of the environment, and I do not strike the balance differently here."); *cf. Ohio Valley Envtl. Coalition. v. U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d 625, 632-34 (S.D.W. Va. 2007) (preliminarily enjoining the filling of a valley with mining waste, notwithstanding company's claim that it might respond by abandoning the mine). "The public has a strong interest in maintaining the balance Congress sought to establish between economic gain and environmental protection. . . . Economic gain is not be pursued at all costs, and certainly not when it is contrary to the law." *U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d at 633.

Congress understood and accepted that it might be "onerous" for some regulated parties to make the investments needed to strictly comply with and avoid accidental violations of the Clean Air Act. *See supra* p. 2 (citing H.R. Rep. No. 95-294, at 71, Ex. JE). The Court should not hesitate to order IPRG to make large investments in new pollution controls, if the evidence shows that this is the surest way to bring an end to its violations at Edwards. *Cf. Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 268 (3d Cir. 2005) (affirming injunction requiring defendant to implement expensive pollution controls, based on evidence that this was "the only one approach [that] would in fact remedy the violation permanently").

**G. The Court should consider the remedial benefits of injunctive relief**

Injunctive relief (such as new pollution controls) that has the effect of reducing future opacity and particulate matter pollution from Edwards will help improve Peoria's air quality and may help counterbalance some of the harms caused by IPRG's past violations by reducing people's prospective levels of exposure to particulate matter. The Court should account for these remedial benefits in weighing the equities and assessing the public interest, because doing so is consistent with the goals Congress expressed in the Clean Air Act and would promote justice.[10] *Cf. United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003) (finding district court did not exceed its equitable discretion by ordering defendants who illegally dug a ditch to haul the dirt away rather than refill the ditch, and crediting court's reasoning that disposal was the best way to avoid further ecological harm and would help keep the defendants from benefitting from their violation); *U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me., LLC*, 339 F.3d 23, 31 (1st Cir.

[10] *See* 42 U.S.C. § 7401(b)(1) (legislative purposes include enhancing air quality); *see also* S. Rep. No. 88-638, at 5 (1963), Ex. JA ("To compensate for past neglect of air quality conservation, a greater effort is required now, by the public, by industry, and by governmental agencies at all levels."); S. Rep. No. 101-228, at 2, Ex. JG (expressing concern that new science was revealing health harms at air pollution levels formerly thought to be safe, and desire to protect people from the cumulative risks of exposure to pollution from many sources).

2003) ("[A] court's equitable power to enforce a statute includes the power to provide remedies for past violations . . . .").

**H. Penalties and injunctions serve different purposes under the Clean Air Act, and it would be contrary to Congress's intent and unjust to use the cost of injunctive relief as a basis for reducing IPRG's penalty**

The Court should not account for IPRG's civil penalty in balancing the harms, because penalties and injunctions serve largely different purposes and involve different equitable considerations. Injunctions look forward and focus largely on the defendant's prospective compliance. *See supra* pts. II.A-G. Penalties are more backwards looking: courts examine the violations that have already occurred and decide what penalties are appropriate to punish violators, strip violators of the economic benefits of noncompliance, and deter others from violating. *See supra* pts. I.A-H; *Bethlehem Steel*, 829 F. Supp. at 1057 (explaining that "even if an individual defendant is likely [sic] to repeat its violation, a substantial penalty is warranted to deter others").

To be sure, penalties can also help deter the defendant from repeating the same kinds of violations—of the same standards, and at the same site—that prompted the lawsuit. This specific-deterrence goal may overlap to some extent with injunctive relief, which should be designed to secure the defendant's compliance, *see supra* pt. II.A. But injunctions are typically a more effective mechanism for ending the defendant's violations than penalties, because injunctions can be better tailored to fit the evidence on questions like how quickly the requisite pollution control can be installed at the specific facility where those violations occurred. When they succeed in securing the defendant's prompt compliance, injunctions also promote judicial economy and finality by obviating the need for further rounds of violation-counting and penalty-setting by the court. *See Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 763 (7th Cir. 2004) (questioning the value of using further penalties to try to secure the

defendant's compliance once a large-scale remedial project that should permanently abate the root causes of the violations is well underway); *Monsanto*, 1988 WL 156691, at *16 (reasoning that injunctive relief would help obviate the need for a follow-up enforcement action and the "consequent expense and delay," in the event that the defendant violated its permit in the future).

As Plaintiffs will show at trial, the appropriate injunctive relief in this case includes an order directing IPRG to install the pollution controls Edwards needs to eliminate further violations of its opacity and particulate matter limits. Lowering IPRG's penalty to account for the costs of such injunctive relief would undermine one of the major purposes of penalties: to discourage others from gambling on non-compliance. *See supra* pts. I.A (citing H.R. Rep. No. 95-294, Ex. JE), I.J. Penalties include an economic-benefit component that is designed to strip violators of the economic gain of delaying needed compliance measures; the longer the delay, the greater the gain. *See supra* pt. I.E. If regulated parties come to expect that any court order to install improperly deferred pollution controls will be coupled with a penalty discount, they will be less motivated to invest in those controls before being ordered to do so. *See United States v. Lexington-Fayette Urban Cty. Gov't*, 591 F.3d 484, 487 (6th Cir. 2010) (finding that the district court's rejection of a Clean Water Act penalty as too high on the ground that the penalty money could be better spent on prospective remedial work was "in tension with, rather than in accordance with, the statutory purpose behind civil penalties");[11] *cf. Pound*, 498 F.3d at 1098-99

[11] Plaintiffs are aware of other out-of-circuit decisions indicating that penalties may be reduced to account for the costs of injunctive relief. *See CITGO Petroleum*, 723 F.3d at 554 (the district court "reduced the civil penalty an unspecified amount based on the award of injunctive relief," and this "does not strike us as clear error"); *Congaree Riverkeeper, Inc. v. Carolina Water Serv., Inc.*, 248 F. Supp. 3d 733, 755 (D.S.C. 2017) (listing, among other things the court considered in setting the penalty, the fact that the defendant "will need to undertake costs to correct the problems caused by its failure to fulfill the permit requirements"); *see also Atlanta Gold*, 879 F. Supp. 2d at 1169 (stating that "the total penalty should take into account sums that [the defendant] will eventually be required to expend on compliance," and reserving the right to

(finding that the district court misapplied the economic-benefit civil-penalty factor in focusing on the defendant's decision to stop selling the violating product, because the factor "requires a court to consider the economic benefit that the violator *has* received as a result of its violations of the [Clean Air Act], not the economic benefit it *will* receive in the future").

Another reason not to trade civil penalties against the costs of prospective injunctive relief is that defendants often have more flexibility in deciding how to respond to injunctions. For example, where the injunctive relief may include installing new pollution controls to bring the defendant's facility into compliance, the defendant or its corporate parent may be able to avoid those costs by closing the facility. IPRG has already asserted that this is one of those cases. *See* Boswell Decl., ECF No. 189, at 1 ¶ 3, 2 ¶ 7 (asserting that Vistra Energy Corporation will close Edwards if this Court orders baghouses or new electrostatic precipitators to be installed on each operating boiler); Def.'s Mot. for Summ. J. Concerning Inj. Relief, ECF No. 180, at 11 ¶ 51, 17 (relying on the Boswell Declaration). Reducing IPRG's penalty on the theory that this will make it easier to pay for new pollution controls invites gamesmanship, because IPRG can always turn around and pocket the discount.

IPRG and its parents can always decide to close Edwards if they would rather not pay to bring it into compliance with the Clean Air Act. That choice has been available all along. That IPRG may eventually install new pollution controls at the plant has no bearing on the appropriate penalty for the thousands of violations IPRG has already allowed to occur, in the absence of those controls.

Respectfully submitted February 27, 2019,

s/ *Selena Kyle*

---

order further penalties based on further information about the defendant's compliance costs and success). Those decisions should not be followed on the issue for the reasons stated here.

Selena Kyle (IL Bar No. 6311573)
Ian Fisher (CO Bar No. 47858)
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7906
skyle@nrdc.org
(312) 995-5903
ifisher@nrdc.org

Jared E. Knicley (DC Bar No. 1027257)
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Ann Alexander (IL Bar No. 6278919)
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6190
aalexander@nrdc.org

*Counsel for Plaintiff Natural Resources Defense Council*

s/ *Gregory E. Wannier*
Gregory E. Wannier (CA Bar No. 275349)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94110
(415) 977-5646
greg.wannier@sierraclub.org

*Counsel for Plaintiff Sierra Club*

s/ *Jeffrey Hammons*
Jeffrey Hammons (IL Bar No. 6324007)
Justin Vickers (IL Bar No. 6305129)
Scott Strand (MN Bar No. 147151)
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
jhammons@elpc.org
jvickers@elpc.org

*Counsel for Plaintiffs Sierra Club and Respiratory Health Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2019, I caused the following to be served on all parties' counsel via the Court's CM/ECF system:

**PLAINTIFFS' INITIAL PRETRIAL BRIEF**

*s/ Selena Kyle*
Selena Kyle