IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, RESPIRATORY HEALTH ASSOCIATION, and SIERRA CLUB, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ILLINOIS POWER RESOURCES GENERATING, LLC, <br><br> Defendant. | Case No. 13-cv-1181 <br> United States District Judge <br>   Joe Billy McDade <br> Magistrate Judge <br>   Thomas P. Schanzle-Haskins III |

**IPRG'S RESPONSE TO PLAINTIFFS' MOTION *IN LIMINE*
TO EXCLUDE CERTAIN TESTIMONY OF EXPERT WITNESS THOMAS KEELER**

Defendant Illinois Power Resources Generating, LLC ("IPRG") respectfully requests that this Court deny Plaintiffs' Motion *in Limine* to Exclude Testimony of Thomas Keeler Concerning the Adequacy of IPRG's Existing Opacity Control and Need for New Pollution-Control Technology at Edwards (ECF # 256).

**Background**

Plaintiffs do not dispute that IPRG's expert witness, Thomas R. Keeler, is a recognized expert in the field of electrostatic precipitators ("ESPs")—or that his qualifications are grounded in more than 37 years of extensive practical experience with ESP inspection, maintenance, evaluation, and improvement, resulting in improved opacity and particulate matter performance for his clients. (*See* March 21, 2018 Expert Report of Thomas Keeler ("Keeler Report"), Ex. NA to Pl. Mot., ECF #261-9, at 5-6; Resume of Thomas R. Keeler, attached as Ex. 1.) Specifically, through his field experience as a degreed electrical engineer, Mr. Keeler has inspected well over 600 ESPs, including all major manufacturer designs from the 1940s to present, and, as president

-1-

of two consulting service groups primarily focusing on ESPs, he has served major energy clients in their operation and maintenance of ESPs. (*Id.*)

In addition to his practical experience with ESPs, he has authored the Electrostatic Precipitator Maintenance Guide, as well as other studies, papers, and presentations on ESP evaluation and optimization. (*Id.*) He is the Manager of, and a lecturer with, Precipitator Seminars, conducting nationwide seminars on electrostatic precipitators. He is the President of TRK Engineering Services Inc., an engineering consulting company whose services include inspecting equipment, supervising repair work, providing technical support and troubleshooting for precipitator and related control equipment, analyzing precipitator operation to optimize system performance, training plant personnel on electrostatic precipitator operation and maintenance, and analyzing gas flow. (*Id.*)

Drawing on that experience, and upon his review of the equipment, data, and information in this case, Mr. Keeler formed several expert opinions, summarized in his Expert Report, including the following two excerpts:

> (1) "I would argue that with the upgrades that have been made, **the precipitators are adequately sized and have demonstrated that capability**. The units have operated in compliance 99.70% of since April 18, 2008, which would be considered excellent operations."
>
> (2) "The low number and infrequency of all opacity events at the Edwards Plant comprises a minute fraction of the plant's reporting period. The data shows that the plant operated within the limits of 35 Ill. Admin Code 212.123 (during the liability period of April 18, 2008 to June 30, 2014) approximately 99.71% of the time. This leaves a residual time of only 0.29% during which opacity events occurred. Perfect operations – in other words, operation 100% of the time with zero opacity events, over a time span of almost seven years – is neither possible nor required. **Based on my experience with plants across the country, it is my opinion that Edwards Plant's control of the opacity events is excellent**."

(*See* Keeler Report, Ex. NA to Pl. Mot., ECF #261-9, at 7, 78 (emphasis supplied)).

Mr. Keeler testified that the "experience with plants," upon which he drew in forming the second of the opinions above included work at "well over 150" plants, including "Big Brown," as well as "at other Dynegy plants, Dominion plants, AEP, Luminant . . . PacifiCorp . . . TransAlta, Kansas City Power Line . . . [and] Adco," noting that he "could keep going on about the plants we've worked at." (June 26, 2018 Dep. of Thomas Keeler ("Keeler Dep."), Ex. ND to Pl. Mot., ECF #261-12, 79:7-82:14.) However, Mr. Keeler appropriately declined to divulge the names and environmental compliance statistics of the individual plants operated by his former clients, for confidentiality reasons, given that "other cases" were pending involving some of those clients—and also because he was "not asked to produce database[s] on" those unrelated plants. (*Id*.)

In addition, Mr. Keeler has experience with the Edwards plant in particular. His company, TRK Engineering Services, has conducted several inspections of the ESPs and related components at Edwards and has conducted gas flow studies aimed at analyzing the ESPs' efficiency at collecting particulate. (Keeler Report, Ex. NA to Pl. Mot., ECF #261-9, at 62-63, 72-73; Keeler Dep., Ex. ND to Pl. Mot., ECF #261-12, 13:16-21, 115:19-116:22; April 15, 2019 Keeler Supplemental Report, Ex. NB to Pl. Mot., ECF # 261-10, p. 15.)

**Argument**

Plaintiffs' Motion does not dispute Mr. Keeler's extensive relevant experience and expertise. Instead, Plaintiffs contend (1) that past marginal exceedances necessarily imply that the existing ESPs are improperly sized—ignoring that operational improvements, maintenance activities, updated compliance reporting procedures, and appropriate use of defenses available under the new Edwards CAAPP permit can minimize or eliminate violations; and (2) that Mr. Keeler's methodology is unsound because it is based on his practical experience working with other ESPs (rather than, as Plaintiffs would prefer, a quantitative study)—overlooking that courts

routinely rely upon experts to render experience-based judgments about the qualities and capabilities of objects within their field of expertise.

Plaintiffs' criticisms are themes they are free to pursue in cross-examination at trial, going to the weight the Court should give Mr. Keeler's opinions. But they are not reasons for excluding opinions with which they disagree.

## I. Plaintiffs Do Not Dispute Mr. Keeler's Credentials or Extensive Relevant Experience with ESPs at Coal-Fired Power Plants.

Plaintiffs do not contend that Mr. Keeler lacks the qualifications necessary to opine on the current and anticipated capabilities and performance of the ESPs at Edwards. That is unsurprising, because Mr. Keeler has decades of practical experience working in and around ESPs, troubleshooting performance issues when they arise, and observing how ESPs perform under variable conditions. (*See*, *e.g.*, Keeler Report at 5-6, Ex. NA to Pl. Mot., ECF #261-9; Keeler Dep., Ex. ND to Pl. Mot., ECF #261-12, 79:7-82:14.) Plaintiffs' expert, Dr. Ranajit Sahu, by contrast, has little to no actual experience working with ESPs. (*See* June 21, 2018 Deposition of Ranajit Sahu, excerpts attached as Exhibit 2, 82:5-14, 85:22-87:8.)

Instead, Plaintiffs have moved to exclude critical portions of Mr. Keeler's testimony because they disagree with his reasoning and conclusions.

## II. Past Marginal Exceedances Do Not Contradict Mr. Keeler's Opinion that the Edwards ESPs are Adequately Sized for Compliance with its Permit Obligations.

Plaintiffs argue Mr. Keeler should be prevented from testifying that the Edwards ESPs are adequately sized for compliance with its permit obligations because (a) some opacity violations have occurred while the existing ESPs have been in use; (b) one example provided by Mr. Keeler of "margin in the system" is, in Plaintiffs' view, too limited; and (c) Plaintiffs contend that non-expert, attorney testimony contradicts Mr. Keeler's testimony that opacity averages at both Unit 2

-4-

and Unit 3 have decreased since the start of the liability period. These contentions, at best, go to weight—not admissibility.

      **a.    Past opacity violations do not negate Mr. Keeler's expert testimony.**

Plaintiffs' contention that past marginal exceedances somehow contradict Mr. Keeler's opinion that the existing ESPs are properly sized is illogical. Plaintiffs assume—without justification—that ESP size is the sole determinant of ESP performance and meeting permitted limits. Plaintiffs' argument is based on several fallacies and mischaracterizations. As Mr. Keeler explains in his Report, how well an ESP performs "is based on a number of factors," and not just size. (Keeler Report, Ex. NA to Pl. Mot., ECF #261-9, at 16-17 (explaining how "effective collecting area" is only one of several factors impacting an ESP's collection efficiency).)

The 99.7% figure cited by Mr. Keeler on page 78 of his report is, as explained earlier in his report, based on opacity exceedances above 30% *before* taking into account available defenses, such as startup and malfunction. (Keeler Report, Ex. NA to Pl. Mot., ECF #261-9, at 36-45). Additionally, as Mr. Keeler points out, significant changes are in progress (and many have already been completed) to the outcome-determinative circumstances *surrounding the existing ESPs* that minimize or eliminate permit violations. For example, IPRG has undertaken extensive maintenance and improvements projects that are directly tied to improved opacity performance. (*See* September 21, 2018 Declaration of Theodore Lindenbusch, Ex. 7 to Def. Opp to Pl. MSJ, ECF #202-3, pars. 4-8, Exs. A-C (detailing the capital projects, maintenance projects, repairs, inspections, operational actions, and other efforts undertaken at Edwards since April 18, 2008 to minimize opacity excursions); Keeler Report, Ex. NA to Pl. Mot., ECF #261-9, at 61-63 (summarizing corrective maintenance and other actions undertaken to enhance ESP performance and minimize emissions and opacity).)

Additionally, the following three procedural and regulatory changes—none of which involves replacing the ESPs—significantly reduce opacity violations.

***First,*** the majority of the post-liability opacity exceedances referenced in Plaintiffs' Motion do not constitute violations because they are subject to the malfunction-breakdown defense, a defense *previously* unavailable to IPRG for most exceedances that occurred during the liability period, due to its then-existing procedures for reporting malfunction events to the IEPA—but which is *now* fully available, due to IPRG's revised procedures for reporting malfunction-breakdown events to IEPA. (*See* Keeler Report, Ex. NA to Pl. Mot., ECF #261-9, at 45-60 (analyzing proportion of post-liability malfunction or breakdown events); Opinion & Order on Liability, ECF #124, at 39-46 (holding that malfunction-breakdown defense was unavailable when IPRG did not immediately report all malfunction and breakdown events to IEPA); December 21, 2017 Deposition of Ted Lindenbusch, Ex. 6 to Def. Opp. to Pl. MSJ, ECF #202-2, at 247-57 (explaining IPRG's revised practices and procedures for prompt reporting of all malfunction-breakdown events).) IPRG changed its procedure for reporting opacity exceedances at Edwards to be consistent with the Court's Liability Order, now notifying IEPA by telephone and email of every event that they determine (based on available information) are malfunctions or breakdowns. (*Id*.)

***Second***, Edwards' *current* Clean Air Act operating permit ("CAAPP Permit"), requires malfunction or breakdown events to be immediately reported to IEPA only if opacity exceeds 30% for eight or more 6-minute averaging periods (that is, 48 minutes) within a two-hour period, unless shutdown of the affected boiler has begun by that time. (*See* April 11, 2019 Revised Edwards CAAPP Permit ("CAAPP Permit"), attached as Ex. 3, Cond. 7.1.10-3(a)(i).) This change, together with IPRG's updated malfunction and breakdown reporting procedures, doubly confirms that

malfunction and breakdown incidents of the sort encountered during the liability period no longer result in permit violations.

*Third*, when analyzed using six-minute averages (the approach Mr. Keeler considered and applied at the time he provided his initial expert report), the count of violations is substantially reduced. *See* Keeler Report, Ex. NA to Pl. Mot., ECF #261-9, at 86. Consistent with this Court's ruling (ECF #235), Defendant asked Mr. Keeler to re-analyze the post-liability opacity exceedances using a 1-minute averaging period. (*See* April 26, 2019 Rebuttal Report of Thomas Keeler, Ex. NC to Pl. Mot., ECF #261-11, at 9-10.) However, in a significant development not addressed in Plaintiffs' motion, the use of six-minute opacity averages is now expressly incorporated in the Plant's CAAPP Permit. (*See* Ex. 3, Conditions 7.1.9(c)(ii)(A) (to address compliance with the opacity standard, keep records on "6-minute block average" basis); 7.1.9(d)(iii) (requiring recordkeeping of opacity exceedances on a "six-minute block average" basis. *See also* Condition 7.1.9(c)(i)(A) (requiring operational records for the COMS, including "Opacity measurements (6-minute, one-hour and three-hour block averages).")

In light of the operational, maintenance, and reporting improvements at Edwards and the availability of defenses that eliminate violations, Plaintiffs' unsupported assumption (essentially that the existing ESPs were operating during exceedances in the past; therefore they *must* be inadequately sized for the future) is not a legitimate basis for excluding an expert opinion that considers the relevant factors that Plaintiffs disregard. Instead, Plaintiffs can, through both cross-examination and the presentation of their own expert opinions, challenge the weight to be given Mr. Keeler's opinions.

    **b.    Plaintiffs' disagreement regarding the sufficiency of "margin in the system" at Edwards is no basis for excluding Mr. Keeler's expert testimony.**

Ironically, Plaintiffs accuse Mr. Keeler of "cherry-picking"—by singling out an isolated demonstrative example from Mr. Keeler's 86-page Report and arguing that the example is insufficient to prove the adequacy of Edwards' compliance margin. (Pl. Mot. at 6.) The example to which Plaintiffs refer is simply an illustration of the principle demonstrated throughout Mr. Keeler's Report: based on Mr. Keeler's experience examining virtually every opacity exceedance that has occurred at Edwards since April 18, 2008, and years of experience inspecting and evaluating ESP performance at Edwards, the existing ESPs provide sufficient margin to maintain permit compliance throughout various circumstances.

    **c.    Plaintiffs' criticisms of Mr. Keeler's testimony regarding decreasing opacity averages are no basis to exclude that testimony.**

Likewise, Plaintiffs' argument that the data showing a steady decrease in opacity at Edwards from 2008 to present is susceptible to multiple interpretations, and could be partially attributable to periods of "limited operations" (Pl. Mot. at 7), does not actually dispute the reliability of Mr. Keeler's testimony. Instead Plaintiffs' attempt to *confront* that testimony with factors that they believe Mr. Keeler did not adequately consider, the very point of cross-examination. Moreover, Plaintiffs' argument is inadequately supported — they rely only on the inadmissible non-expert say-so of their own attorney. (*Id*. at 7-8, citing Fisher Declaration). Unlike Mr. Keeler, Mr. Fisher has not been disclosed as an expert concerning how operating circumstances might affect opacity; however, he is free to question Mr. Keeler on these issues at trial.

### III. Mr. Keeler's Expert Testimony is Grounded in His Extensive Experience with ESPs, the Validity of Which Does Not Require Disclosure of Confidential Details from his Unrelated Clients.

Mr. Keeler's experience-based expert testimony is both valid and helpful. Plaintiffs' argument ignores (1) that courts routinely rely upon experts' experience-based judgments and (2) that expert witnesses are not required to disclose the identifying details of their work in other confidential cases.

*First*, Mr. Keeler's opinion that Edwards' opacity performance is "excellent"—in the context of his work with other power plants throughout the country—is a valid experience-based opinion. Plaintiffs' contention that Mr. Keeler's opinion reveals an "unreliable methodology" improperly insists on a quantitative comparison, when, in reality, courts routinely rely on the experience-based opinions of experts to locate a specific occurrence within the range of practical situations the expert has previously encountered. (*See* Pl. Mot. at 8-11.)

Plaintiffs rely upon *Kumho Tire Co.* (see Pl. Mot. at 5), but ignore that in that case the Supreme Court approved of experience-based testimony from expert engineers. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999) ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in **some** cases. [Citation omitted]. In **other** cases, the relevant reliability concerns **may focus upon personal knowledge or experience**.") (emphasis supplied). While "*Daubert*'s general principles apply" to experience-based testimony, "the [Court's] gatekeeping inquiry must be tied to the facts of a particular case."

Post-*Kumho* cases confirm that Plaintiffs' rejection of experience-based expert opinion as an "unreliable methodology" (instead insisting on a comprehensive quantitative analysis) is misplaced. *See A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 263 F. Supp. 3d 705, 716 (N.D. Ill. 2017), aff'd, 881 F.3d 587 (7th Cir. 2018) (expert experienced in coordinating accommodations

-9-

for disabled athletes permitted to opine whether proposed ADA accommodations for a road race would have been feasible); *Shuffle Tech Int'l, LLC v. Sci. Games Corp*., No. 15 C 3702, 2018 WL 2009504, at *3 (N.D. Ill. Apr. 29, 2018) (industry expert's experience-based opinions on casino practices admissible when testimony did not "involve application of scientific or other established methodology"); *United States v. Mallory*, 902 F.3d 584, 593 (6th Cir. 2018) (handwriting expert's "use [of] knowledge and experience to answer the extremely practical question of whether a signature is genuine or forged," admissible, even though "handwriting analysis may not boast the 'empirical' support underpinning scientific disciplines.").

Here, Mr. Keeler has opined from his experience that the Edwards ESPs are adequate to face the task of achieving compliance with the applicable permit obligations. The opinion is valid. Plaintiffs are free to cross-examine Mr. Keeler and to introduce their own expert testimony at trial.

***Second***, divulging the names and details of Mr. Keeler's former clients is not necessary for ascertaining that he has the experience required to render an opinion about the excellent performance of the Edwards ESPs. *See Allstate Ins. Co. v. Electrolux Home Prod., Inc*., 840 F. Supp. 2d 1072, 1080 (N.D. Ill. 2012) (denying motion to disqualify expert when expert refused to produce documents he had reviewed in a prior confidential arbitration, even though knowledge of the confidential documents was part of expert's "knowledge base" and "background"); *Goldberg v. 401 N. Wabash Venture LLC*, No. 09 C 6455, 2012 WL 3686644, at *4 (N.D. Ill. Aug. 24, 2012) ("To the extent Defendants argue that [plaintiff's expert] has not provided more detail about his experiences to render him qualified, that is an issue of weight that Defendants may explore if this case proceeds to trial.").

Plaintiffs *never moved to compel* the names of the power plants Mr. Keeler encountered in his decades of experience as an engineer working on ESPs and Plaintiffs were able to ascertain a

thorough picture of Mr. Keeler's extensive background through the documents and testimony they did obtain. (*See, e.g.*, Keeler Report, Ex. NA to Pl. Mot., ECF #261-9, at 5-6; Keeler Resume, attached as Ex. 1; Keeler Dep., Ex. ND to Pl. Mot., ECF #261-12, 79:7-82:14.)

Unsurprisingly, Plaintiffs' expert witness, Dr. Sahu, similarly refused to share confidential identifying details of his former clients. When asked for additional information concerning the only ESP "inspection" Dr. Sahu could recall conducting in the past 18 months (an "inspection" that he admitted did not involve observation of anything inside the ESP), his attorney objected that the question "may call for confidential information," and Dr. Sahu stated "I can't really get into that." (*See* Ex. 2, June 21, 2018 Deposition of Ranajit Sahu, 82:15-85:21.)

Here, Mr. Keeler testified extensively about the range of experiences with ESPs and power plants that informed his opinions, and Plaintiffs cite no authority for the premise that he was required to divulge his former clients' confidential identifying information—or that such information constitutes "wholly undisclosed data." And here, as in *Electrolux Home Prod., Inc*. and in *Goldberg*, Plaintiffs' critique of Mr. Keeler's background experiences is a potential topic for cross-examination, not a basis for excluding his opinions.

## CONCLUSION

Defendant IPRG respectfully requests that this Court deny Plaintiffs' Motion in Limine to Exclude Testimony of Thomas Keeler Concerning the Adequacy of IPRG's Existing Opacity Control and Need for New Pollution-Control Technology at Edwards (ECF # 256).

Dated: June 7, 2019

**HINSHAW & CULBERTSON LLP**
J. William Roberts
Charles R. Schmadeke
400 South Ninth Street, Suite 200
Springfield, IL 62701
Telephone: 217-528-7375
cschmadeke@hinshaw.law.com

Respectfully submitted,

/s/ *Barry Hyman*
**SCHIFF HARDIN LLP**
Barry Hyman
Francis X. Lyons
Bina Joshi
Ann H. MacDonald
Neil Lloyd
233 South Wacker Drive
Suite 7100
Chicago, IL 60606
Telephone: 312-258-5500
bhyman@schiffhardin.com
flyons@schiffhardin.com
bjoshi@schiffhardin.com
amacdonald@schiffhardin.com
nlloyd@schiffhardin.com
and
Andrew N. Sawula
Schiff Hardin LLP
One Westminster Place
Lake Forest, IL 60045
Telephone: 847-295-4336
asawula@schiffhardin.com

*Counsel for Defendant*
*Illinois Power Resources Generating, LLC*

**CERTIFICATE OF SERVICE**

    The undersigned attorney certifies that on June 7, 2019, a copy of IPRG's Response to Plaintiffs' Motion *in Limine* to Exclude Certain Testimony of Expert Witness Thomas Keeler was electronically served upon all Counsel of Record using the CM/ECF system.

Ann Alexander
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter Street
21st Floor
San Francisco, CA 94104
415-875-6190
Email: aalexander@nrdc.org

Ian Fisher
Selena Kyle
NATURAL RESOURCES DEFENSE COUNCIL
Suite 1600
20 N. Wacker Drive
Chicago, IL 60606
Email: ifisher@nrdc.org
Email: skyle@nrdc.org

Jacqueline Iwata
Jared Knicley
NATURAL RESOURCES DEFENSE COUNCIL
Ste 300
1152 15th Street NW
Washington, DC, 20005
Email: jiwata@nrdc.org
Email: jknicley@nrdc.org

Justin Vickers
Jeffrey Hammons
Scott Strand
ENVIRONMENTAL LAW & POLICY CENTER
Ste 1600
35 E Wacker Dr
Chicago, IL 60601
Email: jvickers@elpc.org
Email: jhammons@elpc.org
Email: sstrand@elpc.org

Gregory E Wannier
SIERRA CLUB
Staff Attorney
Sierra Club
Ste 1300
2101 Webster Street
Oakland, CA 94110
Email: greg.wannier@sierraclub.org

                                                  /s/ *Barry Hyman*