# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, RESPIRATORY HEALTH ASSOCIATION, and SIERRA CLUB, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ILLINOIS POWER RESOURCES GENERATING, LLC, <br><br> Defendant. | Case No. 13-cv-1181 <br> United States District Judge <br>  Joe Billy McDade <br> Magistrate Judge <br>  Thomas P. Schanzle-Haskins III |

# CONSENT DECREE

CONFIDENTIAL BUSINESS INFORMATION

**Whereas**, Sierra Club, Natural Resources Defense Council, and Respiratory Health Association (collectively the "Plaintiffs"), filed the above-captioned lawsuit (the "Litigation") pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604, against Illinois Power Resources Generating, LLC ("IPRG") (Plaintiffs and IPRG shall be referred to individually as "Party" and collectively as the "Parties"); and,

**Whereas**, IPRG owns a coal-fueled electric power generating facility near Peoria, Illinois known as the Edwards Power Station ("Edwards"); and,

**Whereas**, Edwards' operations have been and are now subject to operating permits ("Permits") issued by the Illinois Environmental Protection Agency (the "IEPA"), pursuant to the Clean Air Act, and other applicable rules and regulations; and,

**Whereas**, the Permits include provisions governing opacity (the "Opacity Limit") and particulate matter emissions ("PM Limits") at Edwards; and,

**Whereas**, under the Clean Air Act, Plaintiffs alleged violations of the Opacity Limit and derivative violations of the PM Limits, in the Permits and Illinois' State Implementation Plan; and,

**Whereas,** the Court bifurcated the Litigation into liability and remedy phases; and,

**Whereas,** in the liability phase of the Litigation, the Court granted partial summary judgment to Plaintiffs as to liability with respect to certain of Plaintiffs' opacity claims and, by presumption, certain of Plaintiffs' derivative PM claims ("Non-Final Partial Summary Judgment Order") and,

**Whereas**, IPRG specifically disputes and disagrees with, and has intended to appeal the Non-Final Partial Summary Judgment Order; and,

**Whereas**, IPRG denied, and continues to deny, all of the material allegations asserted in the Litigation, including but not limited to allegations that IPRG has violated, and continues to violate, the Opacity Limit and PM Limits; and,

**Whereas**, the Court has not made any final determination as to any remedy in the Litigation; and,

**Whereas**, the Plaintiffs and IPRG desire to enter into this Consent Decree to fully resolve the Litigation and avoid the cost, inconvenience, and uncertainty of proceeding with the Litigation; and,

**Whereas**, the Parties jointly served this Consent Decree upon the United States pursuant to 42 U.S.C. § 7604(c)(3) more than forty-five days before submitting the Consent Decree to the Court; and,

**Whereas,** the Parties consider this Consent Decree to be a fair, reasonable, and equitable resolution of all claims in the Litigation;

CONFIDENTIAL BUSINESS INFORMATION

NOW, THEREFORE, the Parties agree as follows:

1.  **Jurisdiction and Venue.** This Court has subject matter jurisdiction under 42 U.S.C. § 7604(a), and 28 U.S.C. §§ 1331, 1367. Venue is appropriate in the Central District of Illinois under 42 U.S.C. § 7604(c)(1), and 28 U.S.C. § 1391(b), because Edwards is located in this district.

2.  **Retirement of Edwards.** IPRG will cease operation of Edwards' coal-fueled electric generating units 2 and 3 ("EGUs") on or before December 31, 2022 ("Planned Retirement Date"); provided, however, that retirement of each of Edwards' EGUs on or before the Planned Retirement Date is contingent on approval by the Midcontinent Independent System Operator ("MISO") as described below.

    2.1 **MISO Approval for Retirement.** The Parties hereby acknowledge that IPRG is required to operate Edwards, and to retire each of Edwards' EGUs, in accordance with MISO rules, regulations, and tariffs, including but not limited to MISO Tariff provisions pertaining to power plant retirement and suspension, and that MISO must provide approval before IPRG may retire either or both of Edwards' EGUs ("MISO Approval").

    2.2 **Request for MISO Approval for Retirement.** On or before January 1, 2020, to initiate retirement of Edwards' EGUs, IPRG agrees that it will request from MISO retirement of Edwards' EGUs as of the Planned Retirement Date. IPRG will provide to Plaintiffs such request within 14 days of submission to MISO, which Plaintiffs will keep confidential until such time (if any) that MISO makes the request public.

    2.3 **MISO Response to Request for Approval for Retirement.** If IPRG receives MISO Approval to retire either or both of Edwards' EGUs on or before the Planned Retirement Date, IPRG shall provide notice of such approval to Plaintiffs within 14 days, which Plaintiffs will keep confidential until such time that MISO makes approval of retirement public.

    2.4 **Operation Beyond Planned Retirement Date.** If IPRG does not receive MISO Approval to retire either or both of Edwards' EGUs on or before the Planned Retirement Date, IPRG shall not be in breach of this Consent Decree for operating either or both of Edwards' EGUs, after the Planned Retirement Date, for which MISO Approval to retire on or before the Planned Retirement Date was not received ("MISO Required EGUs"). IPRG will provide Plaintiffs notice of any MISO Required EGUs within 14 days of such notice from MISO, which Plaintiffs will keep confidential until such time (if any) that MISO makes MISO Required EGUs public. IPRG may continue to operate the MISO Required EGUs after the Planned Retirement Date, in accordance with any terms and conditions prescribed by MISO, until a retirement date for which MISO Approval is received ("Post-Retirement Date Approval"). In the event of a Post-Retirement Date Approval, IPRG shall retire the MISO Required EGUs after receiving Post-Retirement Date Approval and in accordance with any terms and conditions for retirement established by MISO, as soon as reasonably practicable.

3.  **Edwards Not Included in MPS EGU Shutdowns.** IPRG represents and warrants that Edwards' EGUs are not, and shall not be, included as part of the 2,000 megawatts of coal-fueled

CONFIDENTIAL BUSINESS INFORMATION

generation that would be retired under the requirements of the Illinois Pollution Control Board's proposed Multi-Pollutant Standard rulemaking, *In re Amendments to 35 Ill. Adm. Code 225.233, Multi-Pollutant Standard (MPS)*, R2018-020.

4. <u>Economic Transition Funds</u>.  Within sixty (60) days after the Effective Date, IPRG shall deposit the sum of one million seven hundred twenty thousand dollars ($1,720,000 US) ("Economic Transition Fund Money") into an escrow account established by Plaintiffs, pursuant to wire transfer instructions provided by Natural Resources Defense Council to IPRG within 5 days after the Effective Date ("the Economic Transition Fund"), which deposit the Parties hereto agree, understand, and acknowledge, is not made as, and shall not be deemed or considered by any person or entity, for any reason or purpose, to be a penalty, or monetary sanction, of any kind or nature.  IPRG will have no residual interest in the Economic Transition Fund Money. Plaintiffs shall use the Economic Transition Fund Money, and any and all interest or income earned on the Economic Transition Fund Money, to pay for projects that provide funding for job training and/or re-training programs at Peoria-area colleges, schools, community centers, and/or other organizations, that encompass a range of industries and that may be made accessible to Edwards employees and others (collectively, "Economic Transition Projects"), as set forth in Section 4.1.

    4.1   <u>Project Plan for Economic Transition Projects</u>.  Within 90 days of the Effective Date, Plaintiffs shall develop a plan that includes a description of Economic Transition Projects selected by Plaintiffs, as well as a planned budget, recipient(s), and implementation and payment schedule, for those Economic Transition Projects ("Economic Transition Project Plan").  If Plaintiffs identify any need to amend the Economic Transition Project Plan from time to time, they shall prepare amendments to the Economic Transition Project Plan, with a planned budget and schedule for payment and implementation ("Amended Economic Transition Project Plan").  Plaintiffs shall timely file Plaintiffs' Economic Transition Project Plan(s), and Amended Economic Transition Project Plan(s), with the Court.  Plaintiffs shall endeavor in good faith to disburse the Economic Transition Fund Money as soon as possible, and in no event shall the Economic Transition Fund Money be disbursed later than April 15, 2024. Plaintiffs shall endeavor in good faith to disburse the Economic Transition Fund Money as soon as possible after the Effective Date, and, in any event, Plaintiffs shall disburse all Economic Transition Fund Money by April 15, 2024.

    4.2   <u>Restitution</u>. Solely for purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance by IPRG under this Section is restitution.

5. <u>Beneficial Project Funds</u>.  Within sixty (60) days after the Effective Date, IPRG shall deposit the sum of six million eight hundred and eighty thousand dollars ($6,880,000 US) ("Beneficial Project Fund Money") into an escrow account established by Plaintiffs, pursuant to wire transfer instructions provided by Natural Resources Defense Council to IPRG within 5 days after the Effective Date ("the Beneficial Project Fund"), which deposit the Parties hereto agree, understand, and acknowledge, is not made as, and shall not be deemed or considered by any person or entity, for any reason or purpose, to be a penalty, or monetary sanction, of any kind or nature. IPRG will have no residual interest in the Beneficial Project Fund Money. Plaintiffs shall use the Beneficial Project Fund Money, and any and all interest or income earned on the Beneficial Project

CONFIDENTIAL BUSINESS INFORMATION

Fund Money, to pay for public health or environmental projects that benefit the greater Peoria, Illinois area (collectively, "Beneficial Projects"), as set forth in Section 5.1 and Appendix A.

    5.1    <u>Project Plan for Beneficial Projects</u>. Within 90 days of the Effective Date, Plaintiffs shall develop a plan that includes a description of Beneficial Projects selected by Plaintiffs, as well as a planned budget, recipient(s), and implementation and payment schedule, for those Beneficial Projects ("Beneficial Project Plan"). The Beneficial Projects included by Plaintiffs in their Beneficial Project Plan shall fall within the categories of projects listed in Appendix A ("Pre-Approved Project Categories") of this Consent Decree. If Plaintiffs identify any need to amend the Beneficial Project Plan from time to time, they shall prepare amendments to the Beneficial Project Plan, with a planned budget and schedule for payment and implementation ("Amended Beneficial Project Plan"). Plaintiffs shall timely file Plaintiffs' Beneficial Project Plan(s), and Amended Beneficial Project Plan(s), with the Court. Plaintiffs shall disburse all Beneficial Project Fund Money by the later of April 15, 2024 or 12 months after IPRG makes its final payment pursuant to Section 6.5.

    5.2    <u>Restitution</u>. Solely for purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance by IPRG under this Section is restitution.

6.    <u>Additional Payments</u>. IPRG shall make payments for prospective Opacity Events (as defined below) in accordance with the following definitions, terms, and conditions ("Additional Payments"):

    6.1    <u>Definition of Opacity Event</u>. An opacity event occurs if a valid reading produced by the Continuous Opacity Monitor System ("COMS Reading") in either the Common Stack or Stack Three registers an opacity of greater than 30% over a six-minute block average ("Opacity Event"). For purposes of determining each six-minute block average percentage of opacity under Section 6, the six-minute block average percentage values shall be rounded to the nearest whole number with values ending in 0.500 and higher rounded up and values ending in 0.499 and lower rounded down.

    6.2    <u>Start Date for Calculation of Additional Payments.</u> If the Effective Date is on or before October 1, 2019, then the start date for calculation of Additional Payments (the "Additional Payment Start Date") shall be October 1, 2019. If the Effective Date is not on or before October 1, 2019, then the Additional Payment Start Date shall be the Effective Date. Notwithstanding the foregoing, in no event shall the Additional Payment Start Date be later than January 1, 2020.

    6.3    <u>Recordkeeping and Information Sharing</u>. Starting on the Additional Payment Start Date, and continuing through the date IPRG has retired both Edwards EGUs ("Actual Retirement Date"), IPRG will record and collect six-minute block average COMS Readings from each of the Common Stack and Stack Three, in accordance with the requirements set forth in Edwards' currently applicable Title V operating permit, Application No. 95070026, effective as of April 11, 2019 and expiring on April 11, 2024 ("Title V Permit"), as it may be amended, modified, or otherwise revised or superseded

CONFIDENTIAL BUSINESS INFORMATION

("COMS Data"). IPRG shall provide to Plaintiffs a copy of the COMS Data, as submitted to the Illinois Environmental Protection Agency ("IEPA") under the Title V Permit, on or before February 15 of the year following the calendar year to which the reports apply. COMS Data reported to IEPA shall be the sole source of information used to determine whether an Opacity Event has occurred.

6.4     Computation of Additional Payments.  Additional Payments shall be computed as follows.

    (a)     Calendar Year 2019.  IPRG shall not pay any Additional Payments for any Opacity Event that occurs before the Additional Payment Start Date.

        (i)     If the Additional Payment Start Date is October 1, 2019, IPRG shall not pay any Additional Payments if there are 175 or fewer Opacity Events between October 1, 2019 and December 31, 2019.  In such case, if there are 176 or more Opacity Events between October 1, 2019 and December 31, 2019, IPRG shall not pay any Additional Payments for the 175 Opacity Events with the lowest COMS Readings, as represented by their six-minute block average percentage, that occur between October 1, 2019 and December 31, 2019 ("175 Lowest Events"). After excluding the 175 Lowest Events, (1) IPRG will pay $2,000 US for each Opacity Event that occurs between October 1, 2019 and December 31, 2019, where the COMS Reading for that Opacity Event, as represented by the six-minute block average percentage, is greater than 30% and less than 61%, and (2) IPRG will pay $5,000 US for each Opacity Event that occurs between October 1, 2019 and December 31, 2019, where the COMS Reading for that Opacity Event, as represented by the six-minute block average percentage, is greater than 60%.

        (ii)     If the Additional Payment Start Date is after October 1, 2019 and on or before December 31, 2019, the 175 Lowest Events for which there shall be no Additional Payments shall be reduced by two (2) for each day after October 1, 2019 that passes before the Effective Date.  By way of example, if the Additional Payment Start Date is October 3, 2019, the number of the 175 Lowest Events for 2019 shall be reduced from 175 to 171 (i.e., 2 days x 2 = 4)(175 – 4 = 171).  Similarly, if the Additional Payment Start Date is October 5, 2019, the number of the 175 Lowest Events for 2019 shall be reduced from 175 to 167 (i.e., 4 days x 2 = 8)(175 – 8 = 167).

    (b)     Calendar Year 2020.  IPRG shall not pay any Additional Payments if there are 700 or fewer Opacity Events from 12:00 a.m. on January 1, 2020 through 11:59 p.m. on December 31, 2020 ("2020 Calendar Year"). If there are 701 or more Opacity Events during 2020 Calendar Year, IPRG shall owe no Additional Payments for the 700 Opacity Events with the lowest COMS Readings as represented by their six-minute average percentage ("700 Lowest Events").  After excluding the 700 Lowest Events, (1) IPRG will pay $2,000 US for each Opacity Event that occurs in the 2020 Calendar Year with a COMS Reading greater than

6

30% and less than 61%, as represented by the six-minute block average percentage and (2) IPRG will pay $5,000 US for each Opacity Event that occurs during the 2020 Calendar Year with a COMS Reading greater than 60%, as represented by the six-minute block average percentage.

(c) <u>Calendar Years 2021 and 2022.</u> Additional Payments for each of the 2021 Calendar Year and the 2022 Calendar Year shall be determined in the same manner as described above for the 2020 Calendar Year.

(d) <u>Subsequent Calendar Years.</u> If IPRG is forced to continue operating one or both Edwards' EGUs beyond the Planned Retirement Date for reasons described in Section 2, IPRG shall make Additional Payments for each Calendar Year beginning with calendar year 2023 ("Subsequent Calendar Year(s)") until the Actual Retirement Date, as described below:

(i) IPRG shall not pay any Additional Payments for any Subsequent Calendar Year if there are 800 or fewer Opacity Events from 12:00 a.m. on January 1 through 11:59 p.m. on December 31 of that Subsequent Calendar Year. If there are 801 or more Opacity Events during that Subsequent Calendar Year, IPRG shall owe no Additional Payments for the 800 Opacity Events with the lowest COMS Readings as represented by their six-minute average percentage ("800 Lowest Events"). After excluding the 800 Lowest Events, (1) IPRG will pay $1,000 US for each Opacity Event that occurs in that Subsequent Calendar Year with a COMS Reading greater than 30% and less than 61%, as represented by the six-minute block average percentage and (2) IPRG will pay $2,500 US for each Opacity Event that occurs during that Subsequent Calendar Year with a COMS Reading greater than 60%, as represented by the six-minute block average percentage.

6.5 <u>Annual Assessment; Review; Payment Date</u>. Additional Payments, if any, shall be paid as follows:

(a) For the time period beginning at 12:00 a.m. on the Additional Payment Start Date and ending at 11:59 p.m. on December 31, 2019, IPRG shall by March 1, 2020 inform Plaintiffs of the amount of Additional Payments (if any) it believes are due and owing for Opacity Events occurring in 2019. Plaintiffs and IPRG shall attempt to agree, on or before March 15, 2020, on the amount of Additional Payments (if any) due and owing from IPRG for Opacity Events occurring in the 2019. IPRG shall make any Additional Payments due and owing for Opacity Events occurring in 2019 on or before April 15, 2020 ("2020 Payment Date").

(b) For the 2020 Calendar Year, IPRG shall by March 1, 2021 inform Plaintiffs of the amount of Additional Payments (if any) it believes are due and owing for Opacity Events occurring in 2020. Plaintiffs and IPRG shall attempt to agree, on or before March 15, 2021, on the amount of Additional Payments (if any) due and owing from IPRG for Opacity Events occurring in the calendar year 2020. IPRG

7

CONFIDENTIAL BUSINESS INFORMATION

shall make any Additional Payments due and owing for Opacity Events occurring in the 2020 Calendar Year on or before April 15, 2021 ("2021 Payment Date").

(c) For the 2021 Calendar Year, IPRG shall by March 1, 2022 inform Plaintiffs of the amount of Additional Payments (if any) it believes are due and owing for Opacity Events occurring in 2021. Plaintiffs and IPRG shall attempt to agree, on or before March 15, 2022, on the amount of Additional Payments (if any) due and owing from IPRG for Opacity Events occurring in the calendar year 2021. IPRG shall make any Additional Payments due and owing for Opacity Events occurring in the 2021 Calendar Year on or before April 15, 2022 ("2022 Payment Date").

(d) For the 2022 Calendar Year, IPRG shall by March 1, 2023 inform Plaintiffs of the amount of Additional Payments (if any) it believes are due and owing for Opacity Events occurring in 2022. Plaintiffs and IPRG shall attempt to agree, on or before March 15, 2023, on the amount of Additional Payments (if any) due and owing from IPRG for Opacity Events occurring in the calendar year 2022. IPRG shall make any Additional Payments due and owing for Opacity Events occurring in the 2022 Calendar Year on or before April 15, 2023 ("2023 Payment Date").

(e) For each Subsequent Calendar Year, if any, IPRG shall by March 1 of the following year inform Plaintiffs of the amount of Additional Payments (if any) it believes are due and owing for Opacity Events occurring in the Subsequent Calendar Year. Plaintiffs and IPRG shall attempt to agree, on or before March 15 of the following year, on the amount of Additional Payments (if any) due and owing from IPRG for Opacity Events occurring in the Subsequent Calendar Year. IPRG shall make any Additional Payments due and owing for Opacity Events occurring in each Subsequent Calendar Year on or before April 15 of the following year.

6.6 <u>Additional Payments to Beneficial Project Fund; Use of Funds</u>. IPRG shall pay all Additional Payments due and owing to the Beneficial Project Fund and all Additional Payments, and any and all interest or income earned on Additional Payments, shall be used for Pre-Approved Project Categories within the scope of paragraphs 2 and/or 4 in Appendix A.

7. <u>Attorneys' Fees and Costs</u>. Within sixty (60) days after the Effective Date, IPRG shall pay, as attorneys' fees, costs, and expenses, the amount of three million dollars ($3,000,000 US) ("Attorneys' Fees"). IPRG shall make payment of the Attorneys' Fees by wire transfer into an account pursuant to wire transfer instructions provided by the Natural Resources Defense Council to IPRG within 5 days after the Effective Date ("Wire Transfer Instructions"). Plaintiffs shall allocate the Attorneys' Fees by and between themselves as they deem appropriate, without recourse to IPRG. The payment of the Attorneys' Fees in accordance with the Wire Transfer Instructions shall satisfy all obligations of IPRG to pay attorneys' fees, costs, and expenses, including without limitation to each of the Plaintiffs, arising out of or related to the Litigation.

8. <u>No Other Payments</u>. IPRG shall not owe, and shall not pay, any amount of money whatsoever to Plaintiffs, or any of their representatives, chapters, officers, directors, agents, employees, parents, affiliates, organizations, or attorneys (individually or collectively or jointly or

CONFIDENTIAL BUSINESS INFORMATION

severally) in connection with the Litigation, or this Consent Decree, including but not limited to attorneys' fees, costs, and expenses in connection with enforcement of the Consent Decree, other than the Economic Transition Fund Project Payment, Beneficial Project Fund Project Payment, and any Additional Payments due and owing in accordance with this Consent Decree, and the Attorneys' Fees.

9. <u>Release of Claims; Reservation and Waiver of Rights</u>.

    9.1 <u>Release of Past Air Emissions-Related Claims</u>. Plaintiffs, on their own behalf and on behalf of their respective representatives, chapters, officers, directors, agents, employees, parents, corporate affiliates, organizations, and attorneys for the Litigation ("Plaintiff Releasing Parties") release and forever discharge any and all claims alleged by Plaintiffs in the Litigation or that could have been alleged prior to and through the Effective Date, against IPRG, or its parents, subsidiaries, affiliates, directors, officers, employees, agents, representatives, attorneys, insurers, shareholders, or creditors, and all other persons or entities, arising from or for any act, omission, or events related to air emissions at Edwards, including but not limited to, claims under the Clean Air Act, any state, local or federal rules, regulations, or laws, common law, air permits, or any appeals or objections to the Title V Permit or any other air permits.

    9.2 <u>Limited Release of Claims Through Actual Retirement Date</u>. Plaintiffs, on their own behalf and on behalf of Plaintiff Releasing Parties, release and forever discharge any and all claims against IPRG, or its parents, subsidiaries, affiliates, directors, officers, employees, agents, representatives, attorneys, insurers, shareholders, or creditors, and all other persons or entities, arising from or for any act, omission, or events occurring prior to and through the Actual Retirement Date, that are related to opacity and/or particulate matter emissions at Edwards, including but not limited to the allegations in the Litigation.

    9.3 <u>Reservation of Rights to Enforce Consent Decree</u>. Notwithstanding any other provision of this Consent Decree, the Plaintiffs, on the one hand, and IPRG, on the other hand, reserve the right to seek judicial enforcement of any aspect of this Consent Decree consistent with the Dispute Resolution Process described in Section 18.

    9.4 <u>Waiver of Rights to Appeal</u>. The Parties waive any and all rights to appeal in connection with any orders issued in the Litigation prior to and through the Effective Date, including the Court's entry of this Consent Decree.

10. <u>Prohibition of Support</u>. Each of the Plaintiffs, on their own behalf and on behalf of the Plaintiff Releasing Parties, agree that they will not fund or provide legal services to any third parties in pursuing any actual or potential claims, actions, or causes of action, that any of Plaintiffs have released under this Consent Decree.

11. <u>Reservation of Rights.</u> Except as expressly provided by the terms of this Consent Decree, the Parties agree that nothing in this Consent Decree constitutes, may be construed as, or used as evidence of, any admission of fact, law, responsibility, wrongdoing, or liability, whatsoever, on the part of any Party, and no such inference may be drawn therefrom.

CONFIDENTIAL BUSINESS INFORMATION

12.  No Third Party Beneficiary Rights.   This Consent Decree is not intended to and shall not be construed to give any Third Party any interest or rights (including, without limitation, any third party beneficiary rights to any person, entity, or organization identified in, or excluded from, any Economic Transition Project Plan, Amended Economic Transition Project Plan, Beneficial Project Plan, or Amended Beneficial Project Plan) with respect to or in connection with any agreement or provision contained herein or contemplated hereby.

13.  Return or Destruction of Certain Confidential Information.   The Parties hereby agree that entry of this Consent Decree shall constitute a request under Paragraph 17 of the Protective Order entered in the Litigation on December 23, 2014 (ECF # 52) ("Protective Order") by each Designating Party for the destruction of information that was designated "Confidential" pursuant to the Protective Order, and that destruction of such information in accordance with the requirements of Paragraph 17 and any other applicable terms and conditions of the Protective Order shall be completed within 60 days after the Effective Date. The Parties agree that the Protective Order remains in full force and effect and that nothing in this Consent Decree modifies the terms of or any Party's obligations under the Protective Order.

14.  Notice.  If under this Consent Decree a Party desires to or is required to give notice and/or provide information, data, or otherwise communicate with any other Party, including but not limited to providing COMS Data under Section 6, (collectively "Notices"), such Notices shall be made as follows:

    To Plaintiffs:
        Natural Resources Defense Council, via e-mail to:
        Selena Kyle (skyle@nrdc.org) and Jared Knicley (jknicley@nrdc.org)

        Sierra Club, via e-mail to:
        Greg Wannier (greg.wannier@sierraclub.org) and Pat Gallagher
        (pat.gallagher@sierraclub.org)

        Respiratory Health Association, via e-mail to:
        Brian Urbaszewski (burbaszewski@resphealth.org) and Justin Vickers
        (jvickers@elpc.org)

    To IPRG:    Illinois Power Resources Generating, LLC
                 Attn: Stephanie Moore, General Counsel
                 6555 Sierra Drive
                 Irving, Texas 75039
                 stephanie.moore@vistraenergy.com

       With a copy to:    Barry Hyman
                            Schiff Hardin LLP
                            233 S. Wacker Drive

CONFIDENTIAL BUSINESS INFORMATION

Suite 7100
Chicago, IL 60606
bhyman@schiffhardin.com

Notices to Plaintiffs shall be made via electronic transmission, and Notices to IPRG shall be made via electronic transmission and either certified mail or delivery service. Changes to the Notice recipients or address for providing Notices set forth in this Section may be made by providing written notice to the other Parties of the changed recipient or address.

15. <u>Effective Date.</u> This Consent Decree shall be effective upon the date it is entered by the Court having jurisdiction over the Litigation ("Effective Date").

16. <u>Termination.</u> This Consent Decree shall terminate upon the later of the following (1) the Actual Retirement Date; or (2) the final distribution of all Economic Transition Project Fund Money and Beneficial Project Fund Money, and any Additional Payments, pursuant to the Economic Transition Project Plan(s) and Beneficial Project Plan(s), or Amended Economic Transition Plan(s) or Amended Beneficial Project Plan(s), if any. Termination does not require approval of the Court and is automatic upon a filing of a joint notice of termination by the Parties.

17. <u>Retention of Jurisdiction.</u> The Court shall retain jurisdiction of this case after entry of this Consent Decree for purposes of implementing and enforcing the terms and conditions of the Consent Decree.

18. <u>Dispute Resolution.</u> The dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

    18.1 <u>Informal Dispute Resolution.</u> Any dispute under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when either Party ("Complaining Party") serves on another Party a written notice of the dispute ("Notice of Dispute"). Such Notice of Dispute shall state clearly the matter in dispute and shall include any factual data, analysis, or opinion supporting the Complaining Party's position and any supporting documentation relied upon by the Complaining Party. The Parties shall meet and confer within 21 calendar days of the date of the Notice of Dispute in a good faith attempt to resolve the dispute without the Court's involvement.

    18.2 <u>Formal Dispute Resolution</u>.

        (a) <u>Procedure</u>. If the Parties cannot resolve the Notice of Dispute by the end of meet and confer negotiations, the Complaining Party will file written notice to the other Parties that it intends to seek judicial resolution of the dispute by this Court. The Complaining Party will provide such notice at least 7 calendar days before filing any motion to enforce with this Court. This Court will resolve the dispute.

        (b) <u>Responsibilities Remain</u>. Invocation of Formal Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of any Party under this Consent Decree unless and until final resolution of the dispute so provides.

CONFIDENTIAL BUSINESS INFORMATION

19. <u>Successors and Assigns.</u>  This Consent Decree shall be binding upon the successors and assigns of the Parties.  No assignment or delegation by a Party of its obligations under this Consent Decree or of this Consent Decree will release the assigning Party without the prior written consent of the other Parties.

20. <u>Advice of Counsel.</u>  Each Party represents and warrants that this Consent Decree has been negotiated in good faith and that it has sought and obtained any appropriate legal advice it deems necessary prior to entering into this Consent Decree.

21. <u>Necessary Authorizations.</u>  Each Party represents and warrants to each other Party that it has all necessary authorizations and all other actions have been taken such that execution, delivery and performance of this Consent Decree and all other actions taken or to be taken in connection with this Consent Decree have been fully authorized.

22. <u>Severability.</u>  If any provision, paragraph, section, or sentence of this Consent Decree is held by a Court to be unenforceable, that unenforceable portion will be severed and the validity of the remaining provisions will not be affected.

23. <u>Modification.</u>  This Consent Decree may only be modified by the written agreement of the Parties, subject to the approval of this Court.

24. <u>Counterparts.</u>  This Consent Decree may be signed in counterparts and such counterpart signature pages shall be given full force and effect.

25. <u>Entire Agreement.</u>  This Consent Decree embodies the entire agreement and understanding of the Parties with respect to the subject matter herein, and supersedes any and all prior agreements, arrangements and understandings entered into with respect to the subject matter herein.

26. <u>Final Judgment.</u>  The approval and entry of this Consent Decree by this Court shall constitute a final judgment in the above-captioned matter.

SO ORDERED this _____ day of _____, 2019

BY THE COURT:

_____
Honorable Joe Billy McDade
United States District Judge

CONFIDENTIAL BUSINESS INFORMATION

For Illinois Power Resources Generating, LLC:

By: _____

Its: __EVP & General Counsel__

Dated: __8/29/19_____


For Sierra Club:

_____

Dated: _____


For Natural Resources Defense Council:

_____

Dated: _____


For Respiratory Health Association:

_____

Dated: _____

CONFIDENTIAL BUSINESS INFORMATION

For Illinois Power Resources Generating, LLC:

By: _____

Its: _____

Dated: _____


For Sierra Club:

*/s/* _____

Dated: 8/29/19


For Natural Resources Defense Council:

_____

Dated: _____


For Respiratory Health Association:

_____

Dated: _____

CONFIDENTIAL BUSINESS INFORMATION

For Illinois Power Resources Generating, LLC:

By: _____

Its: _____

Dated: _____


For Sierra Club:

_____

Dated: _____


For Natural Resources Defense Council:

*[signature]*

Dated: 8/29/2019


For Respiratory Health Association:

_____

Dated: _____

CONFIDENTIAL BUSINESS INFORMATION

For Illinois Power Resources Generating, LLC:

By: _____

Its: _____

Dated: _____


For Sierra Club:

_____

Dated: _____


For Natural Resources Defense Council:

_____

Dated: _____


For Respiratory Health Association:

*[signature]*

Dated: 8/30/19

## Appendix A – List of Pre-Approved Project Categories

1. Projects that provide funding for electric buses to replace or supplement diesel-fueled buses, that install needed infrastructure to support electric buses, and/or that train drivers for those buses in Peoria-area public school and/or public transit fleets, up to a maximum of 50% of Beneficial Project Fund Money.

2. Projects that provide funding for energy efficiency improvements, including pre-requisite updates needed to perform energy efficiency improvements, in Peoria-area homes (with an emphasis on lower-income homeowners and renters), up to a maximum of 50% of Beneficial Project Fund Money.

3. Projects that provide funding to bring solar power to the Peoria-area region, with an emphasis on schools, government buildings, buildings that provide affordable housing, and/or homes owned by people with low or fixed income, up to a maximum of 25% of Beneficial Project Fund Money.

4. Projects that provide funding for educational programs, home-improvement projects, and/or access to medical interventions to improve lung health, up to a maximum of 50% of Beneficial Project Fund Money.

CONFIDENTIAL BUSINESS INFORMATION